1          IN THE UNITED STATES DISTRICT COURT
          FOR EASTERN DISTRICT OF TENNESSEE
2                   AT CHATTANOOGA

3  _____

GAIL HARNESS,
4
          Plaintiff,
5
vs.                        Case No. 3:18-CV-00100
6                          Case No. 3:19-CV-340
                           Jury Demand
7
WILLIAM T. JONES, individually
8  and in his official capacity;
   and ANDERSON COUNTY, TENNESSEE,
9
          Defendants.
10 _____

11

12

13                    JURY TRIAL

14                 Amended Volume I

15

16

        BE IT REMEMBERED that the above-captioned
17 cause came on for hearing, on this, the 21st day of
   June 2021, before the Honorable Senior Judge Curtis
18 L. Collier, when and where the following proceedings
   were had, to wit:

19

20

21 _____

22

23

24

25

*April Lassiter-Benson, RPR, CSR, LCR*

1      **A P P E A R A N C E S**

2

3   For the Plaintiff:

4          **MR. DAN STANLEY**
           **MS. URSULA BAILEY**
5          **MR. RICHARD EVERETT COLLINS**
           Attorneys at Law
6          Stanley, Kurtz & Collins, PLLC
           422 South Gay Street
7          Suite 301
           Knoxville, TN 37902
8          (865)522-9942
           dan@danchanningstanley.com
9          ubailey65@gmail.com
           richard@knoxvilleattorney.com
10

11  For the Defendant, Anderson County, Tennessee:

12         **MR. ARTHUR F. KNIGHT, III**
           **MS. CAITLIN C. BURCHETTE**
13         Attorneys at Law
           Taylor & Knight, GP
14         800 South Gay Street
           Suite 600
15         Knoxville, TN 37929
           amber@taylorknightlaw.com
16         cburchette@taylorknightlaw.com

17

18

19  COURT REPORTER:

20         APRIL LASSITER-BENSON, RPR, CSR, LCR #752
           2488 Bartlett Boulevard
21         Bartlett, Tennessee 38134
           (901)520-2531
22         handsonreporting@gmail.com

23

24

25

*April Lassiter-Benson, RPR, CSR, LCR*

# I N D E X

1

2                                                                    **Page**

3   **OPENING STATEMENTS**
    By Mr. Stanley                                                  17
4   By Mr. Knight                                                   30

5

6   **TESTIMONY OF TRACY SPITZER**
    Direct Examination
7   By Ms. Bailey                                                   34

8   Cross-Examination
    By Ms. Burchette                                                53
9
    Redirect examination
10  By Ms. Bailey                                                   56

11

12  **TESTIMONY OF KAYLEE WINSTEAD**
    Direct Examination
13  By Ms. Bailey                                                   60

14  Cross-Examination
    By Ms. Burchette                                                88
15
    Redirect Examination
16  By Ms. Bailey                                                   89

17

18  **DEPOSITION TESTIMONY OF JAY YEAGER (Read)**
    Examination
19  By Mr. Collins                                                  95

20

21  **DEPOSITION TESTIMONY OF KIMBERLY JEFFERS-WHITAKER
    (Read)**
22  Examination
    By Mr. Collins                                                  113
23

24

25

*April Lassiter-Benson, RPR, CSR, LCR*

1                            I   N   D   E   X

                                                        **Page**

2

3   **TESTIMONY OF TERRY FRANK**
    Direct Examination
4   By Mr. Stanley                                      160

5   Cross-Examination
    By Mr. Knight                                       195

6

7

    **TESTIMONY OF AMY CARR (OGLE)**
8   Direct Examination
    By Ms. Bailey                                       206

9
    Cross-Examination
10  By Mr. Knight                                       222

11  Redirect Examination
    By Ms. Bailey                                       231

12

13

    **TESTIMONY OF KIMBERLY JEFFREY WHITAKER**
14  Direct Examination
    By Mr. Collins                                      232

15
    Cross-Examination
16  By Ms. Burchette                                    235

17

18                       E   X   H   I   B   I   T   S

19                                                      **Page**

20  Exhibit No. 1                                       145
        May 5, 2015 Email from Angela Brown to
21      Russell Bearden

22  Exhibit No. 5                                       101
        September 26, 2017 Report and Affidavit
23      of Russell Bearden regarding his
        investigation of Angela Brown's sexual
24      harassment complaint

25

                    *April Lassiter-Benson, RPR, CSR, LCR*

1          E X H I B I T S

2                                                        Page

3   Exhibit No. 3                                        155
         May 29, 2015 Report of Russell Bearden's
4        concluding investigation regarding Angela
         Brown
5
    Exhibit No. 7                                        162
6        August 9, 2017 Complaint of Gail Harness
         regarding sexual harassment by William
7        Jones

8   Exhibit No. 8                                        162
         August 9, 2017 Email from Angie Perez to
9        William Jones Critical of Gail Harness

10  Exhibit No. 13                                  167, 128
         March 5, 2018 Complaint of Nicole Lucas
11       alleging sexual harassment by William
         Jones
12
    Exhibit No. 14                                       166
13       March 14, 2018 Letter from Mayor Terry
         Frank to Tim Isbel with Eight Attachments
14       (Bates-Stamped Jones 177-195)

15  Exhibit No. 16                                       151
         September 7, 2017 Anonymous Sexual
16       Harassment Complaint Received by Russell
         Bearden, T & K Doc. Pro. 1
17
    Exhibit No. 17                                       182
18       July 21, 2016 Email from Mayor Terry
         Frank to Russell Bearden regarding a call
19       from Gail Harness' husband

20  Exhibit No. 26                                       189
         Anderson County Resolution Censuring
21       William Jones

22  Exhibit No. 34                                       153
         September 11, 2017 Interview Notes of
23       Russell Bearden regarding Kaylee
         Winstead, T & K Doc. Pro. 49

24

25

*April Lassiter-Benson, RPR, CSR, LCR*

1                    **E  X  H  I  B  I  T  S**

2                                                      **Page**

3   Exhibit No. 35                                      146
         February 27, 2018 Affidavit of Russell
4        Bearden regarding May 2015 sexual
         harassment complaint and conversations
5        with Mayor Terry Frank, T & K Doc. Pro.
         2-3
6
    Exhibit No. 36                                      218
7        March 23, 2018 Written Statement of Amy
         Ogle regarding harassment by William
8        Jones, T & K Doc. Pro. 42-43

9   Exhibit No. 37                                      132
         June 12, 2018 Memo from Kim
10       Jeffers-Whitaker to investigate file, T &
         K Doc. Pro. 804
11
    Exhibit No. 42                                      156
12       March 19, 2018 Email Chain, T & K Doc.
         Pro. 302
13
    Exhibit No. 45                                 134, 159
14       April 13, 2018 Memo by Kim
         Jeffers-Whitaker regarding William Jones
15       having a shotgun in his office, T & K
         Doc. Pro. 331
16
    Exhibit No. 46                                      159
17       March 5, 2018 Letters from Kim
         Jeffers-Whitaker to Judge Elledge
18       regarding William Jones having a gun in
         his office, T & K Doc. Pro. 332-33
19
    Exhibit No. 53                                       46
20       September 14, 2017 Sworn Statement of
         Tracy Spitzer (mislabeled as Tracy
21       Spencer)

22  Exhibit No. 54                                       61
         September 14, 2017 Sworn Statement of
23       Kaylee Winstead

24  Exhibit No. 57                                      195
         September 28 , 2017 Campaign Contribution
25       from Terry Frank to William Jones

1                          E  X  H  I  B  I  T  S

2                                                        **Page**

3    Exhibit No. 58                                     195
4         Terry Frank Candidate Nominating
         Petition, Signed by William Jones

5    Exhibit No. 59                                     195
6         William Jones Candidate Nominating
         Petition, Signed by Terry Frank

7    Exhibit No. 60                                     195
         Photographs of William Jones

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*April Lassiter-Benson, RPR, CSR, LCR*

```
 1                        *    *    *

 2              (WHEREUPON, Voir Dire was completed and

 3  not requested to be transcribed, after which the

 4  following proceedings were had:)

 5              THE COURT:  Okay.  As I call your name,

 6  please go with our courtroom deputy that you will

 7  see there at the back of the courtroom.

 8              Mr. Price, Christopher Price; Mr. Moody,

 9  Frederick Moody; Ms. Francisco; Mr. Rouse;

10  Mr. Fontana; Ms. Whiteley; Ms. Hornbuckle; and

11  Mr. Jones.

12              Mr. Oscar, would you take Seat Number 1.

13  And Mr. Lawson, would you take Seat Number 2.

14  Mr. Short, Seat Number 3; Ms. Morrison, Seat Number

15  4; Ms. Horton, Seat Number 5; Ms. Keyser, Seat

16  Number 6; and Ms. Richardson, Seat number 7.

17              Counsel, this is your jury.  Are there

18  any objections?

19              MR. STANLEY:  No, Your Honor.

20              MR. KNIGHT:  No, Your Honor.

21              MS. BURCHETTE:  No, Your Honor.

22              THE COURT:  Ms. Lewis, please swear our

23  jury.

24              (WHEREUPON, a jury was impaneled and

25  sworn, after which the following proceedings were
```

*April Lassiter-Benson, RPR, CSR, LCR*

1  had:)

2          THE COURT:  Ladies and gentlemen, now

3  that you have been sworn I will give you some

4  preliminary instructions to guide you in your

5  participation in this trial.

6          It will be your duty to find from the

7  evidence what the facts are.  You, and you alone,

8  are the judges of the facts.  You will then have to

9  apply to those facts; the law that I will give you.

10  You must follow that law whether you agree with it

11  or not.  Nothing that I can say or do during the

12  course of this trial is meant to indicate, nor

13  should be taken by you as indicating what your

14  verdict shall be.

15          The evidence in which you will find the

16  facts will consist of the testimony of the

17  witnesses; documents and other things received into

18  the record as exhibits; and facts.  The lawyers may

19  agree or stipulate to, or the Court my instruct you

20  to find certain things about evidence and it must

21  not be considered by you.  Among these things are:

22  Statements; arguments; and questions by the lawyers.

23  These are not evidence.

24          Objections to questions are not

25  evidence.  The lawyers have an obligation to their

1  client to make an objection when they believe

2  evidence is being offered as improper under the

3  rules of evidence.  You should not be influenced by

4  an objection or by the Court's ruling on it.  If an

5  objection is sustained, then just ignore the

6  question.  If an objection's overruled, then

7  truthfully answer it, just as you would treat any

8  other answer.

9          If you are instructed that some item of

10 evidence is received in Limine purposes only, you

11 must follow that instruction.  The testimony the

12 Court may exclude or may tell you to disregard is

13 not evidence and must not be considered.  Anything

14 you may have seen or heard outside of the courtroom

15 is not evidence and must be disregarded.

16         You are to decide this case solely on

17 the evidence presented here in the courtroom.  There

18 are two kinds of evidence:  Direct evidence and

19 circumstantial evidence.

20         Direct evidence is direct proof of a

21 fact, such as the testimony of an eye witness.

22         Circumstantial evidence is proof of fact

23 from which you may conclude that other facts exist.

24         The law makes no distinction between

25 direct and circumstantial evidence, and it is proper

1    for you to consider both kinds of evidence.

2              A very important part of your job as

3    jurors is to decide which witnesses to believe,

4    which witnesses not to believe, or how much of any

5    witness' testimony to accept or to reject.  I will

6    give you some guidelines to assist you in

7    determining the believability or credibility of the

8    witnesses that have entered the case.

9              As you know, this is a civil case.  The

10   plaintiff has the burden of proving her case by what

11   we call the preponderance of the evidence.  That

12   means the plaintiff has to produce evidence which is

13   considered in light of all the facts that lead you

14   to believe that what plaintiff claims, is more

15   likely true than not.

16             To put it somewhat differently, if you

17   were to put plaintiff's and defendant's evidence on

18   opposite sides of the scale, then the plaintiff

19   would have to make the scale tip somewhat in her

20   favor.

21             If the scale tips in favor of the

22   defendant, that means the plaintiff has not carried

23   the burden of proof and she's not succeeded.

24             Likewise, if the scale remains equally

25   balanced, that is, it is not tipped to either side.

1  That also means that plaintiff has not carried her

2  burden and she will not prevail.

3          Those of you who may have sat on a

4  criminal case or watched criminal cases on

5  television, or have heard of proof beyond a

6  reasonable doubt, that requirement does not apply in

7  this case and you should therefore put it completely

8  out of your minds.

9          I will give you detailed instructions at

10  the end of the case and those instructions will

11  control your deliberation and decision.  But at this

12  point, to help you follow the evidence, I'll give

13  you a brief outline of the issues in this case.

14          The plaintiff, Gail Harness, was an

15  employee of Anderson County, Tennessee.  She worked

16  in the office of the Clerk of the Circuit Court.

17  She alleges that the then, Clerk of Court, William

18  Jones, subjected her to sexual harassment and

19  created a hostile work environment.  She claims that

20  Anderson County is legally liable to her for a

21  hostile work environment, in violation of rights

22  under the federal constitution and state law.

23          She is also alleging that Anderson

24  County is liable to her for terminating her

25  employment, in retaliation for complaining about the

1  sexual harassment.  There are certain elements that

2  she must prove to satisfy her claim of hostile work

3  environment, in violation of federal law.

4        The burden is on her to prove by a

5  preponderance of evidence, each of the following

6  elements:  (1) She was subjected to sexual

7  harassment that is unwelcomed harassment; (2) The

8  harassment was based on her gender; (3) The

9  harassment was sufficiently severe or pervasive to

10  all of the conditions of employment and create an

11  abusive working environment and; Anderson County

12  knew or should have known about the harassment and

13  failed to act.

14        To prove her claim of a retaliatory

15  discharge, she must prove by a preponderance of the

16  evidence, the following elements:  (1) She engaged

17  in protective speech or activity; (2) Anderson

18  County knew she was engaging in that protected

19  activity; (3) The defendant took a material adverse

20  action against her; and (4) There was a causal

21  connection between the protected activity and the

22  materially adverse action.

23        Ms. Harness makes her claims on both

24  federal and state law.  To prove the defendant

25  liable under federal law, she has to prove either or

1   both of two things:  She must prove either the

2   decision to violate her rights were made by someone

3   with final decision-making authority for the

4   defendant in that area, or that defendant has a

5   custom of tolerance or acquiescence of the violation

6   of federal rights, which had a direct causal link to

7   the violation of her rights.

8              Now, let me say a few words about your

9   conduct as jurors in this case.  I instruct you

10  first that during this trial, you must not discuss

11  this case with anyone or permit anyone to discuss it

12  with you.  This includes members of your own

13  families.  Until you retire to the jury room at the

14  end of the case to deliberate on your verdict, you

15  simply must not talk about this case at all.  If

16  anyone should try to talk to you about this case,

17  please bring it to Ms. Lewis' attention promptly and

18  she will notify me.

19             Next, do not read or listen to anything

20  on the radio, or television, or the Internet, or in

21  newspapers, touched on this case in any way, the

22  rate of availability of the Internet while at home

23  and work computers, as well as on your cellphones

24  and other communication devices.  Let me also advise

25  you not to use the Internet or any communication

1    device to research anything at all that might

2    pertain to this case.  Just as an example, do not do

3    research on legal definitions, factual matters,

4    information about the lawyers, any legal issues, or

5    anything else that might touch upon this case.

6              Your decision in this case has to be

7    based only on the evidence you heard here in court.

8    The evidence you hear in court is based upon sound,

9    legal standards, as known to the parties and is able

10   to be tested by the two parties.  So, do not try to

11   do any research or make any investigation about the

12   case on your on.

13             Fourth, do not use e-mails, a blog, or

14   any type of social media, such as Twitter or

15   Facebook to communicate with anyone about the trial

16   or this case.

17             Additionally, I remind you that

18   electronic devices are prohibited in the courtroom.

19   This includes cellphones, laptops, tablets, for any

20   reason.

21             Finally, do not form any opinion until

22   all the evidence is in.  Keep an open mind until you

23   start your deliberations at the end of the case.

24             If at anytime during the trial you have

25   personal needs that must be taken care of, just

1  raise your hand or notify me or Ms. Lewis.  Your

2  comfort is important to us and we want to

3  accommodate you in any way that we can.

4         We are asking all participants in this

5  trial to take certain precautions based upon the

6  COVID pandemic.  This is for the safety of all of

7  you members of the jury, the parties, the attorneys,

8  and court personnel.

9         If there are questions or concerns about

10  these precautions, please bring them to the

11  attention of Ms. Lewis.

12         The trial is now about to begin.  First,

13  each side may make an opening statement.  An opening

14  statement is neither evidence or argument.  It is an

15  outline of what that party intends to prove with all

16  the evidence.

17         After the opening statements, plaintiff

18  will present her witnesses, and the defendant may

19  cross-examine them.  Then, defendant will present

20  its witnesses, and the plaintiff may cross-examine

21  them.

22         After all the evidence is in, the

23  attorneys will present their closing arguments,

24  summarize, and interpret the evidence for you.  And

25  the Court will instruct you on the law.  After that,

1   the case will be in your hands and you will retire

2   to deliberate on your verdict.

3           Is the plaintiff ready for their opening

4   statement?

5           MR. STANLEY:  Yes, Your Honor.

6           THE COURT:  You may proceed.

7           MR. STANLEY:  Give us just a minute.  I

8   think we're setting up the presentation.

9           MR. COLLINS:  We should be plugged into

10  the HDMI.

11          THE CLERK:  Are you on --

12          MR. COLLINS:  No, this is -- that might

13  be the wrong HDMI cable.

14          THE CLERK:  Yeah, I'm trying to figure

15  out where you're going to be.

16          MR. COLLINS:  I'll be up here.

17          THE CLERK:  Okay.  Now, you're going to

18  be there.  I didn't know ...

19          There we go.

20          MR. STANLEY:  Thank you, Your Honor.

21          May it please the Court, my name is Dan

22  Stanley.  Again, I'm going to give you just a short

23  opening to what we believe the proof is going to be

24  in this case.

25          The Court has already done a great job

 1  of providing you with what the law is, that this is

 2  a sexual harassment case in violation under the 14th

 3  Amendment, and, also under the Tennessee Human

 4  Rights Act.  And he's going to provide you with that

 5  law when the trial is over.  And so, whatever he

 6  provides you, lean on that and not what I tell in

 7  the opening.

 8          But a good way to look at it is just to

 9  look at what's in Anderson County's own policy and

10  procedures book.  It gives us a little bit of a

11  summary of what sexual harassment is:  Unwelcomed

12  sexual advances; request for sexual favors and other

13  verbal or physical conduct of a sexual nature;

14  creating an intimidating, hostile, or offensive

15  working environment.  And, of course, this includes

16  everybody in the county, including elected

17  officials.  Nobody is above the law.

18          Unfortunately, this man did not

19  understand the policy.  This is William Jones.

20  William Jones was elected as the clerk of the

21  Anderson County Courthouse in 2014.  During that

22  time, he would call the clerks demeaning names like

23  "Daddy's Prissy Bitch".

24          THE COURT:  Counsel, let's leave out

25  profanities, if you can.  You can use the initial --

1          MR. STANLEY:  I'll do that, Your Honor.

2          THE COURT:  -- the first initial.  But

3   this is a court of law.  And there's certain

4   standards that we try to adhere to and we try to not

5   use gutter language.

6          MR. STANLEY:  Absolutely.  Sorry, Your

7   Honor.

8          He would touch the clerks

9   inappropriately, come behind them, grab their waist

10  and other sexual touchings.  He would request sexual

11  favors from them.  And he would punish people who

12  would not give into his advances.  For instance, he

13  would reassign you and fire you.  And he wouldn't go

14  through human resources, he would just do it

15  himself, on a whim.  He kept everybody, basically,

16  on an edge.

17          He stalked clerks outside of work, made

18  prank phone calls, and sent lewd and unwelcomed

19  texts.  I'm not even going to read this out loud.

20  You can read it for yourself.  But this is an

21  example of one of those texts that he sent to Gail

22  Harness.

23          And you'll hear from some people within

24  Anderson County describe him as a sick man who

25  should be in jail for what he's done.  You'll hear

 1    from Russell Bearden.  He was the human resources

 2    manager and he's coming tomorrow to testify.

 3              Now, you would think somebody would be

 4    fired or ousted immediately upon learning this,

 5    right?  Unfortunately, that wasn't the case.  He was

 6    elected in 2014.  He immediately starts to victimize

 7    the women at the courthouse, starting with Nicole

 8    Lucas.  She was reassigned for her protection.  They

 9    didn't investigate William Jones.  They didn't find

10    out who else he was preying upon.  They just solved

11    the problem by getting rid of the one he was

12    victimizing, and allowed him just to continue to

13    prey other women.

14              You'll hear from Tracy Spitzer.  She's

15    sitting outside right now.  She'll be our first

16    witness -- that he would sit on the desk, say sexual

17    things to women, fire people on a whim.  He was just

18    a cruel boss that constantly was asking for favors,

19    and punishing people who did not go along with it.

20              You'll hear from Kaylee Winstead.  She's

21    here as well, to testify.  We couldn't get everybody

22    here because some were too scared to come, and some

23    have moved out of state.  The ones that we could,

24    are here.  She'll say that the way he abused and

25    treated her, she lost weight, got fired.  That led

1  to a domino effect and she couldn't pay her bills,

2  lost her home, lost her marriage.

3          2015, another victim; Angela Brown.  It

4  was so bad that she decided to quit.  He would make

5  her sit in his office and he would go over and make

6  sexual innuendos (that he likes to watch women eat

7  yogurt).

8          In fact, you'll hear from Russell Brown

9  [sic].  When he approached Mr. Jones about this,

10  "Mr. Jones looked at me and laughed."  Again, this

11  is Russell Bearden.  You'll hear from him tomorrow.

12  He's the human resource manager.  He made a

13  statement: "The beauty is that I don't have to

14  report to anyone.  I don't have a boss.  I could sit

15  in my office completely naked with the door open and

16  touch himself [sic] and there's nothing you can do

17  about it."  That is a sick man.  That's a man that

18  shouldn't be there.

19          And, of course, Russell Brown [sic] was

20  shocked and he thought that the best thing to do

21  would be to go to the CEO of the county.  The CEO is

22  the Mayor.  This is the Mayor behind me; this is

23  Terry Frank.  And so, he took this directly to the

24  Mayor and said, "We've got to do something about

25  this man."  Nothing was done and there was no

1   investigation.

2              Victim 6:  Valerie walker.

3              Now we're in 2016.  Victim 7: Amy Ogle.

4   She's outside.  She's going to testify and you'll

5   hear from her today.  Some were -- sorry, that's

6   supposed to be Victim 8.

7              Some of these women were so scared they

8   didn't want to give their names because they knew

9   that they would be fired.

10             And then you have victim -- the last

11  victim, which is Gail Harness.  When she came to

12  work there she didn't know anything about this

13  history.  She didn't know about Nicole Lucas, Angela

14  Brown, or the predator that he was, because nothing

15  had been done about it.

16             Now, when you think about this case, in

17  sexual harassment, typically, you think someone gets

18  fired or the job is lost because they don't do what

19  you say.  And that happened in this case.  She

20  eventually was fired.  But it's also true that if

21  you submit or succumb to it because you're afraid

22  you'll lose your job, that's a form of sexual

23  harassment too.

24             And I won't read all of this, but this

25  is part of a text or Snapchat that Ms. Harness had

1  with William Jones.  And she's just trying to worry

2  about her -- the way she's paid and the hours,

3  because she has a sick child that she's trying to

4  take care of and she doesn't want to mess anything

5  up.  And she's having this conversation with

6  Mr. Jones.  And in here, she even says, "I depend on

7  this job, so I'm worried.  I don't want to lose it,

8  however, at the same time, I have to get Mortisca

9  (phonetic) taken care of."  That's her sick child.

10         This says, "Me."  That's William Jones.

11  You see where it says, "That's not a problem."

12         Well, this is the next text after that,

13  about, "A single kind word or a photo of her chest,

14  can make somebody's day."

15         He knew when people were weak, he knew

16  when they were vulnerable, and he preyed upon them,

17  including Ms. Harness.

18         He continued harassing her and

19  pressuring her.  And in fear for her job, she did

20  submit to one request.  And she did show him her

21  breast one time.  And afterwards, she was promoted

22  full time.  And then she began to reject Jones'

23  requests, the evidence will show.  And then he would

24  retaliate petty reprimands.  And eventually she was

25  fired from the clerk's office.

1          In fact, even though this got started in

2   2014, let's fast-forward to 2018.  Once it became so

3   obvious that he was a predator, the county did not

4   embarrass themselves, and did a resolution.  The

5   truth.  That's nothing.  What they should have done

6   was an ouster suit to get him out.

7          But even in their own resolution, they

8   go through all the things that they found out over

9   the four years that they should have found out in

10  2014, 2015, 2016, 2017, and had a combined

11  cumulative effect to create a hostile work

12  environment for county employees.  By their own

13  admission, they admit they created a hostile work

14  environment.

15          These allegations make -- constituted

16  unlawful implemented practices made.  I'm pretty

17  sure it did.  And that's what the proof will show.

18          As the Court stated in that brief

19  introductory about the law, it's a civil case, so we

20  start out with the scales being equal.  We put on

21  our proof, they put on their proof.  And if at the

22  end just one feather lands in our favor and it's

23  just 51 percent, the law says you must find for the

24  plaintiff, wholly liable.

25          That's not just true on the fault,

 1   that's also true on the damages.  If you find that

 2   she's suffered these damages more likely than not,

 3   you must compensate her for each one.  And this is

 4   the law of damages.  And I want to talk about what

 5   she's gone through now.

 6            When you think about this, these are

 7   each separate claims.  The Court will instruct you

 8   at the end that they're all not just one big claim,

 9   they're all separate.  And these are the different

10   ones:  Mental pain and suffering; embarrassment;

11   loss of reputation; loss of enjoyment of life; and

12   permanent injury.

13            You're going to hear from a Ms. Surdock

14   who will come and testify and explain what

15   post-traumatic stress syndrome is, and that if

16   you're a survivor of sexual harassment it definitely

17   can cause post-traumatic stress disorder, and how

18   that's affected Ms. Harness throughout her life

19   since then.  And that will create the avoidance

20   issues and even panic-related responses.  And she's

21   even had situations where she's seen William Jones

22   out or had a supporter say something, to the point

23   where she's passed out because she's so

24   panic-stricken, or she has nightmares or depression.

25   Anderson County is a small town, you know.

 1          Embarrassment and humiliation:  She has

 2    three daughters.  She'll go to school and her

 3    daughters will say, "They say we're the same kind of

 4    person as you."  I won't say the words they say, but

 5    it's not a pleasant word to have your daughter tell

 6    you, coming back from school.  There's blogs and

 7    radio shows.  What do they do, they blame the

 8    victim.  She's received Facebook comments sent to

 9    her, basically telling her that she's horrible.  I

10    mean, she's had supporters of Jones throwing items

11    in her yard.

12          Loss of reputation:  Before this, she

13    had a Bachelor's degree.  She was working with

14    children in a daycare.  In fact, that's how she got

15    the job.  You'll hear from Tracy Spitzer, her kids

16    went there.  She enjoyed Gail so much -- Gail

17    Harness, then she said, "Hey, you should come work

18    at the clerk's office."  And she enjoyed her work,

19    because it was at juvenile -- it was working with

20    kids.  Of course, she was married and had three

21    daughters.  She was the one brave enough to actually

22    come out.  And now her reputation has just been drug

23    through the mud, because, again, when people get a

24    story like this, it's posted to the local paper.

25    Everybody has their opinions.  And so, now, her

1    reputation is ruined.  And because of that -- this

2    is a separate claim.

3            She's had a loss of enjoyment of life.

4    Because of avoidance issues, she will go different

5    routes to places.  She's been accosted by Jones and

6    his supporters in public places.

7            She's even had to have the police come

8    to her vehicle.  One of the human resource

9    directors' name is Kim Whitaker -- more than once

10   would say, "We're going to send a police officer to

11   your home to make sure you're okay."  So this isn't

12   something to play around with.  This is serious,

13   when you're bringing the police on.

14        And, of course, you'll hear from Dr. Surdock

15   that this is a permanent injury.  There is no

16   treatment for post-traumatic -- there is no cure

17   for post-traumatic stress disorder.  There is

18   treatment that will go on throughout your life.

19   And based upon this life table, she will live 54.9

20   years and 20,039 days.  And we've broken down the

21   damages for pain and suffering, it's $75 a day, at

22   $1.5 million; the embarrassment, at $75 a day; the

23   loss of reputation, to lose your reputation, is at

24   $75 a day; and loss and enjoyment of life, to have

25   to change your life because of what the county did

1    or what this man did, $75 a day; and, of course,

2    the permanency of the injury.  And at the end of

3    this case, we're going to ask for $7.5 million to

4    compensate her.  And the county needs to pay that.

5    And I'll tell you what the county needs to pay.

6         Let me show you "Anonymous".  "Anonymous"

7    said, "Clerk William Jones has sexually harassed

8    employees in using intimidating-to-bullying

9    comments to ensure that fear is put into someone --

10   some of his employees, so that we will not come

11   forward with the things he says or does to us.

12   When he does not get his way, he feels that we are

13   a risk and he transfers us to other courts, to

14   bring fear to us.

15        Many employees have received vulgar, sexual

16   texts; phone calls; sexual Snapchats; had to endure

17   him putting his hands on us; making comments about

18   how we look; and making many of them feel so

19   uncomfortable.  He has bragged numerous times,

20   "There's nothing that can be done."

21        "Help protect us, the employees."

22        The last thing says, "Please do something to

23   protect us."

24        Well, the person that was supposed to

25   protect them was the Mayor.  2014, she knew about

 1  Nicole Lucas; 2015, she knew about Angela Brown;

 2  2016, she knew about Gail Harness, her husband

 3  called and complained about William Jones; 2017,

 4  she knew about the Ogle statement; she knew about

 5  the Winstead statement; the Spitzer statement.

 6  That's how many days from the first time she had

 7  notice, that Jones was a predator, until they

 8  finally censure him four years later.  As a result,

 9  these women were victimized and have suffered

10  lifelong trauma.

11       This is a current picture of the republican

12  party in Anderson County.  William Jones is still

13  part of that party.  This is William Jones and

14  that's the Mayor.  Even after all of these women

15  that she knew about, after September 14, a few

16  months later, the Mayor signs an election support

17  form for him, that he should be reelected, and even

18  donates to his campaign.

19       They're looking for somebody to protect

20  them.  And at the end of this case, I think you're

21  going to learn that people in Anderson County

22  failed them.  The County Commission failed them.

23  The Mayor failed them.  And we're going to ask you

24  to be the ones to protect them, because he's going

25  to run for office again, and he already is.

1  Thanks.

2                UNIDENTIFIED JUROR:  (Raising hand.)

3                MR. KNIGHT:  Your Honor.

4                UNIDENTIFIED JUROR:  I'm sorry.  May I

5  use the restroom?

6                THE COURT:  We'll take a break then.

7  Ms. Lewis, will 15 minutes suffice?

8                THE CLERK:  I think so.

9                THE COURT:  Yeah, I think the rules are,

10  one person in the restroom at a time.  So it may

11  take a little bit longer.  Why don't we try 15

12  minutes and let's see if we can get back in 15

13  minutes.

14                (Short break.)

15                MR. KNIGHT:  I'm really glad that the

16  judge informed you that what lawyers say isn't

17  evidence, and what you see isn't evidence, or what

18  we say isn't evidence, because so much of what I

19  just saw is so out of context and misconstrued, or

20  just plain wrong.

21                This case is not about all kinds of

22  women.  This case is about Gail Harness and whether

23  she was subject to sexual harassment, as the Court

24  generally defined it:  Unwelcomed; severe;

25  pervasive.  "Unwelcomed" means you don't want it to

 1  happen.  If you want it to happen, it's in the

 2  sexual harassment.  If it's consensual, it's not

 3  sexual harassment.  If it's severe, if it's not

 4  pervasive, if it doesn't alter the terms and

 5  conditions of your employment, it's not sexual

 6  harassment.

 7          Gail Harness started -- she's got two

 8  causes of action.  (1) sexual harassment.  And,

 9  basically, her evidence of that is the Snapchat.

10  You saw two of them.  There's a lot more.  I'm not

11  smart.  I'm 54 years old.  I don't know how to do

12  Snapchat.  My 9-year old does better than I do on

13  social media.

14          But, look at the evidence, listen to the

15  witnesses, see what they say, see what the timeline

16  really is and ask yourself if this happened.  Fired,

17  because she made a complaint of sexual harassment.

18          One of her other witnesses, one that was

19  going to be called today, I just learned, that was

20  told to you, she made the same sexual harassment

21  complaint and she went back to work.  She stopped

22  work for Jones, went back to work for Jones and

23  wasn't fired.  She resigned after Rex Lynch took

24  over -- not, "took," elected.

25          The Mayor's not the CEO of anything.  I

 1    could go on-and-on-and-on, but I'm not.  What I want

 2    you just to remember is, this case is about Gail

 3    Harness and Gail Harness alone.  It's not a class

 4    action.  There's not multiple people.  Mr. Stanley

 5    kept using the word "They, they, they."  He kept

 6    saying Anderson was a city.  Anderson's not a city.

 7    Anderson's made up of several cities.  It's a

 8    County:  Morris; Oak Ridge; Clinton; Andersonville,

 9    all are separate cities in Anderson County.

10             So, what you determine about this case

11    and the astronomical figure that she wants, is what

12    you think of what she says and what people say.  And

13    that's all this case is about.  Thank you.

14             THE COURT:  Ladies and gentlemen, we're

15    going to have several days of evidence and a number

16    of witnesses.  Do you think you might like to take

17    notes during the course of trial?  Some of the

18    jurors are saying "yes".  I will see that Ms. Lewis

19    obtains notebooks to give to you, along with a

20    writing implement.  When you take breaks, just leave

21    the notepads in your seat.  Don't take them out with

22    you.

23             So, we will take that -- it's almost

24    about 11:00 now, so at the lunch hour we will have

25    the notebooks distributed to you.

1          Are you ready for your first witness?

2          MS. BAILEY:  Yes, Your Honor.  The

3    Plaintiff calls Tracy Spitzer.

4          (WHEREUPON, the witness was sworn in by

5    the Court Clerk.)

6          THE COURT:  We have a microphone there

7    and it is angled very close to your body.  I think

8    if you speak into it, you will be heard well.  You

9    have your mask on.  It's up to you whether you want

10   to keep your mask on or not.  And, jurors, if you

11   are having trouble hearing her, just raise your hand

12   and we will have her take her mask off and have her

13   speak into the microphone, but I don't think that

14   will be a problem, but we shall see.  Sometimes,

15   experience is better than theory.  So, in theory,

16   you ought to be able to hear, but we'll find out if

17   the theory is correct or not.

18         So, Ms. Spitzer, please say your name

19   clearly into the microphone.

20         THE WITNESS:  Tracy Spitzer.

21         THE COURT:  Yeah, I see some nodding

22   heads from the jury, so I think they can hear you.

23         Proceed, counsel.

24         MS. BAILEY:  Thank you, Your Honor.

25   //

```
 1                          * * *

 2                     TRACY SPITZER,

 3   was called as a witness, and after having been duly

 4   sworn, testified as follows:

 5

 6                    DIRECT EXAMINATION

 7   QUESTIONS BY MS. BAILEY:

 8   Q.     Thank you, Ms. Spitzer.

 9          Can you tell us where you presently work?

10   A.     I work at Anderson County Juvenile Court.

11   Q.     How long have you been there?

12   A.     Since 2014.

13   Q.     Do you have any children?

14   A.     I do --

15   Q.     What are --

16   A.     Two.

17   Q.     I'm sorry.  What are their names and ages?

18   A.     Rogan and Keegan.  They're nine and six.

19   Q.     And are you married?

20   A.     I am.

21   Q.     What is your husband's name?

22   A.     Ronald Spitzer.

23   Q.     What does he do?

24   A.     He's a District Attorney for Anderson County.

25   Q.     Now, you said you work for juvenile court.
```

1    Was there a time when you worked for the Anderson

2    County Clerk's Office?

3    A.      Yes.

4    Q.      When was that?

5    A.      I started in 2014 in the clerk's office for

6    juvenile court.

7    Q.      Who hired you?

8    A.      William Jones.

9    Q.      Did he alone decide to hire you or was there

10   someone else that had input, if you know?

11   A.      Just him.

12   Q.      Is he the person that normally did the hiring

13   for the Anderson County Clerk's Office?

14   A.      Yes.

15   Q.      And it was his decision alone of who to hire?

16   A.      Yes.

17   Q.      Did he have authority over other people that

18   he wanted to place in the office, for example, he

19   moved them from a different office?

20   A.      Yes.

21   Q.      Did he have the authority to decide what

22   policies were followed or not followed?

23   A.      Yes, for his offices.

24   Q.      For his office, the clerk's office?

25   A.      Yes.

1    Q.    He made the policies for the clerk's office?

2    A.    Yes.

3    Q.    What was your position with the clerk's

4    office?

5    A.    I was just a clerk.  I worked on everything

6    that was custody-related.

7    Q.    Okay.  And did you -- do you know Gail

8    Harness, the Plaintiff?

9    A.    I do.

10   Q.    How did you first meet her?

11   A.    I first met Gail when she worked at Heritage

12   Preschool.  She was a daycare worker and she took

13   care of my now oldest son.  He was in her classroom.

14   Q.    Do you know how it is that she came to work

15   at the clerk's office?

16   A.    I do.  She reached out to me one day while

17   she was still working at Heritage, and said that she

18   was going to school to get her bachelor's degree

19   at -- I'm not certain what her degree is.  But she

20   said she needed an intern position, and she knew I

21   worked for the clerk's office, and she wanted to

22   intern there to get some experience.

23   Q.    And you had observed her with your son?

24   A.    I had.

25   Q.    And so, were you confident that she would be

*April Lassiter-Benson, RPR, CSR, LCR*

1    a good fit for the clerk's office?

2    A.    I thought she would be a good fit, yes.

3    Q.    Did you tell her about your -- about her

4    getting an interview with the clerk's office?

5    A.    Yes.  We had talked back and forth.  I told

6    her I was going to reach out to William and ask if

7    he would allow an intern position, and he said, yes.

8    And so, I had reached out to her and told her that

9    he agreed.  And then I'm not sure if he ever reached

10   out to her at that point, but I know I talked to her

11   several times.

12   Q.    Was she excited about the position?

13   A.    She was.

14   Q.    Did she ask a lot of questions about this

15   potential job?

16   A.    She did.

17   Q.    What kind of questions did she ask you?

18   A.    I mean, it varied.  It was everything from,

19   you know, what's it like day-to-day; how much volume

20   of work; what do you guys do; you know, what's the

21   dress code; things of that nature.

22   Q.    Did you ask Jones about what the dress code

23   should be?

24   A.    I did.  I was talking to him at one point,

25   and I had told him in a conversation that she's

1  really excited to start in her internship.  And I

2  said, because she works at a preschool, the dress

3  code in the Court is a little bit different.  And I

4  was joking and said to him, you know, the only thing

5  she's worried about is dress code.

6  Q.     What was his response?

7  A.     His response was, "The tighter and shorter,

8  that's what daddy likes," and then he laughed about

9  it.

10  Q.     And who was daddy?

11  A.     He was, William Jones.

12  Q.     Is that how he referred to himself?

13  A.     It was.

14          MS. BURCHETTE:  Objection.  Hearsay.

15          MS. BAILEY:  Party admission, Your

16  Honor.  Mr. Jones is Anderson County.

17          MS. BURCHETTE:  He is not Anderson

18  County.  He is no longer --

19          THE COURT:  I'm sorry.  I can't hear

20  you.

21          MS. BURCHETTE:  He is no longer a party,

22  Your Honor.  He's been dismissed.

23          MS. BAILEY:  He is Anderson County, Your

24  Honor.

25          MS. BURCHETTE:  No, he is not, Your

 1   Honor.

 2              THE COURT:  Overruled.

 3   BY MS. BAILEY:

 4   Q.    So -- I'm sorry, I lost my place.

 5              THE COURT REPORTER:  Do you need a read

 6   back?

 7              MS. BAILEY:  Please.  Thank you.

 8              (WHEREUPON, the court reporter read

 9   back the pending question, as follows:)

10

11              QUESTION:  "Is that how he referred to

12   himself?

13              ANSWER:  It was."

14

15              (WHEREUPON, the court reporter

16   concluded read-back.)

17   BY MS. BAILEY:

18   Q.    He referred to himself as daddy?

19   A.    Yes.

20   Q.    Is that what he told everyone to call him?

21   A.    Most everyone knew, yes.

22   Q.    How did he refer to the clerks?

23   A.    Some clerks had nicknames.

24   Q.    What kind of nicknames?

25   A.    Some are vulgar.

1   Q.     Can you --

2   A.     I don't --

3   Q.     Can you tell me what some of those are by

4   using the initial of the word?

5   A.     Yeah.

6          So, one clerk he considered "Daddy's B".

7   Another clerk --

8   Q.     I'm sorry, which clerk was that?

9   A.     Her name was Valerie Walker.

10              MS. BURCHETTE:  Objection as to

11  relevance, Your Honor.

12              THE COURT:  Counsel.

13              MS. BAILEY:  Your Honor, it goes to the

14  environment to establish a hostile work environment

15  sexually charged, and it goes to notice.

16              THE COURT:  Have you established that

17  these activities took place while the Plaintiff was

18  there?

19              MS. BAILEY:  No, Your Honor, but it goes

20  to his -- the effect on the listener, which

21  establishes an entire hostile work environment

22  starting before the Plaintiff, which goes to the

23  notice of the --

24              THE COURT:  It's the hostile work

25  environment for the Plaintiff.  It's not a hostile

1   work environment for other people.

2              MS. BAILEY:  Okay, Your Honor.

3              THE COURT:  So, for notice, how does

4   that establish a notice?

5              MS. BAILEY:  Because some of these women

6   have already filed using the same situation, and

7   that put the County on notice that this behavior was

8   going on well before Gail Harness made her

9   complaint.

10             THE COURT:  Well, wouldn't the notice

11  then be the complaint and not the conversations?

12             MS. BAILEY:  Okay.  I'll withdraw the

13  question, Your Honor.

14  BY MS. BAILEY:

15  Q.     When Mr. Jones told you how he liked

16  Ms. Jones to dress, how did that make you feel?

17  A.     Disgusted.

18  Q.     Is that what he normally said about the

19  wardrobe of the Clerk's Office?

20  A.     Yes.

21  Q.     Did you witness Mr. Jones engage in any

22  inappropriate behavior towards any other female

23  employees?

24             MS. BURCHETTE:  Objection under 403,

25  again, Your Honor.

*April Lassiter-Benson, RPR, CSR, LCR*

```
 1              THE COURT:  Counsel?

 2              MS. BAILEY:  Your Honor, if they're

 3   objecting under 403, it's not under relevance, but

 4   it goes, again, to the -- I'm sorry, it goes to the

 5   hostile work environment that was pervasive at the

 6   Clerk's Office.

 7              During his opening argument, Mr. Knight

 8   stated that it was not pervasive; that they had to

 9   find pervasive.  And yes, it started before

10   Ms. Harness worked there, but it was established and

11   it goes to notice of the County having experience

12   and notice of this behavior in Mr. Jones.

13              THE COURT:  I may be mistaken, but as I

14   understand the law, a hostile work environment is

15   particular to a person.  You can have two people

16   working in the same environment, and one person

17   could perceive the environment as being hostile,

18   while another could perceive that environment as

19   being jovial.  Am I incorrect on that?

20              MS. BAILEY:  No, Your Honor.

21              THE COURT:  So, if I'm correct on that,

22   and it's the Plaintiff bringing the lawsuit, then

23   what's important is how the environment was to her.

24   And the fact that other people may perceive the

25   environment before that as hostile or non-hostile,
```

 1  doesn't say anything at all about what the

 2  perception was for her, does it?

 3          MS. BAILEY:  Not to the environment,

 4  Your Honor.  But it also goes to notice that there

 5  was this hostile work environment in existence since

 6  2014, and the County was on notice of it.

 7          THE COURT:  And the fact that he was

 8  using offensive language to a certain employee, how

 9  did the County know about that.

10          MS. BAILEY:  Because it was reported in

11  the 2014 complaints.

12          THE COURT:  Well, why don't we use that,

13  then, instead of -- that would be a notice, instead

14  of comments between Mr. Jones and these individuals

15  that the witness is referring to.  And you're not

16  showing that the substance of that conversation was

17  reported to the County at that time, are you?

18          MS. BAILEY:  We haven't gotten to that

19  point, Your Honor, but there will be testimony that

20  the County received notice of this behavior as early

21  as 2014.

22          THE COURT:  Well, and in showing notice,

23  it's not necessary the contents be accurate or true.

24  The important thing is the notice.  It seems to me,

25  though, that the evidence being brought forth right

1   now does not go to establishing a hostile work

2   environment as perceived by the Plaintiff, and it

3   also doesn't show notice, so the Court sustains the

4   objection.

5           MS. BAILEY:  It also goes -- may I?  I'm

6   sorry, Your Honor.

7           THE COURT:  Of course.

8           MS. BAILEY:  But it also goes to the

9   custom and policy that was accepted by the County

10  for this behavior.

11          THE COURT:  Doesn't that also require

12  some type of knowledge on the County's part?

13          MS. BAILEY:  Well, I'm trying to

14  establish that this happened, and then we'll get to

15  the reporting to the County.

16          THE COURT:  It may be just a matter of

17  putting the cart before the horse.  So why don't we

18  forego this and we'll put the horse in, and then you

19  can bring the cart in later on.

20          MS. BAILEY:  Yes, Your Honor.

21  BY MS. BAILEY:

22  Q.    Did Mr. Jones ever inappropriately touch you?

23          MS. BURCHETTE:  Objection, Your Honor,

24  403, again.

25          THE COURT:  Is this the same

1    conversation?

2              MS. BAILEY:  I guess it is, Your Honor.

3    BY MS. BAILEY:

4    Q.     Did you ever give a statement to the County?

5    A.     I did.

6    Q.     Do you remember when that was?

7    A.     Sometime in 2017.

8    Q.     May I see Exhibit 53, please?

9           Does your screen up there show an exhibit?

10   A.     Uh-huh (affirmative).

11   Q.     Can you tell me what that is?

12   A.     That's the statement typed out by a court

13   reporter of what I gave to Mr. Bearden and

14   Ms. Whitaker at the time.

15   Q.     Who asked you to give the statement?

16   A.     The County law director.

17   Q.     Who was that?

18   A.     JD Aker.

19   Q.     And who was Mr. Bearden?

20   A.     He was the Director of HR at the time that

21   this occurred, that this statement occurred.

22   Q.     Who was Ms. Whitaker?

23   A.     She -- I guess her title was like an

24   Assistant Director of HR at that time.

25             MS. BAILEY:  I'd like to move to Exhibit

1  No. 53, Your Honor.  I guess we've already moved it.

2              THE COURT:  It's admitted.

3              (WHEREUPON, a document was marked as

4  Exhibit Number 53.)

5  BY MS. BAILEY:

6  Q.     Did you talk to anyone else before you gave

7  this statement?

8  A.     In regards to like County employees or

9  anybody?

10  Q.     Anybody in the County, did you talk to them

11  about what was -- you were experiencing in the

12  Clerk's Office before --

13              MS. BURCHETTE:  Objection as to 403.  It

14  doesn't matter what she was experiencing.  It

15  matters what the Plaintiff experienced.

16              MS. BAILEY:  Your Honor, I asked if she

17  talked to someone in the County to establish notice.

18              THE COURT:  Yeah, I thought that's what

19  she was doing.  The question would also elicit and

20  answer that she talked to co-workers, and I don't

21  think that's where you're going.  I think you wanted

22  someone in authority.

23              MS. BAILEY:  That is correct, Your

24  Honor.

25              THE COURT:  Why don't you rephrase the

 1  question, and we'll admit it on the basis that it

 2  may go to notice.

 3           MS. BAILEY:  Thank you.

 4  BY MS. BAILEY:

 5  Q.    Did you ever talk to anyone in Knox County --

 6  I'm sorry, in Anderson County government that have

 7  held a position HR, law director, mayor?

 8           Did you talk to County Commission, any of

 9  those people about what was going on with you?

10  A.    I did not.

11  Q.    Do you know how it is that Mr. Bearden came

12  to you for a statement?

13  A.    My understanding is that a female went to an

14  authority figure and names were given, and mine was

15  one of the names that were given.

16  Q.    Do you know what was said about you?

17  A.    No.

18           MS. BAILEY:  May I have a moment, Your

19  Honor?

20           THE COURT:  You may.

21           (An off-the-record discussion was

22  held.)

23  BY MS. BAILEY:

24  Q.    Do you remember some of the things that you

25  talked about in your sworn statement?

1  A.      Yes.

2  Q.      Can you tell me what you told them?

3          MS. BURCHETTE:  Objection, Your Honor,

4  the statement's been admitted.  It speaks for

5  itself.

6          THE COURT:  Overruled.

7  BY MS. BAILEY:

8  Q.      You may answer.

9  A.      I told them about how it was to work for

10 Mr. Jones and what it was like on a day-to-day

11 basis.  I told them about things that I had heard

12 personally about what he was doing to other females.

13 I said in my statement what he did to me.

14 Q.      Let's go back one-by-one.

15 A.      Okay.

16 Q.      You told them how it was to work for the

17 Clerk's Office.

18         How was it?

19 A.      It was terrible.

20 Q.      In what way?

21         What made it terrible?

22 A.      He -- working there -- you had to work -- you

23 had to come in every day and you had a box under

24 your desk, and you never knew when you were going to

25 be fired or when you were going to be in trouble.

1        Even if you had a question, you were

2    terrified to go to Mr. Jones to ask him 'cause you

3    never knew of the retaliation that you were going

4    to get from him.

5        Sometimes he would come down in the Clerk's

6    Office and he would -- it was very intimidating.

7    He'd sit on the corner of your desk so close to you

8    that it would block you in to your desk and you

9    could not get out.  And he would whisper in your

10   ear and just say really inappropriate things.

11   Q.    Give me an example of something he may have

12   whispered in your ear.

13            THE COURT:  And again, please do not use

14   profanity.

15            THE WITNESS:  He would whisper about,

16   you know, maybe one of the clerks in the office that

17   day in their outfits and how good they looked; he

18   would tell me nicknames of what he called other

19   clerks; he whispered in my ear about how he couldn't

20   stand the DA's Office, knowing my husband worked for

21   the DA's Office; things of that nature.

22   BY MS. BAILEY:

23   Q.    And you said you told them what he had done

24   to others.

25            What had he done to others?

1  A.    He would intimidate them as well.  He called

2  people over to his office and made them sit in his

3  office for a long time and just be awful to them,

4  verbally awful.

5        I know that he Snapchatted some women.  I

6  don't know all of them, but he Snapchatted some.

7  He would send degrading text messages.  He would

8  call people, like, awful at their job.  He'd yell

9  at them.  He'd make scenes at the workplace.  He

10 fired somebody once over 75 cents and had their

11 computer seized during a business day.  I mean, it

12 was -- that was really hard to see.

13 Q.    And then you talked about what he had done to

14 you.

15        What had he done to you?

16 A.    So, in -- in juvenile court how it's set up,

17 there's our offices that are facing the public, and

18 we can help them.  And then if you have to go around

19 the corner, which is not visible to the public or

20 anybody else, there's our copier.  And I was at the

21 copier.  I don't know exactly what I was doing.  I

22 probably was refilling the paper.  And I had bent

23 over, and he came up behind me and grabbed my waist,

24 and was like caressing my waist.  And I jumped up

25 immediately and spun back around to face him head-on

1  so my back was not to him at that point.

2  Q.    Do you remember when this was?

3  A.    Sometime before I gave this statement.

4  Q.    When you started at the Clerk's Office, were

5  you trained at your job?

6  A.    No.

7  Q.    So, when you -- what's your first day like

8  when you go to the Clerk's Office?

9  A.    You know, you're getting your e-mail set up,

10  the phone extensions are set up.

11              MS. BURCHETTE:  Objection as to

12  relevance, again, Your Honor.

13              THE COURT:  Counsel?

14              MS. BAILEY:  Your Honor, it goes to the

15  training or not mistraining of persons in the

16  Clerk's Office, on down to Mr. Jones not following

17  any policies of Anderson County.  They are supposed

18  to be trained on everything, including how to report

19  sexual harassment.

20              THE COURT:  And I guess you're trying to

21  prove it in a negative way by having her explain

22  what happened at her first day of work, and she

23  would not say that she received training on sexual

24  harassment?

25              MS. BAILEY:  Correct.

*April Lassiter-Benson, RPR, CSR, LCR*

1      THE COURT:  If she is a very observant

2 person with a good memory and she recounts

3 everything she did on a first day, that should take

4 us about eight hours.  You think there might be a

5 way to shorten that?

6      MS. BAILEY:  I think there is, Your

7 Honor.

8      THE COURT:  Okay.

9 BY MS. BAILEY:

10 Q.     Did you receive a manual or a handbook on

11 your first day?

12 A.     I don't recall receiving one on my first day.

13 Q.     Do you recall ever receiving one?

14 A.     I don't.

15 Q.     Were you ever told by William Jones, Human

16 Resources or anyone else in the Anderson County

17 government how to report sexual harassment?

18 A.     I don't recall that, no.

19 Q.     Were there any signs posted in the Clerk's

20 Office about how to report sexual harassment?

21 A.     No.

22 Q.     You knew Ms. Harness before this and you

23 continue to know her to this day?

24 A.     Yes.

25 Q.     What's her reputation in the community here?

*April Lassiter-Benson, RPR, CSR, LCR*

1    A.    I --

2    Q.    Do people talk about this?

3    A.    Yes.

4    Q.    Do they talk --

5    A.    -- to some extent.  I mean, it's been going

6    on for years now, so ...

7    Q.    Do they talk about her?

8    A.    If the subject is brought up, usually, yeah.

9    It was brought up as well, yes.

10   Q.    Have you heard them say anything about her

11   kids?

12   A.    I have not.

13             MS. BAILEY:  May I have another moment,

14   Your Honor?

15             THE COURT:  You may.

16             (An off-the-record discussion was

17   held.)

18             MS. BAILEY:  Pass the witness, Your

19   Honor.

20             THE COURT:  Cross-examination.

21

22                  CROSS-EXAMINATION

23   QUESTIONS BY MS. BURCHETTE:

24   Q.    Good morning, Ms. Spitzer.

25   A.    Good morning.

*April Lassiter-Benson, RPR, CSR, LCR*

 1   Q.      Just have a few questions for you today,

 2   going back to the sworn statement you made on the

 3   Elmo.

 4               THE CLERK:  Are you wanting this

 5   document?

 6               MS. BURCHETTE:  Yes.  Thank you.

 7   BY MS. BURCHETTE:

 8   Q.      If you'll look -- technicality is not my

 9   strong suit, if you can't tell.

10               If you would look at the date of that sworn

11   statement.  Can you read that for me.

12   A.      Thursday, September 14, 2017.

13   Q.      So you didn't tell any person in Anderson

14   County government about the actions of Mr. Jones

15   until Thursday, September 14, 2017?

16   A.      Are you asking me if I told, like, co-workers

17   or, like, people who were in a position of

18   authority?

19   Q.      People who were in a position of authority.

20   A.      I did not.

21   Q.      And despite what you've testified as these

22   terrible conditions of the Clerk's Office, you still

23   didn't try to dissuade Ms. Harness from getting an

24   internship there?

25   A.      I did not.

April Lassiter-Benson, RPR, CSR, LCR

1  Q.    And do you know if the statement that you

2  gave was before or after Ms. Harness reported her

3  complaint to Anderson County?

4  A.    It had to be after.

5  Q.    So, they didn't know about yours until after

6  Ms. Harness' complaint?

7  A.    My understanding is that Gail is the one who

8  gave my name.

9  Q.    And at that point in time, Ms. Harness had

10 already left the Clerk's Office, correct?

11 A.    I don't -- no.  Ms. Harness got moved from

12 juvenile court to Oak Ridge Clerk's.  And I don't

13 know the date in which Ms. Harness actually left

14 Anderson County employment.

15 Q.    Okay.  And then you testified that if this

16 case is brought up, Ms. Harness is brought up; is

17 that correct?

18 A.    Yes.

19 Q.    Could that be because she's the one who

20 brought this case?

21 A.    I would imagine.

22 Q.    And do you know if after Ms. Harness left the

23 Clerk's Office, do you know where she went after she

24 left the Clerk's Office?

25 A.    I don't.

 1              MS. BURCHETTE:  No further questions.

 2              THE COURT:  Redirect?

 3              MS. BAILEY:  Very briefly, Your Honor.

 4

 5                   REDIRECT EXAMINATION

 6   QUESTIONS BY MS. BAILEY:

 7   Q.     You said you did not report this until 2017.

 8   Why didn't you report it?

 9   A.     I didn't report 'cause -- I mean, he's an

10   elected official, and he used to tell us all the

11   time that nobody could touch him and nothing could

12   be done, so what was the point of reporting it.

13   Q.     Did you ever hear him tell that to other

14   clerks in the office?

15   A.     Yes.  And he --

16   Q.     I'm sorry.  Go ahead.

17   A.     He bragged about it to everybody.

18   Q.     Did that make you feel like he was

19   untouchable?

20   A.     Yes.

21   Q.     You were asked why you -- or you were asked

22   about you referring Ms. Harness to the Clerk's

23   Office and not trying to dissuade her from going

24   there.  But she asked you specifically about the

25   Clerk's Office, didn't she?

1    A.      She did.

2    Q.      Did she ask about any other office?

3    A.      She did not.

4    Q.      And you talked about moving to Oak Ridge.

5    A.      Uh-huh (affirmative).

6    Q.      Tell me about that.

7    A.      So, it used to be when Mr. Jones was in

8    charge, that if a clerk was moved to the Oak Ridge

9    Clerk's Office --

10            MS. BURCHETTE:  Outside the scope of

11   direct.  Sorry, Your Honor.  Or my cross.  Sorry,

12   Your Honor.

13            THE COURT REPORTER:  Judge, would you

14   mind having her repeat.  I'm sorry.

15            THE COURT:  Let's slow down here.  I

16   think we're talking over each other.  There is an

17   objection --

18            MS. BURCHETTE:  Yes.

19            THE COURT:  -- to the question about Oak

20   Ridge.  And the objection's what?

21            MS. BURCHETTE:  Outside the scope of

22   cross.

23            THE COURT:  Outside the scope of your

24   cross-examination.

25            Ms. Baker?

1          MS. BAILEY:  Bailey.

2          THE COURT:  I'm sorry, Ms. Bailey.

3          MS. BAILEY:  That's okay.

4          It was brought up.  I never brought it

5   up on direct, Your Honor.  It was brought up during

6   cross.  I'm just asking her to expound upon it.

7          THE COURT:  Who brought it up on

8   cross-examination?

9          MS. BAILEY:  The witness spoke about it.

10  She asked where she went after the Clerk's Office.

11  The witness said at one point she went to Oak Ridge.

12         THE COURT:  I think you're correct.  The

13  witness brought up Oak Ridge and talked about Oak

14  Ridge.

15         For redirect, though, I think it has to

16  be something that was brought up by counsel.

17         Was it brought up by counsel?

18         MS. BAILEY:  Indirectly, Your Honor.

19  She asked about being transferred to Oak Ridge.

20  Well, she didn't ask about the transfer.  She did

21  ask was she moved.

22         THE COURT:  Was she moved.

23         MS. BAILEY:  Or what happened after she

24  left the Clerk's Office.

25         THE COURT:  I'll allow it.

1  BY MS. BAILEY:

2  Q.     Tell me about Oak Ridge.

3  A.     When Mr. Jones was in charge, the Oak Ridge

4  Clerk's Office was considered the graveyard for

5  clerks.  You only got transferred there if you were

6  going to be fired.

7  Q.     Was that known throughout --

8  A.     That was very well-known throughout the

9  Clerk's Office, that if you get transferred there,

10  it's a very short time before you're going to get

11  fired.

12  Q.     Thank you.

13             MS. BAILEY:  No more questions, Your

14  Honor.

15             THE COURT:  Thank you, Ms. Spitzer.  You

16  may step down.

17             (Witness excused.)

18             THE COURT:  Call your next witness.

19             THE CLERK:  What was that name?

20             MS. BAILEY:  Kaylee Winstead.

21             (WHEREUPON, the witness was sworn in by

22  the Court Clerk.)

23                     * * *

24                 **KAYLEE WINSTEAD,**

25  was called as a witness, and after having been duly

1   sworn, testified as follows:

2

3                    DIRECT EXAMINATION

4   QUESTIONS BY MS. BAILEY:

5   Q.      Please introduce yourself to the jury and let

6   them know where you currently work.

7   A.      My name is Kaylee Winstead and I work at

8   Harrison's in Clinton.

9   Q.      What level of education did you achieve?

10  A.      I went to school at Brian University, got a

11  bachelor's in litigation, paralegal and electronic

12  discovery.

13  Q.      Did you have an occasion to work for the

14  Clerk's Office in Anderson County?

15  A.      I did.

16  Q.      Do you recall when that was?

17  A.      2014.

18  Q.      Who were you working for?

19  A.      Tyler Mays at first.

20  Q.      And after Tyler Mays.

21  A.      William Jones.

22  Q.      At some point did you give a statement to the

23  Anderson County government?

24  A.      I did.

25  Q.      Who did you give the statement to?

1   A.      It was an HR guy.  I'm not quite sure of his

2   name.  Russell.  I only met him the one time.

3   Q.      That would be the time that you gave the

4   statement?

5   A.      Yes.

6   Q.      And he was the person that was in charge of

7   HR?

8   A.      Yes.

9   Q.      Was anyone else in the room with you?

10  A.      There was a court reporter.

11  Q.      I'm showing you Exhibit 54.

12          (WHEREUPON, a document was marked as

13  Exhibit Number 54.)

14  BY MS. BAILEY:

15  Q.      Do you recognize that?

16  A.      I do.

17  Q.      What is that?

18  A.      That is my sworn statement.

19          MS. BURCHETTE:  Your Honor, we're going

20  to object to at least to parts of this statement,

21  because parts of this contain matters that are

22  outside of her employment with Anderson County in

23  the sworn statement.  And so, we would say that

24  parts of this statement is not relevant to this

25  matter.

*April Lassiter-Benson, RPR, CSR, LCR*

1     THE COURT:  Can you identify the parts

2  as to which you have an objection?

3     MS. BURCHETTE:  Yes, Your Honor.  Give

4  me one second.

5     THE COURT:  Ladies and Gentlemen, before

6  we had a trial such as this, one of the things we do

7  is we ask the attorneys to get together and go over

8  the exhibits so they can identify what they have an

9  objection to and see if they can agree on things so

10  we don't have problems like this.

11     You're sitting up here twirling your

12  thumbs now while the lawyers are going through pages

13  of documents to see what it is they object to and

14  what it is they do not object to.  I apologize for

15  this.  And I'm going to impress upon the attorneys

16  that we don't need this to happen again in the

17  future.  Your time is very valuable and we don't

18  want to use your time in sitting here while the

19  lawyers go through pages of documents and conversing

20  is really an abuse of your time.  So I apologize for

21  that.  And I'm going to do as much as I can to make

22  sure this does not happen again.

23     MS. BURCHETTE:  We'll withdraw the

24  objection, Your Honor.

25  ///

*April Lassiter-Benson, RPR, CSR, LCR*

1  BY MS. BAILEY:

2  Q.    So you were hired by Tyler Mays?

3        Do you remember when that was?

4  A.    It was in March.

5  Q.    How long did you work for the Clerk's Office?

6  A.    Until September 10th.

7  Q.    What was the info -- did you know Mr. Jones

8  before you got to the Clerk's Office?

9  A.    Yes.

10 Q.    How did you know him?

11 A.    I also worked at Gondolier while I was also

12 at the courthouse before and during, and he would

13 come in to Gondolier while I was waiting tables, and

14 he would -- him and his wife would ask for me to be

15 their waitress.

16 Q.    Did you have any other conversations with

17 him?

18        MS. BURCHETTE:  Objection under 403.

19 Your Honor, if we can have a sidebar, I can tell you

20 a bit more.

21        THE COURT:  Well, the question is very

22 broad.  I think she got to say yes.  But those

23 conversations could be about the weather; it could

24 be about football; it could be about anything.

25        Why don't you try to narrow the question

1  down so that everyone will have a better idea of

2  what the subject is and she will have a better idea

3  also.

4          MS. BAILEY:  Yes, Your Honor.

5  BY MS. BAILEY:

6  Q.     Did Mr. Jones ever ask you to work for him

7  and/or his wife?

8  A.     Yes.

9  Q.     What kind of work were they doing?

10 A.     It was a booth that they rented out of Turkey

11 Creek, to my understanding, that bedazzled shirts

12 for different things like balls and different stuff

13 on it.

14 Q.     Did you work for them?

15 A.     No.  I was going to, but the day that I was

16 going to go to work for him, I actually got called

17 into Gondolier.  And since I had been with them for

18 almost 10 years, I had to call and tell them, and

19 they said just not to bother.

20 Q.     Did they respond to it any other way?

21 A.     Did they respond after that?

22 Q.     Yes.

23 A.     He messaged me after that.

24 Q.     What did he message you?

25          MS. BURCHETTE:  Objection under 403

1  again, Your Honor.  How does this pertain to any

2  sexual harassment in Ms. Harness?

3          MS. BAILEY:  Your Honor, it's going to

4  go, if I'm allowed to proceed, to establish the,

5  again, custom, policy of Anderson County and

6  Mr. Jones, in firing people or moving them or

7  reprimanding them upon a complaint of sexual

8  harassment.

9          THE COURT:  We've covered an awful lot

10  of material there.  This is back in 2014, or before

11  2014, right?

12          MS. BAILEY:  Yes.

13          THE COURT:  And the question is:  Was

14  there a conversation between Mr. Jones and this

15  witness?

16          MS. BAILEY:  Yes.

17          THE COURT:  And this is before the time

18  that the Plaintiff started working in Anderson

19  County; is that right?

20          MS. BAILEY:  That is correct.

21          THE COURT:  Okay.  Sustained.

22          MS. BAILEY:  Your Honor, may we have a

23  sidebar, please?

24          THE COURT:  Ladies and Gentlemen, let me

25  have you step outside of the courtroom while the

 1  lawyers talk to me.  I think that they'd like some

 2  clarification on what they can get into evidence and

 3  what they can not get into evidence.  So I think it

 4  might save a lot of time if the Court has the chance

 5  to speak to the lawyers.

 6              (WHEREUPON, the jury was excused for a

 7  break, after which the following proceedings were

 8  had in open court, as follows:)

 9              THE COURT:  Okay.  The jurors are out of

10  the courtroom now, so everyone should be free to

11  speak as openly as they would like to.

12              MS. BAILEY:  Your Honor, the reason I

13  asked for a sidebar is to make a proffer of what

14  this testimony is going to show.  Ms. Winstead was

15  approached by Mr. Jones to have a threesome with him

16  and his wife.  She started working at the Clerk's

17  Office before he was even elected.  But upon his

18  election, he came to the Clerk's office, treated her

19  badly, and fired her.  That goes to the policy, the

20  custom of Anderson County Clerk's Office, which

21  Mr. Jones is the final policymaker.  That policy was

22  carried through to Ms. Harness.

23              THE COURT:  And the policy is what?

24              Would you state the policy?

25              MS. BAILEY:  That if someone makes a

1    complaint of sexual harassment against him or

2    resists, then they're punished.  And this happened

3    before she worked there.  But when she worked there,

4    he noticed her.  He started treating her differently

5    and then he fired her.

6                THE COURT:  So the policy of Anderson

7    County as established by Mr. Jones, was that if you

8    resisted his advances, or if you complained about

9    his advances, then you would be terminated.  That's

10   the policy?

11               MS. BAILEY:  You would be reprimanded,

12   terminated, moved, something, but you would pay for

13   it.  You would be punished.

14               THE COURT:  So that's changed a little

15   bit.

16               MS. BAILEY:  I'm sorry?

17               THE COURT:  The policy's changed a

18   little bit.  The first policy was that you would be

19   terminated.  Then, the policy was that you would be

20   punished.

21               And is this witness going to be able to

22   establish that in every single case where he made

23   advances and someone resisted advances, that that

24   person was fired?

25               MS. BAILEY:  No, Your Honor, we can't

 1   establish that.  We don't know all the cases.

 2                  THE COURT:  How can it be a policy,

 3   then?

 4                  MS. BAILEY:  We can show -- the pattern

 5   is, of the witnesses that we're putting forward,

 6   will show that when a sexual harassment complaint

 7   was made against him, then you were punished.

 8                  We don't have the time or the

 9   wherewithal or even the finances to find all the

10   witnesses that he's harassed, and bring them in to

11   establish the policy.  So we put on our few

12   witnesses to show that even before Ms. Harness got

13   there, this policy was in place, and it carried

14   through until she was terminated.

15                  THE COURT:  Now, a policy might be, if

16   you contract COVID, you're sent home.  And as

17   evidence of policy, would be everybody that got

18   COVID that the decision makers knew about, got sent

19   home.  If the decision maker would send some people

20   home, but not other people home, is that really a

21   policy?

22                  MS. BAILEY:  It's a policy.  It may not

23   be evenly applied.

24                  THE COURT:  I'm just saying, because

25   it's possible it's policy, but it may not be policy.

1    It may be a policy that's not evenly applied, but it

2    also may not be a policy.

3                 A policy, I think --

4                 MS. BAILEY:  I don't think a policy

5    happens in every single place.  I think it is a

6    usual action that is expected by the receiver or

7    that is put down by the policymaker.  It may not be

8    applied in every case.

9                 THE COURT:  Well, what's the difference

10   between a course of action and a policy, then?

11                MS. BAILEY:  A course of action could be

12   a single event.

13                MR. COLLINS:  Your Honor, if I may.  One

14   of the --

15                THE COURT:  No, you may not.  You may

16   not.  You may not.  Ms. Bailey's doing an excellent

17   job.  I don't think she needs any help at all.

18                Are there any --

19                MS. BAILEY:  Your Honor, if I could flip

20   this.

21                THE COURT:  You may.

22                MS. BAILEY:  If we only put one person

23   on the stand and said this happened, they would say

24   that's not a policy, that's just one person.  So,

25   we're putting on more than one person to show that

1  this is consistently going on to establish a policy.

2          THE COURT:  I think I started out by

3  asking you if you were going to establish that in

4  every single case, that the person was terminated or

5  punished or reprimanded or something.  And before

6  this witness could establish that, I think you

7  said, "No," that there was no way to put on evidence

8  to show that every single person resisted.

9          Mr. --

10          MS. BAILEY:  We don't even know

11  everybody that resisted.  Not everybody complained.

12  Some complained anonymously.  Some were too afraid

13  to complain, as we heard the first witness state.

14          THE COURT:  I think I understand your

15  position.  Let me hear from the Defense.  And the

16  Plaintiff is making an argument that they can

17  establish a policy by putting on witnesses who will

18  say that at least with respect to them, that certain

19  things happen when they resisted.

20          Ms. Burchette.

21          MS. BURCHETTE:  Your Honor, I would like

22  to first point out that all of these statements that

23  have been made were made after the Plaintiff

24  complained, and therefore --

25          THE COURT:  Well, I don't know that that

 1  makes a difference, if it goes to policy.  The

 2  policy could have been established prior to the

 3  Plaintiff's employment, could it not?

 4          MS. BURCHETTE:  It could have been, yes,

 5  Your Honor.  But sexual harassment, as you said,

 6  they said, as we've said, is a personal -- it's a

 7  hostile work environment.  It's personal to --

 8          THE COURT:  Well, I think that's a

 9  different issue.  I think what we're talking about

10  is whether it's a policy of punishment or

11  terminating people when they resist.  That's the

12  only thing we're talking about.

13          MS. BURCHETTE:  Okay.

14          THE COURT:  And assuming that policy is

15  relevant, then, whether the Plaintiff was at the

16  office when the policy was developed, I don't know

17  it makes that much difference, so long as the policy

18  was still a policy.  And that's what we're talking

19  now is whether the witnesses can establish a policy,

20  not whether the Plaintiff was there at the time or

21  not.

22          MS. BURCHETTE:  I don't think they can

23  establish a policy, Your Honor.

24          THE COURT:  Why not?

25          MS. BURCHETTE:  Well, Ms. Spitzer is

```
 1   still employed by the juvenile courts.  Ms. Winstead

 2   was.  But each person has their own different

 3   outcome as Mr. Knight said in opening --

 4               THE COURT:  So you're saying that this

 5   witness resisted the overtures of Mr. Brown [sic]?

 6               MS. BURCHETTE:  Mr. Jones.

 7               THE COURT:  Mr. Jones.  Therefore, the

 8   policy could not be if you resisted, you were fired

 9   or terminated?

10               MS. BURCHETTE:  No, I think there's all

11   kinds of outcomes:  Should this be declared the

12   policy of Anderson County, which we would, again,

13   dispute that Mr. Jones is a final policymaker on

14   this.  I think there are numerous outcomes that have

15   happened to these victims that you will hear from

16   that make this an inconsistent policy that they're

17   trying to assert.

18               THE COURT:  Well, if it's inconsistent,

19   how is it a policy, then?

20               MS. BAILEY:  I'm sorry.  Are you asking

21   me, Your Honor?

22               THE COURT:  No, I'm asking

23   Ms. Burchette.

24               MS. BURCHETTE:  I mean, I don't think it

25   is a policy.
```

 1                THE COURT:  What do you understand a

 2   policy to be?

 3                MS. BURCHETTE:  I think that I

 4   understand what they're trying to assert is a

 5   policy.

 6                THE COURT:  That wasn't the question.

 7                MS. BURCHETTE:  Yes, Your Honor.

 8                THE COURT:  What is your understanding

 9   of what a policy is?

10                MS. BURCHETTE:  A policy is an

11   implementation that's done across the board.  It's a

12   standard.  It's basically a rule.

13                THE COURT:  It is a clear rule.

14                MS. BURCHETTE:  Yes, Your Honor.

15                THE COURT:  That's meant to apply, and

16   just, by all circumstances.

17                MS. BURCHETTE:  Yes, like your COVID

18   policy, Your Honor.

19                THE COURT:  And the policy as

20   articulated by the Plaintiff is that if you resisted

21   Mr. Jones' overtures, you would be terminated,

22   punished or moved in some manner.

23                MS. BURCHETTE:  That is their assertion,

24   Your Honor.

25                THE COURT:  And they're not able to show

1    it by this witness again, why?

2              MS. BURCHETTE:  I think each of them had

3    different outcomes to where it is inconsistent as to

4    where it was.  I believe where Ms. Winstead was

5    headed, he never made an advance overture to her

6    while she was an employee.  It was the fact that she

7    rebutted his advances prior to it.  So, therefore,

8    in the context of employment, it wasn't there, and I

9    believe that there was a legitimate reason proffered

10   by her termination.

11             THE COURT:  Ms. Bailey.

12             MS. BAILEY:  Yes, Your Honor.  Your

13   Honor, I'm going to read from the Seventh Circuit

14   pattern jury instructions if the Court will allow.

15             The term "Policy" means a rule or

16   regulation adopted by, in this case, Anderson

17   County.  A custom that is persistent and widespread,

18   a decision at, or policy, statement of, in this

19   case, Mr. Jones.

20             THE COURT:  That seems pretty consistent

21   with the question that I asked.  And so, although

22   we're not bound by Seventh Circuit law, the

23   statement that you just read, I think is pretty

24   consistent with the question that I was asking.

25             MS. BAILEY:  In this case, Your Honor,

1  it was a custom written policy that if you rebuked

2  or reported his sexual harassment, even if it didn't

3  happen in Anderson County government at the time,

4  which it didn't, to her, but when she became an

5  employee of Anderson County, that sexual harassment,

6  that sexual incident caused her to be fired.

7           THE COURT:  Well, I'm still having some

8  difficulty with the inconsistencies, as I think you

9  and Ms. Burchette have talked.

10          MS. BAILEY:  I think what --

11          THE COURT:  Is the witness able to

12 testify that it was a set rule that this is what

13 happened or shown or talk about what happened to

14 her?

15          MS. BAILEY:  She can talk about what

16 happened to her, Your Honor.  And the other

17 witnesses will talk about what happened to them.

18          THE COURT:  Well --

19          MS. BAILEY:  And, Your Honor --

20          THE COURT:  If it's a rule or

21 regulation, employees are probably going to be aware

22 of it.  A rule that employees don't know about is

23 really not a rule at all.

24          MS. BAILEY:  But it's a custom.

25          THE COURT:  If it's a custom, then

1  employees are also going to be familiar with the

2  custom.  It may be a custom that we go to lunch at

3  Gondolier's at 12:00 every day.  Everybody knows

4  about that.  That's why they go.

5            If it's a decision made by a

6  policymaker, then that's disseminated somehow, so

7  people know about that also.  That's a little bit

8  different than saying that, "I experienced 'X',

9  therefore 'X' is a policy."

10            MS. BAILEY:  Right, Your Honor.  But

11  we're not asking her whether it's a policy.  We're

12  asking her what happened to her.  We asked

13  Ms. Spitzer what happened to her.  We're going to

14  ask Ms. Harness what happened to her.  And we will

15  see that there is a consistent policy custom.  He

16  sexually harasses you, you complain or you rebuff,

17  he fires you or he punishes you.  They may not know

18  that.  That's not going to be written policy.  He's

19  not going to write that down.  But if it happens

20  enough and the County looks the other way, then we

21  have an established policy that the County has

22  ignored.

23            THE COURT:  Well, I think there are a

24  couple things there.  On the policy, I think you can

25  establish policies by putting on individuals.  But I

1    think you also have to try to establish that this is

2    always -- the consequences always happen.  That's

3    rule.  That is the custom.

4              The other thing you talked about is

5    "notice", and that's something different.  If --

6              MS. BAILEY:  But, your Honor.

7              THE COURT:  If you're able to establish

8    that in every case, or even in the great majority of

9    cases, that if someone resisted, then there was an

10   adverse consequence, I think that's fair game.

11             If one were putting on haphazard people

12   and they're saying, "something happened to me," I

13   don't know if that goes to established policy or not

14   or a custom.

15             MS. BAILEY:  If it was known throughout

16   the Clerk's Office that this is what happens,

17   that --

18             THE COURT:  I think I asked you that and

19   you said, "No."

20             MS. BAILEY:  No, I said that there's no

21   way we can know every person it happened to.

22             THE COURT:  Well, I'm giving you a lot

23   of leeway.  I'm allowing you to establish through

24   this witness whether it's a rule or regulation.  I

25   think that's what the Seventh Circuit said.  Or

1   whether it's a custom of action.  I think that's

2   also what the Seventh Circuit said.  Or a policy

3   decision made by a policymaker, which is what the

4   Seventh Circuit said.  And I think you're resisting

5   that you just want this witness to testify what

6   happened to her.

7                MS. BAILEY:  Well, Your Honor, I can

8   only ask her what happened to her, but I can ask her

9   if she --

10               THE COURT:  Well, but she worked there.

11               MS. BAILEY:  I understand that.

12               THE COURT:  And she should be aware of

13  what the custom is in the office, what the course of

14  conduct is in the office, what policies existed --

15          (Simultaneous, unreportable crosstalk.)

16               MS. BAILEY:  Well, she only worked there

17  a couple days before he fired her.

18               But if she -- I will ask her, if the

19  Court will allow, if she knew about the policy.  The

20  other clerks did.  As you heard the first witness

21  say, they kept a box under their desk, because they

22  never knew when they were going to be fired.

23               THE COURT:  Ms. Burchette.

24               MS. BURCHETTE:  I mean, Your Honor, not

25  to imply that the witness would do this such -- but

1  we've sat here and listened to this whole discussion

2  about how -- to establish that she needs to testify

3  as to the fact that she knew of this existence of

4  this policy or not.  I don't think a witness who's

5  worked here for 10 days could possibly establish

6  that.  I mean, that is remarkable if she could.  And

7  again, I don't think that this haphazard one victim,

8  two victim, three victim thing can show a policy or

9  a custom or something of that such -- because each

10  person had a different outcome.  And then if you

11  want to get to the notice problem of it all, I can

12  go there or I can let this one process.

13          MS. BAILEY:  May I respond, Your Honor?

14          THE COURT:  Ms. Bailey, I'm going to

15  allow you to try to establish through this witness

16  that there was a policy or a custom or a decision

17  made.  And Ms. Burchette, you have the right to

18  cross-examine the witness, of course, if you can

19  point out that she was either not in a position to

20  know of a policy, or the policy was really not a

21  policy.  It was haphazard.  It was applied.  I think

22  both of you used the word "inconsistent" or

23  "inconsistently".  But I think from my questions I

24  think you can see I'm looking for something a little

25  more substantial than just individual people coming

 1  in saying, "'X' happened to me, therefore 'X' must

 2  be a policy."

 3          MS. BAILEY:  I understand, Your Honor.

 4  Going forward, can we assume the other witnesses

 5  we're putting on will be able to have that same

 6  opportunity to testify to the policy or the custom?

 7  I mean, I think that's where we're getting tripped

 8  up.  Custom and policy are normally used

 9  interchangeably.  In this case we're saying policy,

10  which denotes something written or understood by all

11  versus a custom, which is an accepted pattern of

12  behavior, and that's what this is.

13          We could have brought in 20 witnesses,

14  and as Your Honor said, well, I could keep them up

15  there eight hours a day, but we don't have that kind

16  of time.  The witnesses that we, chose we felt made

17  a strong enough case to show that this is what

18  happens when you report or rebuff his sexual

19  harassment.  And I don't know how many witnesses we

20  need bring in to show that.

21          THE COURT:  You read the law from the

22  Seventh Circuit, and I've not done any research of

23  that at all.  But I think that was an accurate

24  statement of the law.  And I think the Sixth Circuit

25  law would be pretty much the same.  And as long as

```
 1   you are, I think, following that, and how you

 2   establish that is pretty much up to you.  It's not

 3   my job and it's not my role to tell counsel how to

 4   prove their case.  I don't think that there's

 5   anything wrong with the objective that you're trying

 6   to achieve.

 7           Most of the things Ms. Burchette have

 8   brought up on cross-examination items, they really

 9   do not address whether there was a policy at all.

10   And so, what you want to do with other witnesses is

11   pretty much going to be up to you.  I think if you

12   look at the Seventh Circuit jury instruction that

13   you found, I think you're going to find abundant

14   case law on how to establish a policy, or a custom,

15   or a decision by a decision maker.

16           So can we bring the jury back in?

17           MS. BAILEY:  Yes, Your Honor.

18           MS. BURCHETTE:  Yes, Your Honor.

19           (WHEREUPON, the jury re-entered the

20   courtroom, with matters being heard in open court,

21   as follows:)

22           THE COURT:  Ladies and Gentlemen, I hope

23   that you notice when you exit or when you come back

24   everybody stands, and that's in honor of you and the

25   responsibility that you have in a case of this type.
```

1            Counsel, proceed.

2            MS. BAILEY:  Thank you, Your Honor.

3   BY MS. BAILEY:

4   Q.    Ms. Winstead, were you there on Mr. Jones'

5   first day in office?

6   A.    Yes.

7   Q.    Did you have any conversation with him?

8   A.    No.

9   Q.    Did you ever have any conversations with him

10  before he fired you?

11  A.    One.

12  Q.    What was that conversation?

13  A.    That was me initiating a conversation.  He

14  had pulled everybody in the office one-by-one into

15  his office at one point in time just to meet and

16  greet.  I told you I can't exactly say what he told

17  them or didn't tell them.  I wasn't in there.

18  But -- and he hadn't done me.  I was the only person

19  in the office that he hadn't spoke to.

20            So I wanted to introduce myself and tell him

21  that, you know, I was there to work, and I was

22  going to be a good employee for him if he chose,

23  you know, to keep me.  'Cause I just had kind of

24  gotten the wind that he wasn't going to.

25  Q.    Okay.  We've got a lot to unpack there.

*April Lassiter-Benson, RPR, CSR, LCR*

1   A.      Right.

2   Q.      You first said you wanted to introduce

3   yourself.  But you had met him before, isn't that,

4   correct?

5   A.      Yeah.

6   Q.      And so you knew him?

7   A.      Uh-huh (affirmative).

8   Q.      And he knew you?

9   A.      Yeah.

10  Q.      How many days were you there when he was the

11  clerk?

12  A.      It was around 10.

13  Q.      So, the 10 days that he was your boss, he

14  never spoke to you except this one conversation?

15  A.      Yeah.

16  Q.      Did you mention your prior introduction to

17  him when you were having that one conversation with

18  him?

19  A.      I did.  I just was like, I know you probably

20  remember me from Gondolier.  I just wanted to see if

21  he acknowledged that he remembered me.  And he

22  didn't say anything the entire time.  He just sat

23  there across the desk from me.

24  Q.      How was he looking at you?

25  A.      Not very pleasant.  He wasn't being mean or

1  malicious.  He was just kind of staring at me like I

2  was wasting his time.

3  Q.    Now, in your prior conversations with

4  Mr. Jones and/or his wife, what was the essence of

5  those conversations, besides the work that we've

6  already talked about?

7            MS. BURCHETTE:  Objection as to

8  relevance, Your Honor.  This happened before she was

9  employed at the County.

10            THE COURT:  And I assume that this was

11  also before the time that Mr. Jones was the clerk?

12            MS. BURCHETTE:  Yes.

13            MS. BAILEY:  Yes.

14            THE COURT:  So Mr. Jones is a private

15  person and she was an employee of Gondolier Pizza.

16  How is this relevant?

17            MS. BAILEY:  It affected her employment

18  once she became clerk and he was at the office.

19            THE COURT:  Sustained.

20  BY MS. BAILEY:

21  Q.    Were there -- did Mr. Jones ever make a pass

22  at you or suggest any sexual --

23            MS. BURCHETTE:  Objection, leading.

24            MS. BAILEY:  Your Honor, she can say

25  "yes" or "no."

1          THE COURT:  Sustained.

2    BY MS. BAILEY:

3    Q.      Did Mr. Jones ever treat you inappropriately?

4    A.      At the courthouse?

5    Q.      Anytime.

6    A.      Not in front of his wife.  Not in person, no.

7    Q.      In any media?

8          MS. BURCHETTE:  Objection to the extent

9    this was before he took office, before she worked

10   there.

11         MS. BAILEY:  And it, again, goes to her

12   employment, Your Honor, what happened when she

13   worked there and what he did to her.

14         THE COURT:  If the question is limited

15   to the time that she worked for Mr. Jones, it's

16   permissible.  If she is referencing something that

17   took place prior to that, after that, it is not

18   admissible.

19         MS. BAILEY:  Okay.

20   BY MS. BAILEY:

21   Q.      Do you know or have any thought about why

22   Mr. Jones treated you the way he did when you worked

23   for the Clerk's Office?

24   A.      Our past engagement of him trying to employ

25   me, and then getting my phone number and sending me

1    messages that were not responded with very well.

2              MS. BAILEY:  May I inquire into the

3    messages, Your Honor?

4              MS. BURCHETTE:  Your Honor, we would

5    object as it is before the relevant time period.

6              THE COURT:  If it's outside of her

7    employment for Anderson County, the objection is

8    sustained.

9    BY MS. BAILEY:

10   Q.     Tell me about the day you were fired.

11   A.     It was a busy day.  We had pleas that day.

12   So, one of the ladies he had brought in had worked

13   there before, but she wasn't up-to-date with all of

14   our technology and stuff.  So she had got done with

15   pleas and came and brought all of her work, and I

16   was going to do it.  I was happy to do it.  And

17   about that time, he called me into his office, and

18   it was with Cathy Best and Angela Metcalf.  And she

19   basically sat me down and was explaining how I

20   probably heard that some other people had been let

21   go, and that she was sorry to do this, that there

22   was no reason for my firing, and that there was no

23   one thing that I had done, but that I didn't fit the

24   mold of what he was trying to do.  And so, I would

25   be fired under miscellaneous discharge.

*April Lassiter-Benson, RPR, CSR, LCR*

1  Q.      Did she give you any other advice?

2  A.      She asked me if I wanted to do unemployment.

3  And if I did, that I would come down to her office

4  after we were done speaking.

5              MS. BAILEY:  May I have a moment, Your

6  Honor?

7              THE COURT:  You may.

8  BY MS. BAILEY:

9  Q.      Why do you think you were fired?

10  A.      I think I was fired because I talked to

11  Angela Metcalf about things that William Jones had

12  said in the past, not knowing that she was close

13  with him.  And when he took office, I think she let

14  him know that I had made the connection of who he

15  was.  And he couldn't -- I don't think he wanted me

16  around spreading that gossip for better -- lack of a

17  better way of putting it.

18  Q.      So you told Ms. Metcalf.  And who was she?

19  A.      She, at the time when I was there, was doing

20  the cost bill and the payouts of all of the people

21  coming in and making payments in the Court.  But she

22  became like his clerk under him after I left.

23  Q.      And what did you report to her?

24              MS. BURCHETTE:  Objection, Your Honor.

25              THE COURT:  Sustained.

 1          MS. BAILEY:  Pass the witness, Your

 2   Honor.

 3          THE COURT:  Cross-examination.

 4

 5                  CROSS-EXAMINATION

 6   QUESTIONS BY MS. BURCHETTE:

 7   Q.     Good morning, Ms. Winstead.

 8   A.     Good morning.

 9   Q.     I have just have a few questions for you.

10          Now, when Mr. Jones took office, you only

11   worked for him for a total of 10 days; is that

12   correct?

13   A.     Yeah.

14   Q.     So you didn't work with Ms. Harness?

15   A.     No.

16   Q.     And you testified earlier that in those 10

17   days, Mr. Jones didn't speak with you?

18   A.     No.

19   Q.     And did you tell anyone in the county about

20   anything regarding Mr. Jones, anyone in the county

21   with authority making decision -- authority making

22   power prior to your giving your sworn statement?

23   A.     You mean over the previous things that I like

24   talked with my boss --

25   Q.     Yes.

1  A.    I had spoke with my Tyler, my boss, Mays,

2  Julie Carden, I believe is her last name, and Angela

3  Metcalf.

4  Q.    That was the prior clerk, not anyone during

5  Mr. Jones' --

6  A.    Oh, no, no, no.

7  Q.    And how many clerks are there in the circuit

8  court clerk?

9  A.    Quite a few.  You've got General Sessions.

10  Well, you've got Tyler, my boss who is Tyler, who

11  ran -- like, he was the main boss.  But then you

12  had -- underneath you had your criminal court clerk,

13  your circuit clerk.  I was the criminal one.

14  Q.    And you would agree that everyone has a

15  different experience with their boss?

16  A.    Absolutely.

17            MS. BURCHETTE:  Nothing further, Your

18  Honor.

19            THE COURT:  Redirect.

20

21            REDIRECT EXAMINATION

22  QUESTIONS BY MS. BAILEY:

23  Q.    What was it like working for him in those 10

24  days?

25  A.    It was a little rough just because I wanted

1  to keep my job, and I was fairly certain that I was

2  about to lose it.  And so, it was rough.  I had a

3  rough 10 days for sure, just kind of waiting to be

4  fired.

5  Q.     Why did you think you were going to lose your

6  job?

7  A.     Just the general atmosphere.  I wasn't being

8  spoke to by him or any of the people he had brought

9  with him.  And it just makes you feel uneasy when

10  nobody in the office is speaking to you.

11          MS. BAILEY:  Your Honor, just one more

12  thing.  I think I neglected to move the exhibit in,

13  so I will move the exhibit.

14          THE COURT:  It's admitted.  That's the

15  statement that she gave to Mr. Bearden?

16          THE CLERK:  Is that 54, Exhibit 54?

17          MS. BAILEY:  Yes.

18          THE COURT:  It's admitted.

19          MS. BAILEY:  Thank you, Your Honor.  No

20  further questions.

21          THE COURT:  You may step down.

22          (Witness excused.)

23          THE COURT:  Ladies and Gentlemen, we're

24  going to take our lunch break now.  It's about

25  12:04.  Why don't you plan on coming back at 1:30.

1      So the jury is excused.  The jury may

2  depart the courtroom.

3      (WHEREUPON, the jury was excused for

4  lunch, after which the following proceedings were

5  had in open court, as follows:)

6      THE COURT:  Please be seated.  The jury

7  is out of the courtroom now.  We'll wait for

8  Mrs. Lewis to return (indicating clerk).

9      Okay, Mrs. Lewis has returned to the

10  courtroom.

11      There are a couple items I want to bring

12  up with the parties during the course of the

13  testimony of one witness.  Ms. Burchette, she had an

14  objection to certain parts of the exhibit being

15  admitted.  And then she proceeded to start going

16  through the document page-by-page-by page.

17      At the final pretrial conference, I

18  suggested that counsel should sit down and talk to

19  each other and see what they actually had objection

20  to and what they did not have objections to.  I did

21  not make those remarks just to exercise my voice.  I

22  made that statement so what happened today would not

23  happen.  The jury is sitting and watching while one

24  of the attorneys is going through a multi-page

25  document trying to decide what, if any, of the pages

*April Lassiter-Benson, RPR, CSR, LCR*

1  there was an objection to.  That was a waste of the

2  jury's time and it was a waste of the Court's time.

3        I trust that's not going to happen

4  again.  There's nothing wrong with making

5  objections.  But those documents have been in your

6  hands for quite sometime.  You know what's in there

7  and what's not in there.  If you object to

8  something, you ought to be able to state exactly

9  what you object to.  That should have been written

10  down.  You should not be going through a document in

11  front of a jury trying to see what's objectionable

12  and what is not objectionable.

13        So let's make sure that does not happen

14  again.  Use the lunch hour.  There will be other

15  exhibits admitted.  If you have some objections,

16  then decide what you're going to object to.  That

17  should not be done in front of the jury.

18        For the Plaintiffs, your goal is

19  appropriate.  There's nothing at all wrong with

20  trying to establish a policy, a custom, or a

21  decision by a decision maker.  That is highly,

22  highly appropriate.  You may want to take a look at

23  the case law to see how you go about doing that.  I

24  don't think you can establish that by calling

25  haphazard witnesses.  I think you'll run into some

*April Lassiter-Benson, RPR, CSR, LCR*

 1   obstacles there.  I think you want your case to move

 2   smoothly without all these interruptions by the

 3   Defense, and then by the Court asking questions.

 4            So I think if you just focus on your

 5   objective, your case is going to be able to proceed

 6   a lot more smoothly and a lot more persuasively.

 7   The jury's getting lost.  You ask a question, then

 8   the next 15 minutes we're talking about something,

 9   then you ask another question.  The jury is trying

10   to decide, well, what happened before.

11            So why don't we take a look at this

12   during the lunch hour and see if we can not address

13   both of those points when the Court is ready.  We'll

14   see you at 1:30.

15            (Lunch break.)

16            THE COURT:  Call your next witness.

17            MR. COLLINS:  Your Honor, at this time

18   the Plaintiff would read from the deposition of Jay

19   Yeager.  And we have Travis Norman, our law clerk,

20   to read Mr. Yeager's portion.

21            THE COURT:  Okay.  Mr. Norman, please

22   come forward.

23            MR. COLLINS:  Your Honor, we have a copy

24   of the deposition if Your Honor would like to follow

25   along.  And I can pass that up to you if you'd like.

 1            THE COURT:  That's okay for the Court.

 2            MR. COLLINS:  Thank you.

 3            THE COURT:  Ladies and Gentlemen, before

 4    a trial commences in court, the parties engage in

 5    gathering evidence.  This process is called

 6    discovery, and one of the methods of discovery is

 7    taking a deposition.  A deposition is the sworn

 8    testimony of a witness given under oath before the

 9    lawyers for the parties.  And the rules permit that

10    that deposition testimony can be admitted into

11    evidence at the trial.  So, it would be just as if

12    the witness was testifying before you.

13            The witness for some reason is not here,

14    so the lawyers are having an employee of their

15    office take the part of the witness to read what the

16    witness said out of court at the deposition.  You

17    should treat this deposition testimony just as if

18    the witness was here before you testifying.

19            The same rules apply with regard to

20    deposition testimony.  Someone can object to it and

21    the Court will rule on it, just as if the witness

22    was here before you testifying.

23            So, this is deposition testimony you're

24    hearing.  This is the first time you've heard it.

25    There may be other occasions in the proceedings in

1    this trial where there will be other evidence from

2    deposition or other discovery.  As I said, there are

3    other types of discovery, this is just one type.

4                    Counsel.

5                    (WHEREUPON, the deposition of Jay

6    Yeager was conducted by Mr. Richard Collins and,

7    THEREUPON, excerpted portions were read in open

8    Court as follows:)

9                         * * *

10                   **JAY YEAGER,**

11   was previously called as a witness, and after having

12   been duly sworn, testified as follows:

13

14                       EXAMINATION

15   QUESTIONS BY MR. COLLINS:

16   Q.      Mr. Yeager, of course, my name is Richard

17   Collins.  I represent Gail Harness in this lawsuit.

18   A.      Yes.

19   Q.      And you're currently the County Law Director

20   for Anderson County?

21   A.      Yes, sir.

22   Q.      How long have you been the County Law

23   Director?

24   A.      September of 2006.

25                   MR. COLLINS:  Move to Page 6, Line 10.

*April Lassiter-Benson, RPR, CSR, LCR*

1   BY MR. COLLINS:

2   Q.      You know, it's no secret why we're here

3   today, you know.

4   A.      Yes, sir.

5   Q.      All told, do you know how many women came

6   forward and accused Jones of sexual harassment?

7   A.      No.

8   Q.      It was quite a few, though, right?

9   A.      You know, sexual harassment is kind of hard

10  to define.  It's relative.  There was different

11  levels of accusations.  I didn't take the statements

12  myself, but it seems like maybe -- again, there was

13  maybe four women, maybe more that made statements.

14  I don't know if you characterize them as sexual

15  harassment.

16  Q.      I characterize sexual harassment as any

17  unwelcomed sexual conduct or sexual advances made

18  personally.

19  A.      Yeah.

20  Q.      But, you know, I'm really just trying to

21  get -- you know, according to Kim Whitaker, there

22  was eight victims of Jones?

23  A.      Kim knows.  I don't know if I would call

24  them "victims" either.  I mean, there might have

25  been eight women come forward that said various

1  things.  I know one lady he grabbed around the

2  waist.  He made some offhand comments to some

3  ladies.  One of them was interview questions.  Then

4  Harness was some Snapchat texts I guess you would

5  call those.  I'm not familiar with that app too

6  much.  I don't use anything like that.

7  Q.     If you wouldn't call them "victims", what

8  would you call them?

9  A.     Accusers.

10  Q.     Accusers?

11  A.     Yeah.

12  Q.     Do you have an opinion as to whether or not

13  what they were saying was true?

14  A.     I didn't witness any of the stuff.  I mean, I

15  believe what they say.  They were under oath, the

16  ones that took statements.

17  Q.     So, in other words, you don't have any reason

18  to believe that these people, that these women were

19  lying --

20  A.     No, I certainly don't.

21          UNIDENTIFIED SPEAKER:  Were all lying.

22  BY MR. COLLINS:

23  Q.     That's correct.  Let's do it again.

24          So, in other words, you don't have any

25  reason to believe that these people, that these

1  women were all lying?

2  A.      No, I certainly don't.

3  Q.      Thank you.

4          Page 10, Line 8.  So, when was the first

5  time any kind of misconduct by Jones was brought to

6  your attention?

7  A.      I guess it would have to be when Russell

8  Bearden, he e-mailed me about some inappropriate

9  interview questions that Jones had said to another

10  lady.  I don't even know her name.  And I don't

11  think I would characterize it as harassment, maybe

12  stupid, probably the best.

13  Q.      Well, he says he likes to watch women eat

14  yogurt.

15  A.      Yeah.

16  Q.      Which implies quite a bit, I think.  At least

17  it does to me.

18  A.      I understand.  Wasn't there something about

19  where you go to church; are you married?  I don't

20  know.  It was something like that.

21  Q.      Yeah, inappropriate stuff.

22          And you recall that that was probably the

23  first time you heard about Jones engaging in some

24  kind of --

25  A.      Yes, sir, I think that's correct.

*April Lassiter-Benson, RPR, CSR, LCR*

1  Q.    And I'll represent to you just based on the

2  record that we have, that's probably -- that's

3  probably in May of 2015, or sometime in 2015; is

4  that about right?

5  A.    That's reasonable, yes.

6  Q.    Okay.  Let me show you something that Russell

7  Bearden said and I don't understand.

8           MR. COLLINS:  Here, Your Honor, the

9  exhibit was -- that we're referring to is Exhibit 5,

10 and I'm going to pull that up at this time.

11          MR. KNIGHT:  Your Honor, I would just

12 interpose an objection as to if Mr. Bearden's coming

13 tomorrow, then he should be the one to testify to

14 this.

15          THE COURT:  And so what's the objection,

16 then?

17          MR. KNIGHT:  Hearsay.

18          MR. COLLINS:  Your Honor,

19 this -- what -- as to the hearsay objection, as Your

20 Honor knows, we had a meet and confer, and the

21 parties did that.  We did it twice, in fact.  We met

22 and conferred.  And we developed a joint report that

23 we submitted to the Court, and that is docket entry

24 115.  And nowhere was there a hearsay objection to

25 this exhibit, rather, the objection was to

1  relevance.

2          Now, at this deposition, this is an

3  affidavit of Russell Bearden where he goes into

4  detail about some of the allegations --

5          THE COURT:  Is this Mr. Bearden an

6  employee of the Defendant?

7          MR. COLLINS:  Absolutely.  He was

8  Director of Human Resources at the time.

9          THE COURT:  Is he still an employee of

10 the Defendant?

11         MR. COLLINS:  No.

12         THE COURT:  He's not now?

13         MR. COLLINS:  He's not now.

14         THE COURT:  Was he at the time he gave

15 the deposition?

16         MR. COLLINS:  He was -- at the time of

17 this affidavit, that is Russell Bearden's, he was,

18 in fact, the Director of HR.

19         THE COURT:  Mr. Knight, why is that not,

20 then, a statement of a party opponent?

21         MR. KNIGHT:  Okay.  I'll -- if he's

22 going to have Jay or Mr. Yeager testify, that's

23 fine.  I'll withdraw it.

24         THE COURT:  Okay.

25         MR. COLLINS:  And Ms. Lewis -- you're

1  not Ms. Lewis.  My apologies.  Okay.  It's up here.

2  Okay.  This is our Exhibit 5, which we've moved into

3  evidence, Your Honor.  We move Exhibit 5 into

4  evidence.

5           THE COURT:  It's admitted.

6           (WHEREUPON, a document was marked as

7  Exhibit Number 5.)

8  BY MR. COLLINS:

9  Q.    Okay.  Exhibit 5 to Kim Whitaker's deposition

10 is this affidavit that Russell Bearden authored and

11 signed.  Have you seen it before?

12          MR. KNIGHT:  Jay's deposition.

13          MR. COLLINS:  Sorry.  There's some

14 confusion, because this exhibit was a different

15 number at the time of this deposition.  And so I'm

16 going to call it Exhibit 5 instead of Exhibit 18.

17          MS. BURCHETTE:  I'm curious.  You have

18 depositions coming in.

19          MR. KNIGHT:  You said --

20          MR. COLLINS:  That's what -- that's how

21 I described it in the transcript.  Sorry about that.

22 I'll start over.  Page 11, Line 21.

23 BY MR. COLLINS:

24 Q.    All right.  Exhibit 5 is an affidavit that

25 Russell Bearden authored and signed.  Have you ever

April Lassiter-Benson, RPR, CSR, LCR

1    seen it before?  I'm not going to be quizzing you

2    on it.  I just want to know if you --

3    A.    I can't -- probably.  I can't remember.

4    Q.    Right.

5    A.    I remember some of these facts, yes, sir.

6    Q.    Yeah.  And he's talking about Angela Brown,

7    the one that reported the yogurt thing, I think.

8    A.    I'm not even sure of the name, sir.

9    Q.    But here's what I really want to ask you.

10   Bearden says here that he took this complaint

11   against Jones to the mayor, and she said, "There's

12   nothing I can do about Jones' behavior."

13         Did you see that part where he says that?

14   A.    Yeah, I think he told me that.

15   Q.    And then he goes on to say, Bearden

16   does, "Mayor Frank specifically told me not to

17   contact the law director, because he would do

18   nothing but cause a political storm."

19   A.    I don't know where she gets that.  That's not

20   the way I handle cases at all.

21              MR. COLLINS:  Page 14, Line 10.

22   BY MR. COLLINS:

23   Q.    Okay.  All right.

24         Now, at some point, you know, you did become

25   involved in the allegations or at least the

1  investigation of Harness' allegations, right?  If

2  that's not true, just tell me.

3  A.      I knew about it and I gave them directions.

4  Q.      And you were directing the HR Department?

5  A.      I told them what I thought they should do.

6  They brought it to me and explained the facts.  And

7  I said, "Get her out of the work environment

8  immediately.  Get some sworn statements."  I told

9  Mr. Bearden to make sure Kim was with him to take

10  the sworn statements.  I got him a court reporter.

11  He did that.

12  Q.      At some point did you consider filing an

13  ouster suit?

14  A.      Not really.

15  Q.      Why not?

16  A.      The case wasn't that strong.

17  Q.      You're telling me that all these women that

18  came forward with similar allegations, one of sexual

19  harassment, two that they feared for their jobs,

20  that you believed, you've told me you believe them,

21  that none of that rose to the level of an ouster

22  suit?

23  A.      Right.

24  Q.      Okay.  And did you consult with anyone else

25  to make that determination?

*April Lassiter-Benson, RPR, CSR, LCR*

1    A.      Yes.

2    Q.      Okay.  Who would you have consulted with?

3    A.      I spoke with the DA about the case.  I told

4    him what had been said.  I told him my thoughts

5    about the case; spoke with Judge Elledge about the

6    case; I spoke with County Commissioners; I spoke

7    with CTAS, County Technical Assistant Service; I

8    spoke with the State Attorney General's Office.

9    Q.      Would these have been verbal conversations or

10   in writing or what?

11   A.      Verbal.

12   Q.      Okay.  So there's no record of these

13   conversations?

14   A.      There's probably -- I did a resolution at the

15   request of the County Commissioners.  There's a

16   record of that, sir.

17   Q.      Sure, right.  But I'm talking about ouster,

18   discussions of bringing an ouster suit.

19   A.      Oh, my discussions weren't specifically about

20   ouster.  They were about the case and the options.

21   Q.      You know, going back to the Angela Brown, the

22   yogurt incident.  Mr. Bearden has stated in

23   affidavit that when he talked to Jones about it,

24   Jones blew him off basically saying, "I can do

25   whatever the hell I want to.  In fact, I can just

1   start masturbating right now."

2   A.      Yes, sir, I heard that statement.

3   Q.      Okay.  And, you know, so at some point you

4   would have to think, I would think anyway, "I've got

5   a problem on my hands.  We've got a rogue elected

6   official," right?

7   A.      I don't know if I ever said, "A rogue elected

8   official."  I did advocate training for Mr. Jones.

9   And he -- Mr. Bearden set some training up.  My

10  recollection is he refused to go and he took a CTAS

11  online sexual harassment kind of generic type.

12  Q.      Perfunctory thing?

13  A.      Yes.

14  Q.      Right.  I mean -- but so, I mean, you're

15  aware that all this time -- I mean, you know, he's

16  getting these sexual harassment complaints.  He's

17  recalcitrant.  He's saying he's not going to do a

18  damn thing.  He's not complying with what you're

19  asking him to do training-wise.  In fact, he doubles

20  down and says, you know, "I can masturbate in my

21  office if I want to."

22  A.      That wasn't progressive.  That all happened

23  right at one time, the Brown case, and she was gone.

24  Q.      Right.

25  A.      She resigned at that point.  She was gone.

1          MR. COLLINS:  Page 18, Line 21.

2     BY MR. COLLINS:

3     Q.     You agree with me the County Commission can't

4     bring an ouster suit, can they?

5     A.     No.

6     Q.     You would have to do it?

7     A.     Myself.

8     Q.     Or the DA?

9     A.     The DA or citizens can bring it.  I want to

10    say the State Attorney General can, but those are

11    usually the options that you see.

12    Q.     And you're telling me you did at some point

13    at least give it thought, or it was never really a

14    serious --

15    A.     I gave it thought.

16    Q.     Okay.  Did you research it?

17    A.     I'm sure I -- I looked at the law.

18    Q.     Yeah.

19    A.     I'm familiar with that statute and the

20    process.

21    Q.     And constitutional provisions, as well,

22    right?

23    A.     Yes, sir.

24    Q.     And did you -- have you ever brought an

25    ouster suit before?

1    A.      No.

2                  MR. COLLINS:   Page 21, Line 6.

3    BY MR. COLLINS:

4    Q.      But, you know, if you filed an ouster suit,

5    then you can seek for temporary suspension.  That's

6    pretty much a matter of right that once you file,

7    you can ask the judge to --

8    A.      You can ask the judge, but you're going to

9    have to have evidence that he's an immediate threat.

10   Q.      Right.  Okay.  You've got lots of statements

11   and you know this guy is saying --

12   A.      The issue, Mr. Collins, is I had removed all

13   these women from the workforce.  We have actually --

14   from the work environment.  HR had gone and met with

15   each of the ladies that remained in the work

16   environment to determine if there were anymore

17   ladies that were not coming forward or concerned

18   about coming forward.  I wanted to make sure that

19   everyone that could be a potential accuser, a

20   potential victim was removed from that work

21   environment, and we did that.

22                  MR. COLLINS:  22, Line 15.

23   BY MR. COLLINS:

24   Q.      Well, you didn't say it, but you said you

25   removed the victim.  Why not remove the harasser?

1   A.      These --

2   Q.      Why -- I'm just asking.  Why not remove the

3   harasser?

4   A.      The case didn't come to that level.

5   Q.      What kind of case would you have to have to

6   come to the level?

7   A.      You would have to have an immediate threat of

8   continued sexual harassment, and these cases were,

9   again, very few of them even worked there.  None of

10  them worked at that point.  None of them worked with

11  him, other than Harness.  She was placed in a

12  comparative position.  In fact, she went home and

13  was paid her full salary at home for several months.

14              MR. COLLINS:  24; 11.

15  BY MR. COLLINS:

16  Q.      Look, when you have multiple reports of

17  sexual harassment against someone, an employee,

18  okay.  We'll call them an employee for now.  You

19  know, you can either remove the employees who are

20  complaining, like what happened, or you can fire,

21  discipline or do something about the harassment.

22  And here the County chose to remove the victims as

23  opposed to dealing with the harasser.  Is that true

24  or not?

25  A.      Well, first of all, you said -- we can't

1   discipline an elected official.  There's no --

2   Q.     Okay.

3   A.     There's no mechanism for disciplining an

4   elected official.  They answer to their

5   constituents, to the County voters.  There's no

6   process there other than censuring.

7   Q.     And that is in essence what I'm trying to get

8   at is that --

9   A.     I'm glad you understand that.

10  Q.     And the measure you took, instead of

11  disciplining or moving forward --

12  A.     That was off the table.

13  Q.     Off the table.  You can't do that, right?

14  A.     Yes, sir.

15  Q.     You can do an ouster suit.  But in your mind

16  it didn't rise to that level, even though you're

17  removing women to protect them, right?  I mean, it

18  rose to that level.

19  A.     Remove one lady, the only one that remained

20  as an employee.

21          MR. COLLINS:  26; 25.

22  BY MR. COLLINS:

23  Q.     Okay.  But the bottom line is the reason she

24  was removed from under his supervision as opposed to

25  him being fired, because there's a lot of people

1  that get fired for a lot less than he did?

2  A.      We can't fire him.

3  Q.      Unless you bring an ouster suit.

4  A.      I mean, again, if there's evidence to support

5  that and it's successful in court, he could be

6  removed.  And he could be removed by a circuit court

7  judge if he wanted to.

8              MR. COLLINS:  Thank you.  You may step

9  down.  Thank you.

10              THE COURT:  Cross-examination.

11              MR. KNIGHT:  No, Your Honor.

12              THE COURT:  Thank you, sir.

13              (WHEREUPON, the reading of the

14  deposition of Jay Yeager was concluded.)

15              MR. COLLINS:  Your Honor, if the Court

16  please, we would call our second deposition, and we

17  would have our other law clerk, Natalie Batiste

18  (phonetic) read -- this is the deposition of

19  Kimberly Jeffers-Whitaker.

20              MS. BURCHETTE:  She's outside.

21              MR. COLLINS:  Still a party deposition.

22  And under Rule 32, we can read it.  We're an adverse

23  party to Ms. Whitaker.

24              THE COURT:  And what's her position?

25              MS. BURCHETTE:  She's right outside,

*April Lassiter-Benson, RPR, CSR, LCR*

1    Your Honor.

2              MR. COLLINS:  She's the HR Director.

3              THE COURT:  I didn't ask that.  I asked,

4    "What's her position?"

5              MS. BURCHETTE:  She's present and can

6    testify.  If he wants to impeach her with her

7    deposition, impeach her.  But she is present here

8    under their subpoena.

9              MR. COLLINS:  Rule 32 is clear, Your

10   Honor --

11             THE COURT:  Counsel, one at a time,

12   please.  When the Court speaks, I expect everyone to

13   remain silent.  When the Court finishes -- the Court

14   understands what's being said.  The Court

15   comprehends what is being said.  The Court is trying

16   to clarify something with one counsel.  So it does

17   not help when someone else speaks.  So let me finish

18   with Ms. Burchette.

19             MR. COLLINS:  I apologize, Your Honor.

20             THE COURT:  Ms. Burchette, I asked you

21   what position this witness holds?

22             MS. BURCHETTE:  Oh, I'm sorry, Your

23   Honor.  I thought you were asking a different

24   question.  She is the current HR Director for

25   Anderson County.

1    THE COURT:  So she is a high-level

2  employee of the Defendant?

3    MS. BURCHETTE:  Yes.

4    THE COURT:  And don't the rules of

5  evidence say that the other side can introduce

6  statements, out-of-court statements of

7  representatives of the party opponent?

8    MS. BURCHETTE:  I believe it does, Your

9  Honor.  But I also thought the rules stated that for

10  deposition testimony, a witness has to be

11  unavailable.

12    THE COURT:  Where does it say that in

13  the rule?

14    MS. BURCHETTE:  I believe it was 832,

15  Your Honor, but I may be wrong.  It may be Federal

16  Rules of Evidence.

17    Excuse me, Your Honor, it's 804(b)(1).

18    THE COURT:  804(b)(4)?

19    MS. BURCHETTE:  I'm looking, Your Honor.

20  (b)(1).  It would be former testimony.

21    THE COURT:  I think Rule 801(b)(2)

22  trumps that.

23    MS. BURCHETTE:  Okay.  Yes, Your Honor.

24    THE COURT:  Proceed.

25    MR. COLLINS:  Thank you, Your Honor.

**April Lassiter-Benson, RPR, CSR, LCR**

1          MS. BURCHETTE:  Mr. Collins --

2          MR. COLLINS:  So there are actually two

3    depositions of Ms. Whitaker.  We'll read in

4    succession.  The first is from August 5th, 2019.

5    It's a little shorter.

6          May I proceed, Your Honor?

7          THE COURT:  You may.

8          (WHEREUPON, the deposition of Kimberly

9    Jeffers-Whitaker was conducted on August 5th, 2019

10   by Mr. Richard Collins and, THEREUPON, excerpted

11   portions were read in open Court as follows:)

12

13                        * * *

14          **KIMBERLY JEFFERS-WHITAKER,**

15   was previously called as a witness, and after having

16   been duly sworn, testified as follows:

17

18                      EXAMINATION

19   QUESTIONS BY MR. COLLINS:

20   Q.    Would you please state your full name for the

21   record.

22   A.    Full name?

23   Q.    Yes.

24   A.    Kimberly Dawn Jeffers-Whitaker.

25   Q.    So you go by?

1    A.      Kim.

2    Q.      Well, that seems a little informal.  But how

3    about I just call you Ms. Whitaker.  Is that fine?

4    A.      That works as well.

5    Q.      Okay.  You're Director of HR for Anderson

6    County?

7    A.      Correct.

8    Q.      Okay.  You're the Director of HR for Anderson

9    County?

10   A.      Correct.

11   Q.      When did you take on that position?

12   A.      December of '17.

13   Q.      All right.  And what position did you hold

14   before you became director?

15   A.      Deputy Director.

16   Q.      And who was the Director when you were Deputy

17   Director?

18   A.      Russell Bearden.

19   Q.      And how long were you Deputy Director?

20   A.      From '16 to '17.

21   Q.      Did you work for the County prior to '16?

22   A.      I started in 2015.

23           MR. COLLINS:  Page 9, Line 1.

24   BY MR. COLLINS:

25   Q.      All right.  Tell me about your involvement

1  with Gail Harness.  When did you first learn that

2  she had a harassment complaint against William

3  Jones?

4  A.     It would have been in 2017, probably.

5            MR. COLLINS:  Page 17, Line 5.

6  BY MR. COLLINS:

7  Q.     When was the first time that you were made

8  aware of any problems with William Jones and his

9  treatment of his employees?

10  A.     Probably when I was made aware of Gail's

11  complaint?

12  Q.     Are you aware of a complaint brought in 2014

13  shortly after he took office by Nicole Lucas?

14  A.     I have been notified that there was one, yes.

15  Q.     How were you notified of it?

16  A.     I learned after-the-fact, even after the

17  sworn statements.

18  Q.     The sworn statements being the ones --

19  A.     In '17.

20  Q.     In this case?

21  A.     Yes.

22  Q.     Okay.  Do you know why you were never told

23  about it prior to that time?

24  A.     Probably because it was prior to me.

25  Q.     But you got there in '15, right?

1    A.      Yes.

2    Q.      Okay.

3    A.      May of '15.

4    Q.      All right.  Have you ever gone to look for

5    her written complaint?

6    A.      Yes.

7    Q.      And were you able to find it?

8    A.      No.

9    Q.      And where did you look?

10   A.      Her personnel file.  It's the only place I

11   had to look.

12   Q.      Do you know why it wasn't there?

13   A.      No.

14               MR. COLLINS:  25.

15   BY MR. COLLINS:

16   Q.      All right.  Do you know who Cathy Best is?

17   A.      Yes.

18   Q.      Do you recall her being HR Director at any

19   point?

20   A.      I know that she was.  It was before my time.

21   Q.      Before your time.

22               In 2015, I understand there was a complaint

23   brought by Angela Brown against Jones.  You were

24   there in 2015.  Do you remember that complaint?

25   A.      That was prior to me being there.

*April Lassiter-Benson, RPR, CSR, LCR*

1   Q.      Okay.   This is the complaint from the young

2   lady who said she had lunch with him in his office,

3   and he made a very inappropriate comment about

4   yogurt.  Do you remember that?

5   A.      I recall the statement that you're

6   referring -- or speaking of, yes, sir.

7   Q.      Do you know what investigation was performed?

8   Well, let me back up.

9           I know you have not actually laid eyes on

10  Nicole Lucas' complaint.  You couldn't find it.

11  But are you aware of any investigation or anything

12  that was done with respect to Lucas' complaint?

13  A.      I am not aware.

14  Q.      Okay.   Now, fast-forward to Angela Brown in

15  2015.  Are you aware -- let me ask you this:  Do you

16  know what, if anything, the County or the HR

17  Department did in response to that complaint?

18  A.      I wasn't there during that time.

19  Q.      So you don't know?

20  A.      So, I can't speak to anything positive.

21  Q.      When was the first time that you learned

22  about Angela Brown's complaint?

23  A.      It was not long after I was there, but I

24  don't recall being part of those conversations.

25  Q.      Do you recall at any point during that

April Lassiter-Benson, RPR, CSR, LCR

1  timeframe Mr. Bearden meeting with Mr. Jones about

2  it?

3  A.     I don't recall.

4  Q.     Do you recall during that timeframe any

5  retraining performed by the HR Department with

6  respect to reporting sexual harassment or sexual

7  harassment in general?

8  A.     Explain that a bit.  To who?  To Jones or

9  everybody?

10  Q.     To everyone.

11  A.     You're talking about the policy update

12  training that was conducted?

13  Q.     I don't know that there was any.  I've not

14  seen that.  So I'm asking you, was there?

15  A.     Yes.

16  Q.     Okay.  And what did the policy update pertain

17  to?

18  A.     There was several of them.

19  Q.     Well, what I'm asking you is --

20  A.     There was one on harassment.

21  Q.     And when was that?

22  A.     I'm thinking it was in 2016 or '17.

23  Q.     All right.  And was this a training that

24  everybody would have gone to?

25  A.     Yes.

```
 1  Q.      Okay.  And, again, as long as they went?

 2  A.      Correct.

 3              MR. COLLINS:  Page 24; Line 22.

 4  BY MR. COLLINS:

 5  Q.      And who is General Clark?

 6  A.      Dave Clark.

 7  Q.      The attorney, the district attorney?

 8  A.      Yes.

 9  Q.      And what did y'all talk about at that

10  meeting?

11  A.      Ensuring that Anderson County was doing our

12  role.

13  Q.      To protect the employees.

14  A.      And the County; to protect everyone.

15  Q.      Were you more concerned about protecting the

16  county or the employees?

17  A.      My job as the HR Director, I'm on the human

18  side of things, so the employees.

19  Q.      With all due respect, I don't think that

20  answers my question.

21  A.      The employees.

22  Q.      Okay.  All I heard was, "The human side of

23  things."

24          Did you talk about what needed to be done?

25  A.      Ensuring that we were doing what statute
```

1    required and what our policy required us, and to see

2    if there was anything that he needed from us.

3    Q.      What is your understanding of what the

4    statute requires?

5    A.      That we report things in a timely manner, and

6    mostly, that our policy requires, as well as any

7    discrimination or -- what was it in -- the State of

8    Tennessee passed the healthy workplace bill.

9    Ensuring that we were following everything that we

10   were supposed to do.

11   Q.      Do you -- is it your understanding or opinion

12   that as a public employer, you -- the law doesn't

13   require you to take any kind of remedial or

14   corrective action in response to harassment

15   complaints?

16   A.      You will have to ask that again.

17   Q.      So I'm just wondering, you know, it's one

18   thing to have policies in place.

19   A.      Uh-huh (affirmative).

20   Q.      But if you don't execute them, you've got

21   problems.  And when you find that there's been a

22   violation of any discrimination or any harassment

23   policy, I'm still lost on what you guys do about it

24   whatsoever --

25   A.      So do you have --

1  Q.      -- when it involves an elected official.

2  A.      Don't you have a copy of our policy?

3  Q.      Yeah, but that obviously wasn't --

4  A.      And it --

5  Q.      -- effective in this case?

6  A.      And it says what my role is.

7  Q.      Right.

8  A.      Okay.  That when I get through, or what any

9  HR Director gets through, what our role is, what we

10  do, what we report out, when we report out.  Okay.

11  So in that, it tells us what we've done.  And that

12  was, the HR Department done at the time.  Meaning

13  that it was reported.  It was reported to the law

14  director and there was different actions after that.

15  Q.      Okay.  So that's -- we're actually headed

16  where I want to go, okay.  I'm not trying to beat up

17  on you here.  I'm wanting to know who is responsible

18  for taking corrective action.  And you've already

19  told me it's not the HR Department.

20  A.      Uh-huh (affirmative).

21  Q.      So, is it the law director?

22  A.      He is in an adviser role as well.

23  Q.      Well, that's really not my question.  I mean,

24  who enforces the policy?  If you've got a rogue

25  elected official that is just -- is not following

1  the policies, that's creating a hostile work

2  environment.  You've got multiple women reporting

3  this hostile work environment.  Who can correct it?

4  A.    I'm unaware of that answer.

5  Q.    You don't know?

6  A.    That's correct.  I do not know.

7  Q.    Okay.  That's good enough for present

8  purposes, I guess.  Do you find that to be a problem

9  at all?

10  A.    Yes.

11  Q.    Okay.

12  A.    It will take statute, I believe, to change

13  it.

14  Q.    Are you aware of the ouster statute?

15  A.    Yes.

16  Q.    Are you aware -- have you ever seen that

17  carried out?

18  A.    No.

19  Q.    Do you know why that was not done in this

20  case?

21  A.    I don't have knowledge of why it was not.

22  Q.    Okay.  Do you know who made the decision to

23  put Gail Harness on FMLA leave?

24  A.    FMLA?

25  Q.    Yeah.

April Lassiter-Benson, RPR, CSR, LCR

1  A.      She would have had to file for that.

2  Q.      One would think.  But that's what she was

3  told, that she was being put on FMLA leave.

4  A.      FMLA leave is the Family Medical Leave Act.

5  Q.      Oh, I agree.

6  A.      Okay.  All right.

7          MR. COLLINS:  Page 29; 23.

8  BY MR. COLLINS:

9  Q.      Okay.  So she goes on leave, whatever we want

10 to call it.  And who made the decision to put her on

11 leave?

12 A.      The -- that decision came from the law

13 director --

14 Q.      Okay.

15 A.      -- would be my understanding because Russell

16 Bearden was still the director at that time.

17 Q.      And what did you understand to be the endgame

18 there?  I mean, put her on leave to do what?

19 A.      To protect her.

20          MR. COLLINS:  33; 7.

21 BY MR. COLLINS:

22 Q.      Okay.  So, what -- I'm going to go back to my

23 original question, which was, what was the endgame

24 in putting Gail Harness on leave?  I mean, it was to

25 protect her.  I got that.  But what was the plan, or

1    was there a plan, for correcting the hostile work

2    environment?

3    A.    You would have to ask Russell Bearden.

4    Q.    I'm asking you what you understood it to be.

5    And, I mean, surely he had conversations with you.

6    You're the Deputy Director.

7    A.    If I was present, he and I did.

8    Q.    But y'all didn't have these conversations, or

9    did you?

10   A.    As far as an endgame as you're calling it.

11   Q.    Uh-huh (affirmative).  Maybe that's a poor

12   choice of words.  But what I'm really getting at is

13   you put her on leave.

14   A.    Uh-huh (affirmative).

15   Q.    You talked to a couple of employees sometime

16   well later.  There's no systematic interviews of

17   employees going on.  I'm wondering what, if

18   anything, the plan was, to correct the hostile work

19   environment?

20   A.    I think the Commission also probably

21   addressed that during that meeting and what their

22   request was.

23   Q.    But that was in February?

24   A.    Correct.

25   Q.    Okay.  So, I mean, you all just let a hostile

 1  work environment continue to fester for five or so

 2  months and -- I mean, what was the plan?  Well,

 3  strike that.

 4        Was the plan just to wait for him to get --

 5  go through another election and lose?

 6  A.    Again, you're asking a question that I can't

 7  answer.

 8  Q.    So you don't know what the plan was?

 9  A.    I wasn't privy to any information.  I don't

10  guess.

11  Q.    So just like "yes" or "no," if you don't

12  mind, were you -- did you know what the plan was --

13  A.    No.

14  Q.    -- for fixing the hostile work environment?

15  A.    No.

16            MR. COLLINS:  43; 12.

17  BY MR. COLLINS:

18  Q.    Are you satisfied as Director of HR with the

19  way Anderson County handled Gail Harness'

20  complaints?

21  A.    No.

22  Q.    Okay.  And tell me why.  What would you have

23  liked to have seen done differently?

24  A.    I'd like for it to have been a little more

25  systematic, a little more fast moving, and a quicker

1  end result.

2  Q.     I mean, end result in my mind was she was

3  placed on leave and then terminated.  You know, I

4  mean, what was the result of it?  I mean, what would

5  the -- what would you guys have done if William

6  Jones had been reelected?  I mean, you're HR

7  Director.  And as far as I'm concerned, I think you

8  were HR Director when he was reelected, right?

9  A.     When?

10  Q.     Bearden.  Bearden had already left by the

11  time Jones got --

12  A.     Yes.

13  Q.     -- ousted?

14  A.     Yes.

15  Q.     And when I say, "Ousted," I mean --

16  A.     Yes.

17  Q.     -- he got defeated in the primary.

18  A.     Yes.

19  Q.     If he hadn't of gotten defeated, if he had

20  gone on to win the election, what would you have

21  done?

22  A.     I don't know that answer.

23          MR. COLLINS:  This concludes the

24  deposition of August 5th, 2019, and we move to the

25  deposition of February 20, 2020.

 1                  (WHEREUPON, the reading of the

 2     August 5th, 2019 deposition of Kimberly

 3     Jeffers-Whitaker was concluded.)

 4                  THE COURT:  Proceed.

 5                  MR. COLLINS:  Thank you, Your Honor.

 6                  (WHEREUPON, the deposition of Kimberly

 7     Jeffers-Whitaker was conducted on February 20, 2020

 8     by Mr. Richard Collins and, THEREUPON, excerpted

 9     portions were read in open Court as follows:)

10                  MR. COLLINS:  Page 5, Line 6.  Are you

11     ready?

12                  MS. BATISTE:  Uh-huh (affirmative).

13     BY MR. COLLINS:

14     Q.     You go by Ms. Whitaker or Jeffers?

15     A.     Whitaker is fine.

16     Q.     Okay.  Ms. Whitaker, we met before.  You've

17     been deposed by me before in this case.  I don't

18     have a lot of questions for you.  I just want to

19     kind of shore up a few things if that's okay.

20     A.     All right.

21     Q.     When we met last, we talked some about Nicole

22     Lucas.  Do you remember talking about Nicole Lucas?

23     A.     Yes.

24     Q.     And that she had brought a sexual harassment

25     complaint against William Jones in 2014.  Do you

1  recall that?

2  A.     I recall us talking about it.

3  Q.     Of course you don't -- didn't work at the

4  County at that time?

5  A.     I did not.

6  Q.     Let's find her letter to you.

7          MR. COLLINS:  And at this time, Your

8  Honor, I would move Exhibit 13, our Exhibit 13,

9  which is a letter by Nicole Lucas to Kim

10  Jeffers-Whitaker into evidence.  Exhibit 13.

11          THE COURT:  Admitted.

12          (WHEREUPON, a document was marked as

13  Exhibit Number 13.)

14  BY MR. COLLINS:

15  Q.     Have you ever seen that before?

16  A.     Yes.

17  Q.     Okay.  And that is a letter that you received

18  from Nicole Lucas?

19  A.     Yes.

20          MR. COLLINS:  Page 10, Line 2.

21  BY MR. COLLINS:

22  Q.     What do you remember knowing about Nicole

23  Lucas when you first contacted her?

24  A.     That she had filed a complaint.

25  Q.     Okay.  And of course in her letter she states

1  that it's her understanding that her formal

2  complaint, the one that she submitted in writing can

3  not be found.  Is that still the case today?

4  A.     I do not have it.

5  Q.     Well, have you looked for it?

6  A.     I do not have it.  And policy, if I'm not

7  mistaken, I do not have it.

8              MR. COLLINS:  Page 11; 16.

9  BY MR. COLLINS:

10  Q.     Nicole Lucas also says in here that she's

11  aware of another complaint that was filed.  She says

12  here at the bottom of the third page -- the bottom

13  of the third page, "I was chosen for the job, and

14  however, three days into taking the position, I was

15  told that Cathy Best, too, had resigned.  Russell

16  Bearden had been hired, and upon taking his

17  position, I explained the issue to him regarding

18  William Jones, and that I had received telephonic

19  complaints and a written complaint, in parenthesis,

20  separate from mine, regarding Mr. Jones."

21         Have you ever seen the other written

22  complaint that she's referring to?

23  A.     Does it say who she's referring to?

24  Q.     No.

25  A.     I don't know that, then.

1  Q.      Okay.  Did you contact --

2          Okay.  Did you conduct any investigation to

3  find out who that was; whose complaint she was

4  referring to?

5  A.      I don't recall.

6  Q.      You don't recall investigating that

7  whatsoever?

8  A.      I received that, but I do not recall.  At

9  this point, the majority of the paperwork and the

10  documents that I received was then submitted to the

11  law director for his portion of the review.

12              MR. COLLINS:  Page 16; 5.

13  BY MR. COLLINS:

14  Q.      Okay.  Have you ever discussed whether or not

15  the County would proceed with an ouster petition

16  against Mr. Jones?

17          Have you ever discussed that with anyone?

18  A.      I know it was part of the discussions early

19  on.  But, again, I wasn't part of those discussions

20  primarily.  I was the deputy or chief deputy

21  director.

22  Q.      Was Russell Bearden still there when there

23  was talk of an ouster suit?

24  A.      Yes.

25  Q.      To state the obvious, an ouster suit was

1  never brought; is that right?

2  A.     To my knowledge it was not.

3  Q.     And do you know -- what is your understanding

4  of the reason why it was not?

5  A.     I do not have a reason behind it.  I don't

6  have any knowledge of why.  I was part of those

7  discussions -- I wasn't part of those discussions.

8  Q.     No one ever told you?

9  A.     No.

10          MR. COLLINS:  Page 17; 17.

11  BY MR. COLLINS:

12  Q.     Okay.  How many total -- I'm calling

13  them "victims", women that came forward whether by

14  request or on their own, how many total were there?

15  A.     Six or seven.

16  Q.     And in many of the documents that you have

17  authored in this case, you refer to them as Victim

18  No. 1, Victim No. 2.  That's how you did it?

19  A.     Uh-huh (affirmative).

20  Q.     You have to say "yes".

21  A.     I'm sorry, yes.

22  Q.     Do you have a list -- I know right offhand

23  it's difficult for you to say, okay, "well, Victim

24  No. 1 was so and so; Victim No. 3 was so and so."

25  I'm sure, though, that you have a list somewhere of

*April Lassiter-Benson, RPR, CSR, LCR*

 1  the names of the victims?

 2  A.    Yes.

 3          MR. COLLINS:  And here, Your Honor, we

 4  refer to Exhibit 37.  And we'd move it into

 5  evidence.  This is a memo dated August 27, 2018

 6  authored by Whitaker -- Ms. Whitaker, the deponent.

 7          MS. BURCHETTE:  Can I have the

 8  deposition --

 9          MR. COLLINS:  It's the exhibit that is

10  referenced as Exhibit 5 -- or 4.  There's three here

11  and I'd have to -- I should be able to tell you.

12  Okay, it's six.

13          (WHEREUPON, a document was marked as

14  Exhibit Number 37.)

15          MR. COLLINS:  It looks like it's Exhibit

16  6.

17          THE COURT:  Without objection, it's

18  received.

19          MR. COLLINS:  That's Exhibit 37.

20  BY MR. COLLINS:

21  Q.    This is a memo to the file.  It looks like

22  your -- see if you recognize that?

23  A.    All right.

24  Q.    This memo, is that something you authored?

25  A.    Yes.

*April Lassiter-Benson, RPR, CSR, LCR*

1   Q.     You authored.  Excuse me.

2   A.     Yes.

3   Q.     All right.  What -- that's your initials?

4   A.     Yes.

5          MR. COLLINS:  One moment, Your Honor.  I

6   apologize.

7          Okay.  I believe it is Exhibit 45 that I

8   need to have moved into evidence.

9          MS. BURCHETTE:  The dates don't match

10  based on the dates on the exhibit.  Just throwing

11  that out there.  And so that's where I was confused.

12         MR. COLLINS:  Okay, I apologize.  It's

13  sometimes confusing when exhibits don't match.  We

14  would move Exhibit 45 into evidence as well.

15         MS. BURCHETTE:  Which exhibit are you

16  saying is to the deposition?

17         MR. COLLINS:  I believe it's the

18  Exhibit -- I think that's what -- it says Exhibit 6,

19  August 13.  I'm not sure.  I think that some of

20  these dates are wrong on the deposition.

21         MS. BURCHETTE:  Okay.  That's why I was

22  getting confused.

23         MR. COLLINS:  I know.

24         But we would move Exhibit 45, which is

25  another -- this is the April 13, 2018 -- I'm coming

1   to that one.  I'm sorry to waste everyone's time.

2   Okay.  We've moved Exhibit 37 into evidence.

3            (WHEREUPON, a document was marked as

4   Exhibit Number 45.)

5   BY MR. COLLINS:

6   Q.    All right.  This memo, is that something that

7   you authored?

8            MS. BURCHETTE:  Which page again are you

9   on?

10            MR. COLLINS:  Page 18 now.  19; 1.

11            Ms. Batiste.  We're at Page 19, Line 1.

12            THE WITNESS:  Yes.

13   BY MR. COLLINS:

14   Q.    That's your initials?

15   A.    Yes.

16   Q.    What does it concern?

17   A.    Victim No. 8 was receiving prank calls.

18   Q.    And do you know who Victim No. 8 is?

19   A.    Yes.

20            THE COURT:  Counsel, there's a

21   disconnect between what's showing up on the monitor

22   and what the witness is talking about and what

23   you're talking about.

24            MR. COLLINS:  Yes.

25            MS. BURCHETTE:  That's not it either.

April Lassiter-Benson, RPR, CSR, LCR

```
 1              MR. COLLINS:  May I have one moment,

 2  Your Honor, to figure this out?

 3              (An off-the-record discussion was

 4  held.)

 5              MR. COLLINS:  I'll move on, Your Honor.

 6              Starting at 19; 2.

 7  BY MR. COLLINS:

 8  Q.     That's your initials?

 9  A.     Yes.

10  Q.     And what does it concern?

11  A.     Victim No. 8 was receiving prank calls.

12  Q.     And do you know who Victim No. 8 is?

13  A.     Yes.

14  Q.     Who is that?

15  A.     Amy Ogle.

16  Q.     Okay.  So earlier when we said 6 or 7, now

17  we're up to 8?

18  A.     Correct.

19  Q.     And again, this isn't a quiz.  I know it's

20  hard to recall these things with certitude, but

21  we're up to 8 now, right?

22  A.     Correct.

23  Q.     Okay.  And she's reporting prank calls?

24  A.     Correct.

25  Q.     Harassing prank calls, right?
```

1    A.      Yes.

2    Q.      Okay.  Did she tell you who she suspected was

3    behind the prank calls?

4    A.      I don't recall.

5    Q.      Was it William Jones?

6    A.      I think that was her assumption.

7    Q.      Okay.  And I believe it also says there a

8    drive-by.  Victim No. 2, it says, "I was then

9    notified that there had been more phone calls

10   received, as well as Victim No. 2 receiving calls of

11   a threatening nature."  Is that correct?  Is that

12   what it says?

13   A.      Yes.

14   Q.      All right.  Was that -- and who is

15   Victim No. 2?

16   A.      I'm pretty sure that's Gail.  For certain,

17   that was Gail.

18   Q.      Again, although it's not said here, I think

19   it's pretty clear from the context that what Gail

20   and Amy Ogle are reporting to you is that they

21   believe it was William Jones who was engaging in

22   this threatening behavior; is that a fair statement?

23   A.      I believe that would be a fair statement.

24   Q.      Okay.  And this memo, is that something that

25   you created on or around the time that you received

April Lassiter-Benson, RPR, CSR, LCR

1  this information?

2  A.    This says June 7th.  It was created on

3  June 12th.

4            MR. COLLINS:  It's Exhibit 37 that we

5  moved into evidence, as well, Your Honor.  And this

6  is the correct memo.  And I apologize to everyone

7  for that.

8            THE COURT:  There being no objection to

9  the Court?

10            MS. BURCHETTE:  Your Honor, I just don't

11  think it's the correct exhibit.  This one is not

12  referring to what he's been reading so far.

13            MR. COLLINS:  I'm sorry to interrupt.  I

14  don't want to take anymore of the Court's time

15  trying to track down the correct exhibit.  We'll

16  find it at some point.  I'm just going to continue.

17            THE COURT:  Okay, very well.

18  BY MR. COLLINS:

19  Q.    Okay.  And who is Victim No. 2?

20  A.    I'm pretty sure that's Gail.  For certain,

21  that was Gail.

22  Q.    Again, although it's not said here, I think

23  it's pretty clear from the context that what Gail

24  and Amy Ogle are reporting to you is that they

25  believe it was William Jones who was engaged in this

1  threatening behavior.  Is that a fair statement?

2  A.      I believe that would be a fair statement.

3  Q.      Okay.  And this memo, is that something you

4  created on or around the time that you received this

5  information?

6  A.      This says June 7th.  It was created on

7  June 12th.

8  Q.      Okay.  And why did you create the memo?

9  A.      There was a lot of information.  This helps

10  me remember what I've done.

11  Q.      Okay.  So it was something you do to keep an

12  accurate record of things?

13  A.      Yes.

14  Q.      And that would have gone where?

15  A.      That went in a file.

16  Q.      Okay.  It talks about Sergeant Bradley.

17  What's his involvement?

18  A.      Sergeant Bradley was then head of dispatch,

19  so I would contact him.  So there would be -- where

20  it says additional drive-bys, that's where I had the

21  Sheriff's Office -- I had coordinated with the SO to

22  do drive-bys of the homes if they didn't feel

23  secure.

24  Q.      "S.O." stands for?

25  A.      Sheriff's Office.

April Lassiter-Benson, RPR, CSR, LCR

```
 1  Q.      Okay.  And did they do those drive-bys?

 2  A.      Yes.

 3  Q.      Was -- did you refer this to the law

 4  director?

 5  A.      Yes.

 6  Q.      And do you know what, if anything, he did

 7  with it?

 8  A.      I have no knowledge of that.

 9  Q.      Do you know whether this was ever forwarded

10  to the District Attorney?

11  A.      I have no knowledge of that.

12          MR. COLLINS:  Proceed to Page 25, Line

13  9.

14  BY MR. COLLINS:

15  Q.      And who made the decision not to continue her

16  post at the Clerk's Office?

17  A.      That would be the newly elected Rex Lynch.

18  Circuit Court Clerk, Rex Lynch.

19          MR. COLLINS:  Proceed to Page 38, Line

20  9.

21  BY MR. COLLINS:

22  Q.      Okay.  And of course, the only reason Gail

23  Harness was on administrative leave was because she

24  came forward with her complaint, correct?

25  A.      She was placed on administrative leave to my
```

*April Lassiter-Benson, RPR, CSR, LCR*

1  knowledge because Bearden was the director at that

2  time.  She was placed on administrative leave after

3  she made the complaint, correct.

4  Q.    Right.  So, I mean, does that seem fair to

5  you that someone who reports sexual harassment is

6  put in this position where her livelihood is in

7  jeopardy, she's taken out of work, and offered

8  positions as a correctional officer?

9       I mean, I'm just asking you as a human being

10 if you think she was treated fairly in that regard.

11 A.    All I can speak to is that I did my very

12 best, not just as a correctional officer.  I hold

13 those officers -- all positions under the S.O.in

14 very high regard.  And -- but she was also offered

15 positions at the Health Department that I helped

16 facilitate.  And I submitted her resume any time I

17 felt like there was something within Anderson County

18 that she was -- her position fit.

19 Q.    But, I mean, what I'm getting at is probably

20 more general than that.  I mean, I know your hands

21 are tied.  I'm asking you, did you think it was fair

22 the way she was treated after she reported?

23      I'm asking you subjectively whether or not

24 you think she got a raw deal.

25 A.    I think that not just Gail got a raw deal.

1    Q.    Okay.  A lot of people got a raw deal?

2    A.    That is correct.

3    Q.    A lot of his victims got a raw deal?

4    A.    Correct.

5          MR. COLLINS:  41; 19.

6    BY MR. COLLINS:

7    Q.    She was wanting to get back to the Clerk's

8    Office; is that your understanding?

9    A.    That's my understanding.

10   Q.    I mean --

11   A.    Or, like, position?

12   Q.    Right.  And to you, is that a reasonable

13   thing?  I mean, she reports sexual harassment and --

14   well, let me back up.

15         I don't think there's anyone -- I don't know

16   that the County -- I still have yet to figure out

17   all the defenses that the County intends to bring

18   in this case.  A lot of it is just sort of mind

19   boggling to me.  I mean, you don't claim, do you,

20   that Gail was not truthful about her sexual

21   harassment complaints, do you?  I mean, all these

22   women aren't lying.

23   A.    I feel like all these women definitely show a

24   pattern.

25   Q.    Of?

1   A.      Of misconduct, yes.

2   Q.      When you say that they engaged in misconduct

3   -- were you saying that they engaged in misconduct?

4   A.      No.

5   Q.      That they're reporting.  You have no reason

6   to believe that these women are just lying?

7   A.      I do not.

8   Q.      Okay.  And do you know if it's the County's

9   position that Gail, you know, that it didn't rise to

10  the level of hostile work environment or anything

11  like that?  Have you ever --

12  A.      I have not been told that.

13  Q.      Okay.

14  A.      I think the County showed the opposite of

15  that during the County Commission meeting.

16  Q.      The County showed that there was, in fact, a

17  hostile work environment?

18  A.      That there was issues, misconduct.

19  Q.      Yeah.  And the meeting that you're referring

20  to is which County Commission meeting?

21  A.      February of '18.

22          MR. COLLINS:  Proceed to page 47; 18.

23  BY MR. COLLINS:

24  Q.      Okay.  So, when, you know -- how did it come

25  about that all these -- so, there was - who was

1    Victim No. 1?

2    A.      Amanda [sic] Brown.

3    Q.      You mean Angela Brown?

4    A.      Yeah, I'm sorry.

5    Q.      And when did Angela Brown come forward?

6    A.      It was prior to me working.

7    Q.      Okay.  So, prior to '15?

8    A.      Or maybe it was in '15.  It was around that

9    timeframe, I believe.

10   Q.      And she was the one -- what was the

11   substance, we've just got a lot on Angela Brown.

12   Let's just go through Victim No. 1 and Angela Brown,

13   for on a second.

14               MR. COLLINS:  49; 4.

15               THE WITNESS:  That would be my

16   understanding, but she didn't tell me that.

17   BY MR. COLLINS:

18   Q.      It was unwelcomed sexual advances.  He made

19   some off-colored comments about yogurt?

20   A.      Yes, sir.

21               MR. COLLINS:  Page 53.

22   BY MR. COLLINS:

23   Q.      Okay.  Now give me just a second.  I get so

24   confused.  Russell Bearden has done various

25   affidavits, and they have been produced in duplicate

1   form multiple times.  Can you identify Exhibit 17,

2   which is Exhibit 3 here?

3   A.     It is an affidavit that Russell Bearden has

4   submitted and notarized on September 26th of '17?

5             MR. COLLINS:  May we pull the exhibit

6   up?  We're actually referring to 5, Exhibit 5, which

7   I believe has already been moved into evidence.

8   BY MR. COLLINS:

9   Q.     All right.  Can you identify Exhibit 5?

10  A.     It is an affidavit that Russell Bearden had

11  submitted and notarized on September 26 of '17.

12  Q.     And there's an attachment to it, right?

13  A.     Yes.  The attachment is an e-mail from Angela

14  Brown dated May 5th, 2015 to Russell Bearden

15  regarding William Jones.

16  Q.     Okay.  So this is Victim No. 1?

17  A.     Uh-huh (affirmative).

18            MR. COLLINS:  At this time, Your Honor,

19  we would move the e-mail that is referenced here,

20  into evidence, and that's our Exhibit 1, which is

21  the e-mail from Angela Brown to Russell Bearden

22  dated May 5th, 2015.  Plaintiff's Exhibit 1 into

23  evidence.

24            THE COURT:  Without objection, it's

25  received.

```
 1              (WHEREUPON, a document was marked as

 2   Exhibit Number 1.)

 3   BY MR. COLLINS:

 4   Q.      So, this is Victim No. 1, right?

 5   A.      Uh-huh (affirmative).

 6   Q.      And the date is May of 2015, right?

 7   A.      Correct.

 8   Q.      And she's complaining of sexual harassment?

 9   A.      She's complaining, correct.

10   Q.      Of sexual harassment?

11   A.      She doesn't state that --

12   Q.      Okay.

13   A.      -- in the document.

14   Q.      She doesn't use the word "sexual harassment"?

15   A.      I don't want to put words in her mouth

16   either.

17   Q.      But she is complaining of unwelcomed sexual

18   advances or conduct?

19   A.      Correct.

20   Q.      Okay.  And Russell Bearden was Director of HR

21   at the time he did the affidavit, right?

22   A.      Yes.

23              MR. COLLINS:  Which is our Exhibit 5.

24   Page 52, Line 1.

25   BY MR. COLLINS:
```

*April Lassiter-Benson, RPR, CSR, LCR*

1    Q.      Okay.  Okay.  All right.  And then I have

2    another affidavit from Mr. Bearden we'll mark as

3    Exhibit 18.

4              MR. COLLINS:  Which is our Exhibit 35 in

5    this case, I believe.  And we would move Exhibit 35

6    in evidence, another affidavit statement of Russell

7    Bearden report.

8              (WHEREUPON, a document was marked as

9    Exhibit Number 35.)

10             MS. BURCHETTE:  No objection, Your

11   Honor.

12             THE COURT:  Without objection, it's

13   received.

14             MR. COLLINS:  That's Exhibit 35.

15   BY MR. COLLINS:

16   Q.      And it also concerns Angela Brown?

17   A.      Yes.

18             MR. COLLINS:  Line 17.

19   BY MR. COLLINS:

20   Q.      Here on the first full paragraph it says he's

21   referring to the prior complaint in May of 2015,

22   sexual harassment complaint, you know.  We know

23   we're talking Angela Brown.  He doesn't mention her

24   here, but he says he went to Terry Frank.  That's

25   the Mayor, right?

1  A.     Correct.

2  Q.     And he says, "She informed me that there was

3  nothing she could do about his behavior."  Is that

4  what it says?

5  A.     That's what it says.

6  Q.     Okay.  Have you ever had any conversations

7  you would have had between you and the Mayor about

8  William Jones?

9  A.     No, sir.

10  Q.     You haven't?

11  A.     No, sir.

12  Q.     Okay.  Did you ever talk to Russell about

13  what he's saying there that the Mayor told him there

14  was nothing she could do?

15  A.     I don't recall.

16  Q.     Okay.  But you recall -- you've read this

17  affidavit before today?

18  A.     Yes.

19  Q.     Okay.  And you were there when it was

20  notarized, right?

21  A.     I notarized it.

22  Q.     But, I mean, you knew what he was saying that

23  the Mayor blew him off, right?

24  A.     Yes.

25             MR. COLLINS:  54; 21.

1    BY MR. COLLINS:

2    Q.      And then he goes on to say -- this is Russell

3    Bearden speaking through this -- through his

4    affidavit.  "I told Mayor Frank that this needs to

5    be reported to the County Law Director because of

6    the liability the County could be faced with.  Mayor

7    Frank specifically told me not to contact the law

8    director, because he would do nothing but cause a

9    political storm."

10          Did I read that correctly?

11   A.      It sounds correct.

12   Q.      Okay.  Did you ever have conversations with

13   Russell about that fact, that the Mayor had told him

14   not to go to the law director?

15   A.      I don't recall.

16   Q.      Okay.  And according to Russell, the Mayor

17   said it would be like a political circus if he went

18   to the law director, right?

19   A.      That's what it says.

20   Q.      Okay.  Do you find that Russell is a truthful

21   person?

22   A.      Yes.

23   Q.      So do you have any reason to doubt that the

24   Mayor made these comments to him?

25   A.      I don't.

1  Q.    Okay.  So, just to recap.  Angela Brown,

2  which is the last few exhibits we've referenced was

3  Victim No. 1, at least as far as Kim Whitaker is

4  concerned, right?

5  A.    Correct.

6  Q.    In your list of victims?

7  A.    Correct.

8  Q.    But, in fact, according to Nicole Lucas, she

9  was a victim, right?

10  A.    Yes.

11  Q.    And she would have predated Victim No. 1?

12  A.    Yes.

13  Q.    Okay.  And again, according to Nicole Lucas,

14  there were other people that complained, right?

15  A.    I believe so.

16         MR. COLLINS:  58; 6.

17  BY MR. COLLINS:

18  Q.    Okay.  And is it true, in your mind anyway,

19  that more than one of these victims, if not all of

20  them, complained that they felt that they couldn't

21  report it, that they would be retaliated against?

22  A.    Ask me again.

23  Q.    Is it fair to say that many of the victims,

24  the victims, you know, they complain about the

25  sexual harassment, but they have also said things

1    says like they were scared to come forward?

2    A.      Yes.

3    Q.      And that's because Jones would say things

4    like, you know, I can do whatever I want.  I'm not

5    quoting him here, but that's the gist of it?

6    A.      Yes.

7    Q.      I don't want to have to go through all of

8    these affidavits to read different quotes, but the

9    bottom line is, he made it known that the Clerk's

10   Office was like his little victim, and he was going

11   to do whatever the "H" he wanted to; is that a fair

12   statement?

13   A.      Probably.

14   Q.      Nobody could stop him?

15   A.      He did say that.

16   Q.      And at one point you're aware that he

17   actually went so far as to say, and I think this is

18   in one of our exhibits, he told Russell, you know,

19   "Not only can I do whatever the "H" I want, I can

20   sit here and masturbate in my office and nobody can

21   do a "D" thing about it?"

22   A.      That is correct.

23   Q.      It seems to me as an HR -- I mean, you're

24   familiar with the job duties of the clerk, right?

25   A.      Yes.

 1  Q.      Seems like a pretty serious dereliction of

 2  duty or a serious misconduct to say something like

 3  that, would you agree?

 4  A.      Yes.

 5  Q.      But again, Russell was saying, of course, not

 6  according to Exhibit 17, but according to another

 7  exhibit, that the Mayor told her that there was

 8  nothing she could do, and that he shouldn't go to

 9  the law director -- law department because it would

10  just be political?

11  A.      But in here also is 18.  It says that he

12  eventually did.

13              MR. COLLINS:  All right.  And line --

14  Page 63, Line 10.

15  BY MR. COLLINS:

16  Q.      All right.  Let's look at what will be our

17  next numbered exhibit, and if you can try to

18  identify that.

19              MR. COLLINS:  At this time, Your Honor,

20  we'd move Exhibit 16, which is an anonymous sexual

21  harassment complaint sent to Russell Bearden on

22  September 7, 2017.  It's Exhibit 16, Plaintiff's

23  Exhibit 16.

24              (WHEREUPON, a document was marked as

25  Exhibit Number 16.)

1          MS. BURCHETTE:  No objection.

2          THE COURT:  Without objection, it's

3   received.

4   BY MR. COLLINS:

5   Q.    All right.  Let's look at what will be our

6   next numbered Exhibit 16, and if you can try to

7   identify that for me.

8   A.    It appears to be something that was sent to

9   Mr. Bearden.

10  Q.    Is it -- does it -- it's an anonymous letter?

11  A.    In September 7th, 2017.

12  Q.    And you have knowledge and complaints of

13  what.

14  A.    The same type of misconduct against

15  Mr. Jones.

16  Q.    And as we sit here today, do you know who

17  authored that?

18  A.    I do not.

19  Q.    Still don't know?

20  A.    I do not.

21  Q.    Okay.  Let's go to what will be our next

22  numbered exhibit, and ask if you can identify that

23  for us.

24          MR. COLLINS:  And this is Exhibit 34,

25  notes of Whitaker.  And we would move Plaintiff's

1    Exhibit 34 into evidence.

2                (WHEREUPON, a document was marked as

3    Exhibit Number 34.)

4                MS. BURCHETTE:  No objection.

5                THE COURT:  Received.

6    BY MR. COLLINS:

7    Q.    And what is the -- what is the gist of what

8    Kaylee Winstead is saying during this meeting that

9    Russell and Stephanie are memorialized?

10   A.    So, in this, it speaks to her first encounter

11   with Mr. Jones about an inappropriate text she

12   received.  She was -- after that, was hired under

13   the Circuit Court Clerk's Office prior to Mr. Jones'

14   taking office.  After he was elected, she claimed

15   she had a job loss due to this, yes.

16   Q.    And when you say, "claim to job loss," she's

17   complaining that she was sexually harassed?

18   A.    She's complaining of an inappropriate text

19   that she received prior to her working at Anderson

20   County.  She was at Gondolier Restaurant.

21                MR. COLLINS:  She was working at

22   Gondolier Restaurant.

23                MS. BATISTE:  Working at.

24   BY MR. COLLINS:

25   Q.    Right.  And I think that she says that he --

1  that Jones and his wife had approached them about

2  having a threesome or something?

3  A.      Correct.  That's what this is.

4  Q.      And then, why did she say she lost her job?

5  A.      For miscellaneous reasons.  Reports that

6  Cathy Best, who was the prior HR Director to

7  Bearden, told her that she had done nothing wrong.

8  Q.      So it isn't because she didn't have a

9  threesome with him?

10 A.      I don't know that.

11 Q.      Okay.  But Kaylee doesn't say that she didn't

12 go forward with that -- but Kaylee doesn't say that

13 she didn't go forward with that, right?

14 A.      She did not.  It says that her husband took

15 her phone and responded on her behalf.

16 Q.      Then at some point after that she was

17 terminated?

18 A.      After William was -- took office.

19 Q.      Right.

20 A.      So, nine days after he took office.

21 Q.      Did you assign Kaylee a victim number?

22 A.      Yes.

23          MR. COLLINS:  Page 67; 12.

24 BY MR. COLLINS:

25 Q.      Okay.  And here is -- we'll mark this as

1  Exhibit 24, again, so we have -- it looks like a

2  note to file, by Russell Bearden.

3              MR. COLLINS:  This is Plaintiff's

4  Exhibit 3.  We would move Exhibit 3 into evidence,

5  Your Honor.

6              (WHEREUPON, a document was marked as

7  Exhibit Number 3.)

8              MS. BURCHETTE:  No objection.

9              THE COURT:  Admitted.

10             MR. COLLINS:  Let me start again at 67;

11  12.

12  BY MR. COLLINS:

13  Q.     And here is -- we'll mark this as Exhibit 3,

14  Plaintiff's Trial Exhibit 3 again so we have a

15  complete record.  Looks like a note to file by

16  Russell Bearden?

17  A.     Yes.  It's dated May 29th of 2015.  It's

18  where -- signed by Russell Bearden.  It appears it

19  is about the discussion that he had with William

20  Jones regarding comments from Angela Brown.

21  Q.     And I think he says he's closing his

22  investigation.

23  A.     He is, because he can not get in touch with

24  Ms. Brown.

25  Q.     Okay.  He's saying that William admits it

 1  actually, but says it wasn't sexual harassment?

 2  A.      Correct.

 3  Q.      Let's look at an e-mail.

 4          MR. COLLINS:  And here, the exhibit is

 5  Exhibit 42, Plaintiff's Exhibit 42, an e-mail from

 6  Jay Yeager to Robbie Holbrook.

 7          Plaintiff's Exhibit 42; we would move

 8  into evidence.

 9          MS. BURCHETTE:  No objection.

10          THE COURT:  Received.

11          (WHEREUPON, a document was marked as

12  Exhibit Number 42.)

13  BY MR. COLLINS:

14  Q.      And you say in there that the Mayor says

15  something about Gail can't be at the senior center?

16  A.      It's from Robbie.  It was sent on March 19th

17  to me regarding -- this is Harness, sent to Robbie.

18  The e-mail was to Robbie from Jay, is who it was

19  from.

20  Q.      And he --

21  A.      He's stating that, "I'm trying to place Gail

22  at the senior center, but the Mayor does not want

23  her working there."

24  Q.      What was your understanding of -- or do you

25  have an understanding of why the Mayor said she

1  didn't want her working there?

2  A.      I don't.

3  Q.      No one ever told you that?

4  A.      I don't know.

5  Q.      Good question for Jay, I guess?

6  A.      Yes.

7  Q.      And then there was a time, I guess, we talked

8  about threats of retaliation, right?

9  A.      Uh-huh (affirmative).

10  Q.      We talked about how these victims share

11  several common denominators.  One is the reporting

12  of sexual harassment or unwelcomed sexual conduct or

13  advances, right?

14  A.      Yes.

15  Q.      And they're also reporting that Jones, that

16  they're fearful about coming forward; is that right?

17  A.      Yes.

18  Q.      And that Jones engages in types of

19  threatening retaliatory behavior; is that correct?

20  A.      Yes.

21  Q.      And, in fact, we have also talked about how

22  we don't know for sure, but pretty sure it was him

23  who was making prank calls and driving by Amy Ogle's

24  house, right?

25  A.      I don't know that, but that -- that's the

1    claim.

2    Q.    That was -- that was what was the thought, at

3    least?

4    A.    (Nodding head affirmatively.)

5    Q.    Is that a "yes"?

6    A.    Yes.  By the victims, yes.

7    Q.    By the victims.

8          And then here we come into March of 2018,

9    and I mean, God bless you, like I said, your hands

10   were tied.  But here you're getting reports that

11   he's got a shotgun in the office?

12   A.    Yes.

13   Q.    So tell me about that.

14   A.    I received a call that he had a shotgun in

15   his office, I believe, under the couch.

16          MR. COLLINS:  And here, the relevant

17   exhibits are Exhibits 45 and 46, regarding the

18   shotgun, Your Honor.  Plaintiff would move 45 and 46

19   into evidence, if they have not already been.  And I

20   don't believe they have.

21          MS. BURCHETTE:  I mean, we would object

22   as to relevance, Your Honor.  I didn't object to it

23   in the deposition.

24          THE COURT:  Sustained.

25          MS. BURCHETTE:  Thank you.

1               (WHEREUPON, documents were marked as

2     Exhibit Numbers 45 and 46.)

3     BY MR. COLLINS:

4     Q.     So his position is that that was a piece of

5     evidence?

6     A.     That would be my understanding.

7     Q.     But it was under a couch, right?

8     A.     That is correct.

9               THE COURT:  Counsel, I sustained the

10    objection, so we won't make any reference to a

11    shotgun at all.

12              MR. COLLINS:  Thank you, Your Honor.  I

13    apologize.  Give me one moment, please, Your Honor,

14    I want to make sure that I --

15              Your Honor, may I do an offer of proof?

16              THE COURT:  We'll do it at the next

17    recess.

18              MR. COLLINS:  Yes, Your Honor.

19              And that is all questions we have for

20    this witness.  Thank you, Your Honor.

21              THE COURT:  Cross-examination.

22              MS. BURCHETTE:  There's none, Your

23    Honor.

24              THE COURT:  Thank you.  You may return

25    to the spectator section.

*April Lassiter-Benson, RPR, CSR, LCR*

```
 1              (WHEREUPON, the reading of the

 2    deposition of Kimberly Jeffers-Whitaker was

 3    concluded.)

 4                  THE COURT:  Call your next witness.

 5                  MR. STANLEY:  Your Honor, the Plaintiff

 6    would call Terry Frank to the stand.

 7                  (WHEREUPON, the witness was sworn in by

 8    the Court Clerk.)

 9                          * * *

10                      TERRY FRANK,

11    was called as a witness, and after having been duly

12    sworn, testified as follows:

13

14                  DIRECT EXAMINATION

15    QUESTIONS BY MR. STANLEY:

16    Q.     Ms. Frank, good afternoon.  Can you hear me?

17    A.     Yes, sir.

18    Q.     You are the Mayor of Anderson County,

19    correct?

20    A.     Yes, sir.

21    Q.     And you were the Mayor when Jones was elected

22    in 2014?

23    A.     Yes, sir.

24    Q.     Of course, Gail Harness filed her complaint

25    on August the 9th of 2017, correct?
```

 1  A.     I'm just -- from looking at the document,

 2  that's not familiar to me.

 3  Q.     Okay.  I'm going to go over this complaint,

 4  and then I'm going to find out what the County knew

 5  prior to this complaint, either by you or other

 6  department heads.  Okay.  But in her complaint,

 7  let's just read some of that.

 8        She stated that she has panic attacks coming

 9  to work.  And I'm just going to read the

10  highlighted portions.  "I fear for my job.  I know

11  he will continue to retaliate.  There are many

12  other rude inappropriate things he has said or done

13  in the past.  For instance, he calls himself

14  'Daddy'.  He says he has no boss.  He calls one of

15  us -- his officer manager 'Daddy's Prissy B'-word.

16  He used to call a previous office manager 'Daddy's

17  B'-word.  He will lay his head on the clerk's

18  shoulders.  He has grabbed a couple around the

19  waist."

20        Obviously, an investigation was started as a

21  result of this complaint, correct?

22  A.     Yes, sir.

23           MR. STANLEY:  Your Honor, that's Exhibit

24  7.  I don't think it's been moved into evidence.

25  I'd like to move it now.

*April Lassiter-Benson, RPR, CSR, LCR*

 1                    THE COURT:  Without objection, it's

 2   received.

 3                    (WHEREUPON, a document was marked as

 4   Exhibit Number 7.)

 5   BY MR. STANLEY:

 6   Q.    Would you be surprised that the same day that

 7   she filed this complaint, an e-mail was sent to

 8   Mr. Jones complaining about her work performance the

 9   very same day?

10   A.    I can't comment on that.  I mean, I'm not

11   aware of that, other than what you're showing me.

12   Q.    Have you ever seen this e-mail before?

13   A.    I became familiar with all the documents

14   after I requested them from the law director after

15   the County Commission meeting.

16   Q.    Okay.

17                    MR. STANLEY:  I'd like to move this into

18   evidence next, Your Honor.  It's Exhibit No. 8.

19                    THE COURT:  Without objection, it's

20   received.

21                    (WHEREUPON, a document was marked as

22   Exhibit Number 8.)

23   BY MR. STANLEY:

24   Q.    Now, let me show you a letter.  It was

25   drafted by you on March 14th, 2018.  And it's my

                    *April Lassiter-Benson, RPR, CSR, LCR*

1  understanding that this letter from you, which

2  appears to be to a Tim Isbel, Chairman of the

3  Anderson County Board of Commissioners, correct?

4  A.     Yes, sir.

5  Q.     And it looks like it's essentially a list of

6  agendas that you want the County Commission to

7  consider regarding Mr. Jones, correct?

8  A.     Yes.

9  Q.     Let me -- because, you know, this complaint

10 happened in 2017.  We want to know what the County

11 knew about this man beforehand, right, whether it

12 was you or anybody else, right?

13 A.     Yes, sir.

14 Q.     And you don't want him -- how far did he

15 victimize women, how many women were hurt, that's

16 important to you, correct?

17 A.     Yes.

18 Q.     Okay.  In here, No. N, one of the agenda

19 numbers or items says, "Policies for notification to

20 the County regarding alleged criminal activity by

21 employees, department heads or elected officials."

22 Did I read that correctly?

23 A.     Are you asking me what's written here?

24 Q.     Did I read that correctly?

25 A.     Yes.

1    Q.     Okay.  And you reference an Exhibit 7.  It's

2    an attachment that you've put together, correct?

3    A.     Yes, sir.

4    Q.     And Exhibit 7 is dated February 1st, 2016.

5    This would be before Ms. Harness' complaint,

6    correct?

7    A.     Yes.

8    Q.     And these are text messages between you and

9    Mr. Bearden?

10   A.     Yes.

11   Q.     And the text messages are about the fact that

12   William Jones was under criminal investigation by

13   the Tennessee Bureau of Investigators, correct?

14   A.     Well, I don't know that.  I mean, Russell

15   just mentioned that he was speaking to a TBI agent,

16   and he made reference to spy stuff.  And I was

17   inquiring if that was a rumor or if there was really

18   an agent, and that's why I asked him the name.

19   Q.     And who was he spying on allegedly?

20   A.     Mr. Jones.

21   Q.     Okay.  And what was the reason that the TBI

22   wanted Mr. Jones spied on?

23   A.     I mean, I don't have any confirmation that he

24   was actually being investigated by the TBI.

25   Q.     What did Mr. Bearden tell you as far as the

1   investigation.  You're the one asking him about it.

2   Did you ask him what the issues were?

3   A.     When he came to my office and mentioned it,

4   he felt like there were pictures of women on his

5   cellphone, but it didn't reference anything to

6   County employees.  It was just women.

7   Q.     So he's, according to Mr. Bearden, being

8   investigated by the Tennessee Bureau of

9   Investigation, and you really don't know what the

10  investigation was?

11  A.     I don't even know that there was an

12  investigation.  As you can see in the text message,

13  if you look at the rest of it, and I can't read that

14  on this particular printout.  I think there's a

15  second page to this.

16  Q.     Well, did you call the TBI agent?

17  A.     He never provided a name.  He just, as you

18  can see in that text, he just says that the law

19  director referred to him as Jay's blank.  And I

20  said, "I would assume that is a private eye."

21         And he says, "No."

22         It's in there, but it's blurry on my screen.

23              MR. STANLEY:  We'd like to move the

24  letter with the attachments in as the next exhibit,

25  Your Honor, and that would be Exhibit 14.

1          (WHEREUPON, a document was marked as

2    Exhibit Number 14.)

3    BY MR. STANLEY:

4    Q.    Mr. Bearden never communicated to you --

5              THE COURT:  Counsel, I haven't ruled on

6    your objection yet.

7              MR. STANLEY:  I'm sorry.

8              THE COURT:  Your motion yet.  There's

9    been no objection.

10             MR. KNIGHT:  No.  I intend to ask her

11   about it on cross-examination.

12             THE COURT:  I'm sorry?

13             MR. KNIGHT:  No, Your Honor.

14             THE COURT:  There being no objection,

15   the Court admits it.

16   BY MR. STANLEY:

17   Q.    Mr. Bearden didn't communicate to you that

18   Jones was bragging about the fact that the tanning

19   salon he owned, he would secretly videotape women

20   naked?

21        That never came up about the TBI

22   investigation?

23             MR. KNIGHT:  Objection, Your Honor.

24             THE COURT:  Sustained.

25   ///

*April Lassiter-Benson, RPR, CSR, LCR*

1    BY MR. STANLEY:

2    Q.    Now, we just heard from the deposition of

3    Ms. Whitaker, and she went into detail about Nicole

4    Lucas, correct?

5          You were in here when that testimony was

6    being read?

7    A.    Yes, sir.

8    Q.    Now, this is a complaint that was done by

9    Nicole Lucas back in like 2014, correct?

10   A.    That's what you're showing me, yes.

11   Q.    Of course that's several years before

12   Mrs. Harness was hired, correct?

13   A.    Yes, I would assume.

14   Q.    Let me just read some of this that she states

15   in here.  Page 1 --

16          MR. STANLEY:  And this is Exhibit 13,

17   Your Honor.

18   BY MR. STANLEY:

19   Q.    It was at this time Mr. Jones asked me to

20   step in the back room of the General Sessions

21   Clerk's Office alone.  Mr. Jones asked me, "Do you

22   like your job?"

23          I told him, "Yes."

24          "Is your husband a deputy sheriff?"

25          I told him, "Yes," at which, he told me he

1   used to be a Knox County Deputy Sheriff.

2          "How well do you know Tyler Mays?

3          Have you ever had a date with him?"

4          I told him, "Absolutely not."

5          "Have you ever done any favors for him;

6   Tyler?"

7          Mr. Jones then blocked the door leading back

8   into the Clerk's Office, and then asked me, "Were

9   you at the Oak Ridge area campaign for Tyler?"

10         And I said, "Yes."

11         Again, I asked him to move -- go back into

12  the clerk's area to my desk.  He did not move, but

13  said, "You look mad.  Did I hurt your feelings?"

14         He told me that, "I am good friends with the

15  Mayor, and I brought my wife so she could get

16  decorating ideas, but that's none of your business,

17  because I'm the boss now."

18         Do you remember -- do you know why there was

19  never an investigation in 2014 regarding Nicole

20  Lucas?

21  A.     I'm unfamiliar with a complaint by Nicole

22  Lucas.  The HR Department, the way County government

23  is, we're not one -- so, like a City is one entire

24  entity.  A private business is one entire entity.

25  So the HR Department handles each department

 1   separately.  If it would have gone to the HR

 2   Department, Cathy Best, who was the director at that

 3   time, would have handled any of that.

 4          So I don't have on any day-to-day

 5   basis -- you know, I don't know about the

 6   employment issues or complaints that are made

 7   within each department in Anderson County

 8   government.  That doesn't come to me.  I don't have

 9   any authority over those departments.  I only have

10   authority or in the chain of command where County

11   Commission has authorized a department or an

12   appropriation.

13          For instance, animal control.  The

14   Commission says, we want to establish an Animal

15   Control Department.  And then the Mayor is, in

16   essence -- if you look at the origin of our name,

17   we're a County executive.  We execute what County

18   Commission says.

19          So I would have responsibility over those

20   departments where I appoint a supervisor, and then

21   there's a chain of command.  So if there were

22   issues, for instance, with EMS, and it was

23   something where HR needed to consult with me or

24   present a final outcome, that would come to me.

25   But separate fee officials like Mr. Jones, that

1    would not come to me.

2    Q.     So you were unaware of that complaint?

3    A.     Yes, sir.

4    Q.     Do you know why that complaint could not be

5    found in her file?

6    A.     I do not.  I do know that Russell noted -- in

7    fact, he started when he began with Anderson County

8    government, he noted there were numerous missing

9    files.  In fact, he did an audit of those.

10   Q.     Now, let me show you what's already been

11   moved into evidence.  This is the Angela Brown

12   complaint, which is May 5th, 2015.

13          Were you made aware of that complaint?

14   A.     Yes, sir, I was.

15   Q.     And was there an investigation with other

16   women of whether or not he had sexually harassed

17   them?

18   A.     This particular complaint, Russell Bearden

19   was still new.  He brought it to me.  It was not a

20   complaint that fit the personnel policy of Anderson

21   County government.  So, for instance, if you are

22   going to file a complaint, you have to provide a

23   written statement.  You have to sign your name.

24   This was actually, Mr. Bearden heard rumor, and he

25   reached out, himself, to Ms. Brown.  He brought this

*April Lassiter-Benson, RPR, CSR, LCR*

1  to me even though it did not fit the signed

2  complaint process.  Even though he reached out to

3  her accord to his letter and said she did not want

4  to come in.  She had already left Anderson County

5  government.  She did not wish to pursue it.  I did

6  encourage Russell to pursue it.  I received e-mails

7  back with status updates from when he approached

8  Mr. Jones.  I have an e-mail where he said, good

9  news, he's responsive.  He's willing to take some

10 training.  And I did actually raise an issue with

11 Mr. Bearden's affidavit, because he did not put in

12 all of the documents related to his investigation

13 when he presented those.  He did conduct interviews,

14 and he was successful in getting Mr. Jones to take

15 training.

16 Q.    Let's talk about that affidavit.  You're

17 talking about an affidavit signed in September 26th

18 of 2017?

19 A.    I'm not -- I don't know.  He sent -- he sent

20 several.  I think I referenced it in my report to

21 Commission.  And I also wrote the District Attorney

22 General about it, because I considered it an

23 omission of documents to present a false image of

24 the County's response to this complaint.  We went

25 above and beyond.  It did not meet the policy

1  guidelines.  But we went above and beyond and

2  encouraged training anyway.

3  Q.     Yeah, you told him to go get some training,

4  and Mr. Bearden set it up and he didn't show up.  Do

5  you remember that?

6  A.     Well, there was an issue of funding was my

7  recollection.  Mr. Bearden was friends with an

8  attorney from Ogletree Deakins, and that did have a

9  cost.  And apparently Mr. Jones did not want to pay

10  for that.  And so, I believe, Mr. Bearden noted that

11  you have the full complaint that that was a

12  successful outcome.

13  Q.     Do you disagree with this section of his

14  affidavit that said after he approached Mr. Jones

15  about some of his behavior, and Mr. Jones said he

16  doesn't have to answer to anybody.  Where he stated

17  that he went directly to the Mayor's office to

18  report his statement of attitude.  "That was early

19  in my employment.  I mistakenly thought the Mayor

20  was the seat of the County and would not stand for

21  such behavior."

22        Did he go to you and tell you the things

23  that Mr. Bearden said that he could do whatever he

24  wanted in his office, there's no boss?

25  A.     I do not recall that.  I do recall the

 1  discussion even on this particular issue where -- I

 2  mean, you have to understand context.  If you

 3  looked, for instance, at the words, it sounds like

 4  there's no care or compassion, but there is.  And in

 5  this particular case, I was explaining that the

 6  Mayor -- and a lot of folks, I am the facilitator.

 7  So, people whether they are coming in with a legal

 8  question and they've been arrested, and they want

 9  something on civil forfeiture, I'll print them out.

10  You know, I might print the law for them and direct

11  them to the proper fee official or government

12  official.

13        But in this particular case, Russell is

14  still new in May of 2015, and he came from a career

15  in the private sector.  And County government is a

16  very different animal.  There are numerous elected

17  officials that are constitutional offices that each

18  have their own authorities.

19        And so, where the average citizen might

20  believe that you could walk and talk to the Mayor,

21  whether you're either an employee or a citizen, you

22  think that the Mayor has the authority to do

23  something about it, but I don't.  I don't possess

24  that authority.

25        And so, that's what I explained to Russell

1  about being the CEO.  I'm the face of the County.

2  I represent the County on boards and committees.

3  And then I execute the will of Commission when they

4  direct me to do things, but I don't have the

5  authority of a CEO that you would normally think of

6  like at Coca-Cola or something like that.  We're --

7  Q.    Are you saying -- I'm sorry to interrupt you.

8  Are you saying that you don't have any authority

9  over Mr. Jones and his office?

10 A.    I do not.  If you read the Tennessee

11 Constitution.  And CTAS is a great guide for that,

12 County Technical Advisory Service.

13 Q.    We just heard from Ms. Whitaker's deposition,

14 and she said Russell Bearden was a very honest man.

15 You heard that testimony, correct?  She worked in

16 the department with him.

17 A.    Yes.

18 Q.    If she testified that the County Commission

19 voted that every department should follow the sexual

20 harassment guidelines, that your office opted out,

21 Jones' office opted out, and y'all just ran your

22 departments however you really wanted to

23 disregarding the policies.  Would you say he's

24 mistaken about that?

25 A.    The only way to opt out of a policy is to

1    create your own policy.  And if you research the

2    law, you will find that.

3    Q.     I want to know what's done in Anderson

4    County.

5    A.     In Anderson County --

6    Q.     There may be a statute --

7               MR. KNIGHT:  Let her finish her answer.

8               THE WITNESS:  Sure.  In Anderson County,

9    there's a motion -- a full Commission.  It's

10   actually in that one document that you put on the

11   screen that I submitted to County Commission where

12   I'm making sure that the HR Department followed in a

13   timely manner the policies and procedures regarding

14   sexual harassment.

15   BY MR. STANLEY:

16   Q.     I was talking about the other department,

17   your department, and the Clerk's Office, did they

18   opt out of following the sexual harassment policies?

19   A.     No, sir.  County Commission -- the law is if

20   you are going to opt out and create your own

21   policies, and there are some departments in Anderson

22   County that do that.  For instance, the Highway

23   Department has a different way of tabulating

24   vacation pay.  All of the other departments are

25   limited by the number of hours that they can carry

1   over.  The Highway Department has their own policy.

2   That policy has to be submitted to commission and

3   put on file in the County Clerk's Office where there

4   is a record where an employee could go and look at

5   that policy.  The policy of the Mayor's office and

6   my departments is the policy adopted by the

7   authorizing body, and that's your governing body.

8   County Commission.

9   Q.     So if Mr. Bearden testifies in the morning,

10  and he's going to be our first witness, that

11  Mr. Jones drew a big red "X" on the policies and

12  threw it at him, and says, I don't have to follow

13  these, I guess, because we opted out, he would be

14  mistaken?

15  A.     It would be a show of disapproval by

16  Mr. Jones.  But unless he actually went to the next

17  step of creating his own policy and putting it on

18  file with the County Clerk's Office, it's nothing

19  more than a show of disagreement.

20  Q.     You act like you have no power over William

21  Jones during this time.  I want to show you a

22  letter.  I think it's from you to Russell Bearden.

23  It says, "I just got off the phone with a spouse of

24  a County employee who has some questions."

25         Was that spouse Gail Harness' spouse?

1    A.    Yes, sir.

2    Q.    Did he describe to you the concern he had

3    about William Jones?

4    A.    He called me and I had a record of the

5    message that he gave me and Tupper, who's my

6    administrative assistant.  I immediately called him

7    back.  Well, I say immediately.  It must have been

8    within 15 or so minutes, or 30 minutes, and he

9    expressed to me concern that his wife had taken

10   training and classes, and that Mr. Jones was hiring

11   people that had less qualifications than his wife.

12   And so, again, this goes back to the same issue as,

13   we're not a -- we're not one entity.  So, for

14   instance --

15   Q.    Let me stop you.

16            THE COURT:  Let's take our afternoon

17   break now.  It's about five minutes after 3.  Let's

18   come back at 3:20.  3:20.

19            (Short break.)

20            (WHEREUPON, the following matters were

21   heard in open court outside the presence of the

22   jury, as follows:)

23            THE COURT:  I understand the parties

24   wanted to offer proof and wanted to take it up after

25   the break?

1          MR. COLLINS:  Yes, Your Honor.  If the

2    Court please, I would just read the testimony that

3    would have come in through Whitaker, the deposition

4    of Whitaker.  And this is Page 71, Line 14:  "So,

5    his position that it was" -- this is with regards to

6    the shotgun; that objection.

7          "So, his position was that it was a

8    piece of evidence?

9          ANSWER:  That would by my understanding.

10          QUESTION:  But it was under a couch,

11    right?

12          ANSWER:  That is correct.

13          QUESTION:  That doesn't sound like a

14    good place to store evidence.

15          ANSWER:  That would be correct, as well.

16          QUESTION:  And, furthermore, the person

17    who was complaining about this is fearful?

18          ANSWER:  Correct."

19          Page 72, Line 13:

20          "QUESTION:  You still don't know to this

21    day whether it was a piece of evidence or it was a

22    gun he brought from home?

23          ANSWER:  I believe it was reported that

24    it was a piece of evidence, but I don't believe that

25    that's that.

1          QUESTION:  But again, the important part

2     that I care about here is that it was under a couch,

3     right?

4          ANSWER:  Correct.

5          QUESTION:  It wasn't in an evidence

6     locker?

7          ANSWER:  Correct.

8          QUESTION:  And the person who is telling

9     you about this is fearful of it?

10          ANSWER:  Correct.

11          QUESTION:  Okay.  And I'll just mark as

12     collective exhibit, your letters to Judge Elledge.

13          ANSWER:  Okay.

14          QUESTION:  And we don't really need to

15     go into them, but in one, you're reporting, and in

16     the other you're thanking him.  And I take it he

17     took swift action to deal with it.

18          ANSWER:  Yes."

19          And that's it.  Madam Court Reporter,

20     you are very good, because I was reading very fast.

21          THE COURT:  When this evidence was

22     touched upon, initially, the Court sustained an

23     objection to it.  The Court did so for two reasons.

24          The first reason is that the irrelevance

25     of Mr. Jones' possession of the shotgun is at best,

1  marginal.  This is a case about sexual harassment

2  and a retaliation.  And Mr. Jones' possession of a

3  shotgun really does not bear on that issue at all.

4        The second reason the Court ruled to

5  exclude the evidence was under Rule 403, and that's

6  because of the prejudicial effect of this evidence

7  outweighs any irrelevance that the exhibit might

8  have as the Court indicated was marginal at best.

9        A juror could conclude that the shotgun

10  was stolen; that it had been taken from the evidence

11  storage area, or evidence locker.  So now we're

12  injecting into the case some thoughts that Mr. Jones

13  was a thief and was stealing things from the County.

14        There's been no evidence at all

15  presented that Mr. Jones ever posed a physical

16  threat to anyone.  There have been some vague hints

17  that perhaps he was making inappropriate telephone

18  calls, perhaps he was following someone around.  But

19  there's been no evidence at all that he's posed a

20  physical threat to any person.

21        So, as I said, the relevance is very,

22  very weak.  And the idea that the shotgun would have

23  enhanced his ability to threaten someone, or someone

24  had a legitimate reason to be afraid of him because

25  of the shotgun, just invites the jury to make

1    decisions on inappropriate grounds.

2              So, the Court ruled that this evidence

3    was inadmissible and the Court stands by that

4    ruling.

5              Are we ready for the jury?

6              MR. COLLINS:  We are, Your Honor.

7              MS. BURCHETTE:  Yes, Your Honor.

8              (WHEREUPON, the jury re-entered the

9    courtroom, with matters being heard in open court,

10   as follows:)

11             THE COURT:  Please be seated.  The

12   witness is still under cross-examination.  And I

13   believe that the questions concern the witness'

14   authority over other components of Anderson County

15   government.

16   BY MR. STANLEY:

17   Q.    Ms. Frank, this letter here, the only reason

18   I'm bringing it out, you say -- I believe you're

19   saying you have no control over Mr. Jones and his

20   department?

21   A.    Well, in this particular case, her husband

22   called and asked --

23   Q.    I know.  I'm just --

24   A.    -- about the hiring.

25   Q.    I don't think you're answering my question.

*April Lassiter-Benson, RPR, CSR, LCR*

1    Is that true, you don't have any control

2  over Mr. Jones?

3  A.    No, sir.

4  Q.    If Russell Bearden testifies that after this

5  call, that you instructed Jones to actually hire

6  her, make her full-time, would that be mistaken?

7  A.    That would be mistaken.

8  Q.    Okay.  All right.

9         MR. STANLEY:  I'll move this into

10 evidence as exhibit -- oh, my.  I'll have to find

11 out in a minute.

12         THE COURT:  What's the number?

13         MR. COLLINS:  I believe it's 17.

14         MR. STANLEY:  17, Your Honor.

15         THE COURT:  Without objection, exhibit

16 17 is admitted.

17         MR. KNIGHT:  No objection.

18         (WHEREUPON, a document was marked as

19 Exhibit Number 17.)

20 BY MR. STANLEY:

21 Q.    Ms. Frank, finally, there was a censure of

22 William Jones, correct?

23 A.    Yes, sir.

24 Q.    Of course, the first complaint, which

25 disappeared was in 2014, that was from Nicole Lucas.

1   We did have a complaint from Angela Brown in 2015.

2   You got a call from Ms. Harness' husband in 2016.

3   And then she filed a complaint actually in 2017.

4   2018, is that the year he was running for

5   reelection?

6   A.      Yes, sir.

7   Q.      Okay.  So, four years, no censure.  This is

8   the first censure of Mr. Jones, correct?

9   A.      Yes, sir.

10  Q.      Okay.  Let's go through this censure a little

11  bit, and I'm going to ask you some questions.

12          It states in there, "Whereas Anderson County

13  Human Resources Department has received multiple

14  reports regarding the workplace conduct of William

15  T. Jones, Circuit Court Clerk, demonstrating a

16  pattern of conduct that is outside the bounds of

17  reasonable, ethical, moral decency for anybody

18  supervising or working alongside County employees."

19          And is that your signature?

20  A.      Yes, sir.

21  Q.      So, you agree that there was a pattern of

22  conduct?

23  A.      This is a --

24  Q.      I'm sorry.  Do you agree there was a pattern

25  of conduct based upon the investigation?

1    A.    Based on the investigation that took place in

2    September of 2017, yes.

3    Q.    Okay.

4    A.    It appeared to be that way.  However, I know

5    that the investigation was not completed as

6    Mr. Jones was never interviewed.

7    Q.    Right.  He didn't even show up for this

8    censure to defend himself, did he?

9    A.    Correct.

10   Q.    It goes on to say, "Whereas these reports of

11   instances of unwelcomed sexual advances,

12   solicitation of sex, lewd and vulgar text messages

13   of a sexual nature, unwanted touching in a

14   provocative manner, unprofessional remarks to

15   employees, including but not limited to degrading

16   nicknames and recommendations of employees to dress

17   inappropriately, threatening behavior, retaliatory

18   discharge and punishment for these employees that

19   refuse to participate."

20         Was that also the findings of the

21   investigation?

22   A.    Well, the first sentence notes that these

23   reports allege.  So, that's what this censure is

24   about.  There's language in here that if these

25   things did happen, then, yes, we are censuring him.

1  Q.     The next paragraph I do want to point out

2  says, "These reports are supported by five sworn

3  statements taken under oath, two additional sworn

4  affidavits, and a handwritten statement by the

5  husband of one of the female employees."  Right.

6  "If true, these allegations may constitute an

7  unlawful employment practice."

8         Do you not believe that these ladies are

9  telling the truth in these statements that they

10  gave?

11  A.     I do not know.

12  Q.     Do you have any reason to believe that they

13  are falsifying these statements or lying?

14  A.     I'm not alleging that at all.  I do know that

15  that particular sentence about the husband, the

16  husband never mentioned anything about any sexual

17  impropriety.  What he noted to me was that she

18  needed a full-time job.  She had been an intern.

19  She was part-time.  And he felt like she was more

20  qualified.  I offered to help him, which I did.  I

21  suggested that he have his wife bring a resume.  And

22  I suggested that perhaps he did not know about her

23  qualifications.  And then --

24  Q.     Did --

25  A.     -- as an assurance, I asked that she bring --

1   Q.      I know --

2   A.      -- that letter to my office as well.

3   Q.      Ms. Frank, I know we can talk about the

4   husband.  But we've seen the statements from the

5   women.

6   A.      Yes.

7   Q.      Okay.  They're vulgar.  They're horrible.

8   A.      Absolutely.

9   Q.      It's talking about oral sex and all kinds of

10  things he wants to do to them.

11          Have you seen the text messages that he's

12  saying he wants to shoot things in their mouth and

13  things of that nature?

14          I mean, you don't think anybody fabricated

15  these text messages and said they were Mr. Jones'

16  do you?

17  A.      I do not.  But I also do not know the extent,

18  because I did not see any investigation of if it was

19  in fact consensual.  I'm aware that as part of that

20  investigation, she did share texts of her chest.

21  And I did talk to someone about, you know, sexual

22  harassment, what does -- as I have a duty to the

23  taxpayers in Anderson County, what does it actually

24  mean?  And if -- to me, I'm not in the position to

25  be the final say of, was it consensual or not.  I

1  didn't have access --

2  Q.      So, you think --

3  A.      -- to all of that information with regard to

4  Ms. Harness?

5  Q.      You think perhaps that they wanted it from

6  Mr. Jones?

7  A.      I'm not saying that at all.  I'm talking --

8  Q.      You're saying --

9  A.      -- specifically about the text with

10  Ms. Harness that --

11  Q.      Where she --

12              THE COURT:  Counsel, counsel, counsel.

13              MR. STANLEY:  I'm sorry, Your Honor.

14              THE COURT:  You see this court reporter

15  here?  She's trying to do her best to take down what

16  is said in this room.  And I think she's done a very

17  good job.  But it is humanly impossible and it's

18  impossible for her to take down what the witness is

19  saying and take down what you're saying if you're

20  both talking at the same time.

21              You put the witness on the stand and

22  you're asking her questions.  Let her finish her

23  answer.

24  BY MR. STANLEY:

25  Q.      Are you referring to the text where she said

1  she had a sick child and she needed this job to make

2  it?

3          And then the next one, he says, "Send me a

4  picture of your chest."

5          Is that what you're referring to?

6  A.      I don't know.  If you could put it up there,

7  I can take a look at it.

8  Q.      Well, you realize he has the power to fire

9  these women, right?

10 A.      Yes, sir.  I recognize that, yes.

11 Q.      If he says, "hey, send me a -- oh, you've got

12 a sick child; send me a picture of your breast."  He

13 could fire them the next day, couldn't he, if they

14 didn't do it?

15 A.      Yes.  Conceivably, yes.  It would be wrong.

16 Q.      Oh, I just thought you said that if someone

17 concedes to it, it's not sexual harassment.  I must

18 have misunderstood you.

19 A.      Well, I'm saying I don't know if

20 Ms. Harness -- I don't know if there's a full record

21 of the Snapchats.  My understanding is the way they

22 work is they disappear, so ...

23 Q.      So the only evidence you have is negative

24 towards Mr. Jones.  You don't have anything negative

25 towards Ms. Harness or anyone else?

1  A.    I don't understand what you're saying.

2  Q.    You're saying there's no evidence preserved.

3  There's stuff out there that we don't know about.

4  But what we do have, we saw what he was doing to

5  these females, correct?

6  A.    Yes.  I saw their statements.

7  Q.    Okay.  And, in fact, this last statement --

8  this one was really bad.

9           MR. STANLEY:  I would like to move this

10  into evidence.

11           MR. KNIGHT:  26.

12           MR. STANLEY:  What is it?

13           MR. KNIGHT:  26.

14           MR. COLLINS:  It's Exhibit 26.

15           MR. STANLEY:  Exhibit 26.

16           (WHEREUPON, a document was marked as

17  Exhibit Number 26.)

18  BY MR. STANLEY:

19  Q.    So you know about Angela Brown moving

20  forward.  And, of course, Gail Harness.  And then

21  all of a sudden you had Kaylee Winstead.  She

22  testified.  She's got a statement that's into

23  evidence.  You've got Tracy Spitzer.  She testified.

24  She has something -- a statement in evidence.  You

25  have a Valerie Walker.  And then you have

1  "anonymous", and this has been moved into evidence.

2  And that's September the 7th of 2017.

3       Two or three months after this, you signed a

4  petition to have Mr. Jones reelected?

5  A.    When did I sign the petition?

6            MR. KNIGHT:  Objection as to

7  mischaracterization of a document.  Plus, relevance.

8            THE COURT:  There's not a question on

9  the floor.  The witness' response to the question

10  as, when did I sign a petition.  So that's the

11  response to the question.

12           MR. COLLINS:  Stan, that is Exhibit 59.

13           MR. STANLEY:  I'm missing it.

14           MR. COLLINS:  And her signature.  I

15  think she's on the fifth page.

16           MR. STANLEY:  Can you print it up for

17  me?

18  BY MR. STANLEY:

19  Q.    Well, while we're waiting, you have your own

20  candidate nominating petition, did you not?

21  A.    Pardon?

22  Q.    You have your own candidate nominating

23  petition, correct?

24  A.    Yes, sir.

25  Q.    And that would be the one from 2018, correct?

1    Or, I'm sorry, 2017.

2    A.    Is that when -- is this my petition or

3    Mr. Jones' petition?  My petition?

4    Q.    Yes.  And he was one of the signatories to

5    have you reelected, correct?

6    A.    Yes, sir.

7    Q.    And you're saying you don't remember signing

8    a petition to have him reelected even after all of

9    these statements were made?

10   A.    Well, that's my petition running for office,

11   which you've shown that to me.  And I was asking

12   when I signed his.

13            MR. STANLEY:  Can you switch it to

14   the --

15   BY MR. STANLEY:

16   Q.    This is William Jones.  It looks like it's

17   November 20th, 2017.

18            MR. STANLEY:  If you could go down.

19   BY MR. STANLEY:

20   Q.    Teresa Frank?

21   A.    Yes, sir.

22   Q.    Is that you?

23   A.    Yes, sir.

24   Q.    So, are you aware that you actually donated

25   money to his campaign, as well, after all of these

*April Lassiter-Benson, RPR, CSR, LCR*

1  statements came out?

2  A.    Well, when did I donate to his campaign?

3  Q.    It looks like January the 30th of 2018.  Does

4  that sound familiar?

5  A.    Okay.  And that is important, because I did

6  not know about the investigation.  I knew about

7  Angela Brown.  I was a participant in that

8  investigation in May where the HR Director did

9  report to me.  I did encourage him to get training.

10 But these dates, when I had all of the information

11 on all of these investigations and statements, was

12 not until the presentation to County Commission, to

13 the best of my recollection.  I even wrote the

14 Comptroller's Office and questioned many aspects of

15 that.

16 Q.    What made you question many aspects of that,

17 the fact that they kept the investigation from you?

18 A.    The timeline.  I was -- I questioned the

19 timeline of the investigation with regard to was it

20 in compliance with the Anderson County policy -- for

21 whatever policy you wanted to look at it, whether it

22 was the amended policy for, I believe -- you would

23 have to pull that up.  I'm just going from

24 recollection.  It was 15 days or 10 days.  But the

25 prior policy was that it would be swiftly and

1  thoroughly investigated.  And it was September,

2  until, I believe, February when it was presented.

3  So, I was unaware of everything but Angela Brown

4  until that time as far as an official complaint.

5  Q.     Didn't Mr. Bearden, Russell Bearden, come to

6  you with this newest complaint of Gail Harness and

7  you specifically said not to tell anybody, not to go

8  to legal, or to his superior?

9  A.     That is not accurate.

10  Q.     And he went around you and did it anyway,

11  didn't he?

12  A.     He alleged that about the Angela Brown one,

13  which was a closed investigation.  I did not know

14  about the Gail Harness complaint.

15          MR. STANLEY:  Can you switch it back --

16  BY MR. STANLEY:

17  Q.     Are you still part of the Anderson County,

18  I'm assuming, Executive Committee or part of the

19  party, I'm assuming, correct?

20  A.     Yes, sir.

21  Q.     And is Mr. William Jones, as well?

22  A.     Yes, sir.

23  Q.     And this is you, correct?

24  A.     Yes, sir.

25  Q.     And this is Mr. Jones?

1   A.      Yes, sir.

2   Q.      Is his wife a member of the party in any

3   role?  Is she chairman?

4   A.      She ran for chairman, but she did lose.  But

5   she is a member of the State Executive Committee,

6   which is a multi-county office.

7   Q.      This was taken, I think, in April of this

8   year.  Are you familiar with that?

9   A.      Yes.

10  Q.      Where were you at?

11  A.      That is at a Republican party reorganization

12  meeting.

13  Q.      You're not related to Mr. Jones, are you?

14  A.      No, sir.

15  Q.      Were you friends with him?

16  A.      I have been friends with him.

17  Q.      Okay.

18  A.      I'm friends with -- I try to be friends with

19  everyone in the County Courthouse that I have to

20  work with.

21  Q.      Even the ones that he abused?

22  A.      What does that mean?

23  Q.      Well, just based upon your censure, assuming

24  that to be true, you're friendly with him, too?

25  A.      Well, I did sign my name to his censure,

1    because if he did those things, he deserves to be

2    censured.

3              MR. STANLEY:  Your Honor, let me move

4    57.  That was the election commission of Ms. Frank

5    into evidence if there's no objection.  Exhibit 59,

6    which is the election commission of Mr. Jones, if

7    there's no objection.  And then Exhibit 60, which is

8    the photograph.

9              THE COURT:  Without objection --

10             MR. KNIGHT:  No objection.

11             THE COURT:  -- Exhibits 58, 59 and 60

12   are admitted.

13             MR. STANLEY:  I'm sorry, Your Honor, and

14   58, as well.

15             THE COURT:  I said 58.  58, 59 and 60.

16             (WHEREUPON, documents were marked as

17   Exhibit Numbers 57, 58, 59 and 60.)

18             MR. KNIGHT:  Your Honor, I'm going to

19   confine my examination to what Mr. Stanley talked to

20   Ms. Frank about.

21

22                   CROSS-EXAMINATION

23   QUESTIONS BY MR. KNIGHT:

24   Q.    The first thing I wanted to ask you, Mayor

25   Frank, is Exhibit 20, which has been moved into

*April Lassiter-Benson, RPR, CSR, LCR*

 1  evidence, and specifically, Attachment 7, you kept

 2  telling Mr. Stanley that there were -- was another

 3  sheet other than the one he showed you, and you

 4  couldn't read them.

 5          MR. KNIGHT:  May I approach and give her

 6  the 3-page attachment?

 7          THE COURT:  Please give it to our Deputy

 8  Clerk.

 9          MR. KNIGHT:  Okay.

10          (Handing documents to clerk.)

11  BY MR. KNIGHT:

12  Q.     Have you had a chance it read it?

13  A.     Oh, I'm sorry.

14          (Reviews document.)

15          Yes.

16  Q.     In that attachment, were you trying to find

17  out from Russell Bearden if there was a TBI

18  investigation of William Jones?

19  A.     Yes, sir.

20  Q.     And that was part of Exhibit 20 that you were

21  asked about, the front page.

22          Did he ever give you any answer?

23  A.     No, sir.

24  Q.     He also talked -- did he not also say that he

25  had attempted to get the information from Jay

1  Yeager?

2  A.     Yes.  Well, what I think he said -- yes,

3  because he references Jay for getting me into the

4  mess.

5  Q.     Okay.  And he calls Jay a name for getting

6  him into the mess?

7  A.     Yes.

8  Q.     But as we sit here today, are you aware of

9  any investigation, criminal investigation of

10  Mr. Jones?

11  A.     I am not.

12  Q.     Okay.  But you tried to find out through --

13  A.     I did.

14  Q.     -- your HR Director?

15  A.     Yes, sir.

16  Q.     On Exhibit 8, which I'll just put up here for

17  your e-mail to Mr. Bearden, I think the person who

18  called you was Rodney Harness, correct?

19  A.     Yes, sir.

20  Q.     Did you know Rodney Harness?

21  A.     I did not.

22  Q.     Did you know Gail Harness?

23  A.     No.

24  Q.     Did you know anything about the Harness' or

25  anything about Snapchats or anything about that?

*April Lassiter-Benson, RPR, CSR, LCR*

1  A.     No, sir.

2  Q.     Did you know anything about any sexual

3  harassment going on with Ms. Harness and Mr. Jones?

4  A.     No, sir.

5  Q.     Why was Mr. Harness calling you?

6  A.     He indicated that he had called some kind of

7  labor agency.  I don't recall which one.  I do

8  specifically remember that he said the Governor's

9  Office.  He had called the Governor's Office, and

10 the Governor's Office told him to call me.

11 Q.     Okay.  So you didn't dodge his call?

12 A.     No, sir.

13 Q.     Were you in the office when he called?

14 A.     Oh, I don't recall that.  I just know that I

15 received a message from my assistant, and I did

16 return his phone call.

17 Q.     So you weren't hiding from him, you wanted to

18 know what he had to say?

19 A.     Yes, sir.

20 Q.     And he was complaining about her being

21 part-time and she should be full-time as a clerk

22 working for Mr. Jones; is that correct?

23 A.     Yes.

24 Q.     You were asked about Snapchats, and you said

25 you didn't know -- and I'm in weird territory, too,

1  due to my age and my proficiency in Snapchatting.

2  But my understanding is they disappear by the person

3  who Snapchats?

4  A.    That's my understanding as well.  I don't

5  have that app.

6  Q.    And -- neither do I.

7      And they -- but you can save Snapchats, but

8  the person that you're Snapchatting gets

9  notification of that?

10  A.    I'm not familiar.

11  Q.    You can save them.

12  A.    Okay.

13  Q.    And what you were presented was what Gail

14  Harness had saved concerning what William Jones had

15  Snapchatted her; is that correct?

16  A.    Correct.

17  Q.    You do not have anything that Ms. Harness may

18  have Snapchatted to Mr. Jones, other than what she

19  saved, correct?

20  A.    That's correct.

21  Q.    Is that all you were saying?

22  A.    That was all I was saying.  I'm just saying

23  that I can't attest to any full conversation that

24  took place between the two.  All I can comment on is

25  what I saw and was presented as part of that

1    investigation.

2    Q.    Can you -- if you know, great.  How many

3    departments does the County have?

4    A.    We have approximately 500 employees outside

5    of the school system.

6    Q.    School system --

7    A.    I'm sorry.  It would be easier -- I don't

8    want to take up the Court's time, but it would be

9    easier if I write it down or say that we have Animal

10   Control, Fleet Services, the Sheriff's Department,

11   EMS.  When you say "Departments" --

12   Q.    Road department?

13   A.    Yes.  So, there are departments that are

14   under the Office of the Mayor, but then there are

15   all these separate fee officials where they're

16   elected constitutional officers.

17   Q.    Was William Jones elected?

18   A.    Is he?

19   Q.    Yes.  Was he?

20   A.    Yes, sir.

21   Q.    Is the Clerk's Office a fee office?

22   A.    Yes, sir.

23   Q.    And my understanding is your budget is

24   determined if you're a fee office by the fees you

25   take in?

1  A.      Yes.

2  Q.      And Mr. Jones was defeated in the primary by

3  Rex Lynch?

4            MR. STANLEY:  Objection, leading.

5            THE WITNESS:  Yes.

6  BY MR. KNIGHT:

7  Q.      You were asked about petitions to -- your

8  petition to run, Jones' petition to run for

9  reelection.

10           Can you explain how these petitions work in

11  terms of who signs them and how many signatures you

12  have to have to get on about -- my understanding is

13  all a petition does is get you on a ballot?

14  A.      It does.  And there's been a long-standing

15  controversy where some individuals believe that

16  signing a petition indicates support.  So, my office

17  is directly across from the election commission

18  office where you go and file for your candidacy.

19           And so, normally, when a candidate fills out

20  a petition, their first stop is to come into my

21  office.  And my assistant signs usually, and I

22  sign, if I'm there.  And it is not necessarily an

23  indication of support.  Sometimes it is, sometimes

24  it's not.  I've signed numerous individual's

25  petitions.  You know, it gives someone the right to

*April Lassiter-Benson, RPR, CSR, LCR*

1   be on the ballot and be rejected or accepted.  So,

2   I've always been willing to sign everyone's

3   petition who has asked me.

4   Q.     Democrat or Republican?

5   A.     Yes, sir.

6   Q.     And you are a Republican; is that correct?

7   A.     Yes.

8   Q.     But you have signed -- well, in the

9   Commission -- how many Commission members are there?

10  A.     There are 16 County Commissioners.

11  Q.     Do they have to have petitions to run also?

12  A.     They do.

13  Q.     And do you, if asked, would you sign anyone's

14  petition?

15  A.     Yes, sir.

16  Q.     You were also asked about Jones' wife, Amy,

17  as being Chairman of the Republican -- is it the

18  Convention Commission in Anderson County?

19  A.     She serves as a State Executive Committee

20  member.

21  Q.     Right.

22  A.     That's a state position.  So she puts her

23  name on the ballot to run in multiple counties, and

24  that was -- that's her position.

25  Q.     Okay.  My question was, did she run -- you

 1   mentioned when Mr. Stanley was asking you questions

 2   that she ran and she lost.  What was that?

 3   A.      She ran for County Chairman just recently.

 4   Q.      Okay.

 5   A.      So the picture he showed, she ran for

 6   chairman.  She actually did come to me and asked if

 7   I would support her.

 8   Q.      Right.  And what did you tell her?

 9   A.      I told her I would not support her.

10   Q.      Did you support someone else?

11   A.      I supported Myra Mansfield.  He was the

12   chairman in that picture.

13   Q.      Okay.  And is that why she's in the picture?

14   A.      Yes, sir.

15   Q.      Is that why he's in the picture?

16   A.      He was elected vice-treasurer by the body.

17   Q.      I assume as the Mayor of Anderson County, you

18   take lots of pictures?

19   A.      I do.

20   Q.      And that picture seemed to me, having tried

21   cases in Anderson County, that it was in one of the

22   courtrooms?

23   A.      Yes, sir.  The reorganization was held in

24   Judge Elledge's courtroom.  I actually facilitated

25   that with Judge Elledge.

*April Lassiter-Benson, RPR, CSR, LCR*

1    Q.    Okay.  And I'll just ask you this.  Does the

2    fact that they wanted this exhibit of a picture

3    admitted, events any type of support that you have

4    for William Jones?

5    A.    No, sir.

6    Q.    And it was your testimony that you did not

7    get any of the sworn statements collected by

8    Ms. Whitaker or Mr. Bearden, or, I think, Mr. Yeager

9    took Ms. Harness' statement until right around

10   February of 2018 when this resolution that

11   Mr. Stanley asked you about?

12   A.    Yes, that's my recollection.  I actually

13   reached out to Jay Yeager, the law director, and

14   asked for a copy, and he did make that available to

15   me.

16   Q.    And you signed it?

17   A.    The resolution?

18   Q.    Yes.

19   A.    Yes, sir.

20   Q.    In February -- at the meeting, I believe,

21   February 20th, 2018?

22   A.    Yes, sir.

23   Q.    And so, all this stuff that happened in 2017,

24   did you have any idea that he had sexually harassed

25   anyone?

1   A.      No, sir.  Other than the complaint of Angela

2   Brown, and that was a closed matter.

3   Q.      And in that resolution, is that the County --

4   this looks like it was at a Commission meeting --

5   A.      Yes, sir.

6   Q.      -- full of Commissioners.  Everyone is there.

7   It's a public meeting; is that correct?

8   A.      Yes, sir.

9   Q.      And you were there?

10  A.      Yes, sir.

11  Q.      And it was the Commission basically

12  pronouncing that any sort of behavior is not to be

13  tolerated, and if it happened, you're censured?

14  A.      Absolutely.  We wanted to make a strong

15  statement that Anderson County did not tolerate

16  sexual harassment.

17  Q.      Okay.

18          MR. KNIGHT:  One second, Your Honor,

19  please.

20          (An off-the-record discussion was

21  held.)

22          MR. KNIGHT:  That's it for my

23  examination, Your Honor.

24          THE COURT:  Redirect.

25          MR. STANLEY:  No, Your Honor.

*April Lassiter-Benson, RPR, CSR, LCR*

```
 1              THE COURT:  If there's no redirect
 2   testimony, that means your testimony during the
 3   Plaintiff's case is concluded.  You may return to
 4   your seat.
 5              (Witness excused.)
 6              THE COURT:  Call your next witness.
 7              MS. BAILEY:  Plaintiff calls Amy Ogle.
 8              (WHEREUPON, the witness was sworn in by
 9   the Court Clerk.)
10                        * * *
11                   AMY CARR (OGLE),
12   was called as a witness, and after having been duly
13   sworn, testified as follows:
14
15                   DIRECT EXAMINATION
16   QUESTIONS BY MS. BAILEY:
17   Q.     Please introduce yourself to the jury and let
18   them know where you work.
19   A.     I work at PSI Probation in Clinton.
20   Q.     Is that for the Anderson County Clerk's
21   Office?
22   A.     No, ma'am, it isn't.
23   Q.     Did you ever work for the Anderson County
24   Clerk's Office?
25   A.     Yes, I did.
```

1  Q.      When did you work for them?

2  A.      I started in 2016.

3  Q.      How long did you work for them?

4  A.      I left in December of 2019.

5  Q.      Why did you leave?

6  A.      I had a better job opportunity.

7  Q.      Now, at some point did you leave and come

8  back to the Clerk's Office?

9  A.      I actually was -- I was placed on FMLA due to

10 vertigo.  I was having a lot of medical problems.

11 And so, I was placed on FMLA.  And then, I went back

12 to work.  I went back and I was told to go to the

13 Sheriff's Department to work.  I was still with

14 Anderson County, but I went to the Sheriff's

15 Department to work up there because of what was

16 going on.

17 Q.      So you were not trying to get back to being a

18 subordinate of Mr. Jones'?

19 A.      No, I was not.

20 Q.      Did you ever give a statement to the Anderson

21 County about your experiences?

22 A.      I did.  Kim Jeffers come to me and ask me if,

23 you know, if there was anything going on.  And I

24 told her no, because I was embarrassed and ashamed.

25 And then after I thought about it, I thought, well,

 1  maybe I should have said something.  But a couple of

 2  days went by and I was approached by my husband,

 3  which is now, had gotten a phone call from William

 4  Jones asking us to meet him at Arby's in Clinton so

 5  that I could write a statement saying that there was

 6  no sexual harassment being done.

 7         And so, we met him.  And whenever we met

 8  him, he asked me, you know, if I would do it.  And

 9  I was in fear of my job.  And I was like, yes, I

10  will.  But before we left the parking lot, I told

11  him -- I told my husband -- I broke down and

12  started crying.  I said, "I can't do this, because

13  I can't allow my girls to ever have to go through

14  this."

15  Q.     And when you were talking about sexual

16  harassment, were you talking about sexual harassment

17  of yourself?

18  A.     Yes.

19  Q.     Tell me what happened with that.

20  A.     William -- every morning before I'd get up, I

21  was actually getting my daughter on the school bus

22  to get to work.  He would either send me a message,

23  "Good morning beautiful," or, "Good morning sexy."

24         Then I would get to work.  I was, you know,

25  in fear of my job, because at the time I was fixing

*April Lassiter-Benson, RPR, CSR, LCR*

 1  to go through a divorce, and I needed my job at the

 2  time.

 3        And I never would respond back to him.  And

 4  then things just started to occur more and more.  I

 5  worked in juvenile court.  He would come over -- he

 6  put me -- actually, he made a desk in the very back

 7  for me away from the other four girls.  And then,

 8  like, at some point during the day he would come

 9  over, and he would pull a chair right beside of me.

10  And he would be right on top of me and then he

11  would start rubbing my thigh with his hand.

12  Q.    And I see you're adjusting your mask.  If

13  you're more comfortable to take it off, you can do

14  that.

15  A.    Okay.  Yeah, it keeps getting in my mouth.

16  Thank you.

17  Q.    Was it common knowledge or did others in the

18  office know that you were having marital issues at

19  the time?

20  A.    The others knew.

21  Q.    Did Mr. Jones know?

22  A.    His chief deputy -- actually, her husband and

23  my husband at the time, worked together.  So, I'm

24  sure that William had gotten word that, you know, I

25  was having problems.  We was getting ready to get

1    divorced and stuff.  And I had also picked up their

2    insurance.  So, that kind of -- because my husband

3    was fully covered and I was fully covered.

4    Q.    Who was his chief deputy?

5    A.    Angela Metcalf.

6    Q.    Did you and Mr. Jones ever go to lunch

7    together?

8    A.    Yes.

9    Q.    Tell me about that, please.

10   A.    He would come to me around mid-morning and

11   ask me if I'd go to lunch with him.  And I would be

12   like, well -- and, honestly, I would sometimes have

13   plans.  And I was like, well, this is my boss.  If I

14   don't go, I may get fired.  So I would go with him.

15   He'd like we'll run to General Sessions in Oak

16   Ridge.  So, we'd go down there.  And then, he would

17   either take me to Calhoun's or Chick-fil-A or

18   something like that.

19   Q.    Was there a time when you stopped going to

20   lunch with him?

21   A.    There was because his chief deputy, actually,

22   I was coming across the road from juvenile, and his

23   chief deputy stopped me in the parking lot and told

24   me to get into her vehicle.  It was cold outside and

25   she told me to get into her vehicle where it was

 1  warm.  And she approached me, and she said, I'm just

 2  going to let you know, you don't have to go to lunch

 3  with William when he asks you to go.  She said, you

 4  can make up and say --

 5              MR. KNIGHT:  Objection.  Hearsay.

 6  Ms. Metcalf is not a hiring official.

 7              THE COURT:  Ms. Bailey.

 8              MS. BAILEY:  She is a chief deputy, Your

 9  Honor.  She's an agent of the County.

10              MR. COLLINS:  It's also an apparent

11  statement.

12              MS. BAILEY:  And it's also a statement

13  of interest.

14              THE COURT:  Overruled.

15  BY MS. BAILEY:

16  Q.     Continue, please.

17  A.     So I got into the vehicle.  And she said,

18  "You don't have to continue going to lunch with

19  William.  Just tell him that you've got other plans

20  that you have to do on your lunch break."

21  Q.     When you told him no, how did he react?

22  A.     So the first time after that I told him, "No,

23  that I had plans," and he got mad at me.  He made my

24  job hard for three days.  He wouldn't speak to me.

25  Every time he would see me, he would roll his eyes

1  at me and just give me the cold shoulder.

2  Q.     And going back to the text, did you always

3  respond or did you ever respond to him?

4  A.     I did at the beginning.  And then it got to

5  where I was like, no, this is getting a little too

6  far fetched.  So I would just leave my phone turned

7  over just like I didn't see it.

8  Q.     How did he respond to that silence?

9  A.     He would actually come back into the office

10  and ask me if I had checked my phone.  And I'm like,

11  no, I'm working.  And he would just be like, "Well,

12  I've asked you something on your phone.  You need to

13  look at it."  And then I would not respond back.

14  Q.     Did he ever make any remarks about your

15  shyness?

16  A.     Yes.

17  Q.     What did he say?

18  A.     He was constantly telling me that he was

19  going to get me out of my shyness.  Because he would

20  ask me for pictures.  He actually -- what happened

21  was, he asked me to go to his tanning salon to tan.

22  And I told him I didn't need to go to his tanning

23  salon because I had my own.  And then that led into

24  him asking me for photos of me in my tanning bed.

25  Q.     Did he send you photos of him?

1   A.      He sent me photos of him in his tanning bed.

2   Q.      Was he dressed or --

3   A.      No, he was nude.  But he had just a little

4   enough on him to keep him from being seen on his

5   privates.

6   Q.      So, going -- I'm sorry I'm jumping around.

7   But going back to the statement about your shyness,

8   what did you take that to mean?

9   A.      I took it as if he was going to try to get me

10  out of my shyness to try to do something with him.

11  Q.      Something like what?

12  A.      Or sending pictures or something to him.

13  Q.      Did he send you pictures any other time?

14  A.      Yes.  He was all the time sending me pictures

15  in suits like if he was out at conferences, places,

16  things like that.  He was all the time sending me

17  pictures, photos of his personal life, you know, of

18  what he was doing.

19  Q.      Did he ever ask you to accompany him to a

20  conference?

21  A.      He did.  He went on a 3-day conference in

22  Gatlinburg.  He said that Amy Jones, which is his

23  wife, wasn't going to be able to attend, because she

24  had to keep the grandbaby, and he wanted me to come

25  and stay with him that weekend.  And I proceeded to

1  tell him I had two daughters of my own.  I didn't

2  leave 'em, and I wasn't going to leave 'em, and I

3  was married at the time.

4  Q.     Let's discuss a little bit more about his

5  interactions with you.

6         Did he ever discuss sex with you?

7  A.     He never discussed sex with me.  He

8  would -- he was always discussing about how he liked

9  his thing sucked; how he liked it either swallowed

10  and all that.  And then he would ask me, which way

11  did I do it; which way would I prefer.

12  Q.     Did he ask to see other pictures of you naked

13  or body parts or anything?

14  A.     So, I went on vacation, which is now my

15  husband now.  We had went on a little vacation.  I

16  can't remember if it was Memorial Day or 4th of July

17  weekend.  We got an extended, you know, holiday.

18  So, we left on the weekend.  And I had asked for

19  Tuesday off.  That would give us time to travel back

20  so we wouldn't be in all the traffic.  And he sent

21  me a Snap- around -- it was on a Monday.  He sent it

22  around 5:00 or 6:00.

23         He said, "If you don't send me a picture of

24  your breast, you need to be back to work Tuesday

25  morning or else you won't have a job."

1   Q.      Was that normally how he operated?

2   A.      Yes.

3   Q.      At some point did you get a raise?

4   A.      I did.  He kept -- he kept giving me raises.

5   And then he got to the point where he said, I'm

6   going to get you out of your shyness before you got

7   your next raise.  And I never got another raise.

8   Q.      What did you take that to mean?

9   A.      I took it as if I didn't do something sexual

10  with him, that I wasn't going to get a raise.

11  Q.      So this was his pattern to ask you for

12  something sexual.  And if you say no, deny you a

13  raise or day off or give you some kind of

14  punishment?

15  A.      Yes.

16  Q.      That's the way he ran this office?

17  A.      Yes.

18              MR. KNIGHT:  Objection to leading.

19              THE COURT:  Sustained.

20  BY MS. BAILEY:

21  Q.      You said that you engaged in this activity

22  only because you feared for your job?

23  A.      Yes.

24  Q.      What was that atmosphere like as far as

25  people having any kind of job security in that

April Lassiter-Benson, RPR, CSR, LCR

1  office?

2  A.    I really didn't feel like we had any job

3  security.

4          MR. KNIGHT:  She can answer for herself,

5  Your Honor, but to what other people feel or not

6  feel, how would she know that?

7          MS. BAILEY:  She can testify to what the

8  general feeling is around there.  People may have

9  spoken to her.  She may have observed things that --

10          THE COURT:  All that may be true, but

11  she hasn't testified to any of that.  Mr. Knight is

12  correct that she can testify to her own

13  observations, her own perceptions.  And if she has

14  talked to other people, and she's in a position to

15  offer an opinion as to what other people think, then

16  she might be able to do that.  But she hasn't

17  testified to any of that.

18  BY MS. BAILEY:

19  Q.    Did you see other things -- any interactions

20  with him and other clerks in the office?

21  A.    Yes, I did.  I mean, to an extent, but not --

22  I didn't really, I guess, pay enough attention,

23  other than I was focused on what he was doing to me.

24  Q.    Did you see if any other clerks were on

25  standby thinking they may get fired?

*April Lassiter-Benson, RPR, CSR, LCR*

1          Was there something that showed that?

2   A.     Yes, there was a --

3                MR. KNIGHT:  Objection, leading.

4                THE COURT:  Sustained.

5   BY MS. BAILEY:

6   Q.     Was there anything -- what, if anything, did

7   the clerks do that made you think people were afraid

8   for their job security?

9   A.     Like, I had one manager, she would -- like,

10  would -- she would really, like, do anything and

11  everything that he would ask her to do.  And he

12  would always take her to the back room.  I don't

13  know -- I mean, I can't say because I didn't see.

14  But he would take her to the back room, and I don't

15  know what would happen.  But then everything would

16  be okay once they come back out.

17  Q.     Okay.  I think I've asked you, or if I

18  didn't, I'm asking you now.

19         You did give a statement?

20  A.     I did.

21                MS. BAILEY:  May I have Exhibit 36,

22  please.

23  BY MS. BAILEY:

24  Q.     Is this a copy of your statement as you

25  remember it?

1  A.     Yes, it is.

2            MS. BAILEY:  I'd like to move Exhibit

3  Number 36 into evidence.

4            (WHEREUPON, a document was marked as

5  Exhibit Number 36.)

6            THE COURT:  Without objection, it's

7  received.

8  BY MS. BAILEY:

9  Q.     I just want to talk about a couple of things

10 in your statement.  There's a portion where you talk

11 about him asking you to crawl under his desk.

12 A.     It was actually -- it was a desk that he

13 had -- he had moved me out of General Sessions into

14 a single office where I was away from everyone.  It

15 was my desk that I was actually setting up.  And he

16 told me to crawl under to the desk so I could hook

17 the modem up and the wires and stuff to the base.

18 And I crawled under there, and he was actually

19 standing in the office.  But by the time I got

20 everything hooked up, he had sat down into the

21 office chair and had scooted himself close to the

22 desk.  And I was underneath there, and when I

23 started to crawl out, I turned around and I seen him

24 there.  And he said, the top of your head looks

25 really good, he said, but it would look even better

1  if you was sucking.  And he pointed and said it to

2  me.  It scared me so bad.  I started crying 'cause I

3  was afraid he was going to shut the door behind me.

4  And I went running out to the girls out in General

5  Sessions.  And the manager about three or four

6  minutes later, she pulled me back to the lunchroom

7  and asked me if I was okay.  And I told her, "Yes."

8  But I was afraid to say anything, because I was

9  afraid if I did, then he would fire me.

10  Q.     How tall is William Jones, if you know?

11  A.     Probably around 5'10", 5'11".

12  Q.     How tall are you?

13  A.     5'3".

14  Q.     About how much does he weigh?

15  A.     He probably weighed around 235.  230, 235,

16  240 something.

17  Q.     Would you say he's an imposing figure?

18  A.     Yes.

19  Q.     Now, later that same day, did he ask you to

20  meet him?

21  A.     He did.  That same day he went to his office.

22  It was about two or three hours later.  He come back

23  to my office and he asked me to meet him at the

24  Git'N Go on South Clinton.  It scared me to death.

25  I told him, "No."

1      I said, "My mom and dad is bringing my girls

2  to me and meeting me here in the parking lot.

3  We've got plans this evening."

4      So, once William leaves my office and goes

5  into the actual General Sessions part, I get on the

6  phone and I call my mom and I'm frantic.  I'm

7  telling her to get down there immediately to bring

8  the girls to me, because I was afraid William would

9  be outside watching me to see if I really was

10  getting my daughter -- getting my two girls.

11  Q.      So you used your mom and your little girls as

12  a diversion sort of?

13  A.      To -- yeah.

14  Q.      Was there another scenario where he asked you

15  to meet him outside?

16  A.      He did.  It was probably two or three months

17  later he had asked me to meet him at Git'N Go in

18  South Clinton once again on my lunch.

19  Q.      Did you go?

20  A.      No, I did not.

21  Q.      Did he ever ask you -- we've heard a lot

22  about what he likes in wardrobe.  Did he ever talk

23  to you about yours?

24  A.      He did.  He called me to his office once.  I

25  had a blue shirt on.  It was long and it had come

April Lassiter-Benson, RPR, CSR, LCR

1   down almost to my knees with cream colored leggings

2   and brown boots.  And he called my office and told

3   me that I needed to get to his office.

4         So, I went to his office.  And when I got

5   there, he told me to shut the door behind me, which

6   I did.  I sat down.  And he said, "You need to

7   stand up."

8         He said, "Somebody's complained on your

9   outfit."

10        He said, "It's not appropriate for you to be

11   wearing it here."

12        And I stand up, and he says, "I need you to

13   turn around and pull your shirt up."

14        So, me being afraid, I did what he asked.  I

15   turned around and pulled my shirt up.  And he told

16   me, he said, "I think it looks very nice."

17  Q.    When you were hired, did you ever receive an

18  employee handbook?

19  A.    I do not recall ever receiving one.

20  Q.    Do you recall ever being told how to report

21  sexual harassment?

22  A.    I was never told.

23  Q.    Did you ever see any signs telling you how to

24  report sexual harassment?

25  A.    No, I did not.

April Lassiter-Benson, RPR, CSR, LCR

1  Q.     Was William Jones the person that established

2  the policies, procedures, customs, work things,

3  anything that had to do with the Clerk's Office?

4  A.     Yes.

5  Q.     Was he the final say?

6  A.     Yes, he was.

7  Q.     Why did it take you so long to file a

8  complaint?

9  A.     I was a single mother at this point.  I was

10  in fear of losing my job, and I knew I had to make a

11  living for my daughters.  And not only that, I was

12  embarrassed.

13  Q.     Why were you embarrassed?

14  A.     I just felt disgusted.

15         MS. BAILEY:  May I have a moment, Your

16  Honor?

17         THE COURT:  You may.

18         MS. BAILEY:  Pass the witness.

19         THE COURT:  Cross-examination.

20

21              CROSS-EXAMINATION

22  QUESTIONS BY MR. KNIGHT:

23  Q.     So, I just have a few questions.  First of

24  all, these group of lawyers representing you in a

25  lawsuit against Mr. Jones and the County --

1    MS. BAILEY:  Objection, relevance, Your

2  Honor.

3    MR. KNIGHT:  It is relevant.

4    THE COURT:  Mr. Knight, there's an

5  objection.  Let's take up the objection.  What's the

6  basis for the objection?

7    MS. BAILEY:  Relevance.

8    THE COURT:  Mr. Knight.

9    MR. KNIGHT:  If Gail Harness is

10  successful in any way --

11    THE COURT:  I think your answer is, it

12  shows bias; is that right?

13    MR. KNIGHT:  Yes, bias.

14    THE COURT:  The objection is overruled.

15  Proceed.

16  BY MR. KNIGHT:

17  Q.    Isn't that true, Ms. Ogle?

18  A.    I'm sorry?

19  Q.    That you are represented by these lawyers in

20  a lawsuit against Mr. Jones and the County?

21  A.    Yes, I am.

22  Q.    I'm sorry.  I keep calling you Ms. Ogle.

23  You've been married.  It's Carr now, right?

24  A.    Carr, yes, sir.

25  Q.    Sorry.

1    The first time you filed the lawsuit, it was

2  voluntarily dismissed, do you --

3            MS. BAILEY:  Object to relevance, Your

4  Honor.

5            THE COURT:  Mr. Knight.

6            MR. KNIGHT:  The relevance is that

7  after -- if I get some leeway, I think I can show

8  the relevance.

9            THE COURT:  I've allowed you to explore

10  this because of the possibility of bias.  The fact

11  that the lawsuit was voluntarily dismissed, does

12  that also go to bias?

13            MR. KNIGHT:  I think it does, Your

14  Honor.

15            MS. BAILEY:  I don't know how, Your

16  Honor.

17            THE COURT:  Well, let's find out.

18            So, Mr. Knight, proceed.

19  BY MR. KNIGHT:

20  Q.    Your lawyer entered this exhibit, which is a

21  statement by you March 23rd, 2018; is that correct?

22  A.    Uh-huh (affirmative).  Yes.

23  Q.    Now, you went back to work in the Clerk's

24  Office in late June of 2018, didn't you?

25  A.    I did.

*April Lassiter-Benson, RPR, CSR, LCR*

1  Q.     And Mr. Jones was still there, correct?

2  A.     He had actually -- Rex Lynch had taken the

3  office -- had won the election.

4  Q.     He had won the primary election, but was not

5  taking office until September the 1st?

6  A.     Right.

7  Q.     And you know that because even though you

8  made statements of sexual harassment and had filed

9  lawsuits just like Gail Harness, you ended up

10 getting a job with Rex Lynch, didn't you?

11 A.     I did.

12 Q.     And when Rex came in, he was confronted with

13 the budget, and he asked people to take pay cuts,

14 correct?

15 A.     Yes.

16 Q.     And you did, didn't you?

17 A.     Yes.

18 Q.     And he hired you?

19 A.     Yes.

20 Q.     And you ended up resigning?

21 A.     I did.

22 Q.     Was the fact that your first complaint was

23 voluntarily dismissed against Jones and Anderson

24 County, because you had gone back to work in the

25 same environment that you complained of in this

*April Lassiter-Benson, RPR, CSR, LCR*

1  statement?

2  A.     No, it was not.  I was tired of the

3  harassment from William Jones.  And I wanted

4  everything to just stop is the reason why.  I

5  thought maybe if I dropped the lawsuit, maybe

6  William Jones will leave me alone.

7  Q.     Well, you've brought it again --

8  A.     I did.

9  Q.     -- against Mr. Jones and Anderson County,

10  correct?

11  A.     I did.

12  Q.     And you're suing for money; is that correct?

13  A.     I am.

14  Q.     You recall writing a letter of resignation to

15  Rex Lynch and Angie Perez?

16  A.     I did.

17  Q.     And in that letter of resignation, I'll show

18  it to you.

19          MS. BAILEY:  Objection, Your Honor.  I

20  have not seen this document.

21          MR. KNIGHT:  There you go.

22          MS. BAILEY:  (Reviews document.)

23  BY MR. KNIGHT:

24  Q.     Do you recall what you wrote?

25          You were taking a job with

1  Attorney Lauren Biloski's office; is that correct?

2  A.     Yes, sir.

3  Q.     And in this letter you make no mention

4  whatsoever about Mr. Jones or sexual harassment or

5  anything, do you?

6  A.     No, because I had already taken that up with

7  HR.

8  Q.     Okay.  You had given your statement.  In

9  2018, you went back to work for Mr. Jones who had

10  been defeated in the primary, but was still in

11  office.  You got hired by Rex Lynch, and then you

12  went to take a better paying job, correct?

13  A.     Yes.

14  Q.     Did you ever say to any of your lawyers that

15  it's kind of hard to pursue a sexual --

16           MS. BAILEY:  Objection.  Attorney/client

17  privilege.

18           MR. KNIGHT:  Okay.

19           THE COURT:  Let's let him finish the

20  question first, okay.

21  BY MR. KNIGHT:

22  Q.     Did you know that one of your lawyers told me

23  that you dismissed your case, because it's kind of

24  hard to prove sexual harassment when you go back to

25  work for the alleged harasser?

April Lassiter-Benson, RPR, CSR, LCR

1          MS. BAILEY:  Objection, Your Honor.

2          THE COURT:  What's the objection?

3          MS. BAILEY:  It's hearsay.

4          MR. COLLINS:  It's hearsay, for one.

5          THE COURT:  Hold it.  Hold it.

6          MS. BAILEY:  Hearsay.

7          THE COURT:  Ladies and Gentleman, I

8  talked to the lawyers ahead of time to make sure

9  things go smoothly once we get into court, and we

10  don't have interactions like we're having now.  One

11  of the things we told the lawyers was that only one

12  lawyer will examine a witness and respond to

13  objections, so we don't have two lawyers, three

14  lawyers doubling up.

15          So, Ms. Bailey examined the witness, and

16  Ms. Bailey has to respond to all objections and

17  instructions from the Court, no other lawyers.  When

18  other lawyers do it, they just prolong things.  So

19  Ms. Bailey is the person in charge.  Ms. Bailey is

20  the one who decides what the objections are and what

21  the responses are to the objections.

22          Now, Ms. Bailey, there is an objection.

23  What's the basis of the objection?

24          MS. BAILEY:  Your Honor, hearsay.

25          THE COURT:  The objection is hearsay.

1    The witness is being asked to repeat a question that

2    one of the lawyers said to Mr. Knight.

3                    Mr. Knight, why is that not hearsay?

4                    MR. KNIGHT:  Because it goes to why

5    she -- they were asking the relevance of why she

6    dismissed her first lawsuit.

7                    THE COURT:  So you're not offering it

8    for the truth of the matter asserted?

9                    MR. KNIGHT:  No.

10                   THE COURT:  You're offering it for some

11   other reason?

12                   MR. KNIGHT:  Right.

13                   THE COURT:  Why would this witness know

14   anything at all about that statement?  This was a

15   conversation between the lawyer and you.

16                   Was she present when the conversation

17   took place?

18                   MR. KNIGHT:  No, I've never met her.

19                   THE COURT:  So why would she even know

20   about this conversation?

21                   MR. KNIGHT:  Because I thought it was

22   quite interesting that she would just dismiss her

23   case.

24                   MS. BAILEY:  Your Honor, I --

25                   THE COURT:  So you really don't have any

 1  basis to know if the statement was made or not made?

 2          MR. KNIGHT:  No, I do not know if she

 3  knows or not.

 4          THE COURT:  I'm going to sustain the

 5  objection unless she can demonstrate that she has

 6  some way of knowing whether the statement was made

 7  or not.

 8  BY MR. KNIGHT:

 9  Q.    Ms. Ogle, you have filed two complaints in

10  federal court against Mr. Jones and Anderson County.

11  You've complained about sexual harassment.  But when

12  it came time for Rex Lynch to decide which clerks he

13  wanted working for him, do you have any idea why

14  Ms. Harness was not retained by Rex Lynch?

15          THE WITNESS:  No, I do not.

16          MS. BAILEY:  Objection.  Speculation.

17          THE COURT:  The witness answered the

18  question, she does not.

19  BY MR. KNIGHT:

20  Q.    But you were?

21  A.    I were what?

22  Q.    You were --

23  A.    I was hired.

24  Q.    Yes.

25  A.    Yes.

*April Lassiter-Benson, RPR, CSR, LCR*

```
 1   Q.      By Mr. Lynch; is that correct?

 2   A.      Yes.  But I was also told that when Rex

 3   actually got in and started interviewing us all,

 4   that there wasn't going to be a position left for me

 5   if I didn't get back to my position in juvenile

 6   court.

 7   Q.      Okay.  But you did that?

 8   A.      I did.

 9   Q.      And everything up until you got a better

10   paying job went smoothly, didn't it?

11   A.      It did.

12           MR. KNIGHT:  That's all the questions I

13   have, Your Honor.

14           THE COURT:  Thank you.  Redirect.

15           MS. BAILEY:  Yes, Your Honor, very

16   briefly.

17

18              REDIRECT EXAMINATION

19   QUESTIONS BY MS. BAILEY:

20   Q.      When you gave that statement, had you filed a

21   lawsuit?

22   A.      No, I had not.

23   Q.      And as a matter of fact, were you not the one

24   approached to give the statement?

25           You didn't go to them to voluntarily give
```

April Lassiter-Benson, RPR, CSR, LCR

1  them a statement, did you?

2  A.     No.

3  Q.     And there's been much said about you going

4  back to the Clerk's Office.  Would you had gone back

5  if Jones had won and you had to work under him?

6  A.     No, I would not.

7              MS. BAILEY:  Nothing further, Your

8  Honor.

9              THE COURT:  Thank you.  You may step

10 down.

11             (Witness excused.)

12             THE COURT:  You may call your next

13 witness.

14             MR. KNIGHT:  Your Honor, Plaintiff calls

15 Kim Jeffers-Whitaker.

16             (WHEREUPON, the witness was sworn in by

17 the Court Clerk.)

18                      * * *

19         **KIMBERLY JEFFREY WHITAKER,**

20 was called as a witness, and after having been duly

21 sworn, testified as follows:

22

23                  DIRECT EXAMINATION

24 QUESTIONS BY MR. COLLINS:

25 Q.     Please introduce yourself to the jury.

1  A.      My name is Kimberly Dawn Jeffers-Whitaker.

2  Q.      Where do you work currently?

3  A.      Anderson County Government.

4  Q.      And what is your job title?

5  A.      I am the Director of Human Resources and Risk

6  Management.

7  Q.      And I understand before you became the

8  director, you were the Deputy Director of Human

9  Resources; is that right?

10  A.      That is correct.

11  Q.      And the Human Resources Department, I take

12  it, operates with all -- operates on behalf of all

13  the County Departments; is that right?

14  A.      We work in collaboration with the

15  departments.

16  Q.      But when it comes to like the Clerk's Office,

17  for example, the Clerk himself controls the terms

18  and conditions of the employment of those County

19  employees working in the Clerk's Office?

20  A.      Correct.

21  Q.      You interviewed multiple women with sexual

22  harassment complaints against Williams Jones; is

23  that right?

24  A.      Yes.

25  Q.      In fact, we just heard from Amy Ogle.  You

1    interviewed Amy Ogle, did you not?

2    A.      Yes, I received her statement.

3    Q.      Did you find these women to be sincere and

4    believable?

5    A.      Can you explain "women".

6    Q.      The complainants.  I'm sorry.

7    A.      Are we speaking specifically about Ms. Ogle?

8    Q.      I'm asking you whether or not you think these

9    complainants were telling the truth about what they

10   said Mr. Jones did?

11   A.      Yes, I felt like they were telling the truth.

12   Q.      And you've read the resolution censuring

13   Mr. Jones --

14   A.      Yes.

15   Q.      The County Commission's resolution?

16   A.      Yes.

17   Q.      In your opinion, did these women suffer --

18   were they subjected to a hostile work environment

19   under William Jones?

20            MS. BURCHETTE:  Objection.  You're

21   asking her to speculate.

22            MR. COLLINS:  Rule 704.

23            THE COURT:  I think that calls for a

24   legal conclusion.  Sexual harassment has a definite

25   meaning in the law.  I don't think that has meaning

```
 1  at all for lay people.  I think she's a layperson.

 2  So her understanding of what sexual harassment means

 3  may not be the same to what the Court is going to

 4  instruct the jury on.

 5           MR. COLLINS:  Thank you, Your Honor.

 6  Pass the witness.

 7

 8                    CROSS-EXAMINATION

 9  QUESTIONS BY MS. BURCHETTE:

10  Q.      Good afternoon, Ms. Whitaker.

11  A.      Good afternoon.

12  Q.      Now, when did you first start working for

13  Anderson County?

14  A.      It was in May of 2015.

15  Q.      And when were you promoted to Director of

16  Human Resources?

17  A.      It was either -- it would have been the end

18  of December of '17, I believe.

19  Q.      So, is it fair to say that you were promoted

20  in the middle of the investigation into the Clerk's

21  Office?

22  A.      Yes.

23  Q.      And when did you first learn of anything

24  happening -- any alleged wrong doing by Mr. Jones?

25  A.      It was when Ms. Harness first filed the
```

1    complaint.

2    Q.     And that was in September of 2017; is that

3    correct?

4    A.     The complaint was filed in August, and the

5    sworn statement was in September of '17.

6    Q.     And that was the first time you and HR, Human

7    Resources, had any knowledge of any of these alleged

8    wrongdoings by Mr. Jones?

9    A.     That was the first time that I had personal

10   knowledge, correct.

11   Q.     And then it was the Human Resources

12   Department that found the other victims, correct?

13   A.     Correct.

14   Q.     They didn't all just come forward.  You

15   sought them out?

16   A.     Correct.

17   Q.     And all of those other victims gave

18   statements after Ms. Harness in 2017?

19   A.     Correct.

20   Q.     And did you have any involvement with the

21   Angela Brown complaint?

22   A.     No, ma'am.

23   Q.     'Cause that happened a little bit before you

24   started; is that correct?

25   A.     I believe so.

1  Q.    And so, you as Director of Human Resources,

2  have no knowledge of any misdoings by Mr. Jones

3  until Ms. Harness made her complaint in August of

4  2017?

5  A.    Correct.  I just wasn't the director at the

6  time.

7  Q.    Yes.  Give me one second.

8          MS. BURCHETTE:  Your Honor, we will end

9  with this witness as long as we reserve the right to

10 call her in our proof.

11         THE COURT:  I'm sorry?

12         MS. BURCHETTE:  We will end with this

13 witness today as long as we can recall her in our

14 proof.  She is listed on our witness list.

15         THE COURT:  Very well.  That's the end

16 of your cross-examination, then?

17         MS. BURCHETTE:  Yes, Your Honor.

18         THE COURT:  Is there any redirect of

19 this witness?

20         MR. COLLINS:  No, Your Honor.

21         THE COURT:  Thank you, Ms. Whitaker.

22 You're free for today.  You may step down.

23         (Witness excused.)

24         THE COURT:  It's about 10 minutes until

25 the hour, Ladies and Gentlemen, so I think that we

```
 1   will end for the day.  We will resume tomorrow

 2   morning at 9:00.  Let me ask the Plaintiffs how much

 3   more time you think you need for your case in chief?

 4               MR. STANLEY:  I think we'll definitely

 5   get through tomorrow and maybe just a little after

 6   lunch.

 7               THE COURT:  Okay.  And will the Defense

 8   be ready to start tomorrow?

 9               MS. BURCHETTE:  We can be, Your Honor.

10               THE COURT:  Well -- and I would suggest

11   that you be ready to start about 10:00.  And Knight,

12   be ready to start at 1:00.  You've heard me say

13   this.  I do not like lag time in cases.  So have

14   your witnesses ready, so as soon as the Plaintiffs

15   finish, you can go ahead and start your case.

16               MS. BURCHETTE:  Yes, Your Honor.

17               THE COURT:  Is there anything else that

18   the parties need to take up with the Court?

19               MR. STANLEY:  No, Your Honor, not from

20   the Plaintiffs.

21               MR. KNIGHT:  No, Your Honor.

22               THE COURT:  So, that's it, Ladies and

23   Gentlemen.  We will have you back tomorrow.  And

24   from what you've heard the lawyers say, this case

25   may not take the five days.  I told you that this
```

1  morning.  So, be safe, get a lot of rest, and we'll

2  see you tomorrow morning at 9:00.

3              (WHEREUPON, the foregoing proceedings

4  were adjourned for the day at 4:49 p.m., to be

5  resumed June 22, 2021, at 9:00 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*April Lassiter-Benson, RPR, CSR, LCR*

# REPORTER'S CERTIFICATE

STATE OF TENNESSEE

COUNTY OF ANDERSON

       I, April Lassiter-Benson, Licensed Court Reporter, with offices in Memphis, Tennessee, hereby certify that I reported the foregoing Jury Trial of **GAIL HARNESS VS. ANDERSON COUNTY, TENNESSEE** by machine shorthand to the best of my skills and abilities, and thereafter the same was reduced to typewritten form by me.  I am not related to any of the parties named herein, nor their counsel, and have no interest, financial or otherwise, in the outcome of the proceedings.

       *I further certify that in order for this document to be considered a true and correct copy, it must bear my original signature, and that any unauthorized reproduction in whole or in part and/or transfer of this document is not authorized, will not be considered authentic, and will be in violation of Tennessee Code Annotated 39-14-104, Theft of Services.*

April Lassiter-Benson, LCR, CSR
Hands on Reporting & Video
LCR # 752 - Expires: June 30, 2022