1        IN THE UNITED STATES DISTRICT COURT
          FOR EASTERN DISTRICT OF TENNESSEE
2                  AT CHATTANOOGA

3    _____

GAIL HARNESS,
4
              Plaintiff,
5
vs.                          Case No. 3:18-CV-00100
6                            Case No. 3:19-CV-340
                             Jury Demand
7
WILLIAM T. JONES, individually
8    and in his official capacity;
     and ANDERSON COUNTY, TENNESSEE,
9
              Defendants.
10   _____

11

12

13

14                      JURY TRIAL

15                  Amended Volume II

16

17        BE IT REMEMBERED that the above-captioned
     cause came on for hearing, on this, the 22nd day of
18   June 2021, before the Honorable Senior Judge Curtis
     L. Collier, when and where the following proceedings
19   were had, to wit:

20

21

22   _____

23

24

25

                    *April Lassiter-Benson, RPR, CSR, LCR*

```
1              A P P E A R A N C E S

2

3    For the Plaintiff:

4            MR. DAN STANLEY
             MS. URSULA BAILEY
5            MR. RICHARD EVERETT COLLINS
             Attorneys at Law
6            Stanley, Kurtz & Collins, PLLC
             422 South Gay Street
7            Suite 301
             Knoxville, TN 37902
8            (865)522-9942
             dan@danchanningstanley.com
9            ubailey65@gmail.com
             richard@knoxvilleattorney.com
10

11   For the Defendant, Anderson County, Tennessee:

12           MR. ARTHUR F. KNIGHT, III
             MS. CAITLIN C. BURCHETTE
13           Attorneys at Law
             Taylor & Knight, GP
14           800 South Gay Street
             Suite 600
15           Knoxville, TN 37929
             amber@taylorknightlaw.com
16           cburchette@taylorknightlaw.com

17

18

19   COURT REPORTER:

20           APRIL LASSITER-BENSON, CSR, LCR #752
             2488 Bartlett Boulevard
21           Bartlett, Tennessee 38134
             (901)520-2531
22           handsonreporting@gmail.com

23

24

25
```

1

# I N D E X

2                                                              **Page**

3   Rule of Sequestration Invoked                              8

4   Motion to Dismiss Retaliatory Discharge Claim    10

5   Motion to Terminate                                        19

6   Motion for Judgment                                        223

7

8   **TESTIMONY OF RUSSELL BEARDEN**
    Direct Examination
9   By Mr. Stanley                                             21

10  Cross-Examination
    By Mr. Knight                                              46
11
    Redirect Examination
12  By Mr. Stanley                                             68

13

14  **TESTIMONY OF GAIL HARNESS**
    Direct Examination
15  By Ms. Bailey                                              78

16  Cross-Examination
    By Ms. Burchette                                           136
17
    Redirect Examination
18  By Ms. Bailey                                              184

19

20  **TESTIMONY OF AMANDA SURDOCK, PH.D.**
    Direct Examination
21  By Mr. Collins                                             189

22  Cross-Examination
    By Ms. Burchette                                           214
23
    Redirect Examination
24  By Mr. Collins                                             219

25

1                    E X H I B I T S

2                                                    Page

3   Exhibit No. 3                                     60
4       May 29, 2015 Report of Russell Bearden's
        concluding investigation regarding Angela
5       Brown

6   Exhibit No. 7                                    123
        August 9, 2017 Complaint of Gail Harness
7       regarding sexual harassment by William
        Jones

8   Exhibit No. 8                                    168
        August 9, 2017 Email from Angie Perez to
9       William Jones Critical of Gail Harness

10
    Exhibit No., Previously Marked 13                 30
11      March 5, 2018 Complaint of Nicole Lucas
        alleging sexual harassment by William
12      Jones

13  Exhibit No., Previously Marked 15                 42
        September 26, 2017 Report and Affidavit
14      of Russell Bearden with six attachments

15  Exhibit No. 18                                   151
        August 15, 2016 Employee Status Change
16      form, increasing Gail Harness' salary and
        making her full-time
17
    Exhibit No. 21                                    29
18      February 8, 2018 Email regarding HR
        Advisory Committee Minutes of October 12,
19      2016, in which neither William Jones nor
        Mayor Terry Frank attended or signed new
20      harassment policies

21  Exhibit No. 23                                   119
        February 9, 2017 Employee Warning Notice
22      for Gail Harness, signed by William Jones

23  Exhibit No. 27                                    23
        Anderson County Policy and Procedures on
24      Harassment

25

1                      **E X H I B I T S**

2                                                        **Page**

3     Exhibit No. 29                                      220
           United States Life Tables for 2017
4
      Exhibit No. 30                                      129
5          Collective Exhibit of all newspaper
           articles
6
      Exhibit No. 32                                       32
7          March 3, 2015 Notes of Russell Bearden
           regarding complaints against William
8          Jones, T & K Doc. Pro. 274

9     Exhibit No. 33                                    93,106
           Snapchat Messages between William Jones
10         and Gail Harness

11    Exhibit No. 35                                     42,44
           February 27, 2018 Affidavit of Russell
12         Bearden regarding May 2015 sexual
           harassment complaint and conversations
13         with Mayor Terry Frank, T & K Doc. Pro.
           2-3
14
      Exhibit No., Previously Marked 38                  36,40
15         March 14, 2018 Affidavit of Valerie
           Walker regarding sexual harassment by
16         William Jones, T & K Doc. Pro. 46-48

17    Exhibit No. 43                                        97
           March 22, 2018 Email Chain, T & K Doc.
18         Pro. 304-08

19    Exhibit No., Previously Marked 45                     99
           April 13, 2018 Memo by Kim
20         Jeffers-Whitaker regarding William Jones
           having a shotgun in his office, T & K
21         Doc. Pro. 331

22    Exhibit No. 48                                        99
           April 27, 2018 Email Chain regarding Gail
23         Harness' job status, T & K Doc. Pro.
           336-39

24

25

*April Lassiter-Benson, RPR, CSR, LCR*

1                        **E X H I B I T S**

2                                                              **Page**

3    Exhibit No. 51                                        133
4         Gail Harness' FMLA Certification form
          from CareHere Clinic Records

5    Exhibit No. 52                                        102
6         May 19, 2021 Video of William Jones
          Interview by Ron Meredith

7    Exhibit No. 55                                         36
8         Screenshot of April 13, 2021 Anderson
          County Republican Party Facebook post
9         (link:https://www.facebook.com/permalink.
          php?story_fbid=4634145626612144&id=113305
10        375362881

     Exhibit No., Previously Marked 56                     191
11        Dr. Amanda Surdock's CV

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        *   *   *
2               THE COURT:  I understand that counsel
3   had some matters they felt like would be beneficial
4   to discuss with the Court.
5               MR. COLLINS:  Yes, Your Honor.  We have
6   just a few things first.  First, the plaintiff
7   intends to withdraw or dismiss her retaliatory
8   discharge claim.  We believe that that will help
9   streamline things as we go forward.
10              One other thing that we wanted to
11  mention was that we'd like the Court to give the
12  instruction to the jury that, if you see lawyers in
13  the hallway, don't think they're being mean.
14  They're not.  They just can't communicate with you.
15  Because on the way out of here, we were in close
16  quarters with some of the jurors and I thought
17  that -- we obviously walked away and didn't say
18  anything to them.  So I'd like them to know that
19  we're not disagreeable people.
20              One of the exhibits that has been
21  submitted -- Exhibit Number 33 that was submitted,
22  has, inadvertently, some messages that were -- in
23  fact, violate this Court's order on a Motion in
24  Limine.  I think Docket 56 is the docket entry.  And
25  those page numbers are 61 through 65.  And so, we
```

1  are withdrawing those pages.  And we will have that

2  correction made on our end, but we wanted to let the

3  courtroom deputy know, Mrs. Lewis know that those

4  pages don't need to be included.

5          The other preliminary matter is, there

6  is an attorney listed as counsel of record for

7  plaintiff, Darren Berg.  We would ask the Court to

8  terminate his representation on the docket.  He

9  should no longer be counsel of record.  He has not

10  participated in this case since the filing of the

11  complaint, and we would like that noted on the

12  record and have him terminated as counsel of record.

13          Dr. Surdock is here today, who will be

14  testifying.  She is a clinical psychologist and a

15  treating -- who treats Gail Harness.  The defendant,

16  as I understand it, wishes to invoke the rule of

17  sequestration.  And so, I'd like to take that up, if

18  the Court please.

19          As Your Honor knows, under Rule 615, the

20  Court has wide latitude and discretion to allow a

21  witness to remain in the courtroom.  Rule 615

22  specifically says, Subpart (C):  A person whose

23  presence is shown by a party to be essential to

24  present in a party's claim or defense.

25          As the Court is aware, experts often

```
 1   fall in that category, not always.  But here, we do
 2   intend to ask Dr. Surdock some questions regarding
 3   what she observes from Ms. Harnness on the stand.
 4   And we think that's a proper exercise of the court's
 5   discretion, to allow Dr. Surdock to sit in for that
 6   testimony.  And as Your Honor is well aware, under
 7   Rule 703, experts such as Dr. Surdock, can base
 8   their opinions on things they learn at trial.  Which
 9   is specifically why the rules and decisional law
10   carve out this exception as to expert witnesses.
11            And the final thing that we have is,
12   Jones -- William Jones has filed a lawsuit against
13   Gail Harness, seeking his attorney's fees.  It is
14   quite possibly one of the most frivolous lawsuits
15   I've ever seen in my life.  It has absolutely no
16   merit and no legal basis whatsoever.
17            I would ask the Court -- my concern is
18   that they're going to bring this up today, this
19   other lawsuit, and I think it would be entirely
20   improper.  And so, I would ask the Court to issue a
21   ruling to that effect.
22            Thank you.
23            THE COURT:  Thank you.
24            Mr. Burchette, Mr. Knight.
25            MR. KNIGHT:  With regard to --
```

*April Lassiter-Benson, RPR, CSR, LCR*

```
 1              THE COURT:  Mr. Knight, do you have any
 2   objection, then, to the Motion to Dismiss the
 3   retaliatory discharge claim?
 4              MR. KNIGHT:  I mean, it's their lawsuit.
 5   It's the second lawsuit.  But I can't think of an
 6   objection.  I didn't know they were going to do that
 7   until five minutes ago, so ...
 8              I mean, if she doesn't want to bring it,
 9   she doesn't want to bring it, I suspect.  So, I
10   guess the answer is, "No."
11              THE COURT:  And this would be with
12   prejudice or without prejudice?
13              MR. COLLINS:  I think -- I mean, I would
14   like to say, "Without prejudice," Your Honor.  But I
15   think, in effect, it's with prejudice, I just don't
16   know that we -- I mean, I think it would be with
17   prejudice.
18              THE COURT:  Very well.  The Court, then,
19   will grant that request.  So the retaliatory
20   discharge claim is dismissed with prejudice.
21              You have any objection to the Court
22   instructing the jury that it is improper for counsel
23   and the parties to carry on any conversation with
24   the jurors or even interact with the jurors outside
25   of the courtroom?
```

*April Lassiter-Benson, RPR, CSR, LCR*

```
 1              MR. KNIGHT:  No, Your Honor.  I think
 2  that's very appropriate.
 3              THE COURT:  So the Court will do that.
 4              The request to have the expert witness
 5  remain in the courtroom; do you have an objection to
 6  that?
 7              MR. KNIGHT:  We would object to the
 8  extent it conflicts with what your prior practice
 9  is.  I know some judges allow an expert to stay in,
10  or a treating physician to stay in, and some don't.
11  So, the objection is limited in that scope.
12              THE COURT:  I don't know that I have any
13  prior practice.  To the extent that I do, it's based
14  on the rules of evidence.  In instances where the
15  experts remain in the courtroom, is because they're
16  going to base their testimony, in part, on what they
17  hear or observe in the courtroom.
18              For example, one expert is going to
19  opine on another expert's testimony.  And,
20  obviously, that expert has to either get a
21  transcript and read the transcript while she's in
22  the courtroom, to read it.
23              I don't know the circumstances here.
24  I'm assuming that the expert has been, if not
25  treating, at least examining the plaintiff for quite
```

1  sometime.  And the bulk of her opinion is going to

2  be based on the interaction with the plaintiff prior

3  to now, to the extent there might be something that

4  comes under the plaintiff's testimony that would

5  influence her opinion.  It's hard to understand what

6  that would be.  I guess it is possible, and to the

7  extent she already knows what the plaintiff's going

8  to testify to, and that probably has already been

9  added into her opinion.

10            And then, with the rules, as counsel

11  stated, the rule contemplates experts are going to

12  be allowed to remain in the courtroom, if they're

13  going to assist counsel or if their testimony's

14  going to be based on something that comes up during

15  the testimony.

16            MR. KNIGHT:  You know, I don't see how

17  they didn't raise that.  They said to observe

18  Ms. Harnness because she's not been treated in two

19  years.

20            MS. BURCHETTE:  2018.

21            MR. KNIGHT:  2018.  So, her opinions are

22  from observing Ms. Harnness in private and in her

23  office, and that's where -- and she's been deposed.

24  And that's what is the basis of her opinions, not

25  what she sees today.  And I don't know how she can

*April Lassiter-Benson, RPR, CSR, LCR*

```
 1   help counsel.  They didn't even mentioned that they
 2   needed her help.
 3               MR. COLLINS:  Well -- I'm sorry, Your
 4   Honor.  If I may.
 5               It really -- the reason we want her in
 6   the courtroom, I'll just -- it's no secret.  The
 7   diagnosis of post-traumatic stress disorder, there's
 8   a wide spectrum of symptoms.  There are -- we
 9   anticipate Ms. Harnness to testify to symptoms that,
10   perhaps Dr. Surdock has not seen or heard, because
11   there's such a full panel plate of things that
12   qualify as symptoms of post-traumatic stress.
13               And so, the intent would be to say,
14   "Dr. Surdock, you were here.  You listened to
15   Ms. Harnness' testimony.  She testified to "X", "Y",
16   and "Z", having this response on, say, a cue, for
17   example, is that consistent with your diagnosis of
18   post-traumatic stress disorder?  So, that would be
19   the purpose.
20               And then, yes, I mean, if she's
21   willing --
22               THE COURT:  Well, why does she have to
23   be in the courtroom for that question?  You can pose
24   hypothetical questions.
25               MR. COLLINS:  Well, sure I can, but ...
```

1        THE COURT:  I'm sure that that takes

2   into account, facts that have been presented in

3   court.  So why should she have to be in the

4   courtroom for that?

5        MR. COLLINS:  I think it would be good

6   for her to observe Ms. Harnness' mannerisms and

7   actually hear and see the testimony.  I really do.

8   But, of course --

9        THE COURT:  Isn't that true for every

10  witness, though?

11        It wouldn't be better for every witness

12  so they can see and observe the testimony of

13  previous witnesses?

14        MR. COLLINS:  Sure, but it would be

15  improper for me to elicit opinion testimony from a

16  lay testimony about observations that they made on

17  someone on the stand.  Here, we have a clinical

18  psychologist.

19        THE COURT:  It may not be opinion

20  evidence they'd be offering.  It may be evidence

21  that refreshed her recollection.  It may be things

22  that they have forgotten about.  It may be that the

23  previous witness articulates the facts better than

24  they did.  I mean, there are all kind of reasons why

25  you may want to observe somebody speaking before

1  you, other than to have them offer an opinion.  But

2  we don't allow witnesses to observe other witnesses,

3  even though it might be helpful.

4          MR. COLLINS:  But an expert may base his

5  or her opinions on observations made at trial.  This

6  is not -- Dr. Surdock's not an engineer, she's a

7  clinical psychologist who performs psychotherapy on

8  this plaintiff.  And I think that that is a proper

9  course for her to stay in here, listen to the

10  testimony so that I may ask her some questions on,

11  "What did you observe; is this consistent or

12  inconsistent with the diagnosis?"

13          But, again, it's the Court's discretion

14  under the rules.  Very, very clear on the cite, at

15  least in my book, there's a Holder vs. U.S., 150 --

16  no, U.S. vs. Olofson 563 F.3d 652.  This is a

17  Seventh Circuit case.

18          It says the Court, you know -- that Rule

19  703 allows this.  Rule 615 allows it.  A lot of

20  courts do, but, ultimately, it's the Court's

21  discretion.  And we ask the Court to exercise its

22  discretion in favor of allowing her to remain in the

23  courtroom.

24          Thank you.

25          THE COURT:  Counsel's brought to the

1    Court, the ruling.  That's Rule 615.  And 615

2    indicates that the Court must exclude witnesses.

3    But this rule does not authorize excluding a

4    person's presence that party shows to be central to

5    represent the party's claim or defense.  And case

6    law under this rule has held that experts may fall

7    within the exemption, if the party wishing to fall

8    under the exemption, can demonstrate that the

9    expert's presence is central to the presentation of

10   the party's case.

11            And as counsel also indicated, one of

12   the prime examples is where an expert whose opinions

13   are based upon the testimony of other witnesses,

14   qualifies under this exemption.

15            And so, to this point, this knowledge or

16   advice is needed by counsel from the testimony of

17   other witnesses.  And the party relying on this

18   exemption has the burden of establishing that the

19   witness is essential.

20            The example that the Court raised where

21   this comes up most frequently, is where one expert

22   is going to testify, based upon the testimony of

23   another expert, even to contradict the expert, or to

24   corroborate that expert's testimony.  And since the

25   opinion is based strictly upon what happens in the

1   courtroom, then that expert can be allowed in.

2              Here, we have, as the Court understands,

3   a medical expert who has been treating the plaintiff

4   for quite sometime.  And during the course of that

5   treatment, she's come to certain conclusions and

6   she's reached an opinion as to the witness'

7   symptoms -- the plaintiff's symptoms and the

8   prognosis.

9              Counsel would like to have the expert

10  remain in the courtroom to watch the plaintiff while

11  she testifies.

12             Sitting in a doctor's office, undergoing

13  an examination in the usual course of business, I

14  think is the way that psychiatrists and

15  psychologists generally conduct their business and

16  how they reach their decisions.  I'm not aware of it

17  being standard practice for a psychologist or a

18  psychiatrist to watch a person on a witness stand,

19  which is an extremely stressful situation.  It's a

20  high-stake situation.  They're under oath.  They're

21  also being watched by the public.  Their testimony's

22  being recorded.  And anyone in the world who wants

23  to get a copy of the transcript can read it.  And

24  will be subject to cross-examination.  That does not

25  seem, to the Court, to be an optimal way of

```
 1    determining what this person is exhibiting on the

 2    stand, is consistent or inconsistent with a medical

 3    diagnosis.

 4              So, the Court will not exempt the

 5    witness from the restrictions of 615, and the

 6    witness will be excluded.

 7              MR. COLLINS:  Just when we call --

 8              THE COURT:  And the other issue that we

 9    had was, Jones has apparently filed a lawsuit.

10    There's some concern that Mr. Jones' lawsuit will

11    not be brought up somehow in the course of this

12    trial.

13              Mr. Knight.

14              MR. KNIGHT:  We had no -- I had no

15    intent of doing that.  You know -- the

16    characterization of a law -- if it's so frivolous,

17    it's still pending, and he has a lawyer.  So, you

18    know, that's -- that is a little out there and it

19    hasn't been dismissed.  So, could that be a source

20    of stress that affects her reputation, humiliation

21    and embarrassment, I think so.  So, I mean --

22              THE COURT:  Why don't we do this.  You

23    indicated you don't have any intent of bringing it

24    up.  If you change your mind, would you notify the

25    opposing side ahead of time before you mention it?
```

1          MR. KNIGHT:  Sure.

2          THE COURT:  Will that work?

3          MR. COLLINS:  That works for me, Your

4   Honor.  But the reason it hasn't been dismissed is

5   because I haven't gotten around to filing a motion

6   yet.  That's the only reason.

7          THE COURT:  Well, one of the wonderful

8   things about our country is, anybody can file a

9   lawsuit for any reason.

10          Let's bring the jury in.

11          THE CLERK:  Is Mr. Berg dismissed --

12          MR. COLLINS:  Yes, that was the other --

13   we would like to have Mr. Berg terminated.

14          THE COURT:  Yes, the Court will grant

15   that motion.  Mr. Berg is terminated.

16          (WHEREUPON, the following matters were

17   heard in open court in the presence of the jury, as

18   follows:)

19          THE COURT:  Please be seated.  I trust

20   everyone had a peaceful and relaxing night last

21   night.  It looks like we're still on track to finish

22   the plaintiff's case today.  And we hope to get to

23   defendant's case after that.

24          Is the plaintiff ready for their next

25   witness?

April Lassiter-Benson, RPR, CSR, LCR

1          MR. STANLEY:  Yes, Your Honor.

2    Plaintiff would call Russell Bearden to the stand.

3          MR. COLLINS:  Your Honor, just a

4    reminder regarding the instruction we discussed in

5    preliminary.

6          THE COURT:  Okay.  Ladies and gentlemen

7    we are in a very old courthouse here.  Our

8    courthouse is almost 100 years old and we don't have

9    an awful lot of ways to enter and leave the

10   courthouse.  And oftentimes in the halls, you'll run

11   into the party or run into the lawyers.

12          It is improper for the lawyers to even

13   acknowledge you.  They can not speak to you,

14   recognize you, and, generally, will try to avoid

15   making eye contact with you, because of the concern

16   that any type of interaction with you might

17   prejudice the case, it might lead to accusations of

18   improper influence upon you.

19          So, don't take that personally if you

20   see one of the lawyers or a party and they pass by

21   you without saying anything or they turn around and

22   walk away.  It's not because they dislike you.  It's

23   not because of any ill will or any ill feelings.

24   It's just because of the way the system works.  We

25   want you to make your decision that's strictly upon

*April Lassiter-Benson, RPR, CSR, LCR*

1    the evidence and the facts that's presented here in

2    the courtroom and the law that we give you, and not

3    because of an interaction that you may have had with

4    the one side or the other side.

5              Does that suffice?

6              MR. COLLINS:  Yes, Your Honor.  Thank

7    you very much.

8

9              (WHEREUPON, the witness was sworn in by

10    the Court Clerk.)

11

12                          * * *

13                    **RUSSELL BEARDEN,**

14    was called as a witness, and after having been duly

15    sworn, testified as follows:

16

17                    DIRECT EXAMINATION

18    QUESTIONS BY MR. STANLEY:

19    Q.    Mr. Bearden, if you could, just introduce

20    yourself to the jury and tell them where you live

21    at.

22          You can take your mask off.

23    A.    Thank you.

24          My name is Russell Bearden and I live in

25    Lenoir City, Tennessee.

*April Lassiter-Benson, RPR, CSR, LCR*

1  Q.      Where do you currently work at?

2  A.      The company is Solar Titan USA.

3  Q.      And what is your position there?

4  A.      I'm a recruiting manager.

5  Q.      Have you ever worked in human resource?

6  A.      Yes, sir.

7  Q.      How long have you worked in human resource?

8  A.      About 30 years.

9  Q.      Just explain to us, what is that?

10         What does human resources involve?

11         What's its purpose?

12 A.      In the private world, it's to be an employee

13 advocate.  It's to be -- you do the hiring, the

14 disciplines, the terminations, any kind of advocate

15 that the employee needs and the management for

16 training.

17         In the public world, it's not quite like

18 that.

19 Q.      Is training regarding sexual harassment an

20 important part, whether it's private or public?

21 A.      Yes, sir.

22 Q.      Do you regularly attend training and sexual

23 harassment in the work place?

24 A.      Yes, sir.

25 Q.      And do you also provide training to companies

1   or organizations regarding sexual harassment in the

2   work place?

3   A.      And on the company, yes, sir.

4              MR. STANLEY:  Mrs. Lewis, can I have the

5   overhead projector (talking to the Court Clerk)?

6   BY MR. STANLEY:

7   Q.      Mr. Bearden, I'm going to show you what's

8   been pre-marked as exhibit 27.  Do you recognize

9   that manual?

10  A.      Yes, sir, I do.

11  Q.      And what is that manual?

12  A.      It's the Anderson County government employee

13  handbook.

14  Q.      Were you involved in the creation of this at

15  all?

16  A.      Yes, I was.

17             MR. STANLEY:  Let me move that into

18  evidence as the next Exhibit, 27.

19             THE COURT:  Admitted.

20             (WHEREUPON, a previously marked document

21  was admitted as Exhibit Number 27.)

22  BY MR. STANLEY:

23  Q.      And does it have a section regarding, or at

24  least, a written section regarding sexual

25  harassment?

1  A.      Yes, sir, it does.

2  Q.      That's what I want to talk about, is the

3  policies of Anderson County, regarding sexual

4  harassment.

5          Now, this policy, was it voted on by the

6  commission to be adopted by all the departments?

7  A.      Yes, sir.

8  Q.      And did those departments actually adopt this

9  policy?

10  A.      Not all of those departments no, sir.

11  Q.      So, you can actually opt out of these

12  policies.

13  A.      Yes, you can.

14  Q.      So, if the mayor testifies that you can opt

15  out and the department still opts out, that would

16  not be true?

17  A.      That is not true.

18  Q.      And who did opt out of this policy, some of

19  the departments?

20  A.      The county clerk's office; the mayor's

21  office; the permitting department; Johnny Alley's

22  department; property assessor.

23  Q.      So, if they opt out of this policy, the

24  written policy list, what is the real custom and

25  policy regarding sexual harassment in Anderson

1  County?

2  A.      In those departments, they can do what they

3  wanted to.  It was their department.

4  Q.      It's just up to the department head?

5  A.      Yes, sir.

6  Q.      Whatever they wanted?

7  A.      Yes, sir.

8  Q.      And then, in the clerk's office, that would

9  have been William Jones?

10  A.      Yes, sir.

11  Q.      Forget the written policies, it was his

12  policies is all that mattered, right?

13  A.      Yes, sir.

14  Q.      He was the final policymaker in that

15  department?

16  A.      Yes, sir.

17              MR. KNIGHT:  Objection; calls for legal

18  conclusion.

19              THE COURT:  Sustained.

20  BY MR. STANLEY:

21  Q.      Let me show you what's been pre-marked as

22  Exhibit 21.  I want to just discuss some of

23  Mr. Jones' agreeance with the harassment policies.

24  This is pre-marked Exhibit 21, third page.

25          This is an e-mail from you to a Mr. Owaski

1    (phonetic).  Who is Owaski?

2    A.      He was a commissioner at the time.

3    Q.      Was he one of your supervisors or somebody

4    you answered to?

5    A.      No, sir.

6    Q.      Just tell the jury what this e-mail is about.

7            What was the purpose?

8            Was it to document what had happened?

9    A.      Yes, the governor had passed an anti-bullying

10   for the state for government employees.  So we

11   included that in there.  But we tried to put in the

12   Tennessee Drug Free, Social Media Bullying and

13   Harassment in the Workplace.  We had training with

14   those -- with the county.

15   Q.      And according to this e-mail, it looks like

16   you put on a meeting and it says:  "William Jones

17   was present.  He repeatedly asked me how we could

18   enforce these policies on elected officials."

19   A.      Yes, sir.

20   Q.      So, again, even though there might be a

21   written policy, they don't have to adopt it, do

22   they?

23   A.      No, sir.

24   Q.      What did he do with your policy when he said

25   that?

1          Did he physically do anything?

2    A.    Yes, sir.  There was a signature page on the

3    back for them to sign as they left and turned it in,

4    and he put "BS" across it and tossed it at me.

5    Q.    I guess that means he rejected the policy.

6    A.    Yes, sir.

7    Q.    Why would he reject these kind of bullying

8    policies promoted by the governor?

9    A.    I don't know.

10          MR. KNIGHT:  Objection.  Calls for an

11   attempt to get inside Mr. Jones' head.

12          THE COURT:  Counsel.

13          MR. STANLEY:  I'll withdraw the

14   question.

15   BY MR. STANLEY:

16   Q.    Again, Exhibit 21, Page 2, is this -- this is

17   the Anderson County Human Resource Advisory Board

18   minutes.  Can you tell us what is in Paragraph 1.

19   A.    I had --

20          (Simultaneous, unreportable crosstalk.)

21          MR. KNIGHT:  Objection to relevance.

22          This is a social media and bullying in

23   the workplace policy.  It doesn't say anything about

24   sexual harassment.

25          MR. STANLEY:  It's harassment.  Your

 1   Honor, it goes to the widespread failure to train at

 2   all -- in any of these departments.

 3           THE COURT:  Does the second line have

 4   the word "harassment" in it?

 5           MR. KNIGHT:  It has the word

 6   "harassment", not "sexual".

 7           MR. STANLEY:  And it has violence in the

 8   workplace policies.

 9           THE COURT:  Overruled.

10   BY MR. STANLEY:

11   Q.    Tell us, what was this word minutes

12   regarding?

13   A.    These are minutes of the human resource

14   advisory board where I had proposed the policy for

15   social media, bullying in the workplace, and

16   harassment.  There were some changes we had done to

17   the policy what was in place:  Ethics, violence,

18   workplace policies.  And they were voted on by the

19   elected officials.

20   Q.    And did anybody oppose those?

21   A.    Yes, sir, they did.

22   Q.    Who was it?

23   A.    It was Mr. Jones and Mr. Alley.

24   Q.    Did they tell you why?

25   A.    No, sir.

April Lassiter-Benson, RPR, CSR, LCR

1  Q.      Did the mayor attend this?

2  A.      No, she did not.

3  Q.      Did anybody ever attend any training that you

4  were aware of, regarding sexual harassment in the

5  workplace?

6  A.      Did anyone?

7  Q.      In the clerk's office.

8  A.      No, they did not.

9  Q.      So, was the clerk's office properly trained

10 on what is sexual harassment?

11 A.      I can not say that.

12 Q.      Did they train anyone on how to report sexual

13 harassment, that you're aware of?

14 A.      I'm not aware of it.

15         MR. STANLEY:  Your Honor, did I move

16 this in, or Mrs. Lewis; Exhibit 21.

17         (WHEREUPON, a document was marked as

18 Exhibit Number 21.)

19         THE CLERK:  Did you want the docu- --

20 did you want the laptop on the Elmo?

21         MR. STANLEY:  Yes.

22         THE CLERK:  Okay.  Sorry.  I didn't --

23         MR. STANLEY:  I'm probably going to

24 continue.  No, you can leave it on.

25         THE CLERK:  Okay.  I thought you were

1  going to use the laptop.  I apologize.

2          MR. STANLEY:  I'm not going to use the

3  laptop.  I'm just going to use paper (indicating

4  Elmo).

5  BY MR. STANLEY:

6  Q.     Okay.  Let's discuss your time, actually, at

7  Anderson County.

8          What year did you start employment there?

9  A.     I think it was January -- January/February of

10  2015.

11  Q.     At the time, who was running the human

12  resource department?

13  A.     A lady by the name of Nicole Lucas.  She was

14  an employee there.

15  Q.     And we have already moved into evidence, her

16  statement, which is Exhibit 13.  I just want to ask

17  you some questions about that.

18          (WHEREUPON, a previously marked

19  document was shown as Exhibit Number 13.)

20  BY MR. STANLEY:

21  Q.     Here, it states that Russell Bearden had been

22  hired upon taking the position.  I explained the

23  issue to him regarding William Jones and that I had

24  received telephone complaints and written

25  complaints, separate from mine, regarding Mr. Jones.

1          And then, it goes on to discuss how he was

2     taking 2 or 3-hour lunch breaks, according to one

3     complainant.  Did I read that correctly?

4     A.     Yes, sir.

5     Q.     Do you remember that somewhat?

6     A.     I do not remember any complaints.  I remember

7     the complaints about William, as far as treatment,

8     but not in a sexual manner.

9     Q.     So --

10    A.     I do remember the long lunches.

11    Q.     Okay.  And I just want to see -- if you got

12    here in February -- this is a memo from you, March

13    the 3rd of 2015, correct?

14    A.     Yes, sir.

15    Q.     So, you're just kind of new, trying to figure

16    out who's who and how the department is being run,

17    I'm assuming.

18    A.     Yes, sir.

19    Q.     This looks like you're following up on those

20    complaints regarding the 2-hour lunches, correct?

21    A.     Yes, sir.

22    Q.     I notice that he says in here, this is

23    Mr. Jones, that he knew who complained to you.  He

24    told you in your memo that he knows who these people

25    were that made the complaints, right?

1   A.      He says that, yes, sir.

2   Q.      And then underneath, he went -- he goes on to

3   discuss how he could go about cutting two members of

4   the team's salary, does he not?

5   A.      Yes, sir.

6           MR. STANLEY:  Let's move that into

7   evidence; Exhibit 32, Your Honor.

8           THE COURT:  Any objection?

9           MR. KNIGHT:  No objection, Your Honor.

10          THE COURT:  It will be admitted.

11          (WHEREUPON, a document was marked as

12  Exhibit Number 32.)

13  BY MR. STANLEY:

14  Q.      You knew that Ms. Lucas filed a complaint,

15  but was that complaint in her personnel file?

16  A.      No, sir, it wasn't.

17  Q.      Does Anderson County, does it have problems

18  with the personnel files or have they ever had

19  issues with people trying to take documents out of

20  personnel files?

21  A.      There have been problems in the past, yes,

22  sir.

23  Q.      Tell us about those.

24  A.      There was --

25          MR. KNIGHT:  Judge, that's outside the

1  scope of his personal knowledge.

2  BY MR. STANLEY:

3  Q.     Do you have personal knowledge about --

4  A.     Yes, I do.

5  Q.     -- people trying to go to the human resource

6  department and actual take documents out of the

7  people's employment files?

8  A.     I know the sheriff's department set up a card

9  to keep people from going in, after an allegation.

10  Q.     An allegation regarding retaliatory

11  discharge?

12  A.     Yes, sir.

13  Q.     Even though Ms. Brown -- we've heard about

14  her complaint already and it's into evidence.

15       She wasn't working there when you reached

16  out to her, was she?

17  A.     No, sir.

18  Q.     You reached out to her to try to find out

19  what had happened, because a lot of this happened

20  while you were not there, right?

21  A.     Yes, sir.

22  Q.     Again, you're just trying to figure out

23  what's going on in this department.

24       When you found out about Angela brown, did

25  you confront William Jones about these allegations?

1   A.      Yes, I did.

2   Q.      What did he say to you and how was his

3   attitude?

4   A.      He laughed and said that he did not have a

5   boss, except for the voters.  And then he made a

6   very lewd comment, to give an example.

7   Q.      Did you confront the mayor or were you

8   specific about his vulgar comments or lewd comments?

9   A.      You want me to be specific?

10  Q.      Well, were you specific to the mayor?

11  A.      Oh, yes, sir.

12  Q.      We've got the document.  We've seen the

13  documents.

14          Well, what was her response?

15  A.      That he was new and that he probably needed

16  some training.

17  Q.      Did she obviously tell you to contact legal?

18  A.      She told me not to contact legal at that

19  time.

20  Q.      Why would she tell you not to contact legal?

21  A.      I think it would have caused a big stink,

22  because legal and the mayor's office were at odds

23  with each other, constantly.

24  Q.      A political stink?

25  A.      Yes, sir.

*April Lassiter-Benson, RPR, CSR, LCR*

1  Q.     Was the mayor very politically active,

2  obviously?

3  A.     Yes, sir.

4  Q.     And so was Mr. Jones?

5  A.     Yeah -- I don't know that -- or he was the

6  head of the republican party, so, yes, sir.

7  Q.     He was the head of the republican party at

8  the time?

9  A.     Yes, sir.

10 Q.     Did the mayor ever tell you personally that

11 she had political aspirations higher than being

12 mayor?

13 A.     Yes, she did.

14 Q.     What did she tell you?

15 A.     She told me that she was wanting to go for

16 the state senate.  I forget his name, but when he

17 retired, she would like to run for that if it's

18 possible.

19 Q.     You don't want to rock any boats if you're

20 trying to run for higher office, right?

21 A.     I assume.

22 Q.     Do you recognize Ms. Frank and Mr. Jones in

23 this picture?

24 A.     Yes, sir.

25        MR. STANLEY:  I'd like to move this into

*April Lassiter-Benson, RPR, CSR, LCR*

1  evidence as Number 55.

2          THE COURT:  It will be admitted.

3          (WHEREUPON, a document was marked as

4  Exhibit Number 55.)

5  BY MR. STANLEY:

6  Q.    Mr. Bearden, because of what Ms. Harnness

7  did, a lot of victims came forward, right?

8  A.    I'm sorry?

9  Q.    Because of Ms. Harnness coming forward, a lot

10 of victims came forward, correct?

11 A.    Yes, sir.

12 Q.    One of those was Valerie Walker.  Do you

13 remember her?

14 A.    Yes, I do.

15 Q.    Do you remember speaking with her?

16 A.    Yes.

17          (WHEREUPON, a previously marked

18 document was shown as Exhibit Number 38.)

19 BY MR. STANLEY:

20 Q.    I'm going to show you what's been pre-marked

21 as Exhibit 38.

22          Do you remember ever seeing this document

23 and reviewing it?

24 A.    I do.

25 Q.    And I'm not going to read the whole thing,

1    but let me just go over a few things I want to ask

2    you about, because I don't think this has been put

3    into evidence.

4         One of the things, obviously, is what

5    people -- he would refer other people to.  And she

6    states in there:  "I felt that if I didn't go along

7    with Mr. Jones, that I would be the next employee

8    to be targeted."

9         That insinuates there's been prior people

10   that he's targeted, correct?

11   A.    Yes, sir.

12   Q.    She goes on to say:  "He's a tyrant and runs

13   his office with fear, by targeting employees that he

14   did not think too highly of, belittling employees if

15   they made a mistake and just by blatant arrogance."

16        And one of the employees that was targeted

17   was an Angie Alley (phonetic).  Did you know her?

18   A.    I did.

19   Q.    She would keep a box under her desk at all

20   times, because she was afraid that Mr. Jones was

21   going to fire her at anytime?

22   A.    That was Valerie's statement.  I did not see

23   the box.

24   Q.    Did he fire her?

25   A.    Yes, he did.

1  Q.    Mr. Jones would instruct office managers to

2  write up employees he didn't like for the smallest

3  of infractions so that Mr. Jones would have grounds

4  to fire them.

5        Did he have some people that was sort of

6  like his minions that would do his dirty work, as

7  far as doing reprimands?

8  A.    Yes, sir.

9  Q.    And who were those people?

10       Metcalf?

11 A.    Yes, Angela Metcalf.

12 Q.    Who was the highest paid clerk in the office?

13 A.    Angela.

14 Q.    By far?

15 A.    I believe so.

16 Q.    It states in here that:  "Mr. Jones had

17 everyone on edge so much that maintenance would

18 knock on the door before entering the office, so

19 that we would know who was coming in and wouldn't be

20 so jumpy."

21       Did you know that was going on before this

22 statement was happening?

23 A.    No, sir.

24 Q.    It become very well known that if you made

25 Mr. Jones mad or he just didn't like you, you were

 1   moved to General Sessions 2 and you were on your way

 2   out.

 3          Was that the general consensus of most of

 4   the people that you-all talked to?

 5   A.     Yes, sir.

 6   Q.     Mr. Jones told me about a county employee who

 7   was standing at the General Sessions 1 counter and

 8   he snuck up behind her and took the tip of his

 9   umbrella and ran it up the inside of her leg.

10          Did we ever find out who that was?

11   A.     No, sir, not that I'm aware.

12   Q.     There are probably lots of victims we don't

13   know about, correct?

14               MR. KNIGHT:  Objection.

15               THE COURT:  Sustained.

16   BY MR. STANLEY:

17   Q.     For instance, "Anonymous," we never found out

18   who that was.

19   A.     No, sir.

20               MR. KNIGHT:  Objection.

21               MR. STANLEY:  It is anonymous.

22               MR. KNIGHT:  I withdraw, because it is

23   anonymous.

24   BY MR. STANLEY:

25   Q.     And finally, this just sort of describes what

*April Lassiter-Benson, RPR, CSR, LCR*

1    one of these women went through when she lost her

2    job, and it was just painful on her family.  She

3    lost her insurance, her retirement benefits.  She

4    had cash in her 401(k) --

5                    MR. KNIGHT:  Your Honor, how is this

6    relevant?

7                    Is this part of the statement?

8                    THE COURT:  Counsel.

9                    MR. STANLEY:  It's relevant to a hostile

10   work environment.  This guy tortured these women,

11   Your Honor.

12                   THE COURT:  Is this person a party to

13   this litigation?

14                   MR. STANLEY:  No, Your Honor.

15                   I'd like to move this into evidence;

16   Exhibit 38.

17                   (WHEREUPON, a previously marked document

18   was admitted as Exhibit Number 38.)

19   BY MR. STANLEY:

20   Q.    Isn't it true that he inflicted a lot of

21   pain on --

22                   THE COURT:  Any objection to the

23   admission of this document?

24                   MR. KNIGHT:  Isn't it already in

25   evidence?

 1              MR. STANLEY:  This one's not in, I don't

 2   think, Your Honor.

 3              MR. KNIGHT:  Can I confer briefly, Your

 4   Honor?

 5              THE COURT:  You may.

 6              MR. STANLEY:  And, Your Honor, it would

 7   go to notice.

 8              (An off-the-record discussion was

 9   held.)

10              MR. KNIGHT:  No objection, Your Honor.

11   I'm sorry.

12              THE COURT:  It's admitted.

13              MR. KNIGHT:  Is that 38?

14   BY MR. STANLEY:

15   Q.    "If it weren't for my friends and family, I

16   wouldn't have a home right now.  This stress has

17   caused me many days of not being able to eat or

18   sleep.

19         I never questioned Mr. Jones, because I was

20   afraid that he would do just what he said."

21         He threatened these women, didn't he?

22   A.    Yes, sir, he did.

23   Q.    I'm now going to show you what's been

24   pre-marked as Exhibit 15.

25              (WHEREUPON, a previously marked

1   document was shown as Exhibit Number 15.)

2   BY MR. STANLEY:

3   Q.      This is an affidavit from you in which you

4   interviewed some people and attached documents,

5   correct?

6   A.      Yes, sir.

7   Q.      One of the persons you interviewed was

8   Rodney Harness, correct?

9   A.      Yes, sir.

10  Q.      That was Ms. Harnness' husband at the time?

11  A.      Yes, sir.

12  Q.      You even have a witness that came with you,

13  right?

14  A.      I did.

15  Q.      He even brought notes with him, correct?

16  A.      Yes.

17  Q.      And you took notes down, correct?

18  A.      Stephanie Strickland took the notes.

19  Q.      Okay.  Based on your interview with him, you

20  appear to have done an affidavit discussing some of

21  that and I'd like to read that.

22          This affidavit was done, February 27, 2018.

23  It's been pre-marked as Exhibit 35.

24              (WHEREUPON, a previously marked

25  document was shown as Exhibit Number 35.)

1    BY MR. STANLEY:

2    Q.      And he here is talking about -- the husband

3    complied with Mayor Frank's -- hold on a second.

4    Rodney Harness Affidavit -- February 27, 2018.  Oh,

5    I'm sorry.

6            In his written statements and during the

7    interview, is what we just looked at, with the HR

8    office, the husband asserted he had informed the

9    mayor of the late night Snapchats between his wife

10   and Mr. Jones.

11           Did I read that correctly?

12   A.      Yes, sir.

13   Q.      So, if the mayor testified yesterday that he

14   never mentioned Snapchats, he just mentioned she's

15   not getting paid what she should be, would that be

16   false?

17   A.      According to Mr. Jones, yes, sir.

18   Q.      And then, you've got on here, two days later,

19   after the husband complied with Mayor Frank's

20   request to provide her with his life's resume, the

21   victim was offered a full-time position with the

22   circuit court clerk's office.

23           The mayor never informed the HR office of

24   the allegation made by the victim's husband, did

25   she?

1    A.    No, sir.

2    Q.    Here's what I really want to ask about,

3    because this is something I quite can't understand.

4          You've had several complaints now.  You've

5    had Nicole Lucas and Angela brown, and now you've

6    got Gail Harness.

7          You said here:  "Mayor Frank specifically

8    told me, specifically told me not to contact the

9    law director, because he would not do anything but

10   cause a political storm;" is that correct?

11   A.    Yes, sir.

12   Q.    Did she put politics over the victims in this

13   case?

14   A.    In my opinion, yes, sir.

15   Q.    Did she protect Mr. Jones over protecting the

16   women in the office?

17   A.    Yes, she did.

18          MR. STANLEY:  I would like to move

19   Exhibit 35 into evidence.

20          THE COURT:  Admitted.

21          (WHEREUPON, a previously marked document

22   was admitted as Exhibit Number 35.)

23   BY MR. STANLEY:

24   Q.    You've had several conversations with

25   Mr. Jones, correct?

*April Lassiter-Benson, RPR, CSR, LCR*

1    A.      I did.

2    Q.      This is while you were in HR at the Anderson

3    County office?

4    A.      Yes, sir.

5    Q.      Would he talk about inviting employees to his

6    tanning bed?

7    A.      Yes, he did.

8    Q.      Did he brag about what he was doing up there?

9    A.      No, sir.

10   Q.      And what did he say about it?

11   A.      He said he invited them there to spend some

12   alone time with him and "Mama".

13   Q.      And who is "Mama"?

14   A.      That was his wife, Amy Jones.

15   Q.      So, he referred to -- he made people call him

16   "Daddy" and his wife was "Mama"?

17   A.      Yes.

18   Q.      Was the mayor ever made aware of the

19   specifics of an investigation on Mr. Jones while he

20   was at the office?

21   A.      Yes.

22   Q.      So, she knew about the TBI investigation?

23   A.      Yes, sir.

24   Q.      So, if she testified she didn't know about

25   the specifics, that would be a false statement?

1    A.    Yes, sir, it would be.

2    Q.    And what were the specifics?

3    A.    The TBI had contacted me.  Mr. Jones had

4    stated to me that he had placed cameras in the

5    tanning salon and had taken pictures of members of

6    the public.  And I had reported that to Mr. Yeager

7    and he reported it to the TBI.

8    Q.    And the mayor knew?

9    A.    I'm sorry?

10   Q.    And the mayor knew?

11   A.    Yes.

12            MR. STANLEY:  You may ask.

13            MR. KNIGHT:  Did you admit 15?

14

15                CROSS-EXAMINATION

16   QUESTIONS BY MR. KNIGHT:

17   Q.    Mr. Bearden, you realize that Ms. Harness has

18   sued the county over the actions of an elected

19   official, William Jones?

20   A.    Yes, sir.

21   Q.    You knew that, right?

22   A.    Yes, sir.

23   Q.    And we just talked about your tenure.  You

24   came in early 2015.  And then, when did you resign?

25   A.    2018, in, I want to say it was March.

1  Q.      Could it have been in the fall of 2017,

2  Mr. Bearden?

3  A.      Oh, yes, it was.  I'm sorry.  Yes, it was.

4  Q.      So you're incorrect when you say March of

5  2018?

6  A.      Yes, sir.

7  Q.      And Exhibit 15 that you were just shown,

8  Stephanie Strickland was also there and took notes,

9  correct?

10 A.      Yes, sir.

11 Q.      And the notes that Mr. Harness provided was a

12 statement dated 9/10/2017, correct?

13 A.      I don't have that here.

14 Q.      Oh.  It's the first page.

15         Do you recognize that as Mr. Harness' notes?

16 A.      It looks so.  I'm not for sure on that.

17 Q.      Well, it's in the exhibit, so I guess the

18 jury can look at it signed by -- I'm sorry.  On the

19 last page of it, signed by Rodney Harness,

20 9/10/2017; is that correct?

21 A.      Yes, sir.

22 Q.      And he didn't provide any contemporaneous

23 notes from when he spoke to the Mayor in 2016, did

24 he?

25 A.      No, sir.  He had provided phone records later

1    who they had contacted regarding this.

2    Q.    Yes.  And one of them was the Mayor, and she

3    called him back; is that correct?

4    A.    I don't remember that, sir.

5    Q.    Okay.  Well, you seem to remember a lot about

6    the Mayor, so that's why I was asking.

7          Now, Stephanie Strickland was also in that

8    meeting, wasn't she?

9    A.    Yes, sir.

10   Q.    And she took notes, didn't she?

11   A.    Yes, sir.

12   Q.    Now, you've testified that Mr. Harness told

13   the Mayor, and even executed an affidavit, that she

14   kept Human Resources in the dark about Snapchatting

15   with Ms. Harness.

16         Now, look at Ms. Strickland, fourth bullet

17   point down, and I'll read it, "He was shocked"

18   -- all right.  Let me just start.  "Looked up

19   Tennessee Gov.  Called Governor's office, told them

20   names of employees and officials flirting in the

21   office.  Governor's office directed him towards

22   Mayor.  He was shocked she answered.  He told mayor

23   story.  Explained Gail was overlooked."

24         Meaning she wanted to be full-time, correct?

25   A.    Yes, sir.

April Lassiter-Benson, RPR, CSR, LCR

1  Q.    He didn't mention flirting.  Now that's

2  contrary to what you just said Ms. Strickland's

3  notes say.

4  A.    He had told us he knew that there were late

5  night Snapchats, but didn't know the content.  He

6  asked to see them.

7  Q.    I'm talking about Ms. Strickland, what she

8  said, when he called the Mayor in 2016.  You don't

9  have any contemporaneous notes from Mr. Harness

10 about any conversation that he had with the Mayor

11 according to Ms. Strickland, which is an exhibit

12 that the Plaintiff put in, that the Mayor was not

13 told about any flirting.  It was about Gail going

14 from part-time to full-time.

15 A.    I think that was the conversation, yes, sir.

16 Q.    Okay.  And that's not what you testified to

17 earlier, is it?

18 A.    Can you tell me what I testified to?

19 Q.    You testified that she -- even executed an

20 affidavit that was admitted that she knew back in

21 2016 from her conversations with Mr. Harness that

22 she was being sexually harassed?

23 A.    She knew from me back in 2015 that there were

24 allegations against Mr. Jones.

25 Q.    But that's not what your affidavit said.  It

1   was underlined, was it not?

2   A.      I wasn't in that meeting, so I don't know.

3   I'll go with what Rodney had said.

4   Q.      You weren't in that meeting.  It lists you --

5   A.      I'm talking about in the meeting with the

6   Mayor and Rodney.

7   Q.      You were on the phone call?

8   A.      No, sir.

9   Q.      So, you really don't know, do you?

10  A.      I don't know anything except what Rodney had

11  told us.

12  Q.      And what Rodney said was he didn't mention

13  flirting in 2016; isn't that correct?

14  A.      Can you show me that?

15  Q.      Well, according to Ms. Strickland's notes

16  that I just read you to you, that's how he -- he was

17  shocked the Mayor answered; told Mayor of stories

18  explaining Gail was overlooked.  I asked you, does

19  that mean he was talking about putting her

20  full-time.  He didn't mention flirting; told Mary

21  Phillip she was being discriminated against;

22  explained Gail loved her job and gets it done.  He

23  wanted her to go full-time.  He didn't mention the

24  flirting in that 2016.  And it wasn't until he

25  signed that statement that I showed you earlier that

1  he mentioned anything about flirting towards the

2  end; isn't that correct?

3  A.      I guess so.  I don't remember it.

4  Q.      You don't remember even though you were

5  present at the meeting?

6  A.      This has been five years ago, sir.

7  Q.      Well, you seem to remember a lot about what

8  the Mayor does and what her political aspirations

9  are and all that kind of stuff.

10        You don't really like her, do you?

11 A.      I don't think that has any bearing on it.

12 Q.      I think it does.

13        You don't really like the Mayor, do you?

14 A.      I don't like the way she acts.  I don't like

15 the way she treats people.  I don't like the way she

16 retaliates.  But as a person, I don't have anything

17 against her.

18 Q.      But you don't like her, do you?  That's why

19 you go to Jay Yeager for everything.  You mentioned

20 there's a discord between legal and the Mayor.

21 A.      I didn't trust her.

22 Q.      You didn't like her?

23 A.      I didn't trust her.

24 Q.      Now, you were -- Angela Brown's been brought

25 up many times in this lawsuit.  You interviewed her

1  in 2015, and it was over questions in a job

2  application; is that correct?

3  A.    Yes, sir.

4  Q.    And you confronted Mr. Jones about that,

5  didn't you?

6  A.    Yes, sir.

7  Q.    And he denied it, didn't he?

8  A.    No.  He denied -- he only talked -- said he

9  admitted to asking her where she lived, and that it

10  was a bad -- it was a poor, low rent neighborhood.

11  Q.    That's what he admitted to?

12  A.    Yes, sir.

13  Q.    And then you decided that -- and you went to

14  the Mayor and she said that Jones needed to be

15  trained; isn't that correct?

16  A.    Yes, sir.

17  Q.    And you closed the file on that, didn't you?

18  A.    I did because I could not get in touch with

19  Angela Brown to follow up.  Jones, he had provided a

20  written statement back to me, and I followed up with

21  her on the some of discrepancies, or tried, and I

22  could not get in touch with her, so I had no choice.

23  Q.    And in your opinion, it didn't rise to the

24  level of sexual harassment, did it?

25        Isn't that what you concluded in a letter?

1    A.    I don't know, 'cause it was very sexually

2    suggestive.  I don't know that it was harassment.

3    There was talk about eating yogurt in his office and

4    he had a fetish for that.

5    Q.    Okay.  But didn't you conclude that 30 years

6    of experience in HR, that it didn't rise to the

7    level of sexual harassment?

8    A.    I think I believe I said I closed it, because

9    I couldn't get information.

10    Q.    Mr. Jones did go to CTAS training, did he

11    not?

12    A.    I set him up for Ogletree Deakins for

13    training.  He agreed to go.

14    Q.    That's not my question, Mr. Bearden.  He did

15    go to CTAS training, did he not?

16    A.    CTAS training is a computerized program.

17    Yes, he did.  He brought a certificate for that.

18    Q.    I'm not sure this has been admitted.  This is

19    what I've been asking you about, Mr. Bearden.

20    May 29, 2015, at the end of the first paragraph,

21    this is you writing:  "Mr. Jones realizes that the

22    statement like this could offend a person, but it

23    does not rise to the level of sexual harassment."

24          You wrote that, right?

25    A.    Yes, sir, I did.

April Lassiter-Benson, RPR, CSR, LCR

1  Q.      And then, it said -- then it talks about what

2  you said.  You tried to contact Ms. Brown and you

3  couldn't get in touch with her, so you closed it,

4  correct?

5  A.      Yes, sir.

6  Q.      And then on the third paragraph it shows that

7  Jones did complete training offered by the

8  University of Tennessee CTAS as an educational tool

9  for identifying sexual harassment.  Is that not what

10  it says?

11  A.      Yes, sir.

12  Q.      And there was no further investigation on

13  Ms. Brown, because you never were able to get in

14  touch with her, correct?

15  A.      Not to my knowledge.

16  Q.      And the next time anyone came in or made a

17  complaint was Ms. Harness, correct?

18  A.      Yes, sir.

19  Q.      And that was -- do you recall that being

20  August 9th, 2017?

21  A.      I don't remember the date.  But, yes, sir,

22  end of '19.

23  Q.      And she came in and gave a sworn statement,

24  correct?

25  A.      Yes.

1    Q.      And at that sworn statement, you and

2    Mr. Yeager had her removed from the Clerk's Office,

3    correct?

4    A.      No, sir.

5    Q.      No?

6    A.      No, sir.

7    Q.      How -- did she go back to the Clerk's Office?

8    A.      She did when we tried to investigate, yes,

9    sir.

10   Q.      No.  I'm talking about after she gave her

11   sworn statement on September 14, 2017, she was taken

12   out of the --

13   A.      She was, yes.

14   Q.      And she went home on administrative leave

15   with pay and benefits, correct?

16   A.      Yes.

17   Q.      And she stayed there, correct, until she

18   got -- well, it's outside of your time.  But she

19   eventually went to the Senior Center sometime in

20   March of 2018.  Do you know that?

21   A.      I've heard that, yes.

22   Q.      And all this time the County paid her her

23   full salary and benefits?

24   A.      Yes, sir.

25   Q.      As if she was still at the Clerk's Office,

1  but away from Mr. Jones, correct?

2  A.    Yes, sir.

3  Q.    And so, 2017 was the third year of Mr. Jones'

4  term, correct?

5  A.    I believe.

6  Q.    And so, he was going to have to run for

7  election in March -- I'm sorry, in the primary in

8  May of 2018, correct?

9  A.    Yes, sir.

10 Q.    And he did and he lost, correct?

11 A.    Yes, sir.

12 Q.    And are you aware that the County Commission

13 drafted a resolution censuring Mr. Jones in 2018?

14 A.    Yes, sir.

15 Q.    And quite frankly, when you-all went off, you

16 and Ms. Whitaker -- you know Ms. Whitaker, don't

17 you?

18 A.    Yes, I do.

19 Q.    You-all went and interviewed people that you

20 know have given statements, correct?

21 A.    Yes, sir.

22 Q.    And that's the only way you would have known?

23 A.    Only way I would have known what?

24 Q.    About anything going on in the Clerk's Office

25 were these statements in 2017.

1    A.      There were rumors.

2    Q.      Rumors.  Well, there's rumors about a lot of

3    things.

4    A.      Absolutely.  But these are the only ones that

5    came forward?

6    Q.      Right.  And so -- but the point is that

7    Anderson County HR sought them out, correct?

8    A.      No.  After Gail, some of them came in on

9    their own.  We were told names and I did contact

10   some of them, but we had some come in on their own.

11   Q.      Well, you say you don't trust the Mayor.  She

12   actually told me one of the first things you did

13   when you came was you wanted to post -- do a posting

14   about -- at various parts of the Anderson County

15   government building about sexual harassment and how

16   to report it.

17   A.      Yes, sir.

18   Q.      And you did that?

19   A.      I did.  I asked her to sign it and she

20   refused, so I signed it.

21   Q.      You signed it?

22   A.      Yes.

23   Q.      Is this the posting?

24   A.      Yes.

25   Q.      It says, Russell Bearden, if any employee or

1    applicant who has questions concerning the Anderson

2    County policy prohibiting harassment or wishes to

3    discuss any matter confidentially, may contact you.

4    A.    Yes.

5    Q.    Is that correct?

6          And you wanted people to contact you,

7    correct?

8    A.    If they needed to.  I was hoping --

9    Q.    And you would have --

10   A.    -- we wouldn't have had any harassments.

11   Q.    And you would have kept it confidential.  It

12   says it right here.

13   A.    In the policy manual it says it would be kept

14   confidential until the point it could no longer be

15   done that way.

16   Q.    So what were you telling these people?  It

17   says, discuss any matter of confidentially; may

18   contact you.

19   A.    It's self-explanatory.

20   Q.    You weren't going to run around the

21   courthouse and tell everybody that somebody came in

22   to talk to you about an allegation of sexual

23   harassment, were you?

24   A.    No, sir.

25   Q.    And one of the things that the Mayor told me

1    also was that you conducted training about the

2    workplace and discrimination, harassment, all kinds

3    of things, retaliation.  You recall doing that?

4    A.    Yes, sir.

5    Q.    And even had slides.  And she attended that

6    training, didn't she?

7    A.    I do not believe so -- she did.  I don't

8    think so.

9    Q.    You don't think so or do you not know?

10   A.    I don't know.

11   Q.    Is this another mistake?

12   A.    Excuse me?

13   Q.    Is this a mistake, you just don't know?  You

14   were mistaken about when you left government.

15   A.    (Laughing.)

16   Q.    Well, I mean, I want to know.  Did she attend

17   your training in 2015?

18   A.    Sitting here today, I don't remember.

19         THE COURT REPORTER:  I'm sorry, Judge,

20   if you could have him repeat that.

21         THE COURT:  He said he didn't remember.

22         THE COURT REPORTER:  Okay.  Thank you.

23         MR. KNIGHT:  I'm sorry.  I don't think

24   this was admitted, Your Honor.  Which exhibit was

25   this, 3?  Any objection?

```
 1              MR. STANLEY:  I don't have any
 2   objection.
 3              THE COURT:  Without objection, it's
 4   received.
 5              THE CLERK:  Is that Plaintiff's exhibit
 6   or Defendant's?
 7              MR. KNIGHT:  It's Plaintiff's 3.
 8              MS. BURCHETTE:  It's not 3.
 9              MR. KNIGHT:  What is it?
10              MS. BURCHETTE:  I don't know.  It might
11   be --
12              (WHEREUPON, a document was marked as
13   Exhibit Number 3.)
14              MS. BURCHETTE:  It's 3.
15              MR. KNIGHT:  It is 3.
16              THE CLERK:  Okay.  Thank you.
17   BY MR. KNIGHT:
18   Q.     Didn't the Mayor tell you she thought it was
19   an excellent idea to make these postings?
20   A.     Yes, she did.
21   Q.     Now, when you were at Anderson County and
22   there were new hires, did they have to go to the HR
23   Department?
24   A.     They filled out their paperwork there, yes,
25   sir.
```

April Lassiter-Benson, RPR, CSR, LCR

1  Q.     Right.  And do you remember Ms. Harness came

2  in as an intern, and then part-time, then full-time

3  at the Clerk's Office?

4         She would have come to Human Resources to

5  fill out paperwork?

6  A.     She would have, yes.

7  Q.     And sitting here today, do you even know when

8  that was?

9  A.     No.

10 Q.     Whether it was 2000 -- it had to be after you

11 got there.

12 A.     Yes, sir.  I didn't -- there were three

13 people in the HR office.  I wouldn't have

14 necessarily been the one to take her paperwork.

15 Q.     Okay.  But do you recall, or do you remember,

16 or do you disagree with, was it sometime in June or

17 July of 2016 that she became full-time?

18 A.     I don't disagree.

19 Q.     Okay.  Now, the thing about Mr. Jones, and

20 you were talking about the differences between

21 private and public, is that he was an elected

22 official, correct?

23 A.     True.

24 Q.     The Mayor didn't appoint him clerk.  They

25 have to run, correct?

April Lassiter-Benson, RPR, CSR, LCR

1  A.      Yes.

2  Q.      And really the only way to get someone in

3  that, or two ways that I understand, either Judge

4  Elledge could have removed him for some reason, or

5  there had to be -- there was an ouster suit filed

6  after a full investigation, which no one knows how

7  long that could have taken, correct?

8  A.      I don't know the part about Judge Elledge,

9  but the ouster suit, that is true.

10 Q.      Okay.  And by the time that you removed Gail

11 Harness, it was already 2017, and the election, if

12 he was defeated, he wouldn't be there any longer.

13 There just wasn't a lot of time to file an ouster

14 suit in 2017, correct?

15 A.      That's true.  And the ouster suit only lasts

16 for that term.

17 Q.      Right.  So you would have to file two ouster

18 suits.  If he had gotten re-elected, you would have

19 had to file another ouster suit, correct?

20 A.      Yes, sir.

21 Q.      You know Jay Yeager, correct?

22 A.      I do.

23 Q.      Do you consider him to be an honest and

24 reputable person?

25 A.      Yes, I do.

1   Q.      And they read his deposition and he said he

2   contacted a lot of people about calling him an

3   "ouster suit". You have any reason to disagree that

4   Jay did that?

5   A.      No, sir.

6   Q.      This affidavit -- I'm sorry, from Valerie

7   Walker, you didn't take it, did you?

8   A.      Can you put it back up, please?

9   Q.      Would it -- it's been admitted into evidence

10  without objection. Would it surprise you that it

11  was taken in March of 2018?

12  A.      I'd have to see it. I don't know.

13  Q.      Nicole Lucas was there when you were -- she

14  was running the department when you got there,

15  correct?

16  A.      Yes, sir.

17  Q.      And she was one of the individuals that gave

18  a statement in 2018, correct?

19  A.      I believe so. I was --

20  Q.      After Ms. Whitaker sought her out, correct?

21  A.      I don't know that.

22  Q.      You fired Ms. Lucas, didn't you?

23  A.      I did.

24  Q.      And that was in 2015, correct?

25  A.      Yes, sir.

1   Q.      You didn't think she was up to working in

2   Human Resources, correct?

3   A.      I didn't think what?

4   Q.      She was up to working in Human Resources.

5   A.      Her performance was poor.

6   Q.      Okay.  I just found Ali Walker's affidavit.

7   You were asked -- it looks like she swore to this in

8   March 14, 2018.  Does that refresh your

9   recollection?

10  A.      Yes, sir, that would have been after my time.

11  Q.      Were you ever complained on in your

12  department for harassing, not sexually, but just

13  berating an employee?

14  A.      Me, personally?

15  Q.      Yes.

16  A.      No, sir.

17  Q.      Connie Yates didn't file a complaint against

18  you or complain about you?

19  A.      Yes, she did.  I forgot about that.

20  Q.      And you were worried about that and you went

21  to the Mayor, didn't you?

22  A.      I don't remember if I went to the Mayor or

23  not.  She was acting Director of Finance.

24  Q.      And it was over giving a new budget director

25  a hard time, or something like that -- cooperation.

1    Do you even know?

2    A.     I don't remember.

3    Q.     Did you ever complain of bullying or

4    harassment of yourself against the commissioner?

5    A.     Against a commissioner?

6    Q.     Yes --

7    A.     I don't remember it.

8    Q.     -- Commissioner Mead for allegedly not

9    treating you with proper respect at a County

10   Commission meeting?

11   A.     I don't remember that, no.  I mean, I'm not

12   denying it.  I just don't remember it.

13   Q.     You don't remember making a complaint against

14   Commissioner Mead?

15   A.     No, sir.  Do you have that complaint so I can

16   see it?

17   Q.     My understanding is it was verbal.

18   A.     Verbal?

19   Q.     Yeah.

20   A.     Oh, I don't remember.

21   Q.     You went on and on about the Mayor's

22   allegedly higher political aspirations.  You don't

23   know that, do you?

24   A.     She told me.

25   Q.     She told you?  She's still the Mayor of

1    Anderson County.  Are you aware of any petition or

2    anything that she's done to get higher office,

3    campaign for it, talk to other people about it,

4    anything like that?

5    A.    No, sir, other than what she told me.

6    Q.    Now, Mr. Stanley, when he asked you if the

7    Mayor -- about opting out, I'll submit to you that

8    she did say that they could opt out, but they had to

9    file their policies in the County Clerk's Office.

10   Is that your understanding?

11   A.    They would have sent her policy to the Human

12   Resource Department.

13   Q.    Okay.

14   A.    Like, the Sheriff's Department had their own.

15   Q.    Okay.  So when they did -- they sent it to

16   the Human Resources Department, but Mr. Jones never

17   did?

18   A.    No, sir.

19   Q.    Now, you live in Lenoir City, Loudon County?

20   A.    Yes, sir.

21   Q.    Now, in 2018, you supported the Mayor's

22   opponent in the election, correct?

23   A.    I did.

24   Q.    Do you recall in February when you were

25   talking about a TBI investigation, the Mayor trying

1    to find out who was the TBI agent conducting the

2    investigation?

3    A.       Yes, I do.

4    Q.       And you didn't know?

5    A.       I didn't remember his name.  I had his name

6    listed as something different in my phone when he

7    called.  I don't remember his name.

8    Q.       Did he -- well, the Mayor called you?

9    A.       I'm sorry?

10   Q.       The Mayor called you.

11            Did you ever call her back when she found

12   out his name?

13   A.       I don't remember that, no.

14   Q.       Have you ever even seen a TBI report?

15   A.       No, sir.

16   Q.       And this concerned Mr. Jones' tanning

17   business, correct?

18   A.       Yes, sir.

19   Q.       Nothing to do with government or anything

20   like that?

21   A.       (Shaking head negatively.)

22   Q.       So, other than the Brown -- did you say that

23   you had discussed Ms. Lucas' complaints about

24   Mr. Jones while she was there working with you in

25   the Human Resources Department?

1  A.     Gosh, that was early in 2015.  I don't

2  remember any harassment, other than she was moved

3  because of bad treatment, but I don't know the

4  specifics of it.

5  Q.     With Ms. Lucas?

6  A.     With Ms. Lucas, yes.

7  Q.     Now, then you have Angela Brown who worked

8  there for two days and you closed the file, correct?

9  A.     I could not get back in touch with her.

10  Q.     And until Gail Harness showed up again, no

11  one else showed up to complain about sexual

12  harassment?

13  A.     No, sir.

14  Q.     In Jones' department or any other department?

15  A.     No, sir.

16          MR. KNIGHT:  That's all, Your Honor.

17          THE COURT:  Redirect.

18          MR. STANLEY:  Just briefly.

19

20              REDIRECT EXAMINATION

21  QUESTIONS BY MS. STANLEY:

22  Q.     Ms. Brown call you back -- Angela Brown call

23  you back?

24  A.     I don't believe so, no, sir.

25  Q.     We did get in touch with her.  Would you be

```
 1  surprised that she has not been able to sleep or eat

 2  since --

 3            MR. KNIGHT:  Objection.

 4            THE COURT:  Sustained.

 5  BY MR. STANLEY:

 6  Q.    He asked you about the TBI investigation, did

 7  you ever see a report.  How serious was it?  I mean,

 8  did they ask you --

 9            MR. KNIGHT:  Objection.

10            THE COURT:  Sustained.

11            MR. KNIGHT:  Objection.

12            THE COURT:  Sustained.

13  BY MR. STANLEY:

14  Q.    Counsel said that you don't trust the Mayor,

15  and that's why you went around to Jay Yeager,

16  correct?

17  A.    That's why I went around Jay Yeager or to Jay

18  Yeager?

19  Q.    I'm sorry.  Around her to Jay Yeager.

20  A.    I don't know if it was a trust factor or just

21  she didn't care.

22  Q.    Now, when you asked her to sign, what was

23  it -- you asked her to sign something?

24  A.    It was a posting that the Governor had put

25  out for bullying.
```

April Lassiter-Benson, RPR, CSR, LCR

1   Q.      And she did sign it?

2   A.      She did not.

3   Q.      But she told her counsel she signed it.

4   A.      No, I don't think there's anything with her

5   signature on it posted on any board, because she

6   refused to sign it.

7   Q.      Okay.

8   A.      But she didn't want to sign it.

9   Q.      That would be a false statement by her

10  lawyer?

11  A.      Yes, sir.

12          MR. STANLEY:  No further questions.

13          MR. KNIGHT:  She never even said that,

14  Your Honor.

15          THE COURT:  Thank you, sir.  You may

16  step down.

17          (Witness excused.)

18          THE COURT:  It's about 10:30 now.  We'll

19  take our morning recess.  We will be back in 10

20  minutes until the hour.  10 minutes until the hour.

21          (WHEREUPON, the jury was excused for a

22  break.)

23          (Short break.)

24          (WHEREUPON, the following matters were

25  heard in open court outside the presence of the

1  jury, as follows:)

2          THE COURT:  I understand something has

3  transpired with the Plaintiff?

4          MR. STANLEY:  Yes, Your Honor.  While we

5  were on break, Ms. Harness was outside and she

6  was -- Russell Bearden was walking out, and she was

7  at the bottom of the steps outside, and Russell

8  Bearden's still here.  She said that she turned and

9  saw William Jones, and said, "Can you please walk

10  with me?"  So Russell Bearden and her went to walk.

11  And then she just collapsed.  And collapsed kind of

12  on the concrete yard area in the front of the

13  courthouse.  And so, an ambulance was called.

14          But what's the latest, as far as her

15  being able to --

16          UNIDENTIFIED SPEAKER:  She's doing okay.

17  We're seeing if maybe we can get lunch

18  (inaudible) --

19          MR. STANLEY:  She was going to be our

20  next witness.  Is the ambulance still here?

21          UNIDENTIFIED SPEAKER:  The ambulance has

22  left.

23          MR. STANLEY:  The ambulance has left.  I

24  guess we'll just -- maybe we need a little more time

25  or maybe we can take a break.  I'm just getting this

```
 1    the same time you are, Your Honor.
 2              THE COURT:  It's almost 11:00.  You want
 3    to take our lunch break and have a longer lunch
 4    break?
 5              MR. KNIGHT:  That would be fine.
 6              MS. BURCHETTE:  We have no objection to
 7    that, Your Honor.
 8              THE COURT:  And come back at 1:00?
 9              MR. STANLEY:  I think that would be a
10    great idea.  Yes, Your Honor.
11              THE COURT:  Let's bring the jury in.  I
12    won't say anything about Ms. Bailey or Ms. Harness
13    to the jury.  Let's bring the jury in.
14              (WHEREUPON, the jury re-entered the
15    courtroom, with matters being heard in open court,
16    as follows:)
17              THE COURT:  Ladies and gentlemen, we're
18    going to take a little bit earlier lunch than we
19    normally do, and also a little bit longer lunch than
20    we normally do.  It's just about 11:00 now.  We're
21    going to go to lunch now and we will resume at 1:00.
22    We're still or track for the Plaintiff to finish
23    their case.  It won't be this morning, though, but
24    it should be early this afternoon.
25              While you're away from court, do not
```

*April Lassiter-Benson, RPR, CSR, LCR*

1    discuss this case with anyone.  Do not allow anyone

2    to discuss this case with you.  If you decide to go

3    to lunch together, then don't discuss the case.

4    Find something else to talk about.  You can talk

5    about the fine summer weather we're having, even

6    though we're having some rain.  You can talk about

7    the exciting election in New York City that's going

8    on today, or the prospects for the Tennessee laws

9    for this fall, but don't talk about the case.

10               When you come back, we'll have you

11   brought back in, and then we'll hear our next

12   witness.  Okay?

13               Anything further?

14               MR. COLLINS:  No Your Honor.

15               THE COURT:  Mrs. Lewis.

16               (Short break.)

17               (WHEREUPON, the following matters were

18   heard in open court outside the presence of the

19   jury, as follows:)

20               THE COURT:  I see Ms. Harness is back in

21   court.  And Ms. Harness, I hope that you're doing

22   okay.  And whatever it was that you experienced,

23   you're up and you're doing well.

24               Did counsel want to see the Court before

25   we start?

*April Lassiter-Benson, RPR, CSR, LCR*

```
1              MS. BURCHETTE:  We have a brief matter,
2    Your Honor.
3              We would move to exclude any testimony
4    regarding what happened that led to this extended
5    break today coming in either through Ms. Harness or
6    through Dr. Surdock, because it's highly prejudicial
7    and it's not relevant to this case as it stands
8    today.
9              MS. BAILEY:  It is exactly what we're
10   here about today, Your Honor.  It's very relevant.
11   It shows her reaction to him and her PTSD.
12             THE COURT:  Are you saying that she
13   fainted or she collapsed because of Mr. --
14             MS. BAILEY:  Jones.
15             THE COURT:  -- Jones?
16             MS. BAILEY:  Yes, one hundred percent.
17             THE COURT:  Why?  How could that be?
18             MS. BAILEY:  This isn't the first time
19   it's happened.
20             THE COURT:  Whenever she sees him, she
21   collapses?
22             MS. BAILEY:  She has a panic attack.
23             THE COURT:  Well, that wasn't the
24   question.  Whenever she sees him, she collapses?
25             MS. BAILEY:  Yes.  Whenever she sees
```

1   him, she collapses.

2            THE COURT:  I'm having some difficulty

3   understanding.  Unless she's extremely peculiar,

4   that does not seem like a normal reaction to even

5   someone who has experienced the horrors of war.

6            MS. BAILEY:  But it's the reaction she

7   has, Your Honor, and her doctor can testify to that.

8            THE COURT:  Well, why do we need to

9   bring it out today, then?

10           If she's collapsed before, why doesn't

11  the doctor talk about that, that she's collapsed two

12  months ago, six months ago?

13           Why do we need to bring it out that she

14  collapsed on June 22, 2021 at 11:00?

15           MS. BAILEY:  It shows that her PTSD is

16  continuing until today.

17           THE COURT:  Is anybody disputing that?

18           Is that in dispute?

19           MS. BAILEY:  I don't know if it's in

20  dispute, but we have to prove it.  It's our case.

21           THE COURT:  I think someone said -- I'm

22  not sure who said it.  It may have been counsel in

23  opening statements that there's no cure for PTSD,

24  but there's treatment for it.  But it stays with you

25  pretty much forever.

```
 1                    Did someone say that?
 2                    MS. BAILEY:  Yes, Your Honor.
 3                    THE COURT:  Is anyone going to
 4   contradict that?
 5                    MS. BAILEY:  I don't know that, Your
 6   Honor.  But it's an example --
 7                    THE COURT:  Well, until someone
 8   contradicts it, the Court is not going to permit any
 9   testimony about what the Plaintiff underwent today.
10   I think it's fair game for her psychologist to talk
11   about what she's told the psychologist and what the
12   psychologist has observed, and also what the
13   Plaintiff has observed.
14                    MS. BAILEY:  Your Honor, I don't -- can
15   I have one moment, because I'm not sure of
16   something?
17                    (An off-the-record discussion was
18   held.)
19                    MR. COLLINS:  She's still currently
20   seeing her.  That was a misstatement.
21                    MS. BURCHETTE:  She's seeing her.
22                    MR. COLLINS:  She's going back to her,
23   yes.  And, furthermore, Dr. Surdock was down here
24   when this incident happened where she saw William
25   Jones, and then she had this syncope.  And
```

1   Dr. Surdock will testify that that is exactly the

2   type of symptoms that you get, marked physiological

3   reaction to an internal or external cue.  It's right

4   out of the DSM-5.  So, I mean, I think it's

5   important -- I mean, it goes to the severity of her

6   injury.  It goes to damages.

7              THE COURT:  The Court will not allow it.

8              MS. BAILEY:  Thank you, Your Honor.

9              THE COURT:  Are we ready for the jury?

10             MR. STANLEY:  Yes, Your Honor.

11             (WHEREUPON, the jury re-entered the

12   courtroom, with matters being heard in open court,

13   as follows:)

14             THE COURT:  Please call your next

15   witness.

16             MS. BAILEY:  Plaintiff calls Gail

17   Harness.

18             (WHEREUPON, the witness was sworn in by

19   the Court Clerk.)

20

21                        * * *

22                   **GAIL HARNESS,**

23   was called as a witness, and after having been duly

24   sworn, testified as follows:

25   //

```
 1                    DIRECT EXAMINATION

 2   QUESTIONS BY MS. BAILEY:

 3   Q.     Please introduce yourself to the jury.

 4   A.     My name is Edwina Gail Harness.

 5   Q.     Are you presently married?

 6   A.     No.

 7   Q.     Do you have any children?

 8   A.     Yes.

 9   Q.     What are their names and ages?

10   A.     Marisha, Jasmine and Madison.  They're 6, 15

11   and 17.

12   Q.     And are these your natural children?

13   A.     Two of them are.  One I have custody of.

14   Q.     How long have you had custody of that

15   particular --

16   A.     Since she was 12.  So, five years, almost

17   six.

18   Q.     Give me your educational background, starting

19   with high school.

20   A.     I went to Scott High School in Huntsville

21   where I got my GED.  Then, I went to Roane State

22   Community College and got an Associates of Science

23   in Education.  And then, Tennessee Tech in

24   Cookeville for a Bachelor's in Interdisciplinary

25   Studies.
```

1  Q.      So, in furtherance of your education after

2  you got your GED, you went back to school?

3  A.      Yes, ma'am.

4  Q.      Why did you go back to school?

5  A.      To make a better life for me and my kids.

6  Q.      Now, you told us -- what was your degree in?

7  I'm sorry.

8  A.      Interdisciplinary Studies.

9  Q.      One of the requirements for your degree was

10 an internship; is that correct?

11 A.      Yes, ma'am.

12 Q.      Did you do an internship?

13 A.      I did.

14 Q.      Where did you do that?

15 A.      At the Clerk's Office in Anderson County.

16 Q.      Tell me how it came about that you got an

17 internship at the Clerk's Office.

18 A.      I was working at a daycare, and one of my

19 student's mother worked there, and I had been

20 speaking with her about needing one, so she

21 connected me.

22 Q.      If you're uncomfortable, you can remove your

23 mask.

24         How long was this internship supposed to be?

25 A.      From the end of January, first of February

1   until May.

2   Q.      Who did you interview with?

3   A.      William Jones.

4   Q.      How was that interview?

5   A.      It was -- it was different.

6   Q.      Different in what way?

7   A.      He just asked some offbeat questions like if

8   I was married; who I voted for; my political stance.

9   Q.      And who was it that introduced you to this

10  Clerk's Office?

11  A.      Tracy Spitzer.

12  Q.      Tracy Spitzer.

13          Were you offered the job?

14  A.      Yes.

15  Q.      How did you feel when you were offered this

16  job?

17  A.      Well, I was excited, because I needed it

18  (crying).

19  Q.      Did you ask Tracy a lot of questions about

20  the Clerk's Office?

21  A.      I did.

22  Q.      What kind of questions?

23  A.      Just what it entails, what they do on a daily

24  basis, just questions regarding the job.

25  Q.      Did you ask about wardrobe?

1   A.      Yes, I asked about the dress code.

2   Q.      What did she tell you?

3   A.      That William preferred certain things, and I

4   was used to dressing in scrubs.

5   Q.      He preferred certain things like what?

6   A.      Just, like, more like dresses and kind of low

7   cut, and just professional, but revealing, I guess.

8   Q.      How did you feel about that?

9   A.      I just took it as, you know, you got to dress

10  professional.  I didn't really think anything about

11  it.

12  Q.      Tell me about your first day when you got to

13  the Clerk's Office or when you got to the building

14  of the Clerk's Office?

15  A.      On the day that I arrived, I texted William

16  and asked him if I park on top or if I park on the

17  bottom, 'cause there's like a top level and then the

18  bottom parking lot, and he responded back with, "I

19  prefer you on top."

20          And then, I went to his office, he kind of

21  took me around to the other offices to show me

22  around and to introduce me.  And then, he took me

23  to juvenile court.

24  Q.      Is that where you were stationed, in juvenile

25  court?

1   A.      Yes.

2   Q.      On your first day, were you trained on your

3   job?

4   A.      No.

5   Q.      Were you given an employee handbook?

6   A.      No.

7   Q.      Were you told how to report sexual

8   harassment?

9   A.      No.

10  Q.      Who was your immediate supervisor?

11  A.      William Jones.

12  Q.      So, anything that happened, that happened to

13  you, you were to report to him?

14  A.      Yes.

15  Q.      And that's all you know?

16  A.      Yes.

17  Q.      Were there other clerks that worked with you?

18  A.      Yes.

19  Q.      Let me go back.

20          So, William Jones hired you.  Did he have

21  the authority to fire you?

22  A.      Yes.

23  Q.      Did he hire anybody that worked at the

24  Clerk's Office?

25  A.      Yes.

1   Q.      Did he have the authority to fire anyone that

2   worked at the Clerk's office?

3   A.      Yes.

4   Q.      Did he develop the procedures for the Clerk's

5   Office?

6   A.      Yes.

7   Q.      Did he make the policies for the Clerk's

8   Office?

9   A.      Yes.

10  Q.      Were they always in line with the other

11  Anderson County policies?

12  A.      I'm not sure, 'cause I never received anybody

13  else's policies.

14  Q.      Who were the other clerks that worked with

15  you?

16  A.      Valerie Walker, Tracy Spitzer, and

17  Dawn Queener.

18  Q.      Was this a paid position?

19  A.      Not at first.

20  Q.      Did it become a paid position?

21  A.      Yes.

22  Q.      What were your duties as an intern?

23  A.      I started with filing and just really

24  anything they needed help with.

25  Q.      And you said at sometime it became a paid

1  position.  When did that happen?

2  A.      I believe at the -- closer to the end of

3  February.

4  Q.      So, at that point, are you still considered

5  an intern or are you a part-time employee?

6  A.      Yes, I was still an intern.

7  Q.      But you were working part-time?

8  A.      Yes.

9  Q.      We talked about Mr. Jones making the policy.

10  Did his policies ever conflict with judge's orders?

11  A.      Yes.

12  Q.      What happened in cases when his policy, or

13  what he wanted you to do, conflicted with what a

14  judge told you to do?

15  A.      He would just get angry.

16  Q.      What did he do when he was angry?

17  A.      He would yell at you in front of other people

18  and he would demean you, put you down.  He would

19  write you up.

20  Q.      When you first started working with him, how

21  was your interaction with him?

22  A.      It was a little too friendly.

23  Q.      What do you mean by "too friendly"?

24  A.      He was just really flirtatious, I guess, at

25  first; very --

1   Q.      I'm sorry.  Go ahead.

2   A.      Very personal, just in your business, kind

3   of.

4   Q.      Was it just you or was it other people in the

5   Clerk's Office?

6           MS. BURCHETTE:  Objection, Your Honor.

7   It's not relevant what other people in the

8   office -- what his interactions with other people in

9   the office are.  It's a single claim as to

10  Ms. Harness.

11          THE COURT:  Ms. Bailey?

12          MS. BAILEY:  It's harassment; hostile

13  work environment; policy and procedure; custom and

14  policy; all goes to that.

15          THE COURT:  Sustained.

16  BY MS. BAILEY:

17  Q.      Did you ever -- or did he ever communicate

18  with you outside of the office?

19  A.      Yes.

20  Q.      How did he communicate with you?

21  A.      It started with text messages.

22  Q.      What kind of text messages?

23  A.      Through the phone.  It would just be, what

24  are you doing, where are you at, kind of things like

25  that.

1  Q.      Did you find it odd?

2  A.      I did.

3  Q.      Did you reply?

4  A.      Yes.

5  Q.      Why did you reply?

6  A.      He was my boss.

7  Q.      What did you think would happen if you didn't

8  reply?

9  A.      Obviously, I'd be on his bad side.  I could

10 be fired, lose my internship, anything.

11 Q.      And if you lost your internship, what would

12 happen?

13 A.      I wouldn't graduate.

14 Q.      And at the time, what was the status of your

15 marriage?

16 A.      It was rocky.  Me and my husband were pretty

17 much separated, but we was living together trying to

18 work things out.

19 Q.      Did Mr. Jones know about that?

20 A.      Yes.

21 Q.      You said it started with text messages.  Did

22 it progress to something else after the text

23 messages?

24 A.      Yes.

25 Q.      To what?

*April Lassiter-Benson, RPR, CSR, LCR*

1    A.    To Snapchat.

2    Q.    What kind of things were you Snapchatting

3    about?

4    A.    It would be anything throughout the day,

5    like, "how are you doing; where are you at; how's

6    work."  He would send pictures of himself; pictures

7    of his socks every morning, just ...

8    Q.    So he Snapchatted you almost every morning?

9    A.    Yes.

10    Q.    What kind of things would he say in the

11    morning?

12    A.    Just, "good morning, beautiful," or," I hope

13    you're ready for the day; I'll see you later,"

14    just ...

15    Q.    Did they eventually become more sexual?

16    A.    Yes.

17    Q.    When did that happen when they started

18    becoming sexual?

19    A.    It started pretty soon into February, March.

20    Q.    What kind of things was he Snapchatting you?

21    A.    He would make anything sexual.  It's hard to

22    even give examples.  You could say that you're

23    running late and he would have something sexual to

24    say for anything.

25    Q.    When he did that, how would you respond?

```
 1   A.      I would either respond back enough to where I
 2   would keep him happy or I'd completely change the
 3   subject.
 4   Q.      Why were you trying to keep him happy?
 5   A.      Because he was my boss and I needed that job
 6   in the internship.
 7   Q.      What made you think you would lose your job
 8   if you didn't respond?
 9   A.      It was well-known we would lose our job.  We
10   had to please William.
11   Q.      What did William call himself?
12   A.      "Daddy".
13   Q.      And did he make the clerk's refer to him that
14   way?
15   A.      Yes, that was what he preferred.
16   Q.      And what did he call his wife?
17   A.      "Mama".
18   Q.      And that's the way he referred to her to you?
19   A.      Yes.
20   Q.      Did William ever ask you to work at another
21   business that he owned?
22   A.      Yeah.
23           MS. BURCHETTE:  Objection as to
24   relevance.  This is outside of the employment at the
25   Clerk's Office.
```

April Lassiter-Benson, RPR, CSR, LCR

```
 1              THE COURT:  Ms. Bailey?
 2              MS. BAILEY:  Your Honor, it goes to his
 3   treatment of her.  It's outside of the scope of the
 4   Clerk's Office, but it ties into the sexual
 5   harassment.
 6              THE COURT:  And the statement you're
 7   trying to elicit from her, was it made while he was
 8   in the Clerk's Office?
 9              MS. BAILEY:  I'm sorry, Your Honor, I
10   didn't understand you.
11              THE COURT:  You're trying to elicit from
12   the witness a statement made by Mr. --
13              MS. BAILEY:  Jones.
14              THE COURT:  -- Jones.  Was this a
15   statement that he made while he was at the Clerk's
16   Office?
17              MS. BAILEY:  It was in the scope -- it
18   was while he was at the Clerk's Office.
19              THE COURT:  Overruled.
20   BY MS. BAILEY:
21   Q.    What did he tell you he wanted you to do?
22   A.    He wanted me to come and work at his tanning
23   salon that they owned.
24   Q.    Why was that?
25   A.    He said so it would give us alone time.
```

1  Q.    Did you take him up on his offer?

2  A.    No.

3  Q.    Who were you supposed to work with at the

4  tanning salon?

5  A.    His wife.

6  Q.    Which he referred to as what?

7  A.    Mama.

8  Q.    Was there an occasion where you and your

9  husband ran into William outside of work?

10 A.    Yes.

11 Q.    Tell me about that.

12 A.    We ran into him at Sam's Club in Knoxville.

13 That's when they were kind of introduced.  And then,

14 again at the July 4th festival in Lake City.

15 Q.    What's the July 4th festival?

16 A.    It's like a -- just a 4th of July celebration

17 kind of thing.

18 Q.    Was that something you did often, go to the

19 July 4th festival?

20 A.    Yes.

21 Q.    Is that something you do now?

22 A.    No.

23 Q.    Why not?

24 A.    'Cause I don't go anywhere if I think I'm

25 going to see him.

1  Q.      So, has that limited your activities in life?

2  A.      Yes.

3  Q.      How?

4  A.      Because anywhere I think he's going to be, I

5  don't go.  I -- I don't talk to certain people

6  because -- we don't do certain activities.

7  Q.      And when you say, "We," who are you talking

8  about?

9  A.      Me and my kids.

10  Q.      So, that's not only impacted your life, it

11  affected their lives as well?

12  A.      Yes.

13  Q.      How else did it effect your kids' lives?

14              MS. BURCHETTE:  Objection.

15              THE WITNESS:  Well, for one --

16              MS. BURCHETTE:  Because they're not

17  parties to this action, Your Honor.

18              MS. BAILEY:  Your Honor, we're talking

19  about a mother.  Anything that affects her kids

20  affects her.

21              THE COURT:  And your question is what?

22              MS. BAILEY:  I said, is there anything

23  that affects her kids --

24              THE COURT:  I understand that was your

25  answer to me.  That was not a question.

```
1              What was your question?

2              MS. BAILEY:  My question is:  How did it

3    affect your kids' lives?

4              THE COURT:  Sustained.

5    BY MS. BAILEY:

6    Q.    Did your kids ever come home and tell you

7    something that was said to them?

8              MS. BURCHETTE:  Objection, again, Your

9    Honor.

10             MS. BAILEY:  Your Honor, this is very

11   relevant.  If I can have some leeway.

12             THE COURT:  And why is it relevant?

13             MS. BAILEY:  Because her kids are --

14   compared to what she's got going on now.

15             THE COURT:  And why is that relevant?

16             MS. BAILEY:  Because it affected her

17   reputation in the community.

18             THE COURT:  Why is that relevant?

19             MS. BAILEY:  It goes to her damages.

20             THE COURT:  Well, I think what you want

21   to do is relevant.  I think you're trying to elicit

22   hearsay, though, aren't you?  Not only is it hearsay

23   and maybe double hearsay if you're asking her what

24   did the children tell you, what did other people

25   tell them.  So, none of the children are here in
```

1  court.

2          MS. BAILEY:  It goes to the effect on

3  the listener.

4          THE COURT:  So, we can not tell their

5  credibility.  And this is based upon what somebody

6  else said to them, who also are not here in the

7  courtroom.  It's double hearsay.

8          MS. BAILEY:  It doesn't matter.  If it's

9  true, it goes to the effect on her.

10          THE COURT:  For damages?

11          MS. BAILEY:  The effect --

12          THE COURT:  You want to ask this jury to

13  award damages based upon out-of-court statements

14  from people they've never seen, they've never heard

15  of?  They have no way of knowing whether what

16  they're saying is a joke or not, whether it's true

17  or not.

18          Because of the effect it had on her?

19          MS. BAILEY:  Yes, Your Honor.

20          THE COURT:  Is that appropriate to award

21  damages based on that?

22          MS. BAILEY:  I think it is, Your Honor.

23          THE COURT:  Sustained.

24          (WHEREUPON, a document was marked as

25  Exhibit Number 33.)

1   BY MS. BAILEY:

2   Q.      I want to bring up Exhibit 33.

3               THE CLERK:  On the --

4               MR. STANLEY:  It's the HDMI.

5               THE CLERK:  It's there.  There's just a

6   delay.  Is it hooked up?

7               MR. COLLINS:  It is in.  I can try

8   again.  Oh, yeah, I think I got it.

9   BY MS. BAILEY:

10  Q.      Do you recognize these?

11  A.      Yes.

12  Q.      What is this?

13  A.      It's Snap messages between me and William.

14  Q.      Now, this in the corner, "Jones 37," do you

15  know what that means?

16  A.      That means that he provided these.

17  Q.      And is there anything else in this that tells

18  you that he provided these?

19  A.      Because it says, "Gail and me."

20  Q.      So, you would be Gail, and he would be me?

21  A.      Yes.

22  Q.      Can we look at Jones 37, please?  Go up,

23  please.  Can you read that first -- well, that chat

24  from you, what that says?

25  A.      "I'm a little confused.  So if I missed with

1  the kids' doctor's appointments, hours in a day, I

2  can't make up them days.  I'm part-time.  I was just

3  under the impression as long as I didn't get over

4  29.5.  I'm just wondering.  I don't need to speak

5  with Angela.  I was just making sure I understood

6  correctly."

7  Q.      And why were you asking him about this?

8  A.      'Cause I had missed some time and was trying

9  to make up the time.

10 Q.      Why did you miss time?

11 A.      To take my kids -- well, my daughter to a

12 doctor's appointment.

13 Q.      Now, when you first started on your first day

14 as a part-time employee, were you told how to

15 request time off?

16 A.      No.

17 Q.      Were you told you have to work a certain

18 schedule?

19 A.      No.

20 Q.      Were you told that you only had to work 29

21 hours and that's it?

22 A.      As long as I didn't go over that, yes.

23 Q.      It didn't matter when?

24 A.      Yes.

25 Q.      Okay.  So, you're wanting to make up the

1  time.  And this is a conversation you and I -- I

2  mean, you and Mr. Jones had about your time,

3  correct?

4  A.     Yes.

5  Q.     And this was all business?

6  A.     Yes.

7  Q.     And this is just you trying to get your

8  schedule, right?

9  A.     Yes.

10  Q.     So that you can make as much money as

11  possible?

12  A.     Yes.

13  Q.     What was his response?

14  A.     It -- he wanted a picture.

15  Q.     So, you're asking about your job, and he

16  responded with, "I want a picture?"

17  A.     Yes.

18  Q.     Is this what he sent you?

19  A.     Yes.

20  Q.     What was your response?

21  A.     I sent him a picture.

22  Q.     Why did you do that?

23  A.     Because I had to.  Because I couldn't lose my

24  job (crying).  I couldn't lose the internship.  I

25  had to supply for us somehow.

1  Q.     When you say, "Us," who are you talking

2  about?

3  A.     My kids and I.

4  Q.     At this time were you the only source of

5  income for your kids?

6  A.     For the most part.  Like I said, me and my

7  husband were still kind of living together kind of

8  working it out, but we had separate accounts, so ...

9  Q.     Did you make more money than him?

10 A.     I wouldn't say I made more, no.  But he

11 didn't make much either.

12 Q.     Now, we see that he had some --

13        MS. BAILEY:  I want to go to Jones 38,

14 please (talking to co-counsel).

15        MR. STANLEY:  Jones what?

16        MS. BAILEY:  38.  I'm sorry, 43, please.

17 Jones 43.

18        MR. STANLEY:  43?

19        MS. BAILEY:  Yes.  Okay.

20        (WHEREUPON, a document was marked as

21 Exhibit Number 43.)

22 BY MS. BAILEY:

23 Q.     What is this Snapchat talking about?

24 A.     We had to refer to him as "Daddy".

25 Q.     So why --

```
 1   A.      So, it's talking about that.

 2   Q.      So, he's saying, "Tell them what's on my mind

 3   and who they work for."  That's him?

 4   A.      Yes.

 5   Q.      And who did they work for?

 6   A.      For "Daddy", for William.

 7   Q.      And who did he tell you you worked for?

 8   A.      I'm sorry?

 9   Q.      Who did he tell you you worked for?

10           MS. BURCHETTE:  Objection, that's not

11   what this Snapchat says.  That's her response, but

12   that question is leading and improper.

13           THE COURT:  Ms. Bailey.

14           MS. BAILEY:  I'm talking in general,

15   Your Honor, I'm not referring to the Snapchat.

16   She -- we went off the Snapchat.

17           THE COURT:  Okay.  Overruled.

18   BY MS. BAILEY:

19   Q.      Who did he tell you, you worked for?

20   A.      For "Daddy".

21           MS. BAILEY:  Jones 45, please.  Let's

22   stop there.

23           MR. STANLEY:  Oh, that's 47.

24           MS. BAILEY:  I want 45 first, please.

25   Stop.
```

April Lassiter-Benson, RPR, CSR, LCR

1          (WHEREUPON, a previously marked

2   document was shown as Exhibit Number 45.)

3   BY MS. BAILEY:

4   Q.     Okay.  This is another Snapchat between you

5   and Mr. Jones.  It starts with him saying, "Hmm,

6   just hmm.  Then that makes my mind wander down a bad

7   road."

8          Do you know what that's about, do you

9   recall?

10  A.     I don't.  I think it had something to do with

11  the "Daddy" thing though.

12  Q.     We don't know if this is an unbroken chain or

13  not?

14  A.     Correct.

15  Q.     But then you go to, "Going to Bingo."  Why

16  did you say that?

17  A.     Just to change the subject.

18  Q.     Is that how you tried to respond --

19  A.     Yes.

20  Q.     -- often?

21  A.     Often, yes.

22          MS. BAILEY:  Jones 48, please.

23          (WHEREUPON, a document was marked as

24  Exhibit Number 48.)

25  ///

*April Lassiter-Benson, RPR, CSR, LCR*

1  BY MS. BAILEY:

2  Q.      Again, this is you talking to him about

3  getting a job?

4  A.      Yes.

5  Q.      What kind of job were you looking for?

6  A.      To be full-time in the Clerk's Office?

7  Q.      Was it your intent to stay at the Clerk's

8  Office when you originally went there?

9  A.      Not when I originally went there.

10  Q.      Was it ever your intent to stay there?

11  A.      I did like the job, yes.

12  Q.      But -- I heard a but after that.  I like the

13  job, but ...

14  A.      I mean, I wouldn't want to work under him,

15  like, as a career.

16  Q.      Okay.  This is Jones 48, him saying -- well,

17  will you read that, please.

18  A.      Which one?

19  Q.      Him saying -- starting with "The last thing I

20  sent."  If you don't think you can read it, I'll

21  read it.

22  A.      It says, "The last thing I sent was grabbing

23  the back of your head, thrusting my (expletive) in

24  your throat.  And since you don't gag, does that

25  mean I can (expletive) in the back of your mouth?

1    You need to go to the salon after work tomorrow.

2    Mama needs some help and that would give us alone

3    time sometimes."

4    Q.      This sounds like it was in response to

5    something.  Do you recall what that was?

6    A.      He had sent it and I had went off, and I

7    asked him to send it again.

8    Q.      Why did you ask him to send it again?

9    A.      'Cause at the time I took a picture of it

10   with a co-worker's phone, and then sent it to my

11   phone.

12   Q.      Now, why would you take a picture with a

13   co-worker's phone, isn't this something you can save

14   yourself?

15   A.      Yes, it is.

16   Q.      I don't really know how Snapchat works.  Can

17   you explain to me how that works.

18   A.      You can save the messages that come through,

19   and it notifies, obviously, the other person.  And

20   then, pictures just disappear unless you screenshot

21   them.

22   Q.      So, why did you feel it necessary to save it

23   to somebody else's phone versus just saving it to

24   your phone?

25   A.      Because when I would try to save messages, he

1  said -- he would yell at me and tell me to delete

2  them, and I wasn't suppose to save anything.

3  Q.    On Jones 49, here we have you asking for a

4  job again.  "What's Dawn's job?"

5  A.    Dawn was the delinquent in juvenile court.

6  Q.    Was her job full-time or part-time?

7  A.    Full-time.

8  Q.    And you're asking him for a job?

9  A.    Yes.

10  Q.    Okay.  What -- how did he respond?

11  A.    He always just kind of beat around the bush

12  or would respond sexual or -- 'cause I asked him

13  several times.

14  Q.    So, every time you would ask him for a job,

15  he would respond with something sexual?

16  A.    Yes.

17            MS. BAILEY:  Jones 52, please.

18            (WHEREUPON, a document was marked as

19  Exhibit Number 52.)

20  BY MS. BAILEY:

21  Q.    Can you tell me what this conversation is

22  about?

23  A.    It's talking about me being sore.  My husband

24  at the time metal detected, so I was in charge of

25  burying all of the silver in the ground.

1    Q.    And you told him about that?

2    A.    Yes.

3    Q.    Saying there's a lot of up and down and

4    ground to cover?

5    A.    Yes.

6    Q.    And how did he respond?

7    A.    With a sexual comment.

8    Q.    And when you said, "There's a lot of up and

9    down and ground to cover," were you saying that in a

10   sexual way?

11   A.    No.

12           MS. BAILEY:  Can we page up a little

13   bit?  I'm sorry, page down.

14   BY MS. BAILEY:

15   Q.    And this is an unbroken chain, right?

16   A.    This part, yes.

17   Q.    Okay.  And then he comes in with something

18   else?

19   A.    Yes.

20   Q.    About garter belts, corsets and stickings.

21   Stockings, I'm sure he meant.

22   A.    Yeah.

23   Q.    So, we're looking at more Snapchat messages

24   at -- so, this is actually the same conversation we

25   looked at a little bit -- or is it the same

1  conversation about helping mama at the tanning

2  salon?

3            MS. BURCHETTE:  Objection, Your Honor,

4  to speculation.  They're not dated.

5            MS. BAILEY:  I'm asking.  She would know

6  if she had the conversation.

7            MS. BURCHETTE:  Still say it calls for

8  speculation if these messages are not dated.

9            THE COURT:  And your question was, what

10 was the date of this particular message?

11           MS. BAILEY:  No.  I said, is this the

12 same conversation or is this a different

13 conversation?

14           THE COURT:  Overruled.

15           THE WITNESS:  I can't answer, honestly.

16 I'm not sure.

17 BY MS. BAILEY:

18 Q.    Okay.  But these text messages or these

19 Snapchat screen graphs look different than the ones

20 we looked at before?

21 A.    Yes.

22 Q.    And these are different because "Me" is now

23 you, and "William" is Mr. Jones?

24 A.    Correct.

25 Q.    So, these are the ones you've provided?

1   A.      Yes.

2   Q.      Okay.  At the bottom of this text message,

3   you start with "Enough of this Purple Rain and I

4   may."  What does that mean?

5   A.      Me and my kids were out doing karaoke.  And

6   purple rain is just a cocktail drink, and he's

7   talking about me singing.

8   Q.      And when you told him about the Purple

9   Rain -- so you're saying, I had enough of these

10  Purple Rains, I assume?

11  A.      Yes.

12  Q.      How did he respond?

13  A.      Sexual.

14  Q.      "I want to shoot in your mouth."

15          And you were out with your kids?

16  A.      Yes.

17  Q.      And you were telling him about them singing?

18  A.      Yes.

19  Q.      Tell me what this is about.  You start

20  with "Sitting on the couch wrestling with my wild

21  child."

22          Now, this may be a broken chain, because the

23  date starts with him.  So, when you Snapchat the

24  first Snapchat of the day, is that when the date

25  comes up?

1  A.     I think it can -- that's normally when it

2  comes up.  And I think if there's been like hours in

3  between, it'll also do that.

4  Q.     So, by looking at this, we can tell he

5  initiated this conversation?

6  A.     On this, yes.

7  Q.     And how did he initiate this conversation?

8  A.     Talking about a tall glass of me.

9  Q.     And according to this, there was no previous

10  conversation, at least not in that realm?

11  A.     Not on that one that's saved, no.

12            MS. BAILEY:  If I've not moved 33 into

13  evidence, Your Honor, I'd like to move it in now.

14            THE COURT:  Without objection, it's

15  admitted.

16            MS. BURCHETTE:  No objection, Your

17  Honor.

18            (WHEREUPON, a previously marked

19  document was shown as Exhibit Number 33.)

20  BY MS. BAILEY:

21  Q.     Did he ever ask you to meet with him and his

22  wife?

23  A.     Yes.

24  Q.     In what respect?

25  A.     He had asked me to have sex with him and his

April Lassiter-Benson, RPR, CSR, LCR

1  wife.

2  Q.    How did you respond to that?

3  A.    I told him that I didn't think his wife would

4  be too happy with him speaking like that.

5  Q.    And what did he say?

6  A.    That she wouldn't mind.

7  Q.    Now, we've gone through some Snapchats.  Some

8  provided by him; some provided by you.  And I think

9  you told me that they go away after a certain amount

10  of time.

11  A.    If you don't save them, they go away.

12  Q.    So, were there other Snapchats that we've not

13  seen?

14  A.    Yeah.

15  Q.    That have not been provided by him or

16  provided by you?

17  A.    Yes.

18  Q.    How long did the Snapchatting go on?

19  A.    Up until maybe May, June.

20  Q.    Were you -- were they still mostly sexual?

21  A.    Yes.

22  Q.    Did your husband know about it?

23  A.    He knew about the Snapchatting, but he did

24  not know, like, the extent of it.

25  Q.    Did he ever learn the extent of it?

```
1    A.      Eventually, yes.

2    Q.      How did he learn it?

3    A.      He learned the complete extent whenever I

4    made my complaint.

5    Q.      But he was involved in a lot of this at that

6    time, right?

7    A.      Yes.

8    Q.      How was he involved?

9    A.      Well, can you rephrase the question?

10   Q.      Your husband was meeting with people in --

11   A.      Yes.

12   Q.      Tell me about that.

13   A.      He was upset that I wasn't getting a

14   full-time job.  He didn't understand why.

15           MS. BURCHETTE:  Objection, Your Honor.

16   How does this go to a hostile work environment?

17           THE COURT:  Ms. Bailey?

18           MS. BAILEY:  Your Honor, we've had

19   testimony in this from the Mayor, from Russell

20   Bearden about Mr. Harness speaking on Mrs. Harness'

21   behalf.  And ...

22           Okay, I'll withdraw the question.

23   Nevermind.

24   BY MS. BAILEY:

25   Q.      Who did your checks come from?
```

1    A.      Anderson County.

2    Q.      Not the Clerk's Office?

3    A.      No.

4    Q.      There was sometime you did get a full-time

5    job?

6    A.      Yes.

7    Q.      Where -- were you still at the Clerk's

8    Office?

9    A.      Yes.

10   Q.      When was that?

11   A.      August, I believe.

12   Q.      And how long did you stay full-time?

13   A.      From August until August or September the

14   next year.

15   Q.      Okay.  Where were you working at this time?

16   A.      In the juvenile court.

17   Q.      And in August of '17, something happened.

18   You decided to make a complaint.

19   A.      Yes.

20   Q.      Who did you complain to?

21   A.      Russell Bearden.

22   Q.      What did you tell him?

23   A.      I just told him vaguely, what, kind of, was

24   going on, how I felt uncomfortable, how the

25   atmosphere and the environment was.

*April Lassiter-Benson, RPR, CSR, LCR*

1  Q.      What was his response?

2  A.      He said that he would investigate and that he

3  would help.

4  Q.      Did he investigate?

5  A.      As far as I know.  I was told he did.

6  Q.      Was there ever a time when Mr. Jones' wife

7  was in the office?

8  A.      Yes.

9  Q.      Tell me about that.

10  A.      After I'd made the complaint, and the day

11  that I was supposed to go give my sworn statement,

12  William brought his wife into the office and sat her

13  beside me.

14  Q.      Was she an employee?

15  A.      No.

16  Q.      What was she doing there?

17  A.      As far as I know, she had no business there.

18  I think she was just there to intimidate.

19  Q.      Did you eventually give the complaint?

20  A.      I'm sorry?

21  Q.      Did you eventually give your complaint?

22  A.      Yes, I gave it in August.  And then that same

23  day, gave my sworn statement.

24  Q.      Now, at some point, you left the office all

25  together; is that right?

1    A.      Yes.

2    Q.      How is it that you came to leave the office

3    all together?

4    A.      After my sworn statement, Russell walked me

5    over to the Care Clinic and I was put on FMLA.

6    Q.      Whose idea was that?

7    A.      Russell's.

8    Q.      Why were you put on FMLA?

9    A.      To get me out of the environment from --

10   Q.      Who told you that?

11   A.      Russell.

12   Q.      Did you ask for it?

13   A.      No.

14   Q.      How long were you out on FMLA?

15   A.      I think I came back in, like, March.  So from

16   September to March.

17   Q.      What job did you come back to?

18   A.      I went to the Senior Center.

19   Q.      What's the Senior Center?

20   A.      It's just an office that holds, like,

21   seniors.  They can go there and chill out during the

22   day.

23   Q.      So, this is not the job you applied for?

24   A.      No.

25   Q.      So, how was it working at the Senior Center?

1          MS. BURCHETTE:  Objection, Your Honor.

2   What does this have to do with a hostile work

3   environment?

4          THE COURT:  Ms. Bailey?

5          MS. BAILEY:  Your Honor, there was talk

6   at the Senior Center about what was going on with

7   her because it was an election year.  This goes to

8   her damages.

9          THE COURT:  State the question again.

10          MS. BAILEY:  I said, "How was it working

11   at the Senior Center?"

12          THE COURT:  Overruled.

13          THE WITNESS:  It was very rough working

14   at the Senior Center.  The seniors were very

15   friendly and they were nice for the most part.  But

16   it was an election year, so everyone that was

17   running for office was coming in and out, including

18   William.  People would come and they would sit, and

19   they was trying to talk to Sheree on why, you know,

20   they should vote for them.  This was in the news at

21   the time and everywhere.  They would sit beside

22   Sheree and start talking about me, not knowing at

23   the time that that's who I was.  Just saying awful

24   things about the whole situation.

25   ///

1    BY MS. BAILEY:

2    Q.      You said that William came in occasionally.

3    A.      Yes.

4    Q.      What happened when he would come in?

5    A.      I would be sent out for either a long break,

6    long lunch.

7    Q.      And how long were you there?

8    A.      Until September.

9    Q.      And then what happened in September?

10   A.      I was fired in September.

11            MS. BURCHETTE:  Objection, Your Honor.

12   That's been dismissed.

13            THE COURT:  What's the objection?

14            MS. BURCHETTE:  The claim has been

15   dismissed.

16            MS. BAILEY:  I just asked why she left.

17   I didn't go into anything else.

18            THE COURT:  Overruled.

19   BY MS. BAILEY:

20   Q.      What happened in September?

21   A.      I was fired.

22   Q.      Okay.  I want to talk about the harassment

23   retaliation and intimidation.

24            When did this inappropriate behavior start?

25   A.      Shortly after I began working for him.

April Lassiter-Benson, RPR, CSR, LCR

```
1    Q.      And how long did it go on?

2    A.      Until I left in September.

3    Q.      When you gave your complaint to Russell

4    Bearden, did you do it at the courthouse?

5    A.      No.

6    Q.      Where did you do it?

7    A.      I met him at Big Lots.

8    Q.      Why did you meet him at Big Lots?

9    A.      Because I didn't want to go to the courthouse

10   and do it.

11   Q.      Why not?

12   A.      Because I wanted it to stay anonymous.

13   Q.      Did it stay anonymous?

14   A.      No.

15   Q.      Were you told it would stay anonymous?

16   A.      Yes, I was told that it would be anonymous.

17   Q.      When you found out that it was not going to

18   be anonymous, what did you do?

19   A.      I panicked.

20   Q.      Did you try to withdraw your complaint?

21   A.      I did.

22   Q.      What happened?

23   A.      Kim told me that I had to be strong, and I

24   had to do it for my kids and to help other women.

25   Q.      Is that why you continued on?
```

April Lassiter-Benson, RPR, CSR, LCR

```
 1   A.      I'm sorry?

 2   Q.      Is that why you continued on?

 3   A.      Yes.

 4   Q.      Did you see yourself as a strong person or do

 5   you see yourself as a strong person?

 6   A.      No.

 7   Q.      Why not?

 8   A.      Because I let him do the things -- I did

 9   things that I normally would have never done and

10   shouldn't have done, but I was just -- I see myself

11   as very weak.

12   Q.      But you persevered on with this lawsuit?

13   A.      Yes.

14   Q.      At the encouragement of Kim Whitaker?

15   A.      Yes.

16   Q.      Did you have any other conversations with

17   Russell Bearden?

18   A.      Yes.

19   Q.      About what?

20   A.      I mean, we talked throughout the whole thing;

21   what was going on; what was happening.

22   Q.      How many times would you say you had

23   conversations with him?

24   A.      I couldn't count.  There were several.

25   Q.      After you gave your statement, did anything
```

*April Lassiter-Benson, RPR, CSR, LCR*

1    change at the Clerk's Office?

2    A.      No.

3    Q.      Did anything change for you?

4    A.      No.

5    Q.      Did you talk to anyone else in Anderson

6    County government?

7    A.      Jay Yeager.

8    Q.      What did you have to say or what conversation

9    did you have with Jay Yeager?

10   A.      Jay was just telling me that I was a

11   whistleblower, and that I was protected, not to

12   worry about anything.  My job was going to be there;

13   everything was going to be fine.

14   Q.      Did you believe that would be true?

15   A.      Yes.

16   Q.      Did it turn out to be true?

17   A.      No.

18   Q.      During the early period of your employment

19   while James was still in control of your education,

20   your career, your livelihood, did he have any

21   complaints about your job?

22   A.      No.

23   Q.      At some point he did have complaints about

24   your job.

25   A.      Yes.

1   Q.      When was that?

2   A.      February, I think.

3   Q.      February of?

4   A.      '17.

5   Q.      Okay.  There was an instance when you were

6   written up in February of '17, incorrectly dated

7   February '16.  Can you tell me what that

8   was -- well, first of all, who wrote you up?

9   A.      I don't remember which one this one is.

10  Q.      Okay.

11  A.      If I could see it.

12          William.

13  Q.      What did he write you up for?

14  A.      He said it was for insubordination.

15  Q.      And there are two instances on here.  It

16  talks about the first infraction occurred two weeks

17  ago.  Can you tell me about that?

18  A.      I was in the courtroom doing court orders

19  while court was going on, and when I come back to my

20  desk, I had some citations laying on my keyboard.

21  So I picked them up and went to stamp file them.

22  And as I was doing that, he started yelling at me

23  telling me not to do that.

24  Q.      Okay.  Who had told you to do it?

25  A.      The judge.

April Lassiter-Benson, RPR, CSR, LCR

1   Q.      And he said that you argued office procedures

2   with him.

3   A.      Yes.

4   Q.      Is that what happened?

5   A.      No, there was no argument.  I was just

6   explaining to him, well, the judge requires us to

7   stamp file them.

8   Q.      And then, two weeks go -- he said nothing to

9   you at that time?

10  A.      No.

11  Q.      And he had the authority to fire you at that

12  time?

13  A.      Yes.

14  Q.      But then nothing happened.  Two weeks go by

15  and he comes with the second infraction.  And what

16  was that one?

17  A.      Someone was being transferred and someone

18  with the Anderson County Sheriff's Office was asking

19  me about it, and I confirmed her questioning.

20  Q.      So, this says you were spreading rumors

21  essentially.

22  A.      Yes.

23  Q.      So, is that what happened?

24  A.      No.  The rumor was already out.  I wasn't

25  spreading anything.

April Lassiter-Benson, RPR, CSR, LCR

1   Q.      Just answer the question.

2   A.      Yes.

3               MS. BAILEY:  I'd like to move this into

4   the record, please.

5               MR. COLLINS:  23.

6               MS. BAILEY:  Exhibit 23.

7               MS. BURCHETTE:  No objection.

8               THE COURT:  Without objection, it's

9   received.

10              (WHEREUPON, a document was marked as

11  Exhibit Number 23.)

12  BY MS. BAILEY:

13  Q.      And then, there was another instance where

14  you were written up.  Do you remember who wrote you

15  up that time?

16  A.      Jessica.

17  Q.      And this was six weeks or so later?

18  A.      Yes.

19  Q.      And again, before this you had no problems,

20  correct?

21  A.      Correct.

22              MS. BAILEY:  Can we go back to 23,

23  please?

24  BY MS. BAILEY:

25  Q.      This was your first write-up, ever?

1   A.      Yes.

2   Q.      But this says, "Final Warning."  Were you

3   told it was a final warning?

4   A.      Yes.

5   Q.      But first write-up ever?

6   A.      Yes.

7               MS. BAILEY:  Okay.  Next one.

8   BY MS. BAILEY:

9   Q.      And this is the second write-up?

10  A.      Yes.

11  Q.      After the first write-up?

12  A.      Yes.

13  Q.      And this one says, "First Warning"?

14  A.      Yes.

15  Q.      What were you written up for this time?

16  A.      For not writing a receipt and my drawer being

17  over $6.

18  Q.      Was that unusual in the Clerk's Office?

19  A.      No.

20  Q.      How did that happen?

21  A.      Their whole system was very outdated, so that

22  happened often.

23  Q.      Did it just happen to you or did it happen to

24  others?

25  A.      No, that happened to everyone.

April Lassiter-Benson, RPR, CSR, LCR

1   Q.      Was anybody else ever written up?

2                MS. BURCHETTE:  Objection.  You're

3   asking for speculation.  How does she know anything

4   that doesn't pertain to her?

5   BY MS. BAILEY:

6   Q.      If you know, was anybody else ever

7   reprimanded for a short drawer for this situation?

8   A.      Not that I'm aware of.

9   Q.      Was there a time when you were transferred to

10  Oak Ridge?

11  A.      Yes.

12  Q.      What message did that send to you?

13  A.      I was going to be fired.

14  Q.      Why did you think that?

15  A.      Because it's well-known that if you're

16  transferred to Oak Ridge, that's the clerk's

17  graveyard and you're on your way out.

18  Q.      What reason were you given to going to Oak

19  Ridge?

20  A.      He said because I was talking to a DCS worker

21  in the courtroom.

22  Q.      Were you ever told who transferred you to Oak

23  Ridge?

24  A.      Yes.

25  Q.      Who?

1   A.      William told me.

2   Q.      He told you that he had you transferred?

3   A.      Uh-huh (affirmative).

4   Q.      There's something I forgot to ask you about.

5   When you were denied full-time, did he give you a

6   reason?

7   A.      No.  But he would say things like -- like he

8   said once, "Your husband almost got you fired for

9   running his mouth."

10  Q.      Was there something about his wife, too?

11  A.      And it, I guess, somehow had got out that his

12  wife found out we were Snapchatting, and it was a

13  rumor going around the courtroom and the courthouse,

14  and he was mad about that.

15  Q.      And he told you, you couldn't have full-time

16  because of that?

17  A.      Yes.

18  Q.      When you went to HR the first time, did you

19  give a statement?

20  A.      When I met him at Big Lots?

21  Q.      Was it a statement you prepared or a

22  statement he prepared?

23  A.      I prepared.

24  Q.      Do you recognize this?

25  A.      Yes.

1  Q.      What is this?

2  A.      That's the statement I provided him.

3  Q.      And what were you talking about in this

4  statement?

5  A.      Things that had happened.

6  Q.      All the things that we've talked about today?

7  A.      Yes.

8  Q.      And this is before you left the Clerk's

9  Office --

10  A.      Yes.

11  Q.      -- while you were still working there?

12  A.      Yes.

13  Q.      Did Mr. Bearden ask you to give a statement

14  or did you volunteer to give a statement?

15  A.      Well, I had called him the night before and

16  was telling him, and he told me to give a statement.

17              MS. BAILEY:  This is Exhibit 7.  I'd

18  like to move this exhibit into the record, please.

19              THE COURT:  Without objection, it's

20  admitted.

21              (WHEREUPON, a document was marked as

22  Exhibit Number 7.)

23  BY MS. BAILEY:

24  Q.      And then you -- did you get any results or

25  were you satisfied with any results that you got?

1    A.    No.

2    Q.    So, what did you do after that?

3    A.    I was directed to a couple different -- well,

4    to the NAACP.

5    Q.    Why did you go to the NAACP?

6    A.    I was directed there by someone, and I

7    thought maybe they could help, because I know they

8    do, like, discrimination and stuff.

9    Q.    You know that NAACP stands for the National

10   Advancement for the Acceptance of Colored People?

11   A.    Yes.

12   Q.    But you thought that that would be something

13   you could do or somebody that would help you?

14   A.    Yes.  I was told that they possibly could.

15   Q.    Did they help you?

16   A.    They tried.

17   Q.    As far as you know, had Anderson County ever

18   done anything to address your issues with Jones?

19   A.    No.

20   Q.    And is that why you went outside of Anderson

21   County for help?

22   A.    Yes.

23   Q.    Now, we've seen one of your statements.  Did

24   you give another statement to Anderson County?

25   A.    A sworn statement, yes.

1    Q.    How is it that you came to give a sworn

2    statement to Anderson County?

3    A.    I was asked to.

4    Q.    Who asked you?

5    A.    Russell.

6    Q.    And at this time, Russell was head of Human

7    Resources?

8    A.    Yes.

9    Q.    When you gave this sworn statement, who was

10   in the room?

11   A.    I recall Kim being in there.

12   Q.    Kim Whitaker?

13   A.    And Jay.

14   Q.    Jay Yeager, who was the law director?

15   A.    Yes, and Russell.

16   Q.    Another person in Human Resources?

17   A.    I'm not -- I think Stephanie Strickland was

18   there, too.  But I'm not 100 percent certain on

19   that.

20   Q.    Who was she?

21   A.    She was an assistant, I think.

22   Q.    But she was with the government, too, the

23   Anderson County government?

24   A.    Yes.

25            MS. BAILEY:  One moment, please, Your

1    Honor.

2              We're having trouble locating it.  I'll

3    just move on.

4    BY MS. BAILEY:

5    Q.    But the sworn statement you gave, does it

6    mirror the other statement that you gave that you

7    typed up?

8    A.    I believe so.

9    Q.    I want to talk about some of the other things

10   that Jones did to you.  We talked about him trying

11   to get you to meet him at the tanning bed.

12             Tell me about Gatlinburg.

13   A.    He had went on a conference to Gatlinburg,

14   and was trying to get me to come up there with him.

15   Q.    What did he ask you?

16   A.    Asked if I would come up there.  He needed

17   some company.

18   Q.    What was your response?

19   A.    No.

20   Q.    Did he send you pictures from Gatlinburg?

21   A.    Yes.

22   Q.    Since you've left Anderson County, have you

23   seen Jones?

24   A.    Yes.

25   Q.    What happens when you see him?

```
1    A.      I go into a full panic attack.

2    Q.      Are there places that you avoid because of

3    him?

4    A.      Yes.

5    Q.      Like, Cracker Barrel?

6    A.      Yes.

7    Q.      Why?

8    A.      He frequents that place often.

9    Q.      Walmart?

10   A.      Walmart.

11   Q.      What happened in Walmart?

12   A.      He cornered me in Walmart once in the shampoo

13   aisle.

14   Q.      Were your kids with you?

15   A.      Yes.

16   Q.      Did he say anything to you?

17   A.      No, we left.

18   Q.      You saw him one time leaving a restaurant.

19   Tell me about that.

20   A.      We had ate at a Mexican restaurant and went

21   to leave, and we were stopped to pull out.  And

22   before we could pull out, he was pulling in, and he

23   flipped me off and just gave me this evil stare.

24   And so, he pulled out, and maybe a mile and a half

25   or so down the road, I had to pull over at Weigel's,
```

1    because I was having a panic attack.

2    Q.    What happened as a result of the panic

3    attack?

4    A.    I passed out.

5    Q.    How long were you out or do you know?

6    A.    I'm not sure.

7    Q.    What did you awaken to?

8    A.    With the cops and ambulance, the firetruck.

9    Q.    Do you see -- when you see him, do you

10   normally have a panic attack?

11   A.    Yes.

12   Q.    Tell me about the Post Office.

13   A.    He had followed me to the Post Office and had

14   parked behind me to where I couldn't move.

15   Q.    So, kind of fenced you in?

16   A.    Yes.

17   Q.    Did you call the police?

18   A.    Yes, and contacted Kim.

19   Q.    You contacted Kim Whitaker?

20   A.    Yes.

21   Q.    And what did she do?

22   A.    She was trying to calm me down; asked if I

23   needed anything.

24   Q.    Did she ever have the police department do

25   drive-bys by your house?

1    A.      Yes.

2    Q.      What was that for?

3    A.      I had news stations at my house often.  I had

4    people, I'm assuming, supporters of William, that

5    would drive by my house and yell vulgar stuff or

6    throw stuff in my yard.

7    Q.      So this was a well-publicized issue?

8    A.      Yes.

9    Q.      On the news?

10   A.      Yes.

11   Q.      In the newspapers?

12   A.      Yes.

13   Q.      Did you see the articles?

14   A.      Unfortunately.

15   Q.      I'm showing you Exhibit 30, and we're just

16   going to scroll through these slowly.  Are these

17   some of the articles that were written about this

18   incident or this situation?

19   A.      Yes.

20           MS. BAILEY:  Exhibit 30, Your Honor, I'd

21   like to move it into evidence.

22           MS. BURCHETTE:  No objection.

23           THE COURT:  Received.

24           (WHEREUPON, a document was marked as

25   Exhibit Number 30.)

1  BY MS. BAILEY:

2  Q.    Something happened at Burger King.  Tell me

3  about that.

4  A.    I went to Burger King for breakfast, and

5  there was some older people, like senior citizens

6  that I guess recognized me and was saying things,

7  not directly to me, but loud enough, intentionally,

8  so that I would hear them.

9  Q.    Did this happen to you a lot?

10  A.    It has happened several times, a lot.

11  Q.    Now, you live in Scott County now?

12  A.    Yes.

13  Q.    Why did you move to Scott County?

14  A.    When me and my husband divorced, I chose the

15  Scott County house.

16  Q.    Is there a particular reason you wanted to go

17  to Scott County?

18  A.    To get out of Anderson County.

19  Q.    Have you seen a doctor for anything related

20  to this?

21  A.    Yes.

22  Q.    What?

23       I mean, what doctor did you see?

24  A.    Amanda.

25  Q.    How long did you see her?

1  A.    I'm not sure when I started.  I think in

2  maybe '17 or '18.

3  Q.    Did Amanda give you any kind of diagnosis?

4  A.    Yes.

5  Q.    What was her diagnosis?

6  A.    PTSD.

7  Q.    Did she tell you if this was something she

8  could treat or cure?

9  A.    No.  It's not curable.

10  Q.    Do you think you still have symptoms of PTSD?

11  A.    Yes.

12  Q.    What are they?

13  A.    That's -- that would be hard to explain.

14  It's a long list.  It's like --

15  Q.    Give me some.

16  A.    Nightmares, anxiety.  I have trouble with --

17        MS. BURCHETTE:  Objection to the extent

18  she's not a healthcare provider and can't diagnose

19  her own symptoms.

20        MS. BAILEY:  She can tell me --

21        THE COURT:  Overruled.

22        MS. BAILEY:  Thank you, Your Honor.

23        THE WITNESS:  I still have trouble even

24  today with being in relationships with men; panic

25  attacks; just a lot; flashbacks.  Say you're in the

```
 1  grocery store and somebody brushes you; flashbacks.
 2            MS. BAILEY:  This is Exhibit --
 3            MR. COLLINS:  51.
 4            MS. BAILEY:  -- 51.
 5  BY MS. BAILEY:
 6  Q.    Do you recognize these as notes from your
 7  therapist?
 8  A.    I think this is from the Care Clinic maybe.
 9            MS. BAILEY:  I'm sorry.
10            MS. BURCHETTE:  Exhibit 51 is not --
11            MS. BAILEY:  I'm sorry.  Wrong note.
12            Is this what you have as 51?
13            MS. BURCHETTE:  No.  (Indiscernible.)
14            MS. BAILEY:  Yes.
15            MS. BURCHETTE:  Okay, sorry.
16  BY MS. BAILEY:
17  Q.    These are notes from the Care Clinic?
18  A.    Yes.
19  Q.    What is the Care Clinic and why did you go
20  there?
21  A.    It is, like, the clinic that the county has
22  in the courthouse.
23  Q.    Did someone send you there?
24  A.    Yes.
25  Q.    Who sent you there?
```

1    A.      Russell.

2    Q.      Was this your first time seeing somebody

3    about the psychological effects you were suffering?

4    A.      Yes.

5              MS. BAILEY:  I'd like to move this into

6    evidence, Your Honor.

7              THE COURT:  Without objection, it's

8    received.

9              (WHEREUPON, a document was marked as

10   Exhibit Number 51.)

11   BY MS. BAILEY:

12   Q.      We've talked about a lot of things that

13   happened here today, and this has been going on for

14   awhile.  Do you still have flashbacks of this

15   happening?

16   A.      Yes.

17   Q.      Do you have trouble remembering some of the

18   things that happened?

19   A.      Yes.

20   Q.      Did you blame yourself for what happened?

21   A.      Yes.

22   Q.      Why?

23   A.      Because I did what he asked.

24   Q.      How is your life different now than before

25   this happened?

*April Lassiter-Benson, RPR, CSR, LCR*

```
 1   A.      That's a hard question to answer, 'cause it's

 2   not -- it's like a different life all together, so

 3   it's hard to remember what it was like before,

 4   but ...

 5   Q.      You don't even remember your old life?

 6   A.      No.

 7   Q.      Has this changed you?

 8   A.      Yes, this has.

 9   Q.      I'm sorry.  Because what?

10   A.      Yes.

11   Q.      Tell me what happens when you have these

12   panic attacks.

13   A.      My breath gets rapid.  I get dizzy,

14   lightheaded.  If they get too bad, I just pass out.

15   Q.      Have you had property damaged?

16   A.      Yes.

17   Q.      What property have you had damaged?

18           MS. BURCHETTE:  Objection, Your Honor.

19   That's not a source of damages she's seeking.

20           THE COURT:  Ms. Bailey?

21           MS. BAILEY:  Your Honor, it goes to her

22   overall mental state and how this is contributing to

23   it.

24           THE COURT:  Are you able to show that

25   this property damage was caused by the Defendant?
```

1      MS. BAILEY:  No, Your Honor, but I can

2  show the effect that it had on her.

3      THE COURT:  Well, suppose some robber in

4  her neighborhood decides to break in her house and

5  damage her door, steals her television, damages her

6  car.  Obviously, that's going to have a greater

7  effect on her, but what does it have to do with this

8  case?

9      MS. BAILEY:  Because she will always

10  assume everything that happens to her goes back to

11  this incident.  So it goes to more of the effect on

12  her than what actually happened.

13      THE COURT:  Sustained.

14      MS. BAILEY:  May I have a moment, Your

15  Honor?

16      THE COURT:  You may.

17      (An off-the-record discussion was

18  held.)

19  BY MS. BAILEY:

20  Q.    When all the conversations and all the

21  Snapchats and all the sexual innuendoes, and even

22  you responding, like sending a picture of your

23  breast, were his advances welcomed or unwelcomed?

24      MS. BURCHETTE:  Objection, Your Honor,

25  that seeks a legal conclusion.

```
 1                  THE COURT:  Overruled.
 2                  THE WITNESS:  Unwelcomed.
 3    BY MS. BAILEY:
 4    Q.    But you did them anyway because you felt like
 5    you had to?
 6    A.    Yes.
 7                  MS. BAILEY:  Thank you, Your Honor.
 8    Pass the witness.
 9                  MS. BURCHETTE:  Your Honor, just looking
10    at the time.  Would you like to take an afternoon
11    break before I --
12                  THE COURT:  No.
13                  MS. BURCHETTE:  That is fine.  I can
14    proceed.
15
16                     CROSS-EXAMINATION
17    QUESTIONS BY MS. BURCHETTE:
18    Q.    Good afternoon, Ms. Harness.  You began your
19    time in the Anderson County Circuit Court Clerk's
20    Office in January or February of 2016; is that
21    correct?
22    A.    Yes.
23    Q.    And were you always placed in juvenile?
24    A.    Yes.
25    Q.    And the juvenile court is located in the
```

*April Lassiter-Benson, RPR, CSR, LCR*

1  Jolley building, correct?

2  A.      Yes.

3  Q.      And that's across the street from the Circuit

4  Court Clerk's Office?

5  A.      Yes.

6  Q.      And Mr. Jones' office is in the Circuit Court

7  Clerk's Office?

8  A.      Correct.

9  Q.      How long after you started your internship --

10  because that's when you started, as of January,

11  February 2016, as an intern, correct?

12  A.      Yes.

13  Q.      And how long after you started this

14  internship did the -- I believe you testified in

15  your deposition you called it some flirting, some

16  banter.  When did that begin?

17  A.      Shortly after.

18  Q.      And about how often was that?

19  A.      It was very often.

20  Q.      Once a week, once a month?

21  A.      Once a day.

22  Q.      Okay.  And you said that -- you testified

23  that you interviewed with Mr. Jones for this

24  internship.

25  A.      Yes.

1  Q.    And there is nothing about that interview

2  that made you -- gave you pause about taking this

3  internship?

4  A.    No.

5  Q.    And Tracy Spitzer recommended you for this

6  internship?

7  A.    Yes.

8  Q.    Despite knowing the environment of the

9  Clerk's Office, she recommended you?

10           MS. BAILEY:  Objection, Your Honor,

11 calls for speculation and hearsay.

12           THE COURT:  Ms. Burchette.

13           MS. BURCHETTE:  She was sitting here

14 when Ms. Spitzer testified to the same, Your Honor.

15           MS. BAILEY:  Your Honor, but she didn't

16 know that at the time when she took the job.

17           THE COURT:  I'll sustain the objection

18 to the question as phrased.

19 BY MS. BURCHETTE:

20 Q.    Ms. Spitzer was already employed at the

21 Circuit Court Clerk's Office during the time you got

22 the internship, correct?

23 A.    Correct.

24 Q.    And outside of telling you that Mr. Jones

25 liked professional, but maybe slightly tight

1  dresses, she didn't tell you anything else about the

2  environment of the Circuit Court Clerk's Office?

3  A.    No.

4  Q.    And then, how long after this flirting

5  started between you and Mr. Jones did the

6  Snapchatting begin?

7  A.    I believe it was maybe like in

8  February/March.  So, it wasn't long after.

9  Q.    March of 2016?

10  A.    Yes.

11  Q.    And let's go over Snapchat, because it's been

12  explained, but probably not the best.  So that way

13  everyone understands how Snapchat works.

14        Snapchat is an app on a phone, correct?

15  A.    Yes.

16  Q.    And it was made originally, more likely than

17  not, to take pictures and send pictures, correct?

18  A.    Yes.

19  Q.    And the pictures disappear after, like, 30

20  seconds of viewing them?

21  A.    I don't believe it's 30 seconds, but after --

22  Q.    After a certain period of time?

23  A.    Yes.

24  Q.    And if you screenshot a picture on Snapchat

25  like that someone sends you, it instantly sends a

1    notification to the other person that you

2    screenshotted the Snap?

3    A.      Yes.

4    Q.      But they also have a text message feature

5    within the app; is that fair?

6    A.      Yes.

7    Q.      And that's how you and Mr. Jones

8    communicated?

9    A.      Yes.

10    Q.      And this text message feature, like the

11    picture feature, the messages disappear?

12    A.      Yes.

13    Q.      But you can save the messages?

14    A.      Correct.

15    Q.      And by saving the messages, what you do is

16    you tap on the left-hand side of the screen, and it

17    highlights it in a light gray color?

18    A.      I think you just tap on the message.

19    Q.      And then, it sends it to the top of the chat?

20    A.      Yes.

21    Q.      It doesn't give them an affirmative

22    notification that somebody just saved that message?

23    A.      Yes.

24    Q.      But if you screenshot the entirety of the

25    message -- of the screen, then it gives them a

*April Lassiter-Benson, RPR, CSR, LCR*

1    notification?

2    A.      Yes.

3    Q.      Okay.  So, all of these Snaps that were shown

4    and discussed and produced, someone saved them?

5    A.      Yes.

6    Q.      And you saved at least some of them, correct?

7    A.      I think so, yes.

8    Q.      Because you testified in your deposition

9    there was no rhyme or reason for what you saved?

10   A.      Correct.

11   Q.      Because some of these Snapchats seem

12   conversational.  You know, you're talking about your

13   day, correct?

14   A.      Correct.

15   Q.      Talking about applying for a job at DCS,

16   even, correct?

17   A.      Yes.

18   Q.      And so, you're talking about innocuous things

19   intermixed with the explicit messages; is that fair?

20   A.      Yes.

21   Q.      And you testified at first that you and

22   Mr. Jones started originally communicating through

23   text messages?

24   A.      Yes.

25   Q.      Did you not save any of those?

1    A.    I didn't necessarily delete them, no, but

2    they were on a different phone.

3    Q.    Okay.  So, but we don't -- we, as we sit here

4    today, don't know what those text messages are.

5    A.    Correct.

6    Q.    And then you said that you switched over to

7    Snapchat, and that was the main way of

8    communicating, correct?

9    A.    Yes.

10   Q.    And who was the person -- do you know who

11   added who on Snapchat?  Because you have to add each

12   other to be friends, right?

13   A.    Correct.

14   Q.    Do you recall who added who on Snapchat?

15   A.    As far as I can remember, it was just a group

16   effort.  He was in the office and several people

17   added him and we added him back.

18   Q.    Okay.  Because you can ignore someone's

19   friend request on Snapchat, as well, can't you?

20   A.    Yes.

21   Q.    And so, did you -- you sent Mr. Jones a

22   picture of your breasts on Snapchat?

23   A.    Yes.

24   Q.    Were they exposed?

25   A.    Yes.

April Lassiter-Benson, RPR, CSR, LCR

1   Q.      And it was done through the picture part of

2   the app, not through the messages, correct?

3   A.      Yes.

4   Q.      Because the picture he sent you requesting

5   the message, that was sent through the messaging

6   app, correct?

7   A.      Yes.

8   Q.      This right here, this was a picture that was

9   sent through the messaging app so it could be saved?

10  A.      Yes.

11  Q.      And did you send him any other pictures of

12  anything, not just graphic pictures, did you send

13  him any other pictures through Snapchat?

14  A.      Yes, like pictures of my kids, pictures --

15  just random pictures.

16  Q.      Because Snapchat in part is used to -- as a

17  social media app to show people about your day,

18  correct?

19  A.      Yes.

20  Q.      And you testified, and I think if we look

21  through all of these messages, I'm not going to put

22  them all up, but you do talk about your day with

23  Mr. Jones throughout these messages that we have.

24  A.      Yes.

25  Q.      And you would agree, though, that when -- as

1  you testified earlier, there's no rhyme or reason

2  for what was saved on these -- on the app, correct?

3  There's no method as to what you saved or what --

4  A.    As to what was saved, no.

5  Q.    And so, some of these messages, some of them

6  appear to be somewhat out of context, would you

7  agree?

8  A.    Yes.

9  Q.    And so, you may not be getting the full

10  picture of what's going on in the dialogue

11  throughout all of that?

12  A.    Correct.

13  Q.    Okay.  If we look at this Snapchat between

14  you and Mr. Jones, the one that says, "I know who I

15  work for.  You're like my daddy; LOL."  That could

16  appear to be a little bit of banter between the two

17  of you, because you're calling him "Daddy" in this

18  message?

19  A.    Yes, because we are supposed to call him

20  "Daddy".

21  Q.    But the LOL implies that you're joking,

22  because LOL stands for "Laugh Out Loud", does it

23  not?

24  A.    Correct.

25  Q.    And you testified earlier that you were

1  married during this time period, correct?

2  A.     Yes.

3  Q.     And that your husband knew that you were

4  communicating with Mr. Jones via Snapchat, correct?

5  A.     Correct.

6  Q.     How did he feel about you communicating with

7  your boss via Snapchat?

8  A.     He definitely thought it was weird.

9  Q.     Okay.

10 A.     He didn't necessarily say whether he approved

11 or not, but it made him uneasy.

12 Q.     But he didn't know the context of the

13 messaging in the Snapchats --

14 A.     Correct.

15 Q.     -- until later?

16 A.     Correct.

17 Q.     With what I'm going to refer to as probably

18 the most explicit Snapchat that has been saved here,

19 I believe you already testified that you had him

20 repeat the first part of it, which would indicate

21 why he said, "Last thing I sent;" is that correct?

22 A.     Yes.

23 Q.     And then you saved it?

24 A.     I'm not -- I don't recall if I saved it or

25 not.  'Cause every time I save something, he would

*April Lassiter-Benson, RPR, CSR, LCR*

1  yell and get mad.

2  Q.    Okay.  Did you reply to this?  It's not

3  saved, but did you reply?

4  A.    If I did, it was nothing like that.  It would

5  have been a change of subject or something to make

6  him think that, "oh, ha, ha," or something to where

7  he won't get mad.

8  Q.    Okay.  Because, you know, the words "since

9  you don't" would imply that you responded in some

10 way to that in a response?

11 A.    Yes.

12          MS. BAILEY:  Objection, Your Honor,

13 calls for speculation.

14          THE COURT:  Overruled.

15          THE WITNESS:  What brought that up is

16 the girls in the office were talking about a Pure

17 Romance Party.  And so that's what started that

18 conversation, and everybody was talking about that

19 in the office.

20 BY MS. BURCHETTE:

21 Q.    And is a Pure Romance Party something that

22 gets talked about somewhat frequently in the office?

23 A.    I would say not.  Somebody was having a party

24 and was talking about it.

25 Q.    Okay.  And for context here, Pure Romance

1   parties are --

2               MS. BURCHETTE:  Your Honor, I can not

3   think of a good way to say this.

4   BY MS. BURCHETTE:

5   Q.    Adult toy parties; is that correct?

6   A.    I would say, not correct.  I would say it's

7   more of an intimate adult thing, but it's not just

8   toys, no.

9   Q.    Okay.  So it's other things besides the toys?

10  A.    Correct.

11  Q.    Okay.  And those are parties that other

12  people in the Clerk's Office were having?

13  A.    Yes.

14  Q.    And then you spoke with Mr. Jones via

15  Snapchat about work things, as well, correct?

16  A.    Yes.

17  Q.    Why didn't you ever think to switch back to

18  texting him on a work-related matter?

19  A.    Because he preferred Snapchat.

20              MS. BAILEY:  Objection; relevance.

21              THE COURT:  Overruled.

22  BY MS. BURCHETTE:

23  Q.    So, when you say Mr. Jones preferred

24  Snapchat, did he ever tell you, "Don't text me, just

25  only use Snapchat?"

April Lassiter-Benson, RPR, CSR, LCR

1    A.      He just said, "Use Snapchat."

2    Q.      But you testified earlier that you started

3    out by texting him, correct?

4    A.      Correct.

5    Q.      Okay.  And these Snapchats, they started in

6    2016, correct?

7    A.      Yes.

8    Q.      And do you remember what month in 2016 they

9    started?

10   A.      I don't.  I believe it was February or March.

11   Q.      Okay.  And by March 8th of 2016, you were

12   promoted to part-time?

13   A.      Yes.

14   Q.      And were you still Snapchatting with

15   Mr. Jones during this time?

16   A.      Yes.

17   Q.      But at some point, the explicit messages

18   stopped, correct?

19   A.      When we stopped talking via Snap, yes.

20   Q.      So, you're saying the explicit messages carry

21   through all the way until you stop Snapchatting with

22   him?

23   A.      The thing is, the "explicit" was throughout

24   the whole thing, whether it was Snap or in person or

25   any time.

```
 1   Q.      Okay.  And so, you're promoted, then, to

 2   part-time, correct?

 3           And you're still in juvenile?

 4   A.      Yes.

 5   Q.      And that was still in the Jolley building?

 6   A.      Yes.

 7   Q.      Not in the same building as anyone else -- or

 8   as Mr. Jones' main office?

 9   A.      Correct.

10   Q.      And then, you would get hired on at full-time

11   in August of 2016; is that correct?

12   A.      Yes.

13   Q.      And that gets you to be -- are you salaried

14   at that point?

15   A.      No.

16   Q.      So, you're still an hourly employee?

17   A.      Correct.

18   Q.      And you're still Snapchatting during that

19   time with Mr. Jones?

20   A.      I'm not sure when the Snapchatting actually

21   ended.  But I think it was sometime before that for

22   the most part.

23   Q.      Okay.  So, the Snapchatting ended before you

24   went full-time in August of 2016?

25   A.      I'm not saying it fully ended.  I'm not sure
```

*April Lassiter-Benson, RPR, CSR, LCR*

1  when that exactly fully ended, but it was definitely

2  not as frequent.

3  Q.    Okay.  So, he's not at least Snapchatting you

4  every day, multiple times a day once you become

5  full-time?

6  A.    Correct.

7  Q.    That's in August of 2016?

8  A.    Correct.

9  Q.    August 15th, to be exact.  Because you have

10  this promotion sheet where your salary was increased

11  and is effective August 15, 2016, and you were made

12  from part-time to full-time, correct?

13  A.    Yes.

14          MS. BURCHETTE:  Can we admit this?  This

15  is Plaintiff's -- I don't --

16          MR. STANLEY:  It may have been.

17          MS. BURCHETTE:  I don't think this one

18  was.

19          THE COURT:  No objection.  It's

20  admitted.

21          THE CLERK:  Do you know what number it

22  is?

23          MS. BURCHETTE:  I will get you that

24  number, just one second.

25          THE CLERK:  Okay.

April Lassiter-Benson, RPR, CSR, LCR

1              MR. COLLINS:  18.

2              MS. BURCHETTE:  Yes.  Yes, 18.

3              THE CLERK:  Okay.  Thank you.

4              (WHEREUPON, a document was marked as

5    Exhibit Number 18.)

6    BY MS. BURCHETTE:

7    Q.     And then in September of 2016, you become

8    deputized, correct?

9    A.     Yes.

10   Q.     And what does it mean to become deputized?

11   A.     That means you can, like, officially sign

12   things.

13   Q.     So, then, I want to talk about this first

14   write-up you were talking about.

15          Now, you testified that this was mistakenly

16   dated.  And it's in 2017 versus 2016, correct?

17   A.     Correct.

18   Q.     But the date at the top says 2016?

19   A.     Correct.

20   Q.     And the date of the second interaction says

21   2016?

22   A.     Correct.

23   Q.     But then, I see where William -- the

24   signature says '17, but it could have -- could it

25   have been 2016?

1    A.      No.

2    Q.      Why couldn't it have been 2016?

3    A.      Because that happened when I was already

4    full-time, for one, and it did not happen when I

5    first started.

6    Q.      And you're sure of that, despite the two

7    dates that, say, 2016?

8    A.      Absolutely positive.  Because I wouldn't have

9    been allowed to file stamp any way without being

10   deputized.

11   Q.      Okay.  You were given several pay raises

12   while you were there, too, correct?

13   A.      Yes.

14   Q.      And you had -- which would indicate good

15   performance?

16   A.      Yes.

17   Q.      And this was after the Snapchatting had at

18   the very least slowed down?

19   A.      Yes.

20   Q.      And during this time as well, though, you

21   were also having an affair, correct?

22               MS. BAILEY:  Objection, Your Honor.

23               MS. BURCHETTE:  She put her reputation

24   at issue, Your Honor.

25               MS. BAILEY:  Your Honor, this has

```
 1   already been ruled on in document 56.

 2               THE COURT:  Ladies and Gentlemen, let me

 3   have you step outside of the courtroom.

 4               (WHEREUPON, the following matters were

 5   heard in open court outside the presence of the

 6   jury, as follows:)

 7               THE COURT:  Now, Ms. Bailey, you were

 8   making an objection; is that right?

 9               MS. BAILEY:  Yes, Your Honor.  This

10   issues has already been litigated.  Your Honor has

11   ruled on it in document 56.

12               THE COURT:  Ms. Burchette?

13               MS. BURCHETTE:  I need to see the

14   document, Your Honor, the pleadings.  Just give me

15   one second.

16               Document 56, Your Honor, unless I'm

17   looking at the wrong thing, is an order denying

18   motion for summary judgment.

19               MR. COLLINS:  Your Honor, we'll find it

20   really quickly.  The Court clearly ruled on our

21   Motion in Limine about sexual proclivity evidence

22   coming in.  I'm astounded that that question was

23   asked.  So, I'll find the correct document here in a

24   moment.  It's docket entry 57.

25               MS. BAILEY:  I'm sorry, Your Honor, 57.
```

*April Lassiter-Benson, RPR, CSR, LCR*

1    MS. BURCHETTE:  May I see your copy?

2    MR. COLLINS:  Sure.

3    (An off-the-record discussion was

4  held.)

5    MS. BURCHETTE:  Your Honor, I did read

6  your order, and while I see what you have said

7  there, the Plaintiff has put her reputation at

8  issue, seeking $7.5 million.  I'm not offering any

9  documents or speaking -- I'm speaking generalities.

10  She had an affair.  That does not go to sexual

11  proclivities.  I don't think -- I won't go into

12  detail.  I'm not going to ask if they Snapchatted,

13  too, or did anything of that sort.  But when someone

14  puts their reputation at issue --

15    THE COURT:  Let's take a look at Rule

16  412.

17    MS. BURCHETTE:  Yes, Your Honor.

18    THE COURT:  Okay.  And we see there's a

19  jump prohibition --

20    MS. BURCHETTE:  Yes.

21    THE COURT:  -- against introducing

22  evidence of a person's sexual misconduct.

23    MS. BURCHETTE:  Yes.

24    THE COURT:  And you can not offer such

25  evidence to prove that a person engaged in sexual

1  behavior or as a result, prove any alleged victim's

2  sexual predisposition.

3          Now, in civil cases, the evidence may be

4  admitted as to reputation, but only if the victim

5  has placed it in controversy.  And I think that's

6  what you were eluding to.  You were claiming that

7  the Plaintiff has placed her reputation in

8  controversy.

9          MS. BURCHETTE:  Yes, Your Honor.

10          THE COURT:  And how did she do that?

11          MS. BURCHETTE:  She's seeking a million

12  dollars in damages, based on her reputation; damage

13  to her reputation.

14          MS. BAILEY:  Your Honor, they've not

15  proven what her --

16          THE COURT:  Ms. Bailey, I will call you

17  when the Court needs to hear from you.

18          MS. BAILEY:  Yes, Your Honor.

19          THE COURT:  I'm talking to Ms. Burchette

20  at the moment.

21          How does asking for money place her

22  reputation at issue?

23          MS. BURCHETTE:  That is one of the

24  elements of damages they're seeking.  They're

25  seeking damage to her reputation, damage to her

 1  emotional wellbeing, medical -- or damages due to

 2  the Post Traumatic Stress Disorder.  It is one of

 3  the elements of damages.  They've put her reputation

 4  at issue.

 5            THE COURT:  There's also some procedural

 6  requirements.

 7            MS. BURCHETTE:  Yes, Your Honor, I

 8  apologize.  I didn't see those.  I will withdraw the

 9  question.

10            THE COURT:  Oh, you're withdrawing the

11  question?

12            MS. BURCHETTE:  I mean, depending on how

13  you were going to rule, Your Honor.  I do understand

14  I did miss the procedural requirements for doing it.

15  I mean, it's a question.  I don't know how we can

16  have an in-camera review of the question, but I do

17  know there is procedural requirement after reviewing

18  the rule.

19            THE COURT:  Well, it is your question,

20  so it's your decision whether you want to proceed or

21  not to proceed.

22            MS. BURCHETTE:  We'll just proceed, Your

23  Honor.

24            THE COURT:  Okay.  Since this comes up

25  under cross-examination, and it is difficult to

1    predict in advance what's going to come up on

2    cross-examination, it is hard to see how a party

3    could comply with a 14-day requirement.  That may be

4    why it says, "Unless the Court for good cause sets a

5    different time."

6              It does require that notice be given to

7    the other side and also the victim, which here, I'm

8    assuming would be the Plaintiff.  And the Court must

9    conduct an in-camera hearing, which to some extent

10   we're doing now.

11             In-camera could interpret to mean a

12   closed hearing where the public is not allowed.  It

13   might also mean something else, though.

14             You have any thoughts on those two

15   issues?  One is the 14-day requirement and the

16   in-camera hearing.

17             MS. BURCHETTE:  We could do an in-camera

18   hearing, Your Honor.  I fully understand that I

19   missed the 14-day requirement.

20             THE COURT:  Okay.  Why don't we have all

21   of the individuals in the courtroom, other than the

22   lawyers and the parties, depart the courtroom.  The

23   Court security officer, of course, stay in.

24             (Public attendees leaving the

25   courtroom.)

*April Lassiter-Benson, RPR, CSR, LCR*

1      It looks like I saw a person leave with

2  a tape recorder.  Was that recorded?

3      MR. COLLINS:  Yeah.  There's a reporter

4  that just departed, Your Honor.

5      THE COURT:  Was that a tape recorder?

6      MR. COLLINS:  I don't know if I saw it.

7  I didn't see that.  He's with the Oak Ridge or

8  the ...

9      THE COURT:  Now, reputation covers an

10  awful lot of things.  I can see where this rule

11  would be applicable if a person put their reputation

12  up for chastity at issue.

13      You've indicated that the Plaintiff has

14  put her reputation at issue and you've tied that to

15  damages.

16      What particular aspect of reputation has

17  been placed in controversy?

18      MS. BURCHETTE:  Your Honor, she says her

19  reputation was ruined by the treatment of William

20  Jones in the public.  The affair that she was having

21  was with an other prominent member of the public.

22      THE COURT:  Let's talk about reputation.

23  You can have a reputation for honesty.  You can have

24  a reputation for piety.  You can have a reputation

25  for bravery.  You can have a reputation for a lot of

1  different things.  If this was a case involving

2  assault, you could put your reputation of

3  peacefulness in issue by having people testify that

4  you're a very peaceful person.  You don't get

5  involved in fights.  And the jury could deduce from

6  that, that it's not likely that you start a fight.

7          A reputation covers a multitude of

8  possible issues.  I think that the evidence would

9  have to go directly to the aspect of reputation that

10 is at issue.  You guys know this case.  I do not.  I

11 don't know what this evidence is going to consist

12 of.  I've heard you say that the Plaintiff put her

13 reputation at issue and it goes to damages.  But,

14 again, I have no idea what we're talking about --

15 her reputation, because it covers so many things.

16          Specifically, her reputation for what?

17          MS. BURCHETTE:  I think it can be said

18 her reputation for faithfulness.  I mean, she's

19 Snapchatting Mr. Jones.  She's married.  She's had

20 an affair.  She's married.

21          THE COURT:  Ms. Bailey, when you ask for

22 damages, are you going to ask for damages because of

23 the reputation for -- what was the word that you

24 used?

25          MS. BURCHETTE:  "Faithfulness".

 1                     THE COURT:  Faithfulness; asking for

 2     damages.

 3                     MS. BAILEY:  No, Your Honor.

 4                     THE COURT:  Are you going to ask for

 5     reputational damages?

 6                     MS. BAILEY:  Damage to her reputation,

 7     yes, but because --

 8                     THE COURT:  Reputation for what?

 9                     MS. BAILEY:  For her -- just her name.

10     She was made to be the --

11                     THE COURT:  Her reputation for what?

12                     MS. BAILEY:  To being a good worker.

13                     THE COURT:  Her reputation for being a

14     good worker.

15                     MS. BAILEY:  To being a good mother.

16                     THE COURT:  For being a good mother.

17                     MS. BAILEY:  To giving in to his

18     Snapchats.

19                     THE COURT:  Well, I don't know that's

20     reputation.  Reputation is the opinion that people

21     in the community have about you.  And I think you

22     could have a reputation as a good mother.  You could

23     have a reputation as a good worker.  Those are

24     things that people in the community may say about

25     you and may think about you.

```
 1              So, let's see if we can bore down what
 2    we're talking about when we say, "Reputation."
 3              MS. BAILEY:  Your Honor, when this came
 4    out, she was made to be the villain.
 5              THE COURT:  We're talking about
 6    reputation.  What reputation?
 7              MS. BAILEY:  Well, that was the
 8    reputation that she had; that she was the villain;
 9    that this was a politically motivated issue, and it
10    wasn't true.  So, I guess it's the reputation for
11    truthfulness.
12              THE COURT:  Reputation for truthfulness.
13              MS. BAILEY:  With this issue.
14              THE COURT:  Okay.  That's a legitimate
15    form of reputation.
16              And how is this evidence that she was
17    carrying on an affair, go to her reputation for
18    truthfulness?
19              MS. BURCHETTE:  Well, I think it could
20    go to show that she wasn't truthful to her husband
21    if she was carrying on an affair.
22              MS. BAILEY:  Your Honor, they've not
23    proven that the husband didn't know.
24              THE COURT:  Is there evidence that the
25    husband was not aware?
```

*April Lassiter-Benson, RPR, CSR, LCR*

1              MS. BURCHETTE:  The term "affair" itself

2     implies that the husband was not aware, Your Honor.

3     But besides that, I don't have anything in the

4     record so far.

5              MS. BAILEY:  Your Honor, the

6     term "affair" means relationship outside of the

7     marriage or relationship.

8              THE COURT:  And the evidence would

9     consist of her having an affair with some prominent

10    person in the community?

11             MS. BURCHETTE:  Yes.

12             THE COURT:  And it's contemporaneous

13    with the events here?

14             MS. BURCHETTE:  Yes.  It's around the

15    same time period.

16             MS. BAILEY:  Your Honor, she testified

17    in her deposition that it was over before she got a

18    job with the juvenile court.

19             MS. BURCHETTE:  She had the affair

20    during that whole time period.  Then they broke up

21    and they got back together in 2018.

22             MS. BAILEY:  Your Honor, her testimony

23    on Page 42 of her deposition.

24             MS. BURCHETTE:  The 2020 or the 2019?

25             MS. BAILEY:  This is the 2019

1  deposition.

2            "So, when you were there for a month in

3  Oak Ridge, were you having an affair with this

4  person at the time?"

5            "No."

6            "So, it was before or after then?"

7            "Before."

8            "So, you were in juvenile court?"

9            "Yes."

10           Aside from all of that, Your Honor, this

11  evidence will be more prejudicial and outweigh its

12  probative value.

13           THE COURT:  Well, what we're trying to

14  find out exactly, probative value is first, and

15  that's what we're talking about; reputation.  The

16  evidence has to be admissible for a proper person,

17  so we can weigh that.  And we're trying to identify

18  what the problem for the person is.

19           And the ruling anticipates that if the

20  Plaintiff had, in fact, put her reputation in

21  controversy, then this type of evidence is allowed.

22  So I've been persistent in trying to find out

23  exactly what are we talking about when we say,

24  "Reputation."

25           MS. BURCHETTE:  Your Honor, if I

1   understood what Ms. Bailey just read correctly, and

2   I might have not been following, because I'm trying

3   to find in the deposition I took of her of the

4   Plaintiff, it's stated that the affair was before

5   she got transferred to the General Sessions II,

6   which would have happened while she was in Juvenile,

7   which would be around the same time she's

8   Snapchatting Mr. Jones.

9            THE COURT:  Now, the Court is going to

10  be somewhat lenient with regard to the 14-day

11  procedural requirement, because it did come up on

12  cross-examination.  And based upon what the parties

13  have told me, I think it is doubtful that the

14  reputation that the Plaintiff is going to discuss

15  would allow the introduction as evidence.

16           The Court does not have the benefit of

17  knowing exactly what the Plaintiff is going to say

18  and what she's going to be asked.  So at this time

19  the Court will not allow the evidence, but if the

20  Plaintiff does testify, or if counsel asks questions

21  or suggests that the Plaintiff's reputation is

22  such -- or the Plaintiff's reputation has been

23  damaged in such a way, the evidence might be

24  revisited.  The Court will reconsider it.  And that

25  will include at the conclusion of the case after

1  arguments have been made.

2          MS. BURCHETTE:  Yes, Your Honor.

3          MS. BAILEY:  Thank you, Your Honor.

4          THE COURT:  Everyone understand that?

5          MS. BAILEY:  Yes, Your Honor.

6          MS. BURCHETTE:  Yes, Your Honor.

7          THE COURT:  Okay.

8          It's about 10 minutes after.  Why don't

9  we take our afternoon break now, then, and let's

10 resume at 3:30.

11         (Short break.)

12         (WHEREUPON, the jury re-entered the

13 courtroom, with matters being heard in open court,

14 as follows:)

15 BY MS. BURCHETTE:

16 Q.     Ms. Harness, following your write-up in

17 February of either '16 or '17.  I know you say it

18 was an improper date.  It was in '17.  You were

19 written up against in March -- on March 30th of

20 2017, correct?

21 A.     Correct.

22 Q.     And this was for carelessness, correct?

23 A.     Yes.

24 Q.     Because your drawer was over $6?

25 A.     Yes.

1    Q.    And who is Jessica Williams?

2    A.    She was the office manager.

3    Q.    Okay.  So it was Jessica who wrote you up and

4    not Mr. Jones?

5    A.    Yes.

6              MS. BURCHETTE:  And I don't believe that

7    this one has been moved into evidence.

8              THE CLERK:  What number?

9              MS. BURCHETTE:  That's a good question,

10   Mrs. Lewis.

11             MR. KNIGHT:  Part of 15.

12             MR. COLLINS:  It's been moved.  That's

13   number 23.

14             MS. BURCHETTE:  Number 23.

15             THE CLERK:  It has.

16   BY MS. BURCHETTE:

17   Q.    And part of your duties as a clerk is to

18   assist the court staff, correct?

19   A.    Yes.

20   Q.    And you did that while in the juvenile

21   courts, correct?

22   A.    Yes.

23   Q.    And do you recall Amy Perez, who I believe

24   was the judge's judicial assistant at the time,

25   having any complaints about your behavior in court?

*April Lassiter-Benson, RPR, CSR, LCR*

1    A.      No.

2    Q.      So, you don't know that she sent an e-mail to

3    Mr. Jones regarding issues with you in juvenile

4    court?

5    A.      No.

6    Q.      So, you weren't on your phone during a docket

7    reading?

8    A.      Yes, I was on my phone.  That was the only

9    way we could communicate.  So, if they had a

10   question in the office, they would text me about it.

11   Q.      Were you paying attention to what was going

12   on?

13   A.      Yes.

14   Q.      Would you be surprised to say that Ms. Perez

15   said that you weren't paying attention?

16   A.      Yes.

17   Q.      And did you sometimes stay in the courtroom

18   and speak with the members of the DCS, or the

19   District Attorney's Staff instead of going back to

20   your office and filing?

21   A.      I was instructed to stay in the courtroom.

22   That's where I finished the orders while the judge

23   was on break.

24   Q.      So, you didn't know, though, that Ms. Perez

25   wrote an e-mail to Mr. Jones discussing issues with

1   your behavior in juvenile court?

2   A.      I've seen it since.  But, no, not at that

3   time, I was not aware of anything.

4   Q.      So you have seen this e-mail, then?

5   A.      Yes.

6           MS. BURCHETTE:  Can we go ahead and mark

7   this as Plaintiff's Exhibit 8.

8           MR. KNIGHT:  It's in there.

9           (WHEREUPON, a document was marked as

10  Exhibit Number 8.)

11  BY MS. BURCHETTE:

12  Q.      And that e-mail was sent around the time you

13  were transferred to General Sessions II, correct?

14  A.      Correct.

15  Q.      So that moved you out of the juvenile courts,

16  correct?

17  A.      Are you saying the e-mail sent me out of the

18  juvenile court?

19  Q.      No, I'm saying that move.  General Sessions

20  is not juvenile.

21  A.      Correct.

22  Q.      And then, you reported Mr. Jones' behavior in

23  August of 2017, correct?

24  A.      Yes.

25  Q.      And that's a year after you went full-time?

1   A.      Yes.

2   Q.      And that's a year after the vulgar Snapchats

3   ceased?

4   A.      I would not say they ever ceased, but yes, it

5   wasn't near as much or anything.

6   Q.      Okay.  Do you remember giving your deposition

7   on February 19th, 2020?

8   A.      Yes.

9   Q.      And you were under oath and swore to tell the

10  truth.

11  A.      Yes.

12  Q.      And do you see where it says, "Okay.  Did it

13  stop in 2016.  I think the vulgar ones did.  Okay.

14  But then you continued to talk through -- I think

15  there was a conversation after that, but it was not

16  vulgar."

17  A.      Yes, not like the ones that we were referring

18  to with the nasty one.

19  Q.      But this is -- they're -- there weren't

20  vulgar Snapchats.  And you just said there were

21  still vulgar Snapchats.

22  A.      It was still sexual, whether it was really

23  vulgar.

24  Q.      But you didn't report to anyone until 2017,

25  correct?

1   A.      Correct.

2   Q.      And then you went to Mr. Bearden in Human

3   Resources?

4   A.      Yes.

5   Q.      And when you were first hired -- when you

6   were first hired as an intern, did you have to fill

7   out any type of paperwork?

8   A.      Yes.

9   Q.      And did you go to Human Resources to do that?

10  A.      I filled my paperwork out in the Clerk's

11  Office.

12  Q.      Okay.  What about -- did you have to fill out

13  any additional paperwork when you became a paid

14  part-time employee?

15  A.      Everything that I filled out was in the

16  Clerk's Office.

17  Q.      So you never met with Mr. Bearden or any

18  member of HR?

19  A.      I did meet with Kim whenever I had my badge

20  made.

21  Q.      Okay.  So you went to the HR office and met

22  with Kim to have, I guess, it was a badge to let you

23  indoors?

24  A.      Yes.

25  Q.      Okay.  So you knew where HR was?

1    A.      Yes.

2    Q.      Okay.  And you didn't think about turning

3    down the part-time job when Mr. Jones was having

4    this flirty, inappropriate, I'm not sure where we

5    were at on the timeline when the message turned

6    truly vulgar Snapchat conversations, you didn't

7    about looking for something else?

8    A.      I couldn't look for something else at that

9    time.  I was also under an internship.

10   Q.      Did you think about going to your advisor and

11   asking to switch?

12   A.      What advisor?

13   Q.      Your college advisor.

14   A.      No.  It was online and I had to fill out

15   paperwork and send it in.

16   Q.      Okay.  I mean --

17          And so, in even in 2016, then, after you

18   graduated, because I'm assuming in August you would

19   have -- did you graduate from your undergraduate

20   degree in May of 2016?

21   A.      Yes.

22   Q.      So, in August when you got promoted

23   full-time, did you think twice about accepting that

24   full-time job knowing everything that was going on

25   with Mr. Jones?

1    A.    At that time I needed it for my livelihood

2    and my kids, so no, I didn't.

3    Q.    Did you think about applying anywhere else?

4    A.    No.

5    Q.    Where did you apply?

6    A.    I know I applied at DCS a couple times.

7    Q.    And you mentioned that to Mr. Jones in the

8    Snapchat.  Y'all talked about that as well?

9    A.    Yes.

10   Q.    And you testified about Mr. Jones asking you

11   to a conference in Gatlinburg.

12   A.    Yes.

13   Q.    Is it the same conference he asked Ms. Ogle

14   to that she testified to yesterday?

15   A.    I can't attest to that.

16   Q.    Do you still go out to eat at restaurants

17   today?

18   A.    Some, yes.

19   Q.    And do you go to activities with your

20   children?

21   A.    Some, yes.

22   Q.    And do you go and socialize with friends and

23   go -- are you divorced now?

24   A.    Yes.

25   Q.    Do you go on dates?

1   A.      No.

2   Q.      Don't have time with being a mom?

3   A.      No.

4   Q.      But do you go hang out with friends any in

5   social situations?

6   A.      No.

7   Q.      But you still will go and take your kids to

8   things?

9   A.      Yes.

10  Q.      And you still will go out to eat in

11  restaurants?

12  A.      Yes.

13  Q.      Okay.  And you testified that you moved to

14  Scott County to get out of Anderson County; is that

15  correct?

16  A.      Yes.

17  Q.      Aren't you originally -- are you originally

18  from Scott County?

19  A.      Yes.

20  Q.      And is your -- does your sister still live in

21  Scott County?

22  A.      Yes.

23  Q.      And your best friend, does she still live in

24  Scott County?

25  A.      No.

```
 1   Q.     But you still have a support system in Scott
 2   County?
 3   A.     I wouldn't say, "A support system."  My
 4   sister is there.
 5   Q.     Okay.  So, at least that's where some of your
 6   family is, is Scott County?
 7   A.     Yes.
 8   Q.     Okay.  And have you ever filed a lawsuit
 9   before?
10   A.     Yes.
11          MS. BAILEY:  Object to relevance, Your
12   Honor?
13          THE COURT:  Ms. Burchette?
14          MS. BURCHETTE:  It's going to show
15   possibly a pattern of amounts of damages, Your
16   Honor.
17          THE COURT:  Overruled.
18   BY MS. BURCHETTE:
19   Q.     And when you filed -- when you went to HR in
20   August of 2017 --
21          THE COURT:  Counsel.  Counsel, was there
22   an answer to your question?
23          MS. BURCHETTE:  Oh, you overruled my
24   objection.  I'm sorry, I thought you sustained it.
25   My apologies.
```

1  BY MS. BURCHETTE:

2  Q.    Have you ever filed a lawsuit before?

3  A.    Yes.

4  Q.    And have you -- this lawsuit, have you ever

5  sued the Scott County government?

6  A.    Yes.

7  Q.    And in that lawsuit, did you seek $9 million?

8  A.    I'm not sure, honestly.

9          MS. BAILEY:  Your Honor, I object to

10  this lawsuit under 403.

11          MS. BURCHETTE:  She's seeking a large

12  amount of damages, Your Honor.  This shows she has

13  sued governmental entities in the past, seeking

14  large amounts of damages.

15          THE COURT:  Objection overruled.

16  BY MS. BURCHETTE:

17  Q.    Ms. Harness, what's your maiden name?

18  A.    Alreton (phonetic).

19  Q.    So, is this lawsuit, then, the one that you

20  filed in Federal Court against Scott County,

21  Tennessee?

22  A.    Yes.

23  Q.    And this is the last two pages, which

24  includes the prayer for relief where you're seeking

25  $1 million each in compensatory damages, $1 million

1  in punitives for a grand total of $9 million; is

2  that correct?

3  A.     Yes.

4  Q.     And you're seeking $7.5 million from Anderson

5  County; is that correct?

6  A.     Yes.

7  Q.     You previously testified that this lawsuit or

8  this incident between you and Mr. Jones, it was very

9  prominent in the news; is that correct?

10 A.     Yes.

11 Q.     And you said that news stations were at your

12 house?

13 A.     Yes.

14 Q.     And Plaintiff's counsel showed you these news

15 articles, is that correct, that were written about

16 it?

17 A.     Yes.

18        MS. BURCHETTE:  Your Honor, if I may

19 pass to Madam Courtroom Deputy to show the Plaintiff

20 this exhibit?

21        THE COURT:  You may.

22        MS. BURCHETTE:  (Passing document to

23 court deputy.)

24        THE WITNESS:  Thank you.

25 ///

1  BY MS. BURCHETTE:

2  Q.     Where in those news articles is your name

3  mentioned?

4  A.     It will take me awhile to look through every

5  bit of these to see my name.

6  Q.     Well, would you believe me if I said your

7  name wasn't mentioned?

8  A.     It would be hard to believe, considering if

9  you get on the Internet and Google my name, that's

10  what pops up.  So it would be hard to believe that.

11  Q.     Well, then, you can flip through them.

12  A.     (Reviews documents.)

13          MS. BAILEY:  Your Honor, if counsel is

14  saying that her name is not in there, we'll

15  stipulate to that to save the Court some time.

16          MS. BURCHETTE:  To save the Court time,

17  that's fine, Your Honor.

18          THE COURT:  Ms. Harness, the lawyers

19  have stipulated that your name is not to be found in

20  those documents, so you don't have to look anymore.

21          THE WITNESS:  Okay.

22          THE CLERK:  (Passing document back to

23  Ms. Burchette.)

24  BY MS. BURCHETTE:

25  Q.     And Ms. Harness, you know that lawsuits are a

1   matter of public record, correct?

2   A.      Yes.

3   Q.      And that anyone can go on PACER or in any

4   Court Clerk's Office and pull lawsuits?

5   A.      Yes.

6   Q.      Okay.  And so, could that be part of the

7   reason your name's brought up is because you filed

8   this lawsuit?

9   A.      Which one are you referring to?

10  Q.      The one we're here for today.

11  A.      Yes.

12  Q.      And so, in August of 2017, you went to HR and

13  reported it to Mr. Bearden, Mr. Jones' behavior,

14  correct?

15  A.      Yes.

16  Q.      One year after being full-time?

17  A.      Yes.

18  Q.      And then you gave your sworn statement on

19  September 14th of 2017, correct?

20  A.      Yes.

21  Q.      And then, you were put on, I believe,

22  Mr. Bearden testified to it as administrative leave.

23  You called it FMLA leave.  You were put on leave,

24  correct?

25  A.      Yes.

```
1   Q.      Taken away from Mr. Jones?

2   A.      Out of the work area, yes.

3   Q.      Out of the work area of Mr. Jones?

4   A.      Yes.

5   Q.      And you're still receiving your salary that

6   you would have received as a clerk?

7   A.      Yes.

8   Q.      And you're still receiving all your benefits?

9   A.      Yes.

10  Q.      And then in, I believe it's March of 2018, is

11  that when you go to work for the Senior Center?

12  A.      Yes.

13  Q.      And again, you're still receiving your clerk

14  salary?

15  A.      Yes.

16  Q.      And you're still receiving your benefits?

17  A.      Yes.

18  Q.      And then, 2018's an election year, correct?

19  A.      Yes.

20  Q.      And so, Mr. Jones had a challenger in the

21  election of Mr. Lynch?

22  A.      Yes.

23  Q.      And Mr. Lynch beat Mr. Jones in the election?

24  A.      Correct.

25  Q.      And so, do you recall receiving an e-mail
```

April Lassiter-Benson, RPR, CSR, LCR

1  from Ms. Whitaker to all clerk employees saying that

2  they needed to reapply for their jobs, and to do

3  that to show interest in applying that you needed to

4  submit --

5          MS. BAILEY:  Object to relevance, Your

6  Honor.

7          THE COURT:  Ms. Burchette?

8          MS. BURCHETTE:  She testified that she

9  was fired, Your Honor.  I'm going to show that she

10  wasn't, or we might just have a dispute as to what

11  the terminology is as to it, but that's what it's

12  going to.

13          THE COURT:  She wants to contradict the

14  witness' statement that she was fired?

15          MS. BURCHETTE:  Yes.

16          THE COURT:  Ms. Bailey?

17          MS. BAILEY:  Your Honor, we agree that

18  she was not rehired, but ...

19          MS. BURCHETTE:  But she testified she

20  was fired.

21          THE COURT:  Ms. Burchette.

22          MS. BURCHETTE:  Sorry, Your Honor.

23          THE COURT:  You talk to the Court.  Do

24  not talk to opposing counsel.

25          MS. BURCHETTE:  Yes, Your Honor.

```
 1              THE COURT:  Now, Ms. Bailey.

 2              MS. BAILEY:  Your Honor, she was

 3   terminated, which technically is fired, but this is

 4   irrelevant as to whether or not -- they're not

 5   saying she got another job.  We stipulate she was

 6   not rehired.

 7              THE COURT:  Well, I don't think the

 8   point is so much that, but she wants to contradict

 9   what the witness said.  So contradiction is always

10   relevant.

11              Objection is overruled.

12   BY MS. BURCHETTE:

13   Q.     And you interviewed, then -- you reapplied

14   for your job?

15   A.     Yes.

16   Q.     And you interviewed, correct?

17   A.     Yes.

18   Q.     Or you had a meeting with Ms. Whitaker and

19   Ms. Strickland?

20   A.     Yes.

21   Q.     Okay.  And ultimately it was decided that you

22   would not be rehired for your position.  I believe

23   that's what the e-mail Ms. Whitaker sent stated?

24   A.     Yes.

25   Q.     Okay.  But during that time, you had been
```

1  applying at Douglas Cherokee Economic Authority as

2  well?

3  A.    Yes.

4  Q.    And you had accepted a job there?

5         MS. BAILEY:  Object to relevance, again,

6  Your Honor.

7         MS. BURCHETTE:  She said she had a

8  reputation as a good worker.

9         THE COURT:  I don't know where this is

10  going, but I will admit it to see where it goes.

11         Proceed.

12         THE WITNESS:  Yes.

13  BY MS. BURCHETTE:

14  Q.    And you had applied for this job before you

15  left the employment of Anderson County, correct?

16  A.    Yes.

17  Q.    And you were ultimately let go from your job

18  at Douglas Cherokee Economic Authority, correct?

19  A.    Yes.

20  Q.    For performance issues?

21  A.    Yes.

22  Q.    And that was in November of this year?

23  A.    Of last year.

24  Q.    Of last year, of 2020.  COVID years, they

25  mess everything up.

```
 1              MS. BURCHETTE:  One minute, Your Honor.
 2   BY MS. BURCHETTE:
 3   Q.     Are you currently employed, Ms. Harness?
 4   A.     No.
 5              MS. BAILEY:  Object to relevance, Your
 6   Honor.
 7              THE COURT:  Ms. Burchette?
 8              MS. BURCHETTE:  She's seeking $7 million
 9   of damages.  She was terminated from her job.  I'm
10   just trying to see if she sought other employment.
11              MS. BAILEY:  That's not part of the
12   damages we're seeking, Your Honor.
13              THE COURT:  It looks like she's not
14   asking for lost wages or lost income, is she?
15              MS. BURCHETTE:  No, Your Honor.
16              MS. BAILEY:  No, Your Honor.
17              THE COURT:  Okay.  Sustained.
18              MS. BURCHETTE:  No further questions.
19              THE COURT:  Redirect.
20              MS. BAILEY:  Thank you, Your Honor.
21   Very briefly.
22              Can I see that Angie Perez e-mail?
23              MS. BURCHETTE:  Which one?
24              MS. BAILEY:  That Angie Perez, e-mail.
25   Thank you.
```

*April Lassiter-Benson, RPR, CSR, LCR*

REDIRECT EXAMINATION

QUESTIONS BY MS. BAILEY:

Q.     Ms. Harnness, you were shown this e-mail on cross, and you said you didn't know anything about any of these issues.

A.     No.

Q.     And the date of this e-mail is August 9, 2017?

A.     Yes.

Q.     What else happened on August 9, 2017?

A.     That morning I had turned in my complaint.

Q.     So, the day you turned in your complaint, they started complaining about you?

A.     Yes.

Q.     You were asked about some activities that you still do with your kids.  Has anything changed about what you do with your kids?

A.     Yes.

Q.     What?

A.     Like when we go to restaurants, we go to Somerset, 'cause -- which is really out of our way, but it's nowhere where William Jones would probably be.

Q.     What about taking your kids to school?

A.     I take different routes, because they stayed

1   in Anderson County schools last year.

2   Q.    You were asked about a lawsuit in which you

3   sought $9 million.

4   A.    Yes.

5   Q.    Did you sign the complaint?

6   A.    I'm not sure.

7   Q.    Did you know your lawyers were asking for

8   $9 million?

9   A.    No.

10  Q.    Did you get $9 million?

11  A.    No.

12  Q.    The articles in the media that you were asked

13  about, and we said your name wasn't in any of them,

14  were these discussed when they came out, the

15  articles discussed, the Podcasts discussed?

16  A.    Yes.

17  Q.    Did people know who they were talking about?

18  A.    Yes.

19  Q.    And you were -- you were told your name comes

20  up because you filed this lawsuit?

21  A.    Yes.  Well --

22  Q.    Go ahead, I'm sorry.

23  A.    It was even before that, though.

24  Q.    And when you first made a complaint to Kim

25  Whitaker and to Bearden, you asked that it be

1    anonymous?

2    A.      Yes.

3    Q.      And when you found out it was not going to

4    be, you tried to withdraw?

5    A.      Yes.

6    Q.      And you were encouraged by Anderson County

7    Human Resources --

8              MS. BURCHETTE:  Objection, Your Honor.

9    This is leading.

10   BY MS. BAILEY:

11   Q.      Were you encouraged by Anderson County Human

12   Resources to continue?

13   A.      Yes.

14   Q.      Douglas Cherokee; you were fired?

15   A.      Yes.

16   Q.      Why?

17   A.      Most of it was due to the fact that when

18   COVID hit, I was in my office alone, because I

19   worked at a school.  School was out.  And the

20   anxiety and depression got too bad.  I just had --

21   it was overwhelming, so I couldn't focus.

22   Q.      Anxiety and depression due to what?

23   A.      Due to the William -- it was the same kind of

24   setup.  I just couldn't focus at all.

25   Q.      So --

1    A.      It gave me too much free time to think about

2    everything and to come up with scenarios.

3              MS. BAILEY:  May I have a moment, Your

4    Honor?

5              THE COURT:  You may.

6              MS. BAILEY:  (Conferring with counsel.)

7    BY MS. BAILEY:

8    Q.      We don't have the transcript of radio shows,

9    but was your name ever mentioned on the radio?

10   A.      I was mentioned on the radio, yes.

11   Q.      Were they saying you weren't truthful?

12   A.      Yes.

13   Q.      And you were asked, or you were told, that

14   the Snapchats stopped being vulgar, but you said

15   they continued to be sexual?

16   A.      Yes.

17   Q.      Were there other things that were sexual

18   and/or vulgar, that happened after the Snapchats?

19   A.      Yes.

20   Q.      What was that?

21   A.      It was always every day, every time you

22   walked into the office, he would come in and sat on

23   your desk and look down your shirt.  He would pull a

24   chair up and he would, like, rub your leg and lean

25   his head over on you (crying).

1  Q.     And this happened well past the Snapchats?

2  A.     Yes.

3  Q.     Okay.  What else did he do?

4  A.     He would pull a chair up, a rolling chair.

5  And it got so bad and he would be just too much,

6  that I started moving the rolling chair completely

7  out of the office.  And he would put it back.  And

8  I'd come in the next morning, and he had this big

9  sign on it that said, if the chair was moved again,

10 you would be fired.

11 Q.     So, again, because you are rebuffing his

12 advances, you're threatening to be fired?

13 A.     Yes.

14         MS. BAILEY:  That's all I have, Your

15 Honor.  Thank you.

16         THE COURT:  You may step down.

17         (Witness excused.)

18         THE COURT:  You may call your next

19 witness.

20         MR. COLLINS:  Plaintiff calls

21 Dr. Amanda Surdock.  Your Honor, may I be excused

22 briefly to --

23         THE COURT:  You may.

24         MR. COLLINS:  Thank you.

25         (WHEREUPON, the witness was sworn in by

1  the Court Clerk.)

2          MR. COLLINS:  May I proceed, Your Honor?

3          THE COURT:  You may.

4

5                        * * *

6          **AMANDA SURDOCK, PH.D.,**

7  was called as a witness, and after having been duly

8  sworn, testified as follows:

9

10                  DIRECT EXAMINATION

11  QUESTIONS BY MR. COLLINS:

12  Q.      Dr. Surdock, thank you for coming down from

13  Knoxville today.  Would you please introduce

14  yourself to the jury.

15  A.      May I remove my mask?

16  Q.      Oh, yes.

17  A.      Thank you.  Hi, I'm Dr. Amanda Surdock.  I'm

18  a licensed clinical psychologist.

19  Q.      Will you elaborate for us on what you do as a

20  clinical psychologist?

21  A.      The focus of my practice is for diagnostics

22  and evaluation.  So I focus on determining an

23  appropriate diagnosis for a client that comes in, in

24  helping treat them, or provide support, or guide

25  them to other interventions as necessary.

*April Lassiter-Benson, RPR, CSR, LCR*

1  Q.      And I understand you provide clinical and

2  counseling services to patients with mental,

3  emotional and behavioral disorders.

4  A.      Yes, I do.

5  Q.      What kind of degrees and training are

6  required for one to become a clinical psychologist?

7  A.      Well, you have to get a bachelor's degree,

8  master's degree, and then a form of a doctorate

9  degree, as well as getting some post-doctoral

10  training and supervision, and passing a national

11  licensure exam.

12  Q.      And so, you're a Ph.D.?

13  A.      Yes.

14  Q.      You mentioned the post-doc- -- or the

15  pre-doctoral internship in the field.  Where did you

16  do your internship?

17  A.      I did my pre-doctoral internship at

18  Mississippi State Hospital in Whitfield,

19  Mississippi.

20          MR. COLLINS:  Mrs. Lewis, I'm going to

21  pull up an exhibit here.

22          THE CLERK:  Are you -- I mean, it's on

23  there -- oh, are you doing it there at the podium?

24          MR. COLLINS:  Yes, ma'am.

25          THE CLERK:  Okay.  Thank you.

1  BY MR. COLLINS:

2  Q.      This is a copy of your CV, which has been

3  premarked as Exhibit 56.  It may help me kind of go

4  through some of your background.

5            MR. COLLINS:  Plaintiff would go ahead

6  and move Exhibit 56 into evidence, Your Honor.

7            THE COURT:  Any objection?

8            MS. BURCHETTE:  No objection.

9            THE COURT:  Without objection, it's

10  received.

11            (WHEREUPON, a previously marked

12  document was shown as Exhibit Number 56.)

13  BY MR. COLLINS:

14  Q.      So you did your pre-doctoral internship where

15  again, in Mississippi?

16  A.      At Mississippi State Hospital.

17  Q.      And that was before you were actually, what

18  do they call it, "hooded".

19  A.      Yes, that was before I graduated with my

20  Ph.D.  That's part of the graduation requirements,

21  that you do a year of internship.

22  Q.      But that doesn't make you a clinical

23  psychologist, correct?

24  A.      No.

25  Q.      And that's when you go -- you have to do

1  additional post-doctoral hours?

2  A.     Right.  I had to do an additional 1,500 to

3  2,000 hours of post-doctoral supervision.

4  Q.     I know it's quite a bit probably different in

5  many respects, but is it kind of like a residency

6  program that a medical doctor would go through, but

7  this is for clinical psychologists?

8  A.     Yes, very similar.

9  Q.     How many hours of post-doctoral work do you

10  do?

11  A.     I did 1,500 to 2,000 hours.  I did a lot.

12  Q.     So after you get your degree, you do your

13  post-doctoral hours.  Does that make you a clinical

14  psychologist or are there other steps?

15  A.     Well, in order to be -- I mean, you're a

16  clinical psychologist, but you're not licensed until

17  you take the national examination, the examination

18  for professional psychology, the E-triple-P.

19  Q.     That's the -- what did you call it, the

20  "E-triple-P"?

21  A.     "E-triple-P".

22  Q.     That's the Examination for Professional

23  Practice in Psychology?

24  A.     Yes.

25  Q.     And that's an exam that you have to take in

April Lassiter-Benson, RPR, CSR, LCR

1  order to be licensed as a clinical psychologist?

2  A.     Yes.  And then you have to go through the

3  State requirements.  So, that can be oral exams or

4  just jurisprudence or the law in the state you're

5  licensed in.

6  Q.     And I understand you are licensed in both

7  Tennessee and Mississippi?

8  A.     Correct.

9  Q.     Has your license ever been suspended or

10  enacted for any reason?

11  A.     No.

12  Q.     And I take it you passed the national exam?

13  A.     Yes.  Well, above the minimum.

14  Q.     And I believe you said, "Oral exam."  And I

15  take it you passed that without incident?

16  A.     Yes.

17  Q.     What goes into the master's degree in

18  psychology?

19  A.     My masters involved a lot of classes and

20  completing research, and my thesis, which was in

21  guilt as an attribution of -- or guilt as a

22  moderator and attribution of style and trauma.

23  Q.     Your CV, the title of that thesis

24  was "Feelings of Guilt as a Moderator of

25  Attributional Styles and Severity of Post-Traumatic

1   Stress?"

2   A.      Correct.

3   Q.      But it's about trauma?

4   A.      Yes, it's about trauma.

5   Q.      And post-traumatic stress?

6   A.      Yes.

7   Q.      And I understand you went to -- you got your

8   bachelor's degree from California State Polytechnic

9   University?

10  A.      Correct, in Pomona.

11  Q.      And then, you got your master's degree and

12  your Ph.D. from the University of Mississippi?

13  A.      Yes, I did.

14  Q.      In Oxford, Mississippi?

15  A.      Yes.

16  Q.      Ole Miss?

17  A.      Yes.

18  Q.      Do you have continuing education

19  requirements, too?

20  A.      Yes, for both of my states I have to do 20

21  hours of continuing education every year, basically.

22  Several of which have to be in ethics.  And in the

23  State of Tennessee, there is also a legal component.

24  I have to refresh on the law.

25  Q.      And I believe you touched on this, but do you

April Lassiter-Benson, RPR, CSR, LCR

1  have a particular area of focus within the larger

2  field of clinical psychology?

3  A.     My specific focus is in diagnostic and

4  assessments.

5  Q.     Diagnosing patients with mental, emotional

6  and behavioral disorders?

7  A.     Yes.

8          MR. COLLINS:  Your Honor, at this time I

9  would tender Dr. Surdock as an expert in clinical

10 psychology.

11         MS. BURCHETTE:  No objection.

12         THE COURT:  The Sixth Circuit has

13 determined it is improper to move the approval of an

14 expert, and it's improper for the Court to certify

15 in front of the jury as an expert.

16         MR. COLLINS:  I'm sorry, Your Honor.

17         THE COURT:  So the Court declines the

18 opportunity to do so.

19         MR. COLLINS:  I didn't realize that,

20 Your Honor.  I apologize.

21 BY MR. COLLINS:

22 Q.     How did you become involved in this case?

23 A.     Gail Harness was referred to me as a patient

24 in May of 2018 in the practice I was currently in.

25 Q.     And at the time I think you were at Bearden

1  Behavioral Health?

2  A.      Correct.

3  Q.      And that's a group in Knoxville?

4  A.      Yes.

5  Q.      With psychiatrists and psychologists and

6  other lower level providers?

7  A.      Right.  I was a psychologist.  There were

8  psychiatric nurse practitioners, LPCs, LCSWs.  A

9  large group of mental health providers.

10 Q.      And I understand you now have gone out on

11 your own and you have your own private practice?

12 A.      Yes, I do.

13 Q.      But you began seeing her in May of 2018?

14 A.      Correct.

15 Q.      What types of services have you provided just

16 generally?  Is it psychotherapy or what have you --

17 kind of diagnostics for --

18 A.      With Ms. Harness, the initial step when

19 someone presents for psychotherapy is to do a

20 diagnostic interview to figure out what exactly they

21 are presenting with.  So that is the first step.

22         And then, she was presented to me as a

23 therapy case, so we started determining what

24 therapy goals should be.

25 Q.      We'll drill down on your diagnosis and

1  treatment in a moment.  But let's explain to the

2  jury generally just what psychotherapy is?

3  A.    Psychological -- it's talk therapy.  So, most

4  treatment of psychological issues would be either

5  psychotherapy or talk therapy or pharmacotherapy,

6  which is medication.  So, I provide the talk therapy

7  parts, discussing issues.  Specifically, I do

8  cognitive behavioral therapy.  So, we talk about

9  moods and emotions and thoughts and feelings and how

10 those relate to your symptoms.

11 Q.    Are there other approaches to psychotherapy

12 other than cognitive behavioral therapy?

13 A.    There are.  They're not -- I mean, cognitive

14 behavioral therapy is more common, but there are

15 some that are not.

16 Q.    That's - but you follow the prevailing --

17 A.    Yes.

18 Q.    -- form of psychotherapy?

19 A.    Yes, the gold standard, so to speak.

20 Q.    What was Gail's primary complaint that she

21 presented with?

22 A.    She presented with significant anxiety and

23 panic related to repeated harassment she reported

24 experiencing at work.

25 Q.    And what kind of difficulties was Gail

1  having?

2      What kind of mental or emotional symptoms or

3  problems was she there to get help with?

4  A.      She was reporting a lot of anxiety and

5  feelings of panic.  So, difficulty breathing

6  difficulty focusing, feeling shaky, feeling nervous,

7  worrying about things that would happen to her.  She

8  felt threatened by things, wondering if somebody was

9  going to harm her, or if she was going to lose her

10  children.  There was a lot of that.  And some

11  sadness and depression, and a lot of trauma

12  response.

13  Q.      Trauma response?

14  A.      Uh-huh (affirmative).

15  Q.      And did you have an opinion as to what the

16  trauma was?

17  A.      It appeared to be that it was a result of

18  being harassed repeatedly.

19  Q.      Do you still see Ms. Harness as a patient?

20  A.      I do now.  We had a break in treatment.

21  Q.      Can you explain for the jury what that break

22  in treatment was; why?

23  A.      Well, I saw her from May 2018 to

24  approximately September of 2018.  At that time, she

25  lost her insurance and she was not able to afford

1  the self-pay rate through the practice I was with,

2  so I was unable to see her at that time.

3      She returned again and saw me for one

4  session in February 2019.  And then, I did not see

5  her again.

6      She reached out to me this May, 2021.

7  Q.     When you --

8  A.     In my practice.

9  Q.     I'm sorry to interrupt you.

10     When you last saw her in February of 2019,

11 was that a self-pay visit?

12 A.     Yes, it was.

13 Q.     So, it was one of those scenarios where even

14 though she didn't have insurance, she just needed to

15 see you?

16 A.     Yes.

17 Q.     In February 2019, at that time when she lost

18 her insurance, were you still at the Bearden

19 Behavioral Health?

20 A.     Yes, I was.

21 Q.     So you had partners and other colleagues --

22 A.     Right.

23 Q.     -- at that place?

24     You couldn't just do what you wanted to do?

25 A.     No.  I was bound by the expectations of the

*April Lassiter-Benson, RPR, CSR, LCR*

1  practice I was working with under the contract I

2  have.

3  Q.     And you have since re-established a

4  patient -- or a patient/therapist relationship with

5  Ms. Harness?

6  A.     Correct.

7  Q.     How is she paying for her visits with you

8  now?

9  A.     She is currently not paying.  I'm seeing her

10 pro bono.  She does have insurance, but it is

11 TennCare.  I do not take TennCare.  And it is

12 unethical for me to charge her even a reduced rate

13 for TennCare, because she would lose her insurance.

14 Q.     Obviously, you wouldn't have to provide your

15 professional services for free.

16 A.     No.

17 Q.     And that's what is meant by pro bono.  So,

18 why are you doing it?

19 A.     I'm doing it because she's been my patient,

20 and it's important that she have continuing care.

21 She has formed a therapeutic bond with me.  She

22 trusts me and she's coming to me for help.  I

23 couldn't say no to that.

24 Q.     Can sexual harassment lead to development of

25 mental, emotional and behavioral disorders,

*April Lassiter-Benson, RPR, CSR, LCR*

1 diagnosable disorders?

2 A.      Absolutely.

3 Q.      Have you formed any diagnosis of Ms. Harness?

4 A.      Yes, I have several diagnoses.  Her primary

5 diagnosis is post-traumatic stress disorder acute.

6 Q.      In your opinion, does the diagnosis of

7 post-traumatic stress disorder stem directly from

8 the sexual harassment she experienced at the

9 Anderson County Clerk's Office?

10 A.      Yes.

11 Q.      Is there any doubt in your mind what

12 underlies her mental and emotional problems is, in

13 fact, that episode of the harassment at the

14 courthouse?

15 A.      No.

16 Q.      Have you ever had any indication that Gail

17 was putting on or exaggerating her symptoms?

18 A.      No.

19 Q.      In the diagnosis of, I believe you said

20 anxiety disorder.  You may not have said that.  But

21 I believe it is the diagnosis of post-traumatic

22 stress disorder.  But then also I've seen a

23 diagnosis of unspecified anxiety disorder.  Can you

24 help me understand that?

25 A.      Yes.  Post-traumatic stress disorder is her

1    primary diagnosis.  In addition, because she has

2    such episodes of panic, it warranted an additional

3    diagnosis.  There wasn't enough information

4    available to say that she had a panic disorder

5    diagnosis, but there is enough to say it is causing

6    a clinical impact and it warranted this other

7    diagnosis.  So she has unspecified anxiety disorder

8    as well.

9    Q.    Ms. Harness has complained in her testimony

10   today, and I'll just give you an example of, she saw

11   William Jones out when she was --

12             MS. BURCHETTE:  Objection, Your Honor.

13   We've spoken about this before.

14             THE COURT:  Counsel.

15             MR. COLLINS:  I'm not sure I understand

16   the objection.  This is an expert witness.  I'm

17   giving her a hypothetical.  What we talked about

18   earlier is --

19             MS. BURCHETTE:  Your Honor, this is

20   still -- this is a treating physician.  You didn't

21   qualify her as an expert.  And this is directly

22   related to what we discussed before.

23             THE COURT:  Well, counsel says it is

24   not, and I think counsel understands that if it does

25   relate to what we discussed earlier, that that would

1 be a major issue for the Court.  So, I don't think

2 counsel's going there.

3          MR. COLLINS:  I do require some

4 clarification.  What the issue was earlier was

5 whether she could sit in as an under --

6          THE COURT:  No, that was not the issue,

7 counsel.  You may not --

8          MR. COLLINS:  Oh, no, I understand

9 exactly.  I'm sorry.  I fully understand now.  Thank

10 you.  I'm sorry.  No, I'm not going there.

11 Absolutely not.  I would not.

12 BY MR. COLLINS:

13 Q.     Anyways, so, let's -- we were talking about

14 panicky episodes and that sort of thing.

15 A.     Uh-huh (affirmative).

16 Q.     Ms. Harness testified earlier about an

17 incident where she was leaving a Mexican restaurant

18 and saw William Jones, and he flipped her off.  And

19 then she went into this panic.  She describes her

20 heart racing.  And she pulled into a Weigel's and

21 said that she felt like she was having a panic

22 attack, and that she fainted.  She was with her

23 children.  And then when she came to, there was EMS

24 workers around.

25          Is that the type of thing you would expect

1  for someone with post-traumatic stress disorder or

2  is that --

3  A.      Yes.

4  Q.      Okay.

5  A.      I mean, that is definitely something that

6  could happen.

7  Q.      Let's talk a little bit more about

8  post-traumatic stress disorder.

9          I'm going to show you and the jury -- well,

10  first of all, how do you diagnosis post-traumatic

11  stress?

12  A.      You go through the diagnostic criteria in the

13  diagnostic and statistical manual Fifth Edition of

14  the American Psychiatric Association, and you go

15  point-by-point through the diagnosis, and say, "Do

16  they meet criteria or do they not?"

17  Q.      And that's what we call the DSM-5?

18  A.      Correct.

19            MR. COLLINS:  If we could switch to the

20  Elmo.

21  BY MR. COLLINS:

22  Q.      The first criterion:  Exposure to actual or

23  threatening death, serious injury or sexual violence

24  in one or more of the following ways.

25            Did you find that that criterion was

1    satisfied in Ms. Harness' case?

2    A.      Yes.  Harassment is considered a form of

3    sexual violence, particularly, repeated harassment.

4    Q.      Repeated harassment?

5    A.      Uh-huh (affirmative).

6    Q.      And is this Dr. Surdock's own unique opinion

7    or is this something -- a prevailing opinion of a

8    clinical psychologists?

9    A.      This is pretty widely accepted among

10   clinicians.  There's lot of research articles about

11   this.

12   Q.      I do want to ask you, though, kind of move

13   away for a moment from the repeated bit there.  But,

14   let's see --

15           MR. COLLINS:  Sorry.  I'll get moving

16   very quickly.

17   BY MR. COLLINS:

18   Q.      I want to show you something.  If you could

19   just read -- not out loud.  I just would like you to

20   read this text message, because I'm going to have a

21   question about it.

22   A.      (Reviews document.)

23           Okay.

24   Q.      Nevermind the repeated and prolonged exposure

25   that we talked about, which is why I think sexual

*April Lassiter-Benson, RPR, CSR, LCR*

1   harassment can -- or satisfies the criteria under

2   the DSM-5.

3         Would that alone -- could that alone satisfy

4   the DSM-5 criterion A1?

5   A.    I would perceive that as a threat of sexual

6   violence.

7   Q.    But, again, was that even part of your -- was

8   this text message why you diagnosed her with --

9   A.    No, I hadn't seen that.  She never talked

10  about that specific incident.

11  Q.    And that's because you were more focused on

12  the prolonged and repeated sexual harassment?

13  A.    Right.

14  Q.    Let's turn to some of the other criteria, the

15  second criteria, intrusive symptoms associated with

16  traumatic events, recurrent and voluntary intrusive

17  distressing memories.  Is that something that you

18  found in Ms. Harness' case?

19  A.    Yeah, she does report -- this is also

20  commonly known as flashbacks where you experience a

21  cue for a trauma, and you relieve it again as if it

22  was happening all over again.

23  Q.    And that's something that she's reported?

24  A.    She has reported that.

25  Q.    What about the dreams?

*April Lassiter-Benson, RPR, CSR, LCR*

1  A.     She reports recurring nightmares.  It's like

2  whatever is happening to her during her day just

3  follows her down into her sleep.  She really can't

4  escape from it.

5  Q.     I see marked physiological reactions to

6  internal and external cues.  The example that we

7  talked about a moment ago where she's leaving the

8  restaurant and sees him, would that fall into that

9  category?

10 A.     Yes.

11 Q.     That seems like a physiological response,

12 fainting?

13 A.     Yes, anxiety and panic attacks are very much

14 physiological.

15 Q.     Heartbeat's racing.

16 A.     Increased heart rate; increased breathing

17 rate; nausea; sweatiness; faintness; all of these.

18 Q.     And is this something that Gail faces every

19 day?

20 A.     She reports it every day.  Sometimes multiple

21 times per day.

22 Q.     Next is:  Persistent avoidance of stimuli.

23        Ms. Harness testified that she takes

24 different routes around -- to pick up her kids,

25 because she doesn't want to have any kind of --

1   even the remoteness of possibilities of seeing

2   William Jones.  Would that fit -- would that be the

3   kind of avoidance of stimuli?

4   A.      Very much.

5   Q.      She testified that -- and by the way, I mean,

6   I'm giving you examples now, but these are all

7   things you found that she satisfied in the office on

8   the couch, so to speak?

9   A.      Yes.

10  Q.      But I'm just trying to get some examples.

11          She testified that when she goes to dinner

12  with her children, she'll go all the way in

13  Summerset, which is far away.  Would that be an

14  example of avoiding stimuli?

15  A.      Very definitely avoiding.

16  Q.      And that's a problem, right?

17  A.      Well, yes, that's --

18  Q.      It's not normal behavior?

19  A.      No.  It's causing a lot of distress to have

20  to do that.  It's not like, just, "oh, I don't want

21  to go to this Wendy's in town.  I'll go to the other

22  Wendy's."  That's going significantly out of your

23  way, which is indicating a pretty high degree of

24  impairment.

25  Q.      Yes.  She also said she won't go to a Walmart

1   anymore, because he encountered her in the shampoo

2   aisle.  Would that be another example of avoiding

3   stimuli?

4   A.      Yes.

5   Q.      Same with Burger King and some other places,

6   but I think we get the point.

7   A.      Yes.

8   Q.      The next criterion is negative alterations

9   and cognitions and mood associated with traumatic

10  events.  It's a mouthful.  What does that mean?

11          What are they talking about?

12  A.      It's trauma causes a change in how you view

13  the world.  There's a lot of self blame from victims

14  of trauma, there's a lot of changes in the way that

15  they view the world around them.  They're looking

16  for danger.  They lose interest in things that they

17  normally love to do.  They withdraw.  They feel

18  detached and unconnected with others.

19  Q.      And is that -- clearly you found that she

20  meets this criterion, as well?

21  A.      Yes.

22  Q.      And, in fact -- go ahead.

23  A.      I was going to give an example of that.

24  Q.      Yeah, please do.

25  A.      So, for Ms. Harness, I know that one of the

1  biggest things in her world is her children, and she

2  loves her daughters.  She's a very good mom and she

3  has been highly involved in their lives.  But it's

4  been hard for her to be able to engage at times that

5  she's felt so numb and withdrawn, that it's hard for

6  her to be able to interact with her children.

7  Q.    To be present with her children?

8  A.    Right.

9  Q.    And you mentioned she blames herself.  That's

10 something she said just 30 minutes ago.

11 A.    Okay.  Not surprising.  Victims blame

12 themselves very often.

13 Q.    And you mentioned that -- I don't know quite

14 how you put it, but she testified that, let's see,

15 feels like her life will never be the same; that her

16 life was different before; that that was a different

17 life that she had before.  Is that something that

18 would fit -- is that something you see with PTSD,

19 Post-Traumatic Stress Disorder --

20 A.    Yes.

21 Q.    -- and the marked alterations and arousal in

22 reactivity associated with traumatic events?

23       Another mouthful, is that something -- I'm

24 not quite sure I understand what that is:

25 Irritable behavior; outbursts; things like that;

1  sleep disturbance; restlessness.  Is that something

2  that you have found in Ms. Harness' case?

3  A.     Yes, she definitely has sleep disturbance.

4  She reports lots of difficulties with falling

5  asleep, staying asleep and nightmares to disturb her

6  sleep as well.  She has difficulty concentrating.

7  She has engaged in some reckless behavior.  Not to

8  the point of endangering herself, but just like

9  thoughtless behavior that tend to go along with

10  trauma.

11  Q.     Oh, I'm sorry.  Go ahead, please.

12  A.     No.  Go ahead.

13  Q.     She mentioned that she doesn't like to go to

14  the grocery store.  No.  She gave an example of if

15  she's in a grocery store, and someone like brushes

16  up against her, then she'll have like flashback.  It

17  will recall things that Mr. Jones had done to her.

18  Is that something that -- when we're talking about

19  flashbacks, would that be an example?

20  A.     Yeah.  It's a combination likely of the

21  flashback or trying to avoid a trauma cue, or it

22  could be this exaggerated startle response, which

23  is, again, the hypervigilance and jumpiness, just

24  always being on edge and expecting something to

25  happen, and having a very large reaction when

1   something did.

2   Q.      Is that something you've noted clinically

3   with Ms. Harness?

4   A.      Yes.

5   Q.      Next criteria -- we're almost done with the

6   criterion.  Duration of disturbances more than one

7   month.  Did she meet that?

8   A.      Well over.

9   Q.      Clinically significant distress or

10  impairment.  Is that -- did you find that is met?

11  A.      Yes.

12  Q.      Oh, and this is the final one.  Disturbance

13  is not attributable to the physiological affects of

14  substance, basically, alcohol or whatever.  The

15  symptoms she's having aren't caused by her --

16  A.      No.

17  Q.      -- drinking or drugs or anything like that?

18  A.      No.

19  Q.      Okay.  Treatment.  How is post-traumatic

20  stress disorder treated?

21  A.      Primarily treated through exposure therapy.

22  One of the types of exposure therapy -- it's still a

23  pretty high standard.  It's prolonged exposure.

24          Other forms of treatment are still forms of

25  exposure, like, eye movement; desensitization and

1   reprocessing; so EMDR, which is exposure; plus

2   other things to help kind of lead process,

3   neurologically.  I am not specifically trained in

4   that way, but I am trained in prolonged exposure.

5   Q.    And how long -- I mean, first of all, has --

6   is that what you're doing for Ms. Harness?

7         Are you undertaking prolonged exposure?

8   A.    We have not gotten to that.  We are still

9   working on stabilizing her symptoms.

10  Q.    So, do you have an opinion on how long it's

11  going to be before she can even -- strike that.

12        Is it your testimony that you haven't even

13  really started treating her for the post-traumatic

14  street disorder?

15  A.    Correct.

16  Q.    And do you have an opinion on when she will

17  be stable enough to begin that?

18  A.    She has to not be continually traumatized

19  before we can really start working it.

20  Q.    Okay.  And so that can take awhile?

21  A.    Yeah.

22  Q.    And just so the jury understands, I think

23  what you're saying is the prolonged exposure, you're

24  going to have to really -- that's when you roll up

25  your sleeves and you get in with the gory details.

1  And that's just you haven't -- you're not there yet?

2  A.      Right.  In a nutshell, prolonged exposure

3  means that I have to go through her trauma with her

4  over, and over, and over again.  She's not out of it

5  enough that I can do that with her, because then I'm

6  just still continuing to re-traumatize her.  She

7  needs to be stable before we can do that.

8  Q.      So, would you characterize prolonged exposure

9  as an intensive therapy?

10  A.      Yes.

11  Q.      And how long does that normally take?

12  A.      It is between 9 and 12 sessions.  Sessions

13  run around 90 minutes each.  We try to do them in a

14  shorter period of time, so several times a week.

15  Q.      You're saying two to three times a week?

16  A.      Yeah.

17  Q.      Does post-traumatic stress disorder have a

18  cure?

19  A.      No, no mental health issue has a cure.  It's

20  all treatment and management.

21              MR. COLLINS:  Pass the witness.

22              THE COURT:  Cross-examination.

23                  CROSS-EXAMINATION

24  QUESTIONS BY MS. BURCHETTE:

25  Q.      Good afternoon, Dr. Surdock.  So, you

1    testified earlier that you treated Ms. Harness from

2    May of 2018 until about September of 2018; is that

3    correct?

4    A.    Yes.

5    Q.    And were you aware at that time that Anderson

6    County was paying for her therapy?

7    A.    No.

8              MR. COLLINS:  Objection, Your Honor.

9    That's -- that's a misstatement.  And it's

10   argumentative for one, because it's not true.  It's

11   insurance.  And it's irrelevant.

12             THE COURT:  Why is it irrelevant?

13             MR. COLLINS:  Oh, I'm sorry.  Who was

14   paying for her therapy?

15             THE COURT:  Okay, Ms. Burchette.

16             MS. BURCHETTE:  Anderson County

17   representatives stated to Ms. Harness that she

18   would --

19             THE COURT:  No.  The question is why is

20   it relevant?

21             MS. BURCHETTE:  It's relevant because it

22   shows Anderson County did something to assist the

23   victims.

24             MR. COLLINS:  Your Honor --

25             THE COURT:  So, it goes to whether or

 1  not the county was deliberate --

 2              MS. BURCHETTE:  Yes.

 3              THE COURT:  -- deliberately indifferent?

 4              MS. BURCHETTE:  Yes, Your Honor.

 5              THE COURT:  Overruled.

 6              THE WITNESS:  Can you repeat?

 7  BY MS. BURCHETTE:

 8  Q.     Yes.

 9         Did you know at the time that Anderson

10  County was paying for Ms. Harness' therapy?

11  A.     No.

12  Q.     And you only saw her, then, from May until

13  September, correct?

14  A.     Correct.

15  Q.     And discussing that, then, you did diagnose

16  with Ms. Harness' with post-traumatic stress

17  disorder?

18  A.     Correct.

19  Q.     And then there was a break in treatment?

20  A.     Correct.

21  Q.     And you're seeing her now pro bono?

22  A.     Yes.

23  Q.     How often are you seeing her now?

24  A.     I've seen her twice since May.

25  Q.     Okay.  So, once every two weeks?

1  A.      Roughly.

2  Q.      Kind of like your normal schedule, back when

3  you were treating her at Bearden Behavioral?

4  A.      Yes.

5  Q.      And how long are your sessions, typically?

6  A.      45 to 60 minutes.

7  Q.      And so, you're seeing this person for 45 to

8  60 minutes, approximately once every two weeks,

9  unless there's a crisis; is that fair?

10  A.      For standard treatment, yes.

11  Q.      And that's what it was, at least back in

12  2018, that was -- it was standard treatment for

13  Ms. Harness?

14  A.      Correct.  We hadn't proceeded to doing any

15  prolonged exposure, so we didn't need more frequent

16  therapy sessions.

17  Q.      So you're kind of at square one, kind of

18  where you are now?

19  A.      Right.

20  Q.      You testified that there's no cure for any

21  type of mental health condition.

22  A.      No.

23  Q.      Anxiety, depression.  And there's no cure.

24  You just have to learn how to manage it, correct?

25  A.      Right.  It's symptom management and

1  treatment.  It's just like any chronic illness.

2  Q.     And so, there's never going to be a magical

3  cure?

4  A.     No.  I mean, I don't think pharmacology has

5  come that far where there's a magic pill or

6  anything.  It just makes your symptoms go away.

7  It's work.

8  Q.     And you have to put in the work?

9  A.     Yes.

10  Q.     Be willing to put in the work?

11  A.     Am I?

12  Q.     No.  You have to be willing to put in the

13  work?

14  A.     Yes.  The client has to be willing to put in

15  the work.

16  Q.     Yes.

17  A.     And the therapist, too.

18  Q.     Yes.  Give me one second.

19         And you stated that you started seeing her

20  again in May of 2020?

21  A.     2021.

22  Q.     2021, yes.

23         Did you bring those records?

24  A.     No.  We've only had two sessions.  So, one of

25  them I haven't even documented yet.

1    Q.      Okay.

2    A.      I can provide them later if we need them.

3    Q.      Well --

4    A.      It's just intake notes very similar to the

5    one that's already been done, because it was just

6    re-establishing symptoms.

7    Q.      But as I stand here today, all I have been

8    provided is the Bearden Behavioral ones from 2018?

9    A.      I did not receive a request for records.

10          MS. BURCHETTE:  No other questions, Your

11   Honor.

12          THE COURT:  Redirect.

13

14               REDIRECT EXAMINATION

15   QUESTIONS BY MR. COLLINS:

16   Q.      Mrs. -- excuse me.  Dr. Surdock, you were

17   asked about how you were paid previously.

18          Is it your understanding you were actually

19   paid through insurance, like, her group health

20   plan?

21   A.      Yes.  According to the records, there was an

22   insurance number on file.

23   Q.      Are you aware that Anderson County offered to

24   pay and then never did?

25   A.      No.

1  Q.      Okay.  Thank you.

2              THE COURT:  Thank you, ma'am, you may

3  step down.

4              THE WITNESS:  Thank you.

5              THE COURT:  Appreciate you coming.

6              (Witness excused.)

7              MR. COLLINS:  Your Honor, at this time,

8  we would move to stipulate exhibit U.S. Life Tables

9  -- I'll have the exhibit up here.  This is Exhibit

10  29.  We would move Exhibit 29 into evidence, the

11  U.S. Life Tables.

12              THE COURT:  Any objection?

13              MS. BURCHETTE:  No.

14              THE COURT:  It's received.

15              MR. COLLINS:  Thank you, Your Honor.

16              (WHEREUPON, a document was marked as

17  Exhibit Number 29.)

18              THE COURT:  Call your next witness.

19              MR. STANLEY:  Your Honor, we have no

20  more witnesses for today and I don't think we would

21  have any witnesses for tomorrow, either.  We'll just

22  rest.  If the Court is lenient to breaking, we would

23  like to look at our files.  But, otherwise, we

24  would -- if the Court wants to break for the day, I

25  know for certain we would be rested in the morning.

```
 1              THE COURT:  Ms. Burchette, you have a
 2    witness you can put on in 20 minutes?
 3              MS. BURCHETTE:  Your Honor, defense
 4    would want to do things outside of the presence of
 5    the jury first to take up some issues.
 6              THE COURT:  So, you don't have a witness
 7    either?
 8              MS. BURCHETTE:  Yes, we do.
 9              THE COURT:  Will the witness take 20
10    minutes?
11              MS. BURCHETTE:  It might take more.  And
12    I'd like to reiterate, we do want to take up an
13    issue outside the presence of the jury.
14              THE COURT:  You have a deposition you
15    could read that might take 20 minutes?
16              MR. KNIGHT:  We only have one witness.
17              THE COURT:  You only have one witness?
18              MS. BURCHETTE:  Yes.
19              THE COURT:  Okay.
20              Well, ladies and gentlemen, we kept half
21    of our commitment.  We said we'd finish by lunch.
22    We did not.  But we are going to finish today, at
23    least.  And it looks like we'll probably finish
24    tomorrow if what we're hearing is correct, that
25    defense only has one witness and the plaintiffs will
```

1   not have any other witnesses.  So it looks like we

2   may be able to wrap things up and get the case to

3   you tomorrow.

4           That means it's especially important

5   that you be safe this evening so you can come back

6   tomorrow and take the case and finish the case up.

7           We are going to end for the day.  And

8   there have been a lot of automobile accidents out

9   there for some reason.  Some people think it's a

10  result of the virus.  I don't know whether that's

11  the case or not, but I would ask you to be extra

12  careful as you drive on our highways on your way

13  home and in coming back in the morning.

14          We will resume our morning tomorrow at

15  9:00.  While you're away from court, do not discuss

16  the case with anyone.  Do not allow anyone to

17  discuss the case with you.

18          I understand that there is a report in

19  the courtroom, so there may be some media coverage.

20  And make sure you don't read anything at all about

21  this case in the media.  Don't watch anything on TV

22  or listen to anything on the radio.  If anyone tries

23  to discuss the case with you, let Mrs. Lewis know.

24          So, the jury is now excused and we'll

25  see you tomorrow morning at 9:00.

 1          (WHEREUPON, the jury was excused for

 2    the day, after which the following proceedings were

 3    had in open court, as follows:)

 4          THE COURT:  Okay.  The jury has departed

 5    the courtroom.  Counsel may be seated.

 6          I think that the defendant would like a

 7    motion for a judgment as a matter of law.  The

 8    plaintiffs want to make sure they've tied up all the

 9    loose ends before they rest their case.  They've not

10    rested at this point.

11          While we have a little bit of time, I

12    think there are some questions that I might want to

13    address to the parties.

14          One of the issues in the case is whether

15    Mr. Jones was a policymaker.  I've heard a little

16    bit of evidence on that, but is that a matter for

17    the jury to determine or is that a matter for the

18    Court to determine?

19          MR. COLLINS:  Your Honor, I believe the

20    decision of law states that it is for the Court to

21    determine.  The jury would then get a --

22          THE COURT:  If it's for the Court to

23    determine, then what does the Court make that

24    decision on?  Does the Court make that decision

25    on -- well, let me ask another question.

1          In making that decision, does the Court

2    rely on state law or does the Court rely upon the

3    testimony of witnesses?

4          MR. COLLINS:  The Court would rely upon

5    the testimony of the witnesses and make a

6    determination.  And I'm not clear on whether we

7    would file -- that's one thing we would want to look

8    at tonight.  I know I'll be filing a motion.  We've

9    asked for certain excerpts to be printed,

10   transcripts, for example.

11         Of course, we think it's clear that he's

12   the final policymaker.

13         THE COURT:  What case law says that the

14   Court must rely upon a witness' testimony?

15         MR. COLLINS:  If you'll give me a

16   moment, it's in the Seventh Circuit.

17         MR. STANLEY:  I think it's in there.

18         MR. COLLINS:  In the summary judgment

19   one.

20         This is a Seventh Circuit -- Seventh

21   Circuit case.  This is -- again, we're pulling from

22   the annotations from the Seventh Circuit.  And we've

23   got some Sixth Circuit law.  Valentino vs. Village

24   of South Chicago Heights 575 F.3d 664 (7th Cir.

25   2009).  The determination of whether a particular

```
1   official is a policymaker for purposes of of Monell
2   liability, is an issue for the Court and not the
3   jury.  It's a question of law.
4            Under this Seventh Circuit jury
5   instructions, if I can just locate them, the
6   Court -- so the Court would then make a
7   determination, for example, that William Jones is
8   not a policymaker.  The jury would still then get
9   charged.
10           THE COURT:  Well, we're not there yet.
11           MR. COLLINS:  I understand.
12           THE COURT:  And the Court making that
13  determination, does the Court rely upon witness
14  testimony or does the Court rely upon state law?
15           MR. COLLINS:  The Court would rely upon
16  the witness testimony and the law.
17           THE COURT:  If the court relies upon
18  state law, why does the Court need witness
19  testimony, then?
20           Well, what does it matter what the
21  witnesses say, as long as the state law is clear?
22           MR. COLLINS:  I'm not sure I have a very
23  good answer for that.  It's just my understanding
24  that we look at the facts of whether or not he is a
25  final policymaker.  Similar to what the Court did at
```

 1    the summary judgment stage in the order -- the

 2    summary judgment order, looking at whether or not

 3    he's a final policymaker.  So I don't know if I've

 4    got a great response to that.

 5              And, again, this is something that we

 6    had hoped to have a little bit of time to prepare

 7    for, because I'm not quite sure what the proper

 8    procedure is, like, do I need to file a motion --

 9              THE COURT:  Well, if it's strictly a

10    matter of law and the Court bases that decision upon

11    state law, the only thing that the Court has to do

12    is just cite to the Court, the appropriate law.  And

13    the Court could read it and interpret it and the

14    Court will make a decision.

15              If it's a matter of relying on witnesses

16    then, obviously, you have to point the Court to the

17    particular witnesses and exactly what the witnesses

18    said.

19              MR. COLLINS:  Right.

20              THE COURT:  So, in terms of the

21    mechanics, there's just a big difference.

22              If it's a matter of state law, it's very

23    simple, if there's a state statute or a county

24    ordinance that delegates to a person, a certain

25    authority.

1            MR. COLLINS:  Right.  And I think, here,

2     if you look at the Sixth Circuit decisional law

3     following a policymaker, you're looking for things

4     like the level of delegation, for example.  And

5     that's where you would look to the witness'

6     testimony to see whether you've got that level of

7     delegation.

8            I mean, I think it's a matter -- we say,

9     "State law."  I don't think that is quite fair.  I

10     think it's a matter of federal common law too.  And

11     there's a wealth of decisional law about what

12     constitutes a final policymaker for purposes of

13     Section 1983 Monell liability.

14            I mean, at the end of the day, it's

15     final policymaking authority over the thing at

16     issue.  Here, it's the terms and conditions of

17     employment of these county employees.  The county is

18     delegating whatever authority it had over its own

19     employees to this claim, who -- we know who from the

20     testimony, had complete and total authority over the

21     terms and conditions of the county.

22            THE COURT:  Is the county clerk a

23     creation of the county or the creation of the state?

24            MR. COLLINS:  Creation of the state,

25     pursuant to the constitution.  But that's -- I don't

1    think it touched on it.  I mean, at the end of

2    the --

3                THE COURT:  And establishing the clerk

4    of court position to the State's position, does it

5    also endow the clerk of court the authority to hire

6    people?

7                MR. COLLINS:  I don't think so.  I mean,

8    at the end of the day, the budget -- the money

9    that's used to pay for employees, what empowers the

10   clerk to employ anyone, is the county.  And if you

11   look at --

12               THE COURT:  We had something of a

13   dispute here recently.  The county election

14   commission submitted their budget, and then included

15   two new employees in the budget.  The county

16   commission decided not to fund the position because

17   they did not think the new position was necessary.

18               The election board or election

19   commissioners complained, "you have no authority to

20   reduce our fund."  Your only obligation is to just

21   to fund what we say we need.  We say we need two

22   people and you have an obligation, under the

23   constitution of the state, to fund the positions.

24               Does the same thing apply then, that

25   same thinking apply to a county clerk's office in

1  the county?

2          MR. COLLINS:  I'm not quite sure I'm

3  tracking fully, but I don't think so.  I think you

4  have to look at, what's the aspect of what's

5  going -- what's the -- what are we talking about

6  here?  What is the case turning on?  Here, it's the

7  creation of a hostile work environment.  So what

8  we're talking about is the terms and conditions of

9  employment.  And we have heard witness after witness

10  after witness tell us that William Jones had final

11  authority, carte blanche authority.  We've heard it

12  even out of his own mouth through other witnesses.

13  And that's what matters, because the county did not

14  control -- these were county employees.

15  Ms. Harnness was a county employee, county payroll,

16  county benefits, county 401(k).

17          But William -- any authority over the

18  terms and conditions of her employment was solely

19  vested and delegated to William Jones.  And I know

20  where their --

21          THE COURT:  Was that as a result of

22  county law or was that result of the state law?

23          MR. COLLINS:  It was a resolve of how it

24  was done in this particular county.  I mean, they

25  could have said --

*April Lassiter-Benson, RPR, CSR, LCR*

1            THE COURT:  It's not done like that in

2    every county?

3            MR. COLLINS:  I don't think so.  They

4    could have said, for example, you're a fee office.

5    You generate your own fees.  You're responsible for

6    your own payroll, your own benefits.  You're on your

7    own.  See ya.  But that's not what happened.

8            And I sense that you're looking at the

9    case law where the -- what matters -- what drives it

10   is, what are we actually talking about at the end of

11   the day?  We're talking about a hostile work

12   environment, the terms and conditions of employment

13   with these -- so, who is the final policymaker for

14   purposes of the terms and conditions of employment

15   of these county employees in the clerk's office?

16           So, I mean, I think that -- I hope that

17   answers your question.

18           THE COURT:  Mr. Knight, would you like

19   to add anything to the discussion?

20           MR. KNIGHT:  No, Your Honor.  I think

21   that -- it is the same in every county that I'm

22   aware of.  And I represent a lot of counties.  But

23   in terms of Mr. Jones, the constitution requires

24   that he be elected.  And I understand about the

25   terms and conditions of employment and all that kind

1    of stuff.  But we have to fund that office.

2    Anderson County has to fund that office.  And you

3    have an elected official whose only two ways to get

4    rid of him, by the judge, or an ouster suit, which

5    we may or may not have time.  That's a question for

6    the jury to implement as to Jones, as Mr. Bearden

7    testified to.

8              Yeah, Judge Edgar found in 2006 that

9    Meigs County Clerk was not a county employee.  In

10   McGill, an official of the state, McGill vs.

11   Smith -- and the reason I'm being prompted is

12   because this is a case that Ms. Burchette fought on.

13             So, that's my response, Your Honor.

14             THE COURT:  So, we got in this

15   conversation when the Court asked whether that

16   determination is for the judge or whether it's for

17   the jury.  The plaintiff says it is for the Court to

18   determine.

19             I then asked, did we look to state law

20   or did we look to the testimony of witnesses.

21             Do you have any thought on that?

22             MR. KNIGHT:  I think the Court makes the

23   determination.  I would agree with Mr. Collins on

24   that.

25             I, in terms of -- I think that

1    it's -- I, myself, agree with Mr. Collins.  Again, I

2    think -- and that's kind of a hybrid, by looking at

3    the witnesses and testimony and the State

4    constitution -- state law.

5              So -- and the law, according to this

6    case, says what the standard is so ...

7              THE COURT:  Well, you may want to devote

8    a little bit of time for this issue, tonight, to see

9    whether the Court looks at state law.  I think there

10   are a lot of advantages, a lot of practical

11   advantages, if that would be the rule, there would

12   be a lot of consistencies, because the state law is

13   going to be stable and consistent.

14             If you rely upon witnesses, then that

15   means the quality of the witnesses will determine

16   whether a court determines that, an official is a

17   policymaker or not.  So, you have good witnesses if

18   the person is a policymaker.  And you have bad

19   witnesses if the person is not a policymaker.  And

20   it may not have anything at all to do with the

21   person's actual authority or actual

22   responsibilities.  Whereas, if you look at state

23   law, you would avoid that.

24             The issue, Ms. Burchette, through

25   Mr. Knight, just brought up, is a different

1  question.  And that is to whether the clerk of court

2  office is a county office or whether it is a state

3  office.  But that's not been brought to the Court's

4  attention.  So the Court does not have to deal with

5  it.

6           So you may just want to focus on this

7  question of, is it a question that the Court

8  determines from the witnesses, or does the Court

9  determine it based on state law.  If the Court bases

10  it on state law, then I think somebody needs to

11  apply that state law so the Court can make a

12  determination.

13           MR. COLLINS:  Yes, Your Honor.  We

14  appreciate the opportunity to conduct some research

15  and get back with you tomorrow.

16           MR. KNIGHT:  As we would.

17           THE COURT:  Okay.  Thank you.

18           Anything else?

19           MS. BAILEY:  No, Your Honor.

20           MR. COLLINS:  I don't think so, on

21  behalf of the plaintiff.

22           THE COURT:  Okay.  We will conclude

23  then.  We will have a draft of the jury charge

24  available for you probably by mid-morning, so you

25  have a chance to look at it.  I think we're going

1  quicker than we thought.  Tomorrow is just

2  Wednesday, and we were planning on getting done by

3  Friday, and at the earliest, on Thursday.  It looks

4  like we are not too far behind.  Okay .

5          Ms. Lewis.

6          THE CLERK:  All rise.  This honorable

7  court is adjourned.

8          (WHEREUPON, the foregoing proceedings

9  were adjourned for the day at 4:59 p.m., to be

10 resumed June 23, 2021, at 9:00 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

April Lassiter-Benson, RPR, CSR, LCR

1                    **REPORTER'S CERTIFICATE**

2

STATE OF TENNESSEE

3

COUNTY OF ANDERSON

4

5

6              I, April Lassiter-Benson, Licensed Court

7    Reporter, with offices in Memphis, Tennessee,

8    hereby certify that I reported the foregoing Jury

9    Trial of **GAIL HARNESS VS. ANDERSON COUNTY,**

10   **TENNESSEE** by machine shorthand to the best of my

11   skills and abilities, and thereafter the same was

12   reduced to typewritten form by me.  I am not

13   related to any of the parties named herein, nor

14   their counsel, and have no interest, financial or

15   otherwise, in the outcome of the proceedings.

16              *I further certify that in order for this*
     *document to be considered a true and correct copy,*
17   *it must bear my original signature, and that any*
     *unauthorized reproduction in whole or in part*
18   *and/or transfer of this document is not authorized,*
     *will not be considered authentic, and will be in*
19   *violation of Tennessee Code Annotated 39-14-104,*
     *Theft of Services.*

20

21

22   _____
     April Lassiter-Benson, LCR, CSR
23   Hands on Reporting & Video
     LCR # 752 - Expires: June 30, 2022

24

25

*April Lassiter-Benson, RPR, CSR, LCR*